UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

AMANDA L. KONDRAT'YEV,
Plaintiff,
v.                                                    Civil Action No. 4:25-cv-04785
NASA JOHNSON SPACE CENTER,
LEIDOS HOLDINGS INC., and
ALL POINTS LOGISTICS LLC,
Defendants.


EXHIBIT PACKAGE A-K


FOR PLAINTIFF'S RENEWED COMBINED MOTION
FOR APPOINTMENT OF COUNSEL
AND DISABILITY ACCOMMODATIONS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

AMANDA L. KONDRAT'YEV,
Plaintiff,
v.
NASA JOHNSON SPACE CENTER,
LEIDOS HOLDINGS INC., and
ALL POINTS LOGISTICS LLC,
Defendants.

Civil Action No. 4:25-cv-04785

EXHIBIT A

Medical Documentation



**FAMILY MEDICINE & WALK-IN CARE**

RE:     Amanda Kondrat'yev
        79 Monarch Lane
        Pensacola, Florida 32503

October 5, 2015

To Whom It May Concern:

Ms. Kondrat'yev is a patient under my care.  At this time, I am treating her for multiple conditions including Attention Deficit Hyperactivity Disorder, Major Depressive Disorder, and Cubital Tunnel Syndrome.  As a result of these conditions, she may require certain accommodations in her education in order to help her succeed.  Please contact me at (850)437-8485 with any questions.

Sincerely,

Layla Lundquist-Smith, MD

# ONE BEHAVIORAL

comprehensive behavioral care

104 Whispering Pines Ave
Friendswood, TX 77546
Phone 713-429-5325 fax 877-255-0161

To Whom It May Concern                                    January 24, 2022

RE: Amanda Kondrat Yev
DOB: ███████1984

Ms. Kondrat Yev has been under my care at One Behavioral Health (formerly Texas Behavioral Health) since 05/20/2020.

Ms. Kondrat Yev is being treated for the following diagnoses:

- Major Depressive Disorder, Severe, Recurrent (F33.2)

- Attention Deficit Hyperactivity Disorder (F90.0)

- Generalized Anxiety Disorder (F41.1)

- Post Traumatic Stress Disorder (F43.12)

Despite optimizing medication and Ms. Kondrat Yev's compliance with all treatment recommendations she continues to have breakthrough symptoms. These include marked emotional distress, panic attacks social anxiety, impairment of attention and concentration as well as short-term memory deficits.

Any further questions can be directed to me with patient's consent at the contact information listed in the above letterhead.

Sincerely,

1/25/2022 4:57 PM (CST)

KHWAJA KHUSRO TARIQ, M.D.



help@prosperhealth.io
(954) 366-9978
prosperhealth.io

# Confidential Report of Autism Diagnostic Evaluation

| | |
|---|---|
| **Name:** | Amanda Kondrat'yev |
| **Date of birth:** | ▮1984 |
| **Dates of evaluation:** | 3/12/2025, 3/13/2025, 3/24/2025 |
| **Evaluator:** | Kelly Whaling, PhD |
| **Date of report:** | 04/10/2025 |

Amanda, who uses she/her pronouns, came to Prosper Health for an autism diagnostic evaluation. She self-referred to Prosper Health.

Amanda is a 40-year-old contractor who formerly worked as a PC Tech at NASA. She lives in Houston, Texas. Amanda was living with her child at the time of evaluation. Amanda requested an autism diagnostic evaluation because she is "twice exceptional (gifted and ADHD) and highly suspect autistic as well. I was told I was 'too social' but I later realized I had just become skilled at masking to meet social demands sometimes and that it would explain so much of my struggles." She noted that she is mostly seeking personal knowledge.

She has reported that in the past, in addition to attention-deficit hyperactivity disorder (ADHD), she has been diagnosed with "borderline traits", post-traumatic stress disorder, anxiety, binge-eating disorder, and "treatment-resistant" depression. Her childhood is significant for adverse childhood experiences in the home. She is currently taking 70 milligrams of Vyvanse, 15 milligrams of mirtazapine, and 20 milligrams of Trintellix prescribed by Shamira Green. She has engaged in psychotherapy from 2005-2006, in 2018, and from 2020-2023. She does not have a history of psychiatric hospitalization.

# Autism Diagnostic Summary

The signs of autism are separated into two categories: Social-Communication and Interests & Behaviors. The following signs of autism were noted in this evaluation:

## Social–Communication

There are three domains of social-communication functioning that are considered: social-emotional reciprocity, nonverbal communication, and relationships. Each of these are discussed below.

### Social-emotional reciprocity

Social-emotional reciprocity refers to one's social approach, the quality of conversation, responses to social overtures and sharing interests, emotions, and affect. Amanda's differences in social-emotional reciprocity were clearly evident.

In the clinical interview, Amanda that she hates social events and does not enjoy small talk. Despite this, she is capable of engaging it when forced due to extensive training in sales. She reported, "I can turn on my customer service voice and maintain a reciprocal conversation" but that afterward she feels drained and needs to recharge. She reported significant difficulty interpreting social interactions, especially humor. She reported that even though she has studied comedy and believes she has a strong sense of humor, her jokes are often misinterpreted, and people "sometimes think I'm being mean when I am just trying to be funny." With regard to social-emotional reciprocity, she noted that challenges with this do not just apply to strangers; she reported, "even with my friends… I'm not sure what to do." She typically does not join conversations unless she feels the need to correct misinformation or offer advice and reported that when she attempts to contribute it is not usually successful. She reported that she frequently upsets others unintentionally; she described a time at a previous job where she created a mind map to improve efficiency and thought she was being very helpful and her management perceived it as challenging authority. She noted similar things happened in school, like reminding teachers she had homework, which would often upset peers without her understanding why.

# Summary

Based on the findings from this evaluation, Amanda meets the diagnostic criteria for autism spectrum disorder. The clinical diagnosis is: F84.0 Autism Spectrum Disorder, without intellectual/developmental delay or significant language impairment, requiring support at level one.

Given the targeted nature of this evaluation, a full diagnostic evaluation for psychological conditions was not completed. However, autism commonly co-occurs with mental health conditions, such as anxiety and depression. Often, anxiety and depression develop over time and are related to the stress of masking one's autism in environments which were not designed for autistic people.

Finally, it is worth noting Amanda's many strengths. She has an exceptionally strong sense of justice. She is very intelligent. She is kind with a good sense of humor and cares about those around her. She is a joy to talk to. When addressing any areas of concern for Amanda, it will be important for therapy to be informed by her self-knowledge and build upon her many assets.

Recommendations for next steps are provided below:

# Recommendations

**Therapy**

- Amanda is encouraged to share this report with her psychotherapist.
- Some helpful treatment recommendations could be:
    - Help her build a predictable routine in therapy, ensuring the sessions are stable and consistent.
    - Emphasize validation and empowerment throughout therapy.
    - Approach her experiences of intense emotions and social struggles as trauma responses and neurodivergent traits, rather than pathologizing them as symptoms.
    - Integrate bottom-up approaches (e.g., sensory regulation, body-based grounding) with top-down approaches (e.g., cognitive restructuring) to help her feel safe and grounded before processing complex trauma.
    - Incorporating neurodiversity-affirming perspectives into therapy, where her unique social communication style is seen as part of her authentic identity, not something that needs to be "fixed."

**Workplace Accommodations**

- Amanda will likely benefit from formal supports for autistic individuals. More information can be found here:
  - https://www.eeoc.gov/laws/guidance/enforcement-guidance-reasonable-accommodation-and-undu
  - https://autismsociety.org/wp-content/uploads/2021/11/ADA-Fact-Sheet-1-1.pdf
  - https://disabilityrightstx.org/en/home/
  - https://www.texasautismsociety.org/employment-resources/
  - https://www.twc.texas.gov/programs/vocational-rehabilitation
  - https://www.neurotalentworks.org/
- Some accommodations may be:
  - Offering remote work as much as possible. Remote work is a reasonable accommodation for an autistic person because it allows for a controlled environment that minimizes sensory overwhelm, reducing distractions like bright lights, office chatter, or strong smells that can be distressing. It also eliminates the stress of commuting, which can be unpredictable and exhausting for those who rely on routine and struggle with sensory sensitivities. Additionally, remote work enables more flexible communication, allowing autistic employees to engage via written text or scheduled calls rather than being expected to navigate spontaneous in-person interactions. Many autistic individuals thrive with structure and autonomy, and working from home allows them to set up a workspace and routine that best supports their productivity. Providing this accommodation not only benefits the autistic employee but also helps employers retain talented workers who might otherwise struggle in a traditional office setting.
  - In order to reduce sensory overload and maintain Amanda's focus and motivation, it would be helpful to reduce sensory stimulation in Amanda's work environment. Strategies include: schedule hourly breaks during which Amanda can go somewhere with little sensory stimulation; assign a work station with minimal background noise and visual distractions; allow Amanda to block sound with earplugs, headphones, an environmental sound machine, or physical barriers; minimize scents and perfumes in the workspace; and avoid fluorescent or bright lights in the work area. Also, allow Amanda to come in early to have a period of work time before others come in; to have uninterrupted work time; and to telework, when practical and feasible for Amanda's role.
  - To accommodate Amanda's social-communication differences, people should use, whenever possible, straightforward, blunt, and clear communication. It is imperative to delineate opinions versus expectations. It may help Amanda to have regularly-scheduled meetings with her direct supervisor for mentoring, feedback, and suggestions so that Amanda has clear knowledge of what she is doing well and concrete ideas of how to improve.

- To accommodate Amanda's differences in adjusting to new information, she may benefit from an agenda ahead of time and inform Amanda of participation expectations. If at all possible, Amanda should be able to offer some or all of her portion of participation in writing rather than voice or in-person and to work in smaller work groups.
- Recognize her blunt, direct communication as a strength. Avoid penalizing her for not using small talk, "softening" language, or neurotypical social niceties. Allow her to communicate in her natural style without fear of reprimand. Ensure feedback is direct, specific, and delivered in a supportive, nonjudgmental tone. For example: "This was helpful; can we add XYZ next time?" rather than vague criticism.
- More resources for workplace accommodations can be found at askjan.org and autismsociety-nc.org.

**Share Report with Medical Providers**

- Amanda should share this report with her primary care physician and discuss whether a referral for genetic testing is recommended. In a growing percentage of cases, a known genetic cause of autism can be identified in genetic testing. (Whole exome sequencing finds a known genetic cause in 10-30% of cases.) Some genetic causes of autism are associated with known medical risks, and knowing the cause may have implications for life-saving medical treatment.
- It may also be helpful for Amanda to share this report with other healthcare professionals (e.g., dentists, physical therapists, etc.) in order to help educate those providers about autism affects Amanda. An additional resource to consider is the AASPIRE Healthcare Toolkit, which can help facilitate communication between autistic people and their healthcare providers.

**Academic and Educational Accommodations**

- Should Amanda return to school, she may require accommodations in academic and testing environments to support her specific needs associated with autism. Some things that might help are:
  - Taking fewer credits per semester while maintaining eligibility for financial aid, scholarships, or student benefits.
  - Ability to request deadline extensions due to executive function challenges or autistic burnout.
  - Early access to course selection to choose schedules that minimize exhaustion (e.g., avoiding back-to-back classes or early mornings).
  - Ability to take some classes online or attend lectures asynchronously if in-person attendance is overwhelming.
  - Flexibility in graduation timelines without academic or financial penalties.
  - Access to a distraction-free testing room and a designated quiet space for studying.
  -

Option to sit near natural light, wear tinted glasses, or request softer lighting in study spaces.

- During independent work, exams, or in-class activities that don't require discussion.
- Ability to sit in a preferred location (e.g., near an exit for breaks, away from high-traffic areas).
- Extra time for processing, problem-solving, and written responses to accommodate executive function needs.
- Reducing working memory load by allowing lecture recordings or AI transcription tools.
- Access to peer note-takers, professor-provided slides, or assistive technology for organizing notes.
- Alternative testing methods such as take-home exams, oral responses, or project-based assessments instead of timed tests.
- Ability to step out for sensory decompression without penalty.
- Ability to contribute to class discussions through written responses, discussion boards, or chat features instead of verbal participation.
- Professors providing clear, step-by-step instructions for assignments rather than only verbal explanations.
- Option to schedule one-on-one meetings at low-traffic times to reduce social overwhelm.
- Ability to work solo on group projects or be assigned structured roles to minimize unpredictable interactions.
- Reduced penalties for missing class due to autistic burnout, sensory overload, or mental health needs.
- Option to switch a class to pass/fail or withdraw without academic consequences when experiencing burnout.
- A dedicated disability advisor who understands neurodivergent needs and can advocate for accommodations.
- Access to career coaches who understand autistic strengths and challenges in professional settings.
- More resources for school accommodations can be found at: collegeboard.org, askjan.org, and autismsociety-nc.org.

**General Wellness Recommendations**

- **Executive Functioning**
  - Amanda may benefit from taking scheduled breaks from tasks requiring extended attention periods. Amanda should consider using The Pomodoro Technique when completing tasks. For example: Pomofocus timer.
  - Use of environmental cues (e.g., calendars, audible alarms, visual schedules) may help prompt Amanda to complete tasks.

- <u>Online Adult Support Groups</u>: AANE is an autism affirming organization which offers support groups for autistic adults.
- https://thinkingautismguide.com/resources
- https://www.autism.org.uk/advice-and-guidance/topics/mental-health/autistic-fatigue/autistic-adults
- www.autisticadvocacy.org
- Autistic Women & Nonbinary Network
- The Prosper Health website has blog posts that cover topics like relationships, interests, information about what autism is, and co-occurring conditions that may be useful for Amanda as they begin their learning process.
- The blog Autism Chrysalis has put together a book list in which all the books have been read and vetted by an autistic adult. As Amanda learns more about their diagnosis, use of these books may be helpful: Autism Chrysalis book recommendations.
- Adulting on the Spectrum (podcast)
- Today's Autistic Moment (podcast)
- Your Neurodiverse Relationship with Jodi Carlton (podcast)
- Divergent Conversations (podcast)

It was a pleasure to evaluate Amanda. Please contact Prosper Health if we can provide further information or referrals.

Sincerely,

*Kelly Whaling PhD*

Kelly M. Whaling, Ph.D.
Licensed Clinical Psychologist
UT #12466836-2501
TX #40368
PSYPACT APIT #13194



**ONE BEHAVIORAL**

c o m p r e h e n s i v e   b e h a v i o r a l   c a r e

106 Whispering Pines Ave suite 103
Friendswood, TX 77546
Phone: 713-429-5325 Fax: 877-255-0161

November 4, 2024

To Whom It May Concern,

This letter serves as certification that Amanda Kondrat'yev is an individual with a severe physical, intellectual, or psychiatric disability that qualifies her for consideration under 5 CFR 123.3102(u), schedule A hiring authority, appointment for persons with disabilities.

I may be contacted at the above listed phone or fax.

Shanira Green, PMHNP-BC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

AMANDA L. KONDRAT'YEV,
Plaintiff,
v.                                                    Civil Action No. 4:25-cv-04785
NASA JOHNSON SPACE CENTER,
LEIDOS HOLDINGS INC., and
ALL POINTS LOGISTICS LLC,
Defendants.

EXHIBIT B

Declaration Regarding Court Access/Litigation Barriers

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

AMANDA L. KONDRAT'YEV,
Plaintiff,
v.                                                    Civil Action No. 4:25-cv-04785
NASA JOHNSON SPACE CENTER,
LEIDOS HOLDINGS INC., and
ALL POINTS LOGISTICS LLC,
Defendants.

**DECLARATION REGARDING COURT ACCESS / LITIGATION BARRIERS**

I, Amanda L. Kondrat'yev, declare under penalty of perjury pursuant to 28 U.S.C. § 1746

that the following is true and correct to the best of my knowledge:

**Background**

1. I am the pro se Plaintiff in this action. I am diagnosed with Autism Spectrum
   Disorder Level 1, ADHD, and PTSD.

2. My diagnoses and functional limitations are supported by medical documentation
   submitted as **Exhibit A**.

3. I submit this declaration to document the specific and repeated barriers I have
   encountered in accessing the Court's processes and systems, which form the basis
   for my request for reasonable accommodations and appointment of counsel.

**Disability-Related Communication Differences and Why Real-Time Conferral Is a
Barrier**

1. My disabilities substantially limit my ability to process, respond, and advocate

effectively in real-time verbal interactions, especially under conflict or time pressure. I am significantly stronger in written communication and in structured formats where I can organize information.

2. I have previously needed a support person to help me participate effectively in a live, adversarial proceeding conducted by phone. For example, during the second session of my Texas Workforce Commission (TWC) unemployment appeal hearing on May 2, 2024 (the continued session of the April 3, 2024 first session), the hearing officer stated on the record that Blair Castro was participating on my behalf and Blair stated she was present to assist me as my representative and to ask questions and seek clarity.

3. During that hearing, the hearing officer also emphasized not "wast[ing] our time" and repeatedly instructed me not to interrupt and to listen carefully to the question being asked. My difficulty tracking fast-moving oral procedure in real time contributed to confusion about evidence submission and whether my questions were being answered before the hearing moved on.

4. At the close of the first session of the TWC appeal hearing on April 3, 2024, I was informed by the hearing officer that I would have an opportunity to ask questions. When I attempted to do so, the hearing ended before I could ask them. I was cut off immediately and the proceeding concluded without my questions being addressed. This experience illustrates a specific and recurring barrier: even when a structured opportunity to participate is formally promised, the real-time pace of oral proceedings can render that opportunity inaccessible to me. I was prepared to

participate, the procedural opportunity was represented to me as available, and it was withdrawn without notice before I could use it — leaving me unable to correct the record or seek clarification on evidence presented against me.

5. This is directly relevant to my ability to litigate this case pro se because Rule 26(f) conferences, meet-and-confers, depositions, and scheduling conferences often require real-time verbal negotiation and rapid decision-making. Without counsel, or at minimum a written/structured process and the ability to have a support person present, those interactions are not reliably accessible to me.

**September 30, 2025 Help Desk Email - No Response**

1. On September 30, 2025, I emailed the Court's help desk at district_ecf_helpdesk@txs.uscourts.gov. In that email, I explicitly disclosed that I have AuDHD (Autism and ADHD), described a PACER account error I was actively trying to resolve, noted that I had emailed PACER the day before and was simultaneously on hold with PACER for an estimated two more hours, and stated that my right-to-sue deadline was looming. I asked the Court's help desk to provide me with the forms I needed, written instructions for filing, and help ensuring the online filing system would work for me.

2. I never received any response — not an acknowledgment of receipt, not an offer of alternative assistance, and not any follow-up.

3. The timing is significant: I was simultaneously managing a PACER phone hold exceeding two hours while reaching out to the Court's help desk because I could

not resolve the filing account error by phone alone. Two separate court-access channels were unavailable to me simultaneously while my right-to-sue deadline was imminent. Written email communication and written procedural guidance are necessary accommodations for someone with my documented executive function, organizational, and working-memory limitations. Being completely ignored when requesting help via email — at a moment of acute deadline pressure, while also stuck on a two-hour phone hold — created a concrete and compounding access barrier.

**Pro Se Guidelines Promised in ECF 13, and Non-Receipt by Email**

1. On November 13, 2025, the Court issued an Order (ECF 13) stating: "The Court will email Plaintiff a copy of the Guidelines for Litigants Without Lawyers for the Southern District of Texas."

2. I did not receive an email from the Court or Clerk's Office containing the Guidelines.

3. I repeatedly checked my inbox and spam/junk folders and did not find an email containing the Guidelines.

4. I ultimately obtained the Guidelines through other means. However, the failure of the promised email delivery created avoidable uncertainty and anxiety for me, because I have disabilities that substantially limit my ability to tolerate delays and ambiguity in time-sensitive procedural matters.

**CM/ECF Registration Rejection — No Response**

1. On November 16, 2025, I submitted a request to register my PACER account for NextGen CM/ECF electronic filing with the Southern District of Texas. On November 17, 2025, I received an automated rejection stating that non-attorney e-filing accounts are created "only following the order of a district judge" and directing me not to submit a registration request until after such an order issues.

2. I replied the same day stating that I had a court order granting access (ECF 13, November 13, 2025) and providing my case number, 4:25-cv-04785. I received no response — not a confirmation that my registration would be processed, not a request to provide the order, and not any follow-up.

3. This left me without access to the Court's electronic filing system and without any written confirmation of whether my account would be activated, while my case was actively pending.

**PACER Help Desk Extended Hold Times**

1. I attempted to contact the PACER help desk by phone to resolve technical issues and ask procedural questions.

2. I experienced hold times exceeding one hour. Extended holds create significant access barriers due to ADHD and autism traits—I completed the call, but the difficulty managing extended unstructured waiting, combined with anxiety stemming from prior workplace experiences documented in Exhibit A, makes

phone-based support extremely hard to use. Additionally, phone conversations leave no written record I can reference later for the details discussed, which my disabilities require for recall and verification.

3. I require written communication (email) for technical support questions as a reasonable accommodation. As documented above, on September 29, 2025, I both emailed PACER support and was on hold with PACER by phone for an estimated two or more hours attempting to resolve the account error. I received no response to my email. Despite email being my required accommodation format, PACER's support system provided no written response — leaving phone hold as the only functional channel while my right-to-sue deadline was imminent.

**Court Clerk Phone Calls—Three Attempts to Reach Someone**

1. I needed to ask the Court clerk about USMS service confirmation and docket updates regarding my Motion for Entry of Default.

2. **First attempt:** Called clerk's office, experienced hold message, call eventually disconnected without reaching anyone.

3. **Second attempt:** Called clerk's office again, experienced hold message, call disconnected again without reaching anyone.

4. **Third attempt:** Finally reached a clerk after hold time. During that call, I explained that USMS had confirmed via email on December 22, 2025 that all process had been served, but nothing was updating on PACER. The clerk confirmed that the last docket entry they could see was the November 17, 2025

order, and told me: "The marshals just probably haven't brought their returns yet." I asked whether the return of service might be in the filing queue. The clerk checked and confirmed: it was not in the queue. The clerk stated explicitly: "We don't have anything to update it with" and "there's no reason to do [anything] because it's not on the record." The clerk instructed me to go back to the USMS and ask them directly when they were going to put their proof of service on file with the Court. I asked directly whether All Points had responded — the clerk confirmed they had not. This phone call, which I had to reach on my third attempt after two disconnections, is the only way I obtained confirmation that the USMS returns were not on file and not in the queue. No email, no PACER notification, and no proactive contact from USMS or the Court had conveyed this to me.

5. These repeated attempts create functional barriers due to ADHD and autism traits documented in Exhibit A, but I persisted because I had no alternative written channel to obtain information about my pending motion. I recorded and transcribed the call myself immediately afterward to preserve the substance, because I cannot reliably retain fast-moving verbal information without a written record.

**U.S. Marshals Service Communication Difficulties**

1. After the Court granted my in forma pauperis application and ordered service by the U.S. Marshals Service, I sent six written communications to USMS and the Court regarding proof of service between December 15, 2025 and January 28,

2026. I received one substantive response. That response was incomplete. The formal returns of service were not filed with the Court until 51 days after service was completed — and only after I independently discovered they were missing.

2. On December 15, 2025, I emailed USMS requesting individual service confirmation for each defendant: NASA (and any appropriate federal entity served on its behalf), Leidos Holdings Inc., and All Points Logistics LLC, including the date(s), method, and location of any completed or attempted service for each. I received no response prior to my December 18 follow-up.

3. On December 18, 2025, I sent a follow-up email noting the lack of reply and again requesting a status update. I received no response.

4. On December 22, 2025, USMS representative Gabriela Osoria replied: "All process have been served." Her response confirmed service for three defendants — NASA, Leidos, and All Points — but it did not address all five required service packets. Under FRCP 4(i)(1), service on a federal agency defendant requires service on three separate recipients: the agency itself, the U.S. Attorney for the Southern District of Texas, and the Attorney General of the United States in Washington, D.C. Gabriela's response addressed only one NASA packet. The two additional required recipients — the U.S. Attorney and the Attorney General — were not mentioned.

5. That same evening, within fifteen minutes of receiving Gabriela's reply, I sent a follow-up email asking specifically about the status of those two additional summons. I received no response.

6. On December 29–30, 2025, I contacted the Court Clerk's office to check on service status. After two disconnected calls, I reached a clerk on my third attempt. The clerk confirmed that USMS had not filed any returns of service — not for any defendant, and not for any of the five required packets. No return was in the filing queue. The clerk told me: "We don't have anything to update it with" and "there's no reason to do [anything] because it's not on the record." The clerk directed me to contact USMS directly and ask them to file the returns. I had not been notified of any of this; I discovered it only because I persisted through two disconnected calls.

7. On January 2, 2026, I emailed Gabriela Osoria explicitly listing all five service packets that required proof of service on file with the Court: NASA Johnson Space Center, the U.S. Attorney's Office for the Southern District of Texas, the Attorney General in Washington, D.C., Leidos Holdings Inc., and All Points Logistics LLC. I requested written confirmation that proof of service for all five would be filed and that copies would be sent to me. I received only an automated out-of-office reply stating that Gabriela was out until January 5, 2026. No response followed after her return.

8. On January 28, 2026 — 26 days after I filed my Motion for Entry of Default, and 51 days after service was completed on December 8, 2025 — I sent a joint coordination email to both the Court's case manager (Kimberly Picota) and USMS, documenting that my January 2 email had received only an auto-reply, that my January 20 email to the case manager had received no response, and that proof of service still did not appear on the docket. USMS filed all returns of service on

January 28–29, 2026 — more than seven weeks after service was completed.

9. The cumulative effect of this sequence was severe. USMS's December 22 response addressed only 3 of the 5 required service packets, left the U.S. Attorney and AG summons unconfirmed, and was followed by silence when I flagged the gap. I then had to independently discover — through three phone attempts to the Clerk's office — that no returns had been filed and none were pending. I had to track answer deadlines for all three defendants while unable to confirm the date or completeness of service. And I had to send repeated, unanswered written follow-ups over six weeks before USMS fulfilled its ministerial obligation to file the returns.

10. As a result of USMS's failure to file the returns, I was unable to confirm the completeness of service for 51 days and could not determine with certainty when answer deadlines for each defendant began to run. I sent six written communications over that period to obtain information that was never proactively provided to me. During that same window, I filed a Motion for Entry of Default that could not be processed because the required returns were absent from the docket — a fact I discovered only by making three separate phone attempts to the Clerk's office. The inability to obtain written confirmation of a fundamental procedural step required me to manage competing uncertainties without the administrative support available to represented parties.

**Case Manager Communication Delays**

1. I have emailed the Court's case manager, Kimberly Picota, on multiple occasions with procedural questions and requests for information.

2. On January 20, 2026, I emailed regarding the status of my Motion for Entry of Default (ECF 18), which had been pending for 18 days without any ruling or entry. I did not receive a response. On January 28, 2026 (8 days later), I sent a detailed coordination email to both the case manager and USMS, documenting the full outstanding status: the default motion pending 26 days, USMS's January 2 email receiving only an auto-reply with no follow-up, the proof of service still absent from the docket, and my prior unanswered emails to both offices.

3. On January 29, 2026, Kimberly Picota responded to my January 28 email with a single sentence: "This case has been referred to Magistrate Judge Bennett. Feel free to contact his case manager for further assistance." No substantive assistance was provided, and I was directed to identify and contact a different case manager to resolve issues that had been pending for weeks.

4. The combination of delayed responses, deflections to other offices, and the absence of any proactive communication from the Court about missing filings or procedural status has required me to repeatedly re-initiate contact — sometimes across multiple offices simultaneously — to obtain basic information about my own case.

**January 14–15, 2026 Joint Discovery/Case-Management Plan Deadline (Short-Notice Barrier)**

1. On January 14, 2026, I received an email from the Court (Shannon Jones) stating that the Joint Discovery/Case Management Plan and proposed scheduling order were due by noon the next day, January 15, 2026.

2. This left less than a day of practical time for me, as a pro se litigant without counsel, to determine what was required, learn what "conferral" meant in this context, and attempt compliance given the case's procedural posture (including All Points' nonappearance and my pending motion for entry of default).

3. That same night, I emailed NASA's and Leidos's counsel to request written Rule 26(f) conferral as a disability-related accommodation and to seek their positions for purposes of a discovery plan.

4. The following afternoon — January 15, 2026, at approximately 1:29 PM — NASA counsel Ariel Wiley emailed the Court's scheduler, Shannon Jones, directly (copying me and Leidos counsel), stating: "Plaintiff reached out to the parties last night about filing a motion to continue the initial conference. If the Plaintiff does not have the motion on file by the end of the day, Defendant NASA will file their portions of the discovery case management plan." This message was not addressed to me — it was directed at the Court's scheduler, leveraging the institutional relationship between a DOJ attorney and the Court. The effect was to impose a hard end-of-day ultimatum on a pro se litigant who had received less than 30 hours' notice of the deadline in the first place, and who had written to the Court that same morning requesting guidance on the appropriate procedure. Managing the original short-notice deadline, overnight conferral requests to two defense

attorneys, drafting a motion to continue, and a government attorney's ultimatum directed at the Court — all simultaneously, within a 30-hour window — is a concrete example of the disproportionate burden that pro se status creates when the opposing party is represented by institutional government counsel.

## Motion for Entry of Default Unprocessed (ECF 18)

1. On January 2, 2026, I filed a Motion for Entry of Default against All Points Logistics LLC (ECF 18) because All Points had failed to answer or otherwise appear within the time required by Federal Rules of Civil Procedure.

2. As of January 20, 2026 (18 days after filing), the Court had not issued any ruling or order on the Motion for Entry of Default.

3. The direct cause of the default motion going unprocessed is connected to the USMS failure described above. Under Federal Rule of Civil Procedure 55(a), the Clerk's entry of default requires the formal proof of service — the USM-285 return — to be on file. USMS did not file any returns with the Court until January 28–29, 2026, 51 days after service was completed. Without those returns on the docket, the Clerk could not process the default motion regardless of how long it sat pending.

4. All Points Logistics LLC filed its Answer on January 28, 2026 (ECF 23) — the same day USMS finally filed all five returns of service. All Points' Answer was filed 30 days past the deadline. All Points appeared represented by counsel and denied every material allegation, including allegations regarding Plaintiff's

qualifications.

5. Because USMS had not filed the returns during the 26-day window between the default motion and All Points' appearance, the Clerk never entered default. All Points was able to appear after the deadline without a default having been entered. During those 26 days, I had no way to determine whether the default would be entered or whether All Points would eventually appear. I contacted USMS, the case manager, and the Clerk repeatedly during this period and received no substantive assistance.

6. My disabilities substantially limit my ability to manage sustained uncertainty and ambiguity, as documented in Exhibit A. The 26-day period during which I could not determine the status of the default motion or whether All Points would appear required repeated, unrewarded outreach efforts and created functional barriers to managing other aspects of this litigation during the same period. A represented party's counsel would typically track this procedural gap directly with USMS and the Clerk without requiring the client to initiate and manage that process.

**Email Delivery Failures in Conferral Communications**

1. On January 15, 2026, I sent two separate conferral emails to defense counsel — one regarding a Motion to Continue the ISC and one regarding the Motion for Appointment of Counsel and ADA Accommodations. In both emails, I copied Cynthia Williamson at Ogletree Deakins (cynthia.williamson@ogletree.com). Both emails generated immediate automated delivery failure notices: Ogletree's

email security system (Mimecast) blocked the messages. I did not discover this until I received the delivery failure notification. I was required to re-evaluate my contact list and resend.

2. These delivery failures are concrete examples of how the absence of counsel creates practical communication barriers that represented parties do not face. Attorney service lists are maintained by the court and by counsel; pro se litigants must research, track, and verify opposing counsel's contact information independently and without administrative support.

## Defendants' Opposition to Accommodation Requests

1. In my conferral emails to defendants' counsel, I explicitly requested reasonable accommodations including written communications, written conferral where permitted, and a structured process to reduce the need for real-time verbal negotiation.

2. On January 15, 2026, I sent a conferral email regarding my Renewed Combined Motion for Appointment of Counsel and ADA Accommodations. NASA counsel Ariel Wiley responded that day: "Defendant NASA is opposed to these motions because they have already been ruled on and denied." No accommodation was offered or proposed, and no acknowledgment of the ADA request was provided.

3. On February 2, 2026, I sent a conferral email about the same Renewed Motion. All Points counsel Katherine Strathman responded: "Defendant All Points Logistics is opposed." No accommodation discussion followed.

4. On February 4, 2026, I sent a follow-up conferral about both the motion to extend my amended complaint deadline and the Renewed Motion for Counsel and Accommodations. NASA counsel again explicitly stated opposition: "we are opposed to the motion for counsel and motion accommodations." All Points counsel again explicitly stated opposition: "opposed to the motion for counsel and the motion for accommodations."

5. Leidos counsel (Stephen J. Quezada, Ogletree Deakins) responded to conferral requests about the ISC and the amended complaint extension but did not provide any explicit position on the accommodation requests themselves, leaving those requests unanswered.

6. In no instance did any defendant's counsel acknowledge, engage with, or propose any alternative to the accommodations I requested. All three defendants are represented by sophisticated institutional counsel — a DOJ attorney, a board-certified labor and employment specialist at a major national firm, and an associate at one of the largest defense litigation firms in the country.

**Pattern of Access Barriers**

1. Taken together, these incidents demonstrate a pattern in which:

- Written communication and documentation I require as a reasonable accommodation are systematically unavailable or delayed

- Phone-based communication is the default, despite my documented disabilities that make sustained phone communication difficult

- Procedural information is provided verbally without written confirmation, making it difficult for me to track and verify
- Short deadlines with insufficient advance notice create unnecessary barriers
- Pro se litigants with disabilities are effectively excluded from support systems available to represented parties

**Impact on Litigation**

1. These access barriers have made it extremely difficult for me to effectively litigate this case pro se.

2. The barriers have caused me significant stress, anxiety, and time spent navigating procedural obstacles that could have been avoided with reasonable accommodations.

3. Without appointment of counsel or comprehensive disability accommodations, I will continue to face these barriers throughout discovery, motion practice, and trial.

**Pro Se Legal Education Efforts — and Their Limits**

1. In the absence of counsel, I have made sustained, deliberate efforts to educate myself on the law and procedures governing this case. These efforts include:
   - Conducting both in-person and online legal research through the **Harris County Robert W. Hainsworth Law Library** and its resources, including physical library visits, law pod research terminals, and online research tools

and programs available to card-holding patrons.

- ○ Completing **LinkedIn Learning coursework** specifically chosen to address my lack of legal representation, including *Legal Tips for Non-Lawyers*, *Responsible AI*, and related courses. Certificates of completion are attached hereto as attachments to this Declaration.

- ○ Independently researching Fifth Circuit precedent, the Federal Rules of Civil Procedure, the Southern District of Texas Local Rules, and substantive employment and disability law applicable to my claims throughout the pendency of this litigation.

- ○ Reviewing and applying Judge Hanks's and Magistrate Judge Bennett's individual court procedures, the Court's Initial Discovery Protocols for Employment Cases, and the Southern District of Texas Pro Se Litigant Guide.

2. Despite these sustained efforts, the procedural and substantive complexity of this case — multi-defendant federal contractor litigation involving joint-employer theory, simultaneous ADA, Title VII, and retaliation claims, and the prospect of depositions, expert witnesses, summary judgment briefing, and trial — is beyond what any amount of self-directed study can bridge. LinkedIn Learning courses and law library webinars can provide general orientation, but they cannot substitute for the judgment, skill, and experience required to litigate a complex federal employment case against three represented institutional defendants.

3. The fact that I have gone to these lengths to compensate for the absence of counsel

is itself evidence of the exceptional difficulty I face. I am not a passive or disengaged litigant. I have done everything within my capacity to prepare. The gap that remains is not one of effort or willingness — it is structural, and it is the precise gap that appointment of counsel is designed to fill.

**Conclusion**

1.  I submit this declaration to demonstrate the specific and ongoing barriers I face in accessing the Court's processes, and to support my requests for appointment of counsel and comprehensive disability accommodations.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on February 25, 2026, in Houston, Texas.

---

/s/ Amanda L. Kondrat'yev

AMANDA L. KONDRAT'YEV

*Plaintiff, Pro Se*

1102 Buoy Rd

Houston, Texas 77062

Telephone: 346-366-0787

Email: amandakondratyev@gmail.com



# Introduction to Prompt Engineering for Generative AI

Course completed by Amanda Vanderwall

Nov 30, 2025 at 01:07AM UTC · 1 hour 3 minutes

### Top skills covered

AI Prompting    Prompt Engineering    Artificial Intelligence (AI)



Shea Hanson, Head of Learning Content Strategy



Certificate ID: 313511b1e1155c9fd4d9a72e393b0ebdea978e64f5bb66739ff51fdaecdf8ce6



# Legal Tips for Non-Lawyers

Course completed by Amanda Vanderwall
Nov 29, 2025 at 09:50PM UTC · 40 minutes

Top skills covered

Legal Advice



Shea Hanson, Head of Learning Content Strategy



Certificate ID: 3593e9978d751705caa74df3ff0a68df3ad9dbfd005563d8abc6251389b1da52



# Notion AI: Your New Productivity Partner

Course completed by Amanda Vanderwall

Nov 29, 2025 at 11:18PM UTC · 53 minutes

### Top skills covered

AI Productivity    Artificial Intelligence (AI)    Notion Productivity Software



Shea Hanson, Head of Learning Content Strategy



Certificate ID: 1c139d7289276ec51b058ebc7e0506cd5591a8a1abc880933bef8599764c6969



# Responsible AI to the Rescue

Course completed by
Nov 26, 2025 at 09:00PM UTC · 24 minutes

## Top skills covered

( Business Ethics )   ( Artificial Intelligence (AI) )   ( Responsible AI )



Shea Hanson, Head of Learning Content Strategy

Certificate ID: fe9ac96942a46b908062c7614b51205c851564605340c6155fa1e9c5c3939d55



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

AMANDA L. KONDRAT'YEV,
Plaintiff,
v.                                                      Civil Action No. 4:25-cv-04785
NASA JOHNSON SPACE CENTER,
LEIDOS HOLDINGS INC., and
ALL POINTS LOGISTICS LLC,
Defendants.

EXHIBIT C

Attorney Contact Log
(Efforts to Secure Counsel)

## EXHIBIT C: Attorney Contact & Representation Efforts Log

*17 Contact Attempts Documented | Period: February 2024 – September 2025*

| # | Date | Organization / Firm | Contact Name | Contact Method | Outcome | Notes / Reason | Fee | Paid | Reference # |
|---|------|---------------------|--------------|----------------|---------|----------------|-----|------|-------------|
| 1 | 2/23/2024 | The Verde Law Firm, PLLC | Joshua A. Verde | Online intake | Written declination | Unable to undertake representation at this time. | | No | |
| 2 | 4/16/2024 | HKM Employment Attorneys | | Online intake | Email declination | Not in a position to represent at this time. | | No | |
| 3 | 6/30/2024 | J. Armstrong (via National Employment Lawyers Association) | J. Armstrong | Email inquiry | Non-response | No response received (de facto declination). | | No | |
| 4 | 7/24/2024 | Dupree Law Firm | Ronald E. Dupree | Paid consultation | Paid consult completed | Paid consultation completed; representation not undertaken. | $250 | Yes | Stripe receipt #1329-7647 |
| 5 | 7/30/2024 | Prestage Law | Art Prestage | Referral portal | Non-response | No response received after referral and follow-up (de facto declination). | | No | HLRS Referral #3994216 |
| 6 | 8/5/2024 | Lone Star Legal Aid (LSLA) | Bianca Metcalf | Legal aid application | Written declination | Legal aid application declined; insufficient staff/resources. | | No | Application 24-1072570 |
| 7 | 9/4/2024 | Texas Legal Services Center — Impact Litigation Team | | Legal aid application | Written declination | Declined representation; provided referral list. | | No | |
| 8 | 9/4/2024 | Disability Rights Texas | Maria Sanchez | Legal aid application | Info-only (services) | Provided informational materials only; full representation not offered. | | No | |
| 9 | 12/18/2024 | Rob Wiley, P.C. | Deontae Wherry | Paid consultation | Paid consult completed | Paid consultation completed; representation not undertaken. | $250 | Yes | PayPal Transaction ID 28442868RY9988328 |
| 10 | 8/11/2025 | Disability Rights Texas | Maria Sanchez | Legal aid application | Info-only (services) | Provided informational materials only; full representation not offered. | | No | |
| 11 | 8/13/2025 | Lone Star Legal Aid (LSLA) | Hong Nguyen | Legal aid application | Closed by legal aid | Legal aid application closed due to insufficient staff/resources. | | No | Application 25-1146222 |
| 12 | 8/13/2025 | Lone Star Legal Aid (LSLA) | Jill Cunningham | Legal aid application | Closed by legal aid | Legal aid application closed due to insufficient staff/resources. | | No | Application 25-1146254 |
| 13 | 8/13/2025 | Lone Star Legal Aid (LSLA) | Hong Nguyen | Legal aid application | Closed by legal aid | Legal aid application closed due to insufficient staff/resources. | | No | Application 25-1146263 |
| 14 | 9/1/2025 | TB Robinson Law Group | Terrence B. Robinson | Phone inquiry | Paid consult offered only | Representation required substantial upfront fees (consult fee and retainer), not affordable. | $500 | No | |
| 15 | 9/22/2025 | Shellist Lazarz Slobin LLP | | Email inquiry | Email declination | Firm reviewed provided EEOC documents and declined; provided referral. | | No | |
| 16 | 9/23/2025 | Tully Rinckey PLLC | Lucas W. Wells | Phone inquiry | Paid consult offered only | Firm required paid consultation to proceed; not pursued. | $150 | No | |
| 17 | 9/29/2025 | AH Law PLLC | Amanda Hernandez | Email inquiry | Email declination | Declined due to being fully booked; provided referral to TELA directory. | | No | |



4600 Highway 6 North
Suite 320
Houston, TX 77084

Phone (713) 909-4347 | Fax (713) 588-2431

Joshua A. Verde
*Managing Member*

**BOARD CERTIFIED®**
Texas Board of Legal Specialization
LABOR AND EMPLOYMENT LAW

February 23, 2024

Amanda Kondrat'yev                                        ***Via Email***
2305 Bay Area Blvd #1606
Houston, TX 77058

      RE:    Declining Representation

Ms. Kondrat'yev,

      Thank you very much for contacting us about a possible legal engagement. I appreciate having the chance to hear about your potential claims.

      Unfortunately, at this time The Verde Law Firm, PLLC and its attorneys must decline to take your case. While we make no determination as to the merits of your case, we are unable to undertake a representation at this time. It is important to know that while we agree to keep the subject of our conversation confidential, no attorney-client relationship has formed.

      There may be important deadlines that you should be aware of (for example, the statute of limitations or administrative deadlines). Most claims and causes of action have deadlines that must be observed to preserve your rights. If you still wish to pursue your claim(s), you should not delay in contacting a different attorney.

      Thank you again for your consideration.

                         Very truly yours,

                         Joshua A. Verde
                         Managing Member
                         The Verde Law Firm, PLLC

cc: File



Amanda Kondrat'yev <hello@amandavanderwall.com>

## Thank you for completing your intake with HKM Employment Attorneys
3 messages

**HKM Employment Attorneys** <updates@hkm.com>                    Tue, Apr 16, 2024 at 8:44 PM
Reply-To: updates@hkm.com
To: amandakondratyev@gmail.com

Amanda,

Thank you for completing our intake process today. We look forward in working with you and we appreciate your patience through our review process. Again, we will be getting back with you in roughly 3 business days to let you know if we can assist you with your employment situation or not. If you would like to receive a status update, please email updates@hkm.com. **This is the best way to receive an update. We monitor this mailbox during normal business hours and you can expect a response within one hour.**

Thank you again,



This email may contain confidential or attorney-client privileged information and is intended only for the recipient(s) identified above.

If you receive this email and are not the intended recipient, please contact our office and destroy any and all copies of this message that are in your possession.

Getting too many emails from Law Ruler? Unsubscribe

**Amanda Kondrat'yev** <amandakondratyev@gmail.com>                    Wed, Apr 17, 2024 at 8:30 AM
To: updates@hkm.com

Hi,

If it is at all possible to review my info asap please, it would be greatly appreciated. Thank you very much.

Sincerely,

Amanda Kondrat'yev
Sent from my iPhone

> On Apr 16, 2024, at 8:44 PM, HKM Employment Attorneys <updates@hkm.com> wrote:
>
> Amanda,



Amanda Kondrat'yev <hello@amandavanderwall.com>

---

## Follow Up from HKM Employment Attorneys
1 message

**HKM Employment Attorneys** <updates@hkm.com>                          Wed, Apr 17, 2024 at 6:07 PM
Reply-To: updates@hkm.com
To: amandakondratyev@gmail.com

Amanda

Unfortunately, HKM is not going to represent you at this time.  I wanted, however, to give you an explanation why my firm cannot assist you.  When talking with potential clients about their employment issues, we carefully listen for a variety of aspects in determining those cases that we can move forward with.  This includes the seriousness of the case, the overall legal viability (*i.e.*, given the specifics of the law, do we think together we can prevail?), the potential for the outcome to make a meaningful difference for our clients, the overall capacity of the firm, and whether we consider ourselves qualified in each specific case. At this point, enough of those thresholds were not met in order for us to move forward.  It doesn't mean you haven't been treated poorly, nor that you don't have legal standing - just that we aren't in a perfect position to represent you at this time.

I understand that you've spent a significant amount of time talking with us and sharing some difficult and personal issues. I'd encourage you to continue to advocate for yourself and consider talking with some additional employment attorneys who may be more well suited for your specific issue.

Here are some law firms in Houston that we would encourage you to contact:

1. Oberti Sullivan -https://osattorneys.com/
2. Wiley Wheeler -https://www.wiley-wheeler.com/

We wish you the best of luck in the future.  If you have any comments about your experience with HKM, feel free to click here and leave us some feedback.

Very Truly Yours, HKM Employment Attorneys LLP



Getting too many emails from Law Ruler?  Unsubscribe

[Quoted text hidden]

---

**HKM Employment Attorneys - Updates** <updates@hkm.com>     Wed, Apr 17, 2024 at 9:27 AM
To: Amanda Kondrat'yev <amandakondratyev@gmail.com>

Hi,

Thank you for contacting us. Your information is still under review by the attorney, we will make sure that you are reached back as soon as we have information for you.

We appreciate your patience,

Kindly



updates@hkm.com

www.hkm.com

,

Arlington | Atlanta | Baltimore | Bellevue | Birmingham | Boston | Charlotte | Chicago | Cincinnati | Denver
Houston | Indianapolis | Irvine | Kansas City | Las Vegas | Los Angeles | Minneapolis | New Paltz | New York
Philadelphia | Phoenix | Pittsburgh | Portland | Riverside | San Diego | Seattle | Spokane | St. Louis | Washington, D.C.

*This email may contain confidential or attorney-client privileged information and is intended only for the recipient(s) identified above.*
*If you receive this email and are not the intended recipient, please contact our office and destroy any and all copies of this message that are in your possession.*

---

**From:** Amanda Kondrat'yev <amandakondratyev@gmail.com>
**Sent:** Wednesday, April 17, 2024 7:30 AM
**To:** HKM Employment Attorneys - Updates <updates@hkm.com>
**Subject:** Re: Thank you for completing your intake with HKM Employment Attorneys

> You don't often get email from amandakondratyev@gmail.com. Learn why this is important

Hi,

If it is at all possible to review my info asap please, it would be greatly appreciated. Thank you very much.

Sincerely,

 **Gmail**                                    **Amanda Kondrat'yev <hello@amandavanderwall.com>**

## New Appointment: Consultation (Amanda Kondrat'yev) on Thursday, July 25, 2024 11:20am with Ronald Dupree
1 message

**Dupree Law Firm, PLLC** <scheduling@acuityscheduling-mail.com>          Wed, Jul 24, 2024 at 1:46 PM
Reply-To: "Dupree Law Firm, PLLC" <ronald@dupreelawfirm.com>
To: amandakondratyev@gmail.com

# Appointment Scheduled

## for Amanda Kondrat'yev

| | |
|---|---|
| What | Consultation (Ronald Dupree ) |
| When | Thursday, July 25, 2024 11:20am (50 minutes) |
| Where | Click to join meeting: https://app.acuityscheduling. com/schedule.php?owner= 17372090&action=zoom&uniqueID= e6742d2cd34db2d1ea7f86b264d249 87&ownerID=17372090 |

Thank you, your appointment has been successfully scheduled.

Change/Cancel Appointment

Add to iCal/Outlook Calendar



Amanda Kondrat'yev <hello@amandavanderwall.com>

## Following Up (Virtual Consultation)
2 messages

**ronald@dupreelawfirm.com** <ronald@dupreelawfirm.com>          Thu, Jul 25, 2024 at 9:53 AM
To: "amandakondratyev@gmail.com" <amandakondratyev@gmail.com>

Thank you for scheduling a Virtual Consultation.  This meeting has been scheduled for today, **July 25, 2024, at 11:20am**.

If you have any evidence that you would like me to review, please save as a PDF and share in advance of the meeting.

**The Virtual Consultation will be conducted via Zoom video conference.**  Please make sure that you are in an area where you can speak privately and view your screen.

Thank you again and I look forward to meeting with you.

Ronald E. Dupree

**Attorney at Law**

**Williams Tower** | 2800 Post Oak Blvd., Suite 4100

Houston, Texas 77056

Direct 832-800-4LAW (4529)

Fax 281-503-7905

Website/Bio/Map



 Go Green! Print this email only when necessary. Thank you for helping The Dupree Law Firm be environmentally responsible.

This communication and any attachments to it are confidential and intended solely for the use of the person to whom they are addressed. This e-mail transmission may contain confidential information that is legally privileged. If you have received this e-mail in error, please notify us by telephone immediately at (832) 800-4529, and you are notified that any disclosure, distribution, or the taking of any action in reliance on the contents of this information is prohibited. Nothing in this message may be construed as a digital or electronic signature of any employee of DUPREE LAW FIRM, PLLC ("DLF"). DLF automatically blocks e-mails containing objectionable language or suspicious content. Messages sent to DLF should be considered received only if confirmed by a return receipt. The IRS does not allow the use of informal tax advice, such as this communication, to avoid tax penalties.

**Amanda Kondrat'yev** <amandakondratyev@gmail.com>                    Thu, Jul 25, 2024 at 11:12 AM
To: "ronald@dupreelawfirm.com" <ronald@dupreelawfirm.com>

Good morning,

I have attached some of the documents regarding my case. The Counselor's Report from NASA ODEO is very long, but there is one page in particular, page 4, that shows that my employer unlawfully terminated me with statements that do not match what JSC Security says. Thank you. Logging into zoom now.

Sincerely,

Amanda Kondrat'yev

  Appeal Case 3719044 Evidence Submission.pdf

  Kondrat'yev Counselor's Report (NCN-24-JSC-00038).pdf

  ODEO Formal Filing.pdf

[Quoted text hidden]

---

**2 attachments**

  **Evidence packet 2.pdf**
1217K

  **I00311965-All Points Logistics LLC-Notice to Complnt.pdf**
232K

 Gmail

**Amanda Kondrat'yev <hello@amandavanderwall.com>**

---

### Your DUPREE LAW FIRM PLLC receipt [#1329-7647]
1 message

---

**DUPREE LAW FIRM PLLC** <receipts+acct_1EDiu8FbJgUMBms2@stripe.com>    Wed, Jul 24, 2024 at 1:46 PM
Reply-To: DUPREE LAW FIRM PLLC <ronald@dupreelawfirm.com>
To: amandakondratyev@gmail.com

---

## Receipt from DUPREE LAW FIRM PLLC

Receipt #1329-7647

| **AMOUNT PAID** | **DATE PAID** | **PAYMENT METHOD** |
|---|---|---|
| $250.00 | Jul 24, 2024, 1:46:18 PM | **MasterCard** - 7829 |

**SUMMARY**

| | |
|---|---|
| 1301653197 - Amanda Kondrat'yev - Consultation - July 25, 2024 11:20am | $250.00 |
| **Amount charged** | **$250.00** |

If you have any questions, contact us at **ronald@dupreelawfirm.com**
or call us at **+1 832-800-4529**.

8:42



**+1 (713) 206-5233** ›

iMessage
Aug 2, 2024 at 1:32 PM

This is Art Prestage

My email address is
aprestage@prestagelaw.com

(713) 206-5233

Thank you! I'm on my way to a tire appointment, will send once I get situated somewhere!

No rush, I will review and get back to you early next week. I'm out of town presently

Enjoy your weekend! Thank you for your help!

Aug 6, 2024 at 9:39 AM

Good morning! Checking to see if you received links to shared docs in your email or if I should send again. Thank you!

Aug 6, 2024 at 11:25 AM

+    iMessage    

I got it and will review and

8:42

My email address is
aprestage@prestagelaw.com

) 206-5233

**+1 (713) 206-5233 ›**

way to a
tire appointment, will send once
I get situated somewhere!



No rush, I will review and get
back to you early next week.
I'm out of town presently

Enjoy your weekend! Thank you
for your help!

Aug 6, 2024 at 9:39 AM

Good morning! Checking to see
if you received links to shared
docs in your email or if I should
send again. Thank you!

Aug 6, 2024 at 11:25 AM

I got it and will review and
respond

Sep 3, 2024 at 3:38 PM

Hello. 👋 Are you still able to
help me? Did you see the
shared docs?

Delivered

iMessage



**Amanda Kondrat'yev <hello@amandavanderwall.com>**

---

## Kondrat'yev / Legal Aid Application Number: 24-1072570
1 message

**Bianca Metcalf** <BMetcalf@lonestarlegal.org>                          Mon, Aug 5, 2024 at 9:38 AM
To: "amandakondratyev@gmail.com" <amandakondratyev@gmail.com>


Please find attached correspondence regarding your request for legal assistance.



Please do NOT reply to this email. This account is not monitored for responses and any replies sent to it will be deleted
and will not be read. Please refer to the attached letter for information on contacting us back about this matter.



STATEMENT OF CONFIDENTIALITY – CIUCMP1

The contents of this e-mail and its attachments are intended solely for the addressee(s) hereof. In addition, this e-mail transmission
may be confidential and it may be subject to privilege protecting communications between attorneys and their clients. If you are not
the named addressee, or if this message has been addressed to you in error, you are directed not to read, disclose, reproduce,
distribute, disseminate or otherwise use this transmission. Delivery of this message to any person other than the intended
recipient(s) is not intended in any way to waive privilege or confidentiality. If you have received this transmission in error, please
alert the sender by reply e-mail; we also request that you immediately delete this message and its attachments, if any.

---

📄 **Kondrat'yev, Amanda CIU Closing Letter 24-1072570.pdf**
140K



Amanda Kondrat'yev <hello@amandavanderwall.com>

---

# Declination of Representation and Referral Resources
1 message

---

**No-Reply** <no-reply@tlsc.org>           Wed, Sep 4, 2024 at 10:32 AM
To: "amandakondratyev@gmail.com" <amandakondratyev@gmail.com>

Dear Amanda Kondrat'yev


Thank you for contacting Texas Legal Services Center's Impact Litigation Team. Unfortunately, we cannot offer you legal representation at this time. Please see a list of legal resources and referrals below.


Filing a discrimination charge against your employer: https://texaslawhelp.org/article/filing-a-discrimination-charge-against-your-employer


Filing a complaint against your employer: https://texaslawhelp.org/article/filing-a-complaint-about-your-employer-answers-to-frequently-asked-questions


Job termination or discrimination: https://texaslawhelp.org/article/job-termination-or-discrimination


**Disability Rights Texas**

Assisting people with disabilities to understand and exercise their rights under the law.

http://www.disabilityrightstx.org/

**Phone:** (800) 252-9108


**Equal Justice Center - Employment Justice**

Providing legal assistance to low-income individuals for worker justice and fair treatment in the justice system.

https://www.equaljusticecenter.org/legal-help/

**Phone:** (800) 853-4028


**Houston Volunteer Lawyers**

Assist in providing free legal services to low-income residents of Harris County.

http://www.makejusticehappen.org/

**Phone:** 713-228-0735


**Lone Star Legal Aid - Houston Office**

Providing free advocacy, legal representation, and community education.

https://www.lonestarlegal.org/get-help/

**Phone:** (713) 652-0077


**Houston Lawyer Referral Service**

Houston area residents can get help finding the right lawyer to hire.

https://hlrs.org/for-the-public/

**Phone:** (713) 237-9429


**State Bar of Texas - Lawyer Referral & Information Service**

Texas residents can get help finding the right lawyer to hire.

https://www.texasbar.com/LawyerReferral

Phone: (800) 252-9690


 **https://texaslawhelp.org/ - Chat available Monday-Thursday from 10am-2pm**


**Legal Help Directory: https://texaslawhelp.org/directory**


I hope you find this information helpful, and best of luck.


Regards,


Impact Team

This electronic communication (including any attached documents) may contain privileged and/or confidential information. If you are not an intended recipient of this communication, distribution, copying, or other use of this communication or any attached document is prohibited. If you have received this communication in error, please notify the sender immediately by replying to this email and promptly destroy all electronic and printed copies of this communication and any attached document. To learn more about Texas Legal Services Center's privacy policies, visit tlsc.org/e-disclosure.



Amanda Kondrat'yev <hello@amandavanderwall.com>

---

# Disability Rights Texas - in response to your request
1 message

---

**Maria Sanchez** <msanchez@disabilityrightstx.org>                    Mon, Aug 11, 2025 at 8:29 AM
To: "amandakondratyev@gmail.com" <amandakondratyev@gmail.com>

Good morning,

Please find attached a letter and handouts in response to your request for services.

**Maria Sanchez**
Legal Secretary



Direct: (214) 845-4049
Intake: 1-800-252-9108
www.DRTx.org

*Connect With us on* <u>Social Media</u>.

PRIVILEGED AND CONFIDENTIAL:  This email message and all attachments may contain information that is confidential, an attorney-client communication, and/or attorney work product. This communication is confidential and should not be shared without permission.  Any unauthorized review, use, disclosure or distribution is prohibited.  If you believe this message has been sent to you in error, please notify the sender by replying to this transmission and delete the message without first disclosing it.  Thank you.

---

**4 attachments**

  **CAPE LOR and LOP Letter - Kondrat'yev.pdf**
150K

**Handout re Complaint Procedures, EM4-v4.pdf**
261K

**EM5 - Employment Discrimination rev 5_28_2015.pdf**
253K

**How_to_Appeal_DRTx_Decision.pdf**
193K



Protecting and advocating for the rights of Texans with disabilities - because all people have **dignity** and **worth**.

August 11, 2025

Via email: amandakondratyev@gmail.com

Amanda Kondrat'yev
1102 Buoy Rd.
Houston, TX  77062

Re:    Kondrat'yev, Amanda – EM4, SR #242927, Web Intake ID:32417

Dear Ms. Kondrat'yev,

Thank you for contacting us for help.  We reviewed the information you provided our intake staff but unfortunately, we are unable to offer you any legal assistance or advocacy services at this time.  **Due to reductions and delays in federal funding, we do not have the resources to accept your request for services. Again, given that funding issue, we cannot commit to representing or assisting anyone with litigation.**

This does not mean that we have determined that your problem is unimportant or that it lacks merit. It means only that **due to reductions and delays in federal funding**, we do not have the resources to assist you at this time.  Therefore, we are unable to provide you with the services of an advocate or attorney.

Additionally, we are unable to offer more help because some or all of the issues you contacted us about are not within the types of cases our Board of Directors has authorized us to handle.  We only assist clients with certain discrimination issues, but only if the discrimination issue is disability related.

We have enclosed a HANDOUT that has information about IMPORTANT DEADLINES and complaint procedures that may apply to your situation.  Because we do not

 **Main Office**
214-630-0916

 **Toll-Free**
800-315-3876

 **Fax**
214-630-3472

 **Website**
www.DRTx.org

 **Address**
1420 W. Mockingbird Ln
Ste. 450
Dallas, Texas 75247

Amanda Kondrat'yev
August 11, 2025
Page 2

have sufficient resources to assist you with your request, we cannot give you any legal advice about the specific deadlines or complaint procedures that do apply to your case.  We encourage you to REVIEW THE ENCLOSED INFORMATION and to contact other lawyers and/or the agencies that are listed in order to find out which deadlines and procedures apply to your case.

You may want to refer to the TELA website as a possible resource of attorney referrals at www.mytela.org.

If you want to pursue this claim legally, seek the services of an attorney now.  An attorney will need time to research and prepare your case.  Do not wait until the end of the deadline to sue before looking for an attorney.  If you have limited income and resources, you may be eligible for free legal services from your local legal aid office.  You may also call the "lawyer referral" number published by your local Bar Association (an organization of lawyers).  If you can't find that number in your telephone book, you can call the state-wide lawyer referral service at 1-800-252-9690.

If you wish to appeal the decision to not accept your case, please refer to the enclosed handout entitled "How to Appeal Disability Rights Texas' Decision Regarding Your Request for Services" for the steps you should take in order to submit your appeal.

We thank you for contacting us and regret that we were not able to be of more assistance.

Sincerely,

Lucia Romano
Supervising Attorney
CAP, Accessibility, PABSS, and Employment Team



Amanda Kondrat'yev <hello@amandavanderwall.com>

---

## Rob Wiley P.C.: Appointment Scheduled.
1 message

---

**Rob Wiley P.C.** <noreply@robwiley.com>
Reply-To: noreply@robwiley.com
To: amandakondratyev@gmail.com

Wed, Dec 18, 2024 at 3:08 PM

Logo of Rob Wiley, P.C.

Dear Amanda Kondrat'yev,

**<u>THANK YOU!</u>**
We appreciate you choosing our firm for an initial consultation on 20-Dec-2024 at 11:00 AM (America/Chicago GMT -06:00)

**<u>HOW TO ATTEND YOUR MEETING</u>**

We use secure online video conferencing from Zoom. At the time of your meeting, click the zoom link below:

Here's a link to join the meeting online: https://us06web.zoom.us/j/89266682463

It takes about 5 minutes to download and set up your computer or phone. Please wait in the online meeting room even if the attorney hasn't joined. Sometimes we are running late, and we appreciate your patience. If an attorney is more than 10 minutes late, please call us at 214-528-6500 and we will find out what's going on. If you would prefer an old fashioned phone call instead, or if you're having technical difficulties, please call us and let us know.

**<u>MASKS? ARE YOU SERIOUS?</u>**
We represent older workers and workers with disabilities. For the sake of clients and staff, we require guest to wear masks while in our office.

**<u>BEFORE YOUR MEETING</u>**
Please fill out the forms provided in the link below prior to your meeting:

Client Intake Sheet and Conflicts of Interest Checklist

**<u>IMPORTANT INFORMATION</u>**
The purpose of the initial consultation is to let us determine if you

have a case we can help you with – and to allow you to decide if we're the right attorneys for you. We won't have an attorney-client relationship unless and until we both sign a written retainer agreement. But don't worry, information you tell us is confidential unless (1) your goal is to commit or enable a crime or fraud, (2) disclosing your information would prevent death or serious injury, or (3) we will be representing more than one client. We will provide you with our thoughts, opinions, and general information, but we can only give specific legal advice to clients who have entered into a retainer agreement with the firm.

## <u>HOW TO CHANGE OR CANCEL</u>

If you change your mind and decide to cancel or reschedule your appointment, please inform us 24 hours prior to your scheduled appointment to avoid rescheduling fees.

<u>reschedule</u>    <u>cancel</u>

---

This email was sent to you by noreply@robwiley.com from Rob Wiley P.C. via Zoho Bookings. Contact the sender noreply@robwiley.com for any clarifications. If you think this is spam, please report it to abuse@zohocorp.com for immediate investigation and action.

---

**Zoom Initial Consultation - Amanda Kondrat'yev.ics**
1K

 **Gmail**

Amanda Kondrat'yev <hello@amandavanderwall.com>

## Purchase receipt from Rob Wiley, P.C.
1 message

**member@paypal.com** <member@paypal.com>                                    Wed, Dec 18, 2024 at 3:07 PM
Reply-To: intake@robwiley.com
To: "AmandaKondratyev@gmail.com" <amandakondratyev@gmail.com>

Hi Amanda,
Please find the receipt for the payment of $250.00. It was a pleasure doing business
with you, thank you.

### Receipt

12/18/2024 15:07:20

**Rob Wiley, P.C.**
2613 Thomas Ave
Dallas, TX 75204

| Transaction ID | Billing information |
|---|---|
| 28442868RY9988328 | MasterCard •••• •••• •••• 4838 |
| | Amanda Kondrat'yev |
| | amandakondratyev@gmail.com |

| Order information | | |
|---|---|---|
| consultation | Amount | $250.00 USD |
| | Shipping | $0.00 USD |
| | Tax | $0.00 USD |
| | Total | **$250.00 USD** |

2/24/26, 1:11 AM
Case 4:25-cv-04785     Document 33-1     Filed 02/26/26 in TXSD     Page 58 of 159
amandavanderwall.com Mail - Reminder: Your appointment at Rob Wiley P.C.



Amanda Kondrat'yev <hello@amandavanderwall.com>

---

## Reminder: Your appointment at Rob Wiley P.C.
1 message

**Rob Wiley P.C.** <noreply@robwiley.com>                                    Fri, Dec 20, 2024 at 10:30 AM
Reply-To: noreply@robwiley.com
To: amandakondratyev@gmail.com

Logo of Rob Wiley, P.C.

Dear Amanda Kondrat'yev,

This is a reminder for your appointment on  20-Dec-2024 at  11:00 AM
(America/Chicago GMT -06:00).

To join your meeting, please use the following link:
https://us06web.zoom.us/j/89266682463

Thank you,
Rob Wiley Team

---

This email was sent to you by noreply@robwiley.com from Rob Wiley P.C. via Zoho Bookings. Contact the sender
noreply@robwiley.com for any clarifications. If you think this is spam, please report it to abuse@zohocorp.com for immediate
investigation and action.

📄 **Zoom Initial Consultation - Amanda Kondrat'yev.ics**
    1K

**PAUL E. FURRH, JR.**
Attorney at Law
Chief Executive Officer

**ERNEST W. BROWN, JR.**
Attorney at Law
Deputy Director



**Lone Star Legal Aid
Central Intake Unit**

**CAROLYN TURLEY**
Attorney at Law
Directing Attorney

Address:
1415 Fannin Street
Houston, Texas 77002

713-652-0077 Telephone
800-733-8394 Toll-free

August 5, 2024

Amanda Kondrat'yev
Houston, TX 77058
amandakondratyev@gmail.com

> **RE:   Kondrat'yev / Legal Aid Application Number: 24-1072570**
> **29 Other Employment**
> Application for Legal Services Closing Letter

Dear Amanda Kondrat'yev:

Thank you for contacting Lone Star Legal Aid. I am sorry to inform you that Lone Star Legal Aid will not be able to accept your case.

Lone Star Legal Aid is funded to serve low income persons. We have looked at your household's income. Your household income is more than the limit set by our board. We must deny your application.

If your household income changes, you may reapply for our services.

There are some other places you can go to get help. You can call the State Bar of Texas, Lawyer Referral Service at 1-800-252-9690. You can also go online to the Texas Law Help website at www.texaslawhelp.org for more legal help. You can also look at the Local Resources we are sending with this letter.

Sincerely,

*Britnee Chism*

Britnee Chism
Managing Attorney
Central Intake & Legal Assistance Unit

BC/bm
Enclosure(s):   *Notice of Rights*
*Local Resources*

*Serving the East Region of Texas since 1948*
Beaumont, Belton, Bryan, Clute, Conroe, Galveston, Houston, Longview, Nacogdoches, Paris, Richmond, Texarkana, Tyler, Waco

  

**PAUL E. FURRH, JR.**
Attorney at Law
Chief Executive Officer

**ERNEST W. BROWN, JR.**
Attorney at Law
Deputy Director



**Lone Star Legal Aid**
**Central Intake Unit**

**CAROLYN TURLEY**
Attorney at Law
Directing Attorney

**Address:**
1415 Fannin Street
Houston, Texas 77002

713-652-0077 Telephone
800-733-8394 Toll-free

August 19, 2025

Sent Via Email: AmandaKondratyev@gmail.com
Amanda Leigh Kondrat'yev
Houston, TX 77058

**RE: Kondrat'yev / LEGAL AID APPLICATION NUMBER: 25-1146263 & 25-1146222**
**29 Other Employment**
**32 Divorce/Separation/Annulment**
Application for Legal Services Closing Letter

Dear Ms. Kondrat'yev:

Thank you for contacting Lone Star Legal Aid for help with your legal problem. It was a pleasure talking to you. We gave you legal advice regarding your 29 Other Employment and 32 Divorce/Separation/Annulment matters. We are not able to help everyone who applies because we do not have enough staff. The legal advice we gave you is all the help we can give you. **Your files are now closed.**

There are some other places you can go to get help. You can call the State Bar of Texas, Lawyer Referral Service at 1-800-252-9690. You can also go online to the Texas Law Help website at www.texaslawhelp.org for more legal help. If you do visit this website, you will find a form that will allow you to ask the court to waive court fees because you have a very low income. If you use this form, you should attach the **Documentation of Financial Eligibility for Legal Assistance** that we are sending with this letter. You can also look at the Local Resources we are sending with this letter.

Feel free to call us if you have any other legal problems.

Very Truly Yours,

*Rudy Szabados*

Rudy Szabados
Managing Attorney
Central Intake & Legal Assistance Unit

RS/hn
Enclosure(s):    *LSLA Notice of Rights*
*Documentation of Financial Eligibility for Legal Assistance*
*Local Resources*

*Serving the East Region of Texas since 1948*
Beaumont, Belton, Bryan, Clute, Conroe, Galveston, Houston, Longview, Nacogdoches, Paris, Richmond, Texarkana, Tyler, Waco







**PAUL E. FURRH, JR.**
Attorney at Law
Chief Executive Officer

**ERNEST W. BROWN, JR.**
Attorney at Law
Deputy Director

**CAROLYN TURLEY**
Attorney at Law
Directing Attorney

**Address:**
1415 Fannin Street
Houston, Texas 77002

713-652-0077 Telephone
800-733-8394 Toll-free

**Lone Star Legal Aid**
**Central Intake Unit**

August 19, 2025

Amanda Leigh Kondrat'yev
(No address listed - address confidentiality program)
Houston, TX 77058

**RE: DOCUMENTATION OF FINANCIAL ELIGIBILITY FOR LEGAL ASSISTANCE**

Dear  Kondrat'yev:

You are eligible for our legal services under our financial guidelines.

We regret that we will not be able to provide additional legal assistance to you because we do not have enough staff.

Very Truly Yours,

*Rudy Szabados*

Rudy Szabados
Managing Attorney
Central Intake & Legal Assistance Unit

*Serving the East Region of Texas since 1948*
Beaumont, Belton, Bryan, Clute, Conroe, Galveston, Houston, Longview, Nacogdoches, Paris, Richmond, Texarkana, Tyler, Waco






Amanda Kondrat'yev <hello@amandavanderwall.com>

---

## Kondrat'yev / LEGAL AID APPLICATION NUMBER: 25-1146263 & 25-1146222
1 message

---

**Hong Nguyen** <HNguyen@lonestarlegal.org>                    Tue, Aug 19, 2025 at 2:07 PM
To: "AmandaKondratyev@gmail.com" <AmandaKondratyev@gmail.com>

<br>

This account is not monitored. Any messages sent to this account will not be read or receive a response.

STATEMENT OF CONFIDENTIALITY – CIUCMP1
The contents of this e-mail and its attachments are intended solely for the addressee(s) hereof. In addition, this e-mail transmission may be confidential and it may be subject to privilege protecting communications between attorneys and their clients. If you are not the named addressee, or if this message has been addressed to you in error, you are directed not to read, disclose, reproduce, distribute, disseminate or otherwise use this transmission. Delivery of this message to any person other than the intended recipient(s) is not intended in any way to waive privilege or confidentiality. If you have received this transmission in error, please alert the sender by reply e-mail; we also request that you immediately delete this message and its attachments, if any.

---

📄 **Kondrat'yev, Amanda Scanned Emailed Closing Letter 08.19.25.pdf**
336K

 **Gmail**

**Amanda Kondrat'yev <hello@amandavanderwall.com>**

---

## Tully Rinckey Law Firm Information

1 message

---

**Lucas W. Wells** <lwells@tullylegal.com>                                              Tue, Sep 23, 2025 at 11:23 AM
To: "amandakondratyev@gmail.com" <amandakondratyev@gmail.com>

Good afternoon Amanda,

This is Lucas from the Tully Rinckey Law Firm. We spoke concerning your case.

Just so you have them in front of you, you can read the biographies of the attorneys I was looking to book you with below.

Paul Friener - Tully Rinckey PLLC

Michael C. Fallings | Attorney at Law | Tully Rinckey PLLC

Like we discussed on the phone, the cost for a consult with either of them would be 150.00 for up to a full hour of their time to analyze your case and discuss your legal rights, options, and best next steps.

If you have any follow-up questions or what to book an appointment, please let me know!

Thanks!

Lucas W. Wells
CLIENT RELATIONS ASSOCIATE
lwells@tullylegal.com



**Tully Rinckey PLLC**
1203 Troy-Schenectady Road Suite 101 | Latham, New York 12110
Phone | +1 (518) 640-3506 Direct | (518) 218-0496 Fax
www.tullylegal.com

Confidentiality / Privilege Notice: This transmission, including attachments, is intended solely for the use of the designated recipient(s). This transmission may contain information that is confidential and/or privileged or otherwise protected from disclosure. The use or disclosure of the information contained in this transmission for any purpose other than that intended by its transmittal is strictly prohibited. If you are not an intended recipient of this transmission, please immediately destroy all copies received and notify the sender.

 **Gmail**

Amanda Kondrat'yev <hello@amandavanderwall.com>

---

## Additional Information
3 messages

---

**Shellist Lazarz Slobin, LLP** <sls@eeoc.net>                    Mon, Sep 22, 2025 at 2:39 PM
To: amandakondratyev@gmail.com

Good afternoon Amanda,

Please forward a copy of your Original Charge and a copy of your Right To Sue letter.

Thank you,

**Shellist | Lazarz | Slobin LLP**
5373 W. Alabama, Suite 600 | Houston, TX 77056
Tel: 713.621.2277 | Fax: 713.621.0993
sls@eeoc.net | www.eeoc.net

**SLS SHELLIST | LAZARZ | SLOBIN**
EMPLOYMENT LAW TRIAL LAWYERS

This e-mail may contain confidential and privileged material for the sole use of the intended recipient(s).  Any review, use, distribution, or disclosure by others is strictly prohibited.  If you are not the intended recipient (or authorized to receive for the recipient), please contact the sender by reply e-mail and delete all copies of this message.

---

**Amanda Kondrat'yev** <amandakondratyev@gmail.com>                    Mon, Sep 22, 2025 at 4:21 PM
To: "Shellist Lazarz Slobin, LLP" <sls@eeoc.net>

Good afternoon,

The original charges and the right to sue letters are attached. Please let me know if you have any questions or need additional information.

Sincerely,
Amanda Kondrat'yev
[Quoted text hidden]

---

**4 attachments**

📄 **2025-07-11+161+Amanda+L.+Kondratyev+.pdf**
236K

📄 **2025-07-03+NRTS+460-2024-04943.pdf**
184K

📄 **5A EEOC LEIDOS.pdf**
1554K

📄 **5A EEOC All Points.pdf**
1523K

---

**Shellist Lazarz Slobin, LLP** <sls@eeoc.net>                    Mon, Sep 22, 2025 at 4:28 PM
To: Amanda Kondrat'yev <amandakondratyev@gmail.com>

Thank you, Amanda.  Your information has been forwarded to the attorneys.

**Shellist | Lazarz | Slobin LLP**
5373 W. Alabama, Suite 600 | Houston, TX 77056

 **Gmail**

Amanda Kondrat'yev <hello@amandavanderwall.com>

---

## Referred - with urgent EEOC right to sue deadlines
3 messages

---

**Amanda Kondrat'yev** <amandakondratyev@gmail.com>                    Mon, Sep 29, 2025 at 1:47 PM
To: amanda@ahfirm.com

    Preview attachment 5A EEOC All Points.pdf



    5A EEOC All Points.pdf
    1.5 MB
    Preview attachment 5A EEOC LEIDOS.pdf



    5A EEOC LEIDOS.pdf
    1.5 MB
    Preview attachment 2025-07-03+NRTS+460-2024-04943.pdf



    2025-07-03+NRTS+460-2024-04943.pdf
    184 KB
    Preview attachment 2025-07-11+161+Amanda+L.+Kondratyev+.pdf



    2025-07-11+161+Amanda+L.+Kondratyev+.pdf
    236 KB
Hello Ms. Hernandez,

I was referred to you from Shellist Lazarz Slobin in regards to my EEOC right to sue letters and deadlines for filing. My deadlines are 10/1 and 10/5. It is two cases due to a joint employer relationship with my former employer, the subcontracting company (All Points Logistics), and with the primary contractor (Leidos).

My charges were primarily in regards to wrongful termination and discrimination (sex and disability). I am attaching the charges, the ODEO findings, and the right to sue letters and can give you any additional information needed right away.

I was told by the EEOC investigators that NASA may also need to be involved based on what was said in the responses from the companies, despite me having a Counselor's Report from NASA ODEO saying that the head of NASA JSC Security said they were not involved.

I have Autism, ADHD, major depression, PTSD, and other disabilities and prefer written communications whenever possible. I understand that this may not be possible any longer with my deadline so if needed, my number is 346-366-0787. I hope that you are able to help me. I'm having such a hard time. Thank you so much.

Sincerely,

Amanda Kondrat'yev



Amanda Hernandez <amanda@ahfirm.com>                    Mon, Sep 29, 2025 at 1:50 PM
To: Amanda Kondrat'yev <amandakondratyev@gmail.com>

Hi Amanda,

I am sorry you are going through this. I am completely booked and cannot help at this time with those deadlines.  I would recommend speaking with another workers-side attorney. Perhaps someone that is a member of the Texas Employment Lawyers Association: www.mytela.org.

Wishing you the best of luck,

Amanda Hernandez
AH LAW, PLLC
5718 Westheimer, Suite 1000
Houston, Texas 77057
Office: 713.588.4359
Direct: 915.204.8928

**From:** Amanda Kondrat'yev <amandakondratyev@gmail.com>
**Date:** Monday, September 29, 2025 at 1:47 PM
**To:** Amanda Hernandez <amanda@ahfirm.com>
**Subject:** Referred - with urgent EEOC right to sue deadlines

Preview attachment 5A EEOC All Points.pdf



5A EEOC All Points.pdf
1.5 MB
Preview attachment 5A EEOC LEIDOS.pdf



5A EEOC LEIDOS.pdf
1.5 MB
Preview attachment 2025-07-03+NRTS+460-2024-04943.pdf



2025-07-03+NRTS+460-2024-04943.pdf
184 KB
Preview attachment 2025-07-11+161+Amanda+L.+Kondratyev+.pdf



2025-07-11+161+Amanda+L.+Kondratyev+.pdf
236 KB
[Quoted text hidden]

---

**Amanda Kondrat'yev** <amandakondratyev@gmail.com>                    Mon, Sep 29, 2025 at 1:51 PM
To: Amanda Hernandez <amanda@ahfirm.com>

I understand, thank you very much.

Amanda
[Quoted text hidden]

 Gmail

**Amanda Kondrat'yev <hello@amandavanderwall.com>**

---

## Referral to Attorney Amanda Hernandez
1 message

---

**Shellist Lazarz Slobin, LLP** <sls@eeoc.net>                              Thu, Sep 25, 2025 at 2:33 PM
To: Amanda Kondrat'yev <amandakondratyev@gmail.com>

Amanda,

I hope this message finds you well. After careful consideration, we regret to inform you that the law firm of Shellist Lazarz Slobin LLP will be unable to take on your case at this time. Please understand that this decision does not reflect the merits of your potential case, and we fully encourage you to continue exploring legal options with another firm that may be a better fit for your needs.

Should you wish to move forward, I strongly encourage you to contact another attorney promptly. You may use resources such as the National Employment Lawyers Association or the Texas Bar Association, or I highly recommend contacting the following attorney, who may be able to assist you further:

**Amanda Hernandez**
AH Law, PLLC
**5718 Westheimer, Suite 1000**
**Houston, TX 77057**

**(713) 588-4359**

Be sure to confirm their rates and ask questions, especially about their experience with cases like yours. This will help you make the most informed decision possible. While we cannot guarantee the work of any other lawyer, I recommend that you feel comfortable with whomever you choose.

Please also keep in mind that time is of the essence. There may be statutes of limitations and important deadlines that apply to your case. We have not assessed the timeline for your specific situation, so it is important that you take action as soon as possible. I encourage you to contact the Equal Employment Opportunity Commission (E.E.O.C.) at (713) 651-4900 and speak with other attorneys to ensure your rights are protected.

We wish you the best in finding the right representation and pursuing your case, and we are genuinely sorry that we cannot assist you further at this time.

**Shellist | Lazarz | Slobin LLP**
5373 W. Alabama, Suite 600 | Houston, TX 77056
Tel: 713.621.2277 | Fax: 713.621.0993
sls@eeoc.net | www.eeoc.net

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

AMANDA L. KONDRAT'YEV,
Plaintiff,
v.
NASA JOHNSON SPACE CENTER,
LEIDOS HOLDINGS INC., and
ALL POINTS LOGISTICS LLC,
Defendants.

Civil Action No. 4:25-cv-04785

EXHIBIT D

Intersectional Framework Analysis (Exhibit D-1) +
Twice-Exceptional Framework (Exhibit D-2)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

AMANDA L. KONDRAT'YEV,
Plaintiff,
v.
NASA JOHNSON SPACE CENTER,
LEIDOS HOLDINGS INC., and
ALL POINTS LOGISTICS LLC,
Defendants.

Civil Action No. 4:25-cv-04785

## INTERSECTIONAL FRAMEWORK ANALYSIS

### Model Minority Myth, Gender Masking, and Disability Stereotyping

I. LEGAL FOUNDATION: INTERSECTIONAL DISCRIMINATION AS DISTINCT

PROTECTED SUBGROUP

In *Jefferies v. Harris County Community Action Ass'n*, 615 F.2d 1025 (5th Cir. 1980), the

Fifth Circuit held that "recognition of black females as a distinct protected subgroup for

purposes of the prima facie case... is the only way to identify and remedy discrimination

against black females." An employer could otherwise claim it didn't discriminate against

Black people (by pointing to Black male employees) or against women (by pointing to

white female employees).

Plaintiff is an Asian American woman with disabilities—a distinct protected subgroup

experiencing barriers that neither Asian men, white women, nor white disabled litigants

encounter. Under *Jefferies*, courts must analyze access barriers through an intersectional

lens recognizing the compounding effects of race, gender, and disability.

II. THE MODEL MINORITY MYTH: DIAGNOSTIC AND LEGAL BARRIERS

A. ADHD/Autism Diagnostic Disparities for Asian Americans

Asian Americans have the lowest ADHD diagnosis rates (1-6.1%) of any racial/ethnic group—not because of lower prevalence, but because the model minority myth causes clinicians and educators to overlook symptoms when grades are adequate.

Research Documentation:

- White male doctors dismissed Asian women's ADHD with "you did fine in school"

- Asian women reported they were believed only by Asian female clinicians who understood cultural nuances

- Healthcare providers systematically minimize disability in high-achieving Asian American students and adults

- Model minority stereotype creates presumption that Asian Americans don't need help or accommodations

Academic Support — Autistic Camouflaging (Turnock et al., 2022):

Turnock et al., *Autistic Adults' Perspectives on Camouflaging: Definitions, Motivations, and Consequences*, J. Autism & Dev. Disorders (2022), provides peer-reviewed support for the masking/camouflaging dynamic central to this analysis:

- Invisible burden: Camouflaging produces neurotypical-appearing behavior and work product while concealing the psychological cost from observers—directly paralleling the model minority dynamic in which Asian Americans' outward competence masks underlying disability burden.

- Disproportionate burden on women: Autistic women camouflage at higher rates

than autistic men due to social expectations of compliance and sociability—the same gendered norms that shaped expectations of Plaintiff at the worksite.

- Stigma as driver: Camouflaging is motivated by fear of stigma and the anticipation that autistic communication traits (directness, literal language, precision) will be perceived as aggression or social violation—explaining why Plaintiff's disability-related self-advocacy was labeled "combative" by management.

- Psychological harm: Sustained camouflaging causes burnout, anxiety, depression, and cognitive depletion—directly supporting Plaintiff's documented inability to sustain pro se litigation at the level her written filings would suggest.

B. Extension to Legal System: Courts Replicate Healthcare Bias

Just as healthcare providers dismiss Asian women's disabilities based on academic achievement, courts may dismiss Plaintiff's disability based on pro se filing quality—replicating documented systemic bias.

The National Women's Law Center's amicus brief in *Cheung v. Maryland* (2024) explains that Asian American women with disabilities experience "distinct harms that cannot be understood by viewing each aspect of their identity in isolation."

Contradictory Expectations Imposed on Asian American Women:

- Must be submissive "lotus blossoms" OR fierce "dragon ladies"

- WHILE being model minority high achievers who don't make waves

- WHILE not requesting accommodations (because model minorities don't need help)

- "For disabled Asian Americans like Dr. Cheung, the myth can also cause

employers to downplay their disability-related needs and judge their work more harshly when they fail to 'live up' to inflated expectations."

C. Disability Stereotyping Intersects with Race and Gender

Autistic people are frequently stereotyped as:

- "Argumentative"
- "Pedantic"
- "Always needing to be right"
- "Combative"

When they engage in literal communication, seek precision in language, or request clarification.

For Asian American women, this disability stereotype intersects with racial and gender stereotypes:

- Asian women expected to be "submissive," "quiet," "obedient"
- When Plaintiff—an Asian American woman with autism—requested written instructions, asked clarifying questions, or reported discrimination, she violated BOTH sets of expectations simultaneously

Management's characterization of her as "combative" and "difficult" reflects:

1. Disability-based stereotyping of autistic communication traits
2. COMBINED WITH expectations that Asian women shouldn't assert themselves

Dr. Whaling's March 2025 autism evaluation documents this exact pattern:

"She reported frequent misinterpretations in conversation as she can often focus on precise wording which others tend to find 'pedantic.' She reported, 'Words mean things.

Why else would they be there?'"

The behaviors management labeled as "combative" and "difficult" were autism-related

communication traits:

- Focus on precise wording

- Literal interpretation

- Need for explicit instructions

Not personality problems or insubordination. This is textbook disability-based

stereotyping at the intersection of race, gender, and disability.

III. GENDER AMPLIFIES MASKING BURDEN

A. The "Perfect Storm" for Women with ADHD/Autism

Research shows women with ADHD face a "perfect storm for masking, exhaustion, and

burnout" because they navigate both disability and gender expectations.

Autistic females mask more than males due to societal norms expecting women to be

compliant and sociable, resulting in:

- Greater risk of self-harming behaviors

- Increased burnout

- Delayed diagnosis (often not diagnosed until adulthood)

B. "Three Times Harder" Compensation Strategy

Women work "three times harder than neurotypical colleagues to produce same

results"—but nobody sees the struggle behind the achievement. *See* Turnock et al. (2022)

(documenting the psychological depletion and burnout associated with sustained autistic

camouflaging, disproportionately affecting female-presenting autistic individuals).

Giftedness masks ADHD/autism by:

- Enabling rapid learning of compensatory strategies

- Producing academic success that camouflages underlying challenges

Creating the following invisible burdens:

1. "Chameleon Effect"

- Constantly reading micro-expressions

- Adjusting tone mid-sentence

- Shapeshifting to fit situations

- Exhausting invisible labor

2. Imposter Syndrome

- Constantly adapting to neurotypical norms

- Creates belief that authentic self is unacceptable

- Persistent fear of being "found out" as inadequate

3. Health Consequences

- Physical/mental exhaustion

- Increased mental health difficulties

- Autistic burnout

- Suicidal behaviors

C. Application to Plaintiff's Case

Plaintiff's compensation strategies include:

- Working through nights to complete written filings

- Hyperfocus binges lasting 12-17 hours

- Skipped meals during intensive research

- Delayed medical care to meet deadlines

- Teaching herself complex areas of law under extreme stress

The December 29, 2025 crisis exemplifies this pattern:

- 21 hours over 36 hours during the Christmas-New Year's holiday period

- Managing trauma anniversary triggers (2-year anniversary of workplace assault)

- Simultaneous handling of four separate crises:

  1. Leidos corporate entity research — Leidos counsel's email at 11:36 PM during the Christmas-New Year's holiday period requiring research into Texas alter ego doctrine, Fifth Circuit single employer doctrine, FRCP 15(c) relation back, and strategic response options

  2. All Points default research — All Points missed its December 29 answer deadline; had to learn FRCP 55 procedures from scratch and draft Motion for Entry of Default

  3. EEOC FOIA document review — Received 1,721 pages total from two separate FOIA responses (931 pages, Leidos Charge; 790 pages, All Points Charge) requiring urgent review for Amended Complaint due December 30

  4. USMS/Clerk Catch-22 — Simultaneously calling USMS, emailing USMS Case Manager Shannon, emailing Deputy Clerk Kim, and researching the procedural Catch-22 preventing entry of default

This level of compensation is not sustainable through 12-18 months of federal litigation.

## IV. APPOINTMENT OF COUNSEL AS INTERSECTIONAL ACCOMMODATION

A. Compounded Barriers Require Comprehensive Accommodation

The burden of advocating for invisible disabilities—already substantial—is magnified for Asian American women facing:

1. Healthcare/legal systems that dismiss their disabilities based on achievement

    o "You did fine in school" dismissal

    o Quality work product interpreted as proof of no disability

    o Model minority myth creating presumption against accommodation needs

2. Model minority expectations that discourage help-seeking

    o Cultural pressure to avoid "making waves"

    o Shame associated with needing accommodations

    o Family/community expectations of self-sufficiency

3. Gender expectations amplifying masking burdens

    o Expected to be compliant and sociable

    o Penalized for assertiveness ("combative," "difficult")

    o Invisible labor of constant social adaptation

4. Predominantly white workplaces and legal systems

    o Replicating documented discrimination patterns

    o Lack of cultural understanding

    o Intersectional barriers not recognized

B. Meaningful Access Under ADA Title II

Under ADA Title II and *Tennessee v. Lane*, 541 U.S. 509 (2004), courts must provide

"meaningful access" to judicial proceedings for individuals with disabilities.

When disability barriers are compounded by systemic obstacles at the intersection of race, gender, and disability, appointment of counsel becomes the reasonable accommodation enabling access to justice.

This is not special treatment—it is leveling the playing field to ensure that meritorious claims are not lost to the compounding barriers of:

- Disability (ADHD, ASD, PTSD)

- Systemic bias (model minority myth)

- Gender expectations (masking burden)

- Sophisticated defendants' procedural tactics

C. Why Individual Accommodations Are Insufficient

While Plaintiff requests specific accommodations (written agendas, advance notice, breaks, etc.), these accommodations cannot fully address the compounding barriers she faces:

Accommodation without counsel still requires Plaintiff to:

- Navigate three sophisticated defense teams alone

- Manage real-time adversarial interactions triggering PTSD

- Overcome auditory processing deficits in verbal proceedings

- Break through model minority bias when advocating for disability needs

- Counter stereotype that quality work product = no disability

- Sustain "three times harder" compensation through 12-18 months

Appointed counsel removes these compounding barriers by:

- Managing adversarial interactions (no PTSD triggers)

- Communicating with court using professional norms (no model minority bias)

- Operating at neurotypical processing speed (no 5-8x inefficiency ratio)

- Eliminating need for unsustainable compensation strategies

- Ensuring case is decided on merits, not lost to procedural attrition


## V. CONCLUSION

Plaintiff's intersectional identity as an Asian American woman with disabilities creates unique and compounding barriers that cannot be understood by viewing each aspect of her identity in isolation.

The model minority myth dismissed her disabilities during diagnosis, now threatens to dismiss her accommodation needs based on quality written work. Gender expectations amplified her masking burden at work, now amplify the unsustainable compensation required for pro se litigation. Disability stereotypes labeled her "combative" at work, now risk labeling her accommodation requests as "making excuses."

Appointment of counsel is the only accommodation capable of leveling the playing field when disability barriers are compounded by systemic bias and sophisticated defendants' procedural tactics. Without counsel, meritorious claims are lost not on the merits, but to the exhaustion strategy enabled by intersectional barriers.

Under *Jefferies*, this Court must recognize Asian American women with disabilities as a distinct protected subgroup and provide accommodations adequate to their compounding barriers. Appointment of counsel is that accommodation.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

AMANDA L. KONDRAT'YEV,
Plaintiff,
v.
NASA JOHNSON SPACE CENTER,
LEIDOS HOLDINGS INC., and
ALL POINTS LOGISTICS LLC,
Defendants.

Civil Action No. 4:25-cv-04785

**TWICE-EXCEPTIONAL FRAMEWORK ANALYSIS**

**Twice-Exceptional Paradox: Unsustainability Documentation and Court Access
Analysis**

I. THE TWICE-EXCEPTIONAL PARADOX

A. Definition: "Twice-Exceptional" (2e)

Twice-exceptional individuals have BOTH:

1.  Significant cognitive strengths (high intelligence, strong writing ability, capacity
    for deep research)

2.  Significant disabilities (ADHD, ASD, PTSD, executive dysfunction)

B. The Harmful Dynamic

This combination creates a particularly harmful pattern:

Plaintiff can produce high-quality work product, but only by sacrificing her health

through unsustainable compensation strategies.

What observers see: Polished written filings, sophisticated legal arguments, organized

evidence

What observers don't see: Sleepless nights, 12-17 hour hyperfocus binges, skipped meals, delayed medical care, physical exhaustion, worsening psychiatric symptoms

II. THE *TUDOR* STANDARD: "UNDER GREAT DURESS AND HARM"

A. *Tudor v. Whitehall Central School District*, No. 23-665 (2d Cir. Mar. 25, 2025)

Holding: The ADA protects employees who can technically perform essential job functions but do so "under great duress and harm."

The Court Rejected: The district's argument that accommodation was unnecessary because the plaintiff could perform her duties without it.

The Court Reasoned: Accommodations serve to reduce burden even when performance is technically possible.

B. Direct Application to Plaintiff's Situation

Technical Capability: Plaintiff CAN research complex legal doctrines and write coherent briefs when given unlimited time and no adversarial pressure.

The Duress and Harm: Plaintiff can only do this by:

- Working through nights (sleepless 12-17 hour sessions)

- Entering hyperfocus binges that exclude basic self-care

- Skipping meals during intensive research

- Delaying necessary medical care to meet deadlines

- Teaching herself complex areas of law under extreme stress

- Sacrificing mental health to produce quality output

Under *Tudor*: The fact that Plaintiff CAN produce quality filings does NOT negate her disability—it evidences the unsustainable compensatory strategies that characterize twice-exceptional presentation.

## III. THE COGNITIVE INEFFICIENCY RATIO: 5-8X LONGER PROCESSING TIME

A. Medically Documented Processing Speed Deficits

Plaintiff's ADHD and ASD create a documented cognitive inefficiency ratio:

What a represented plaintiff's counsel completes in 2 hours of billable time:

- Research a legal doctrine
- Identify relevant cases
- Draft motion section
- Move to next task

What Plaintiff requires for the same task: 10-16 hours

Spanning multiple days, including:

- Anxiety-driven research loops
- Endless questions about legal possibilities
- Compulsive re-reading when retention is impaired
- Working memory failures requiring repeated research
- Executive function barriers to task initiation
- Hyperfocus that won't disengage until exhaustion forces shutdown

B. This Inefficiency Is NOT Laziness—It Is Medically Documented Disability

Affecting:

- Processing speed

- Working memory

- Executive function

- Task switching

- Information retention

- Decision-making under pressure

The 5-8x ratio means: For every 2-hour task a neurotypical attorney completes, Plaintiff requires 10-16 hours—consuming her entire capacity for that day, leaving no time for parenting, job search, self-care, or other litigation tasks.

IV. CASE STUDY: DECEMBER 29, 2025 CRISIS

A. The Crisis: Four Simultaneous Demands

On December 29, 2025 at 11:36 PM (the Christmas-New Year's holiday period, two-year anniversary of workplace assault), Leidos counsel emailed stating Leidos Holdings was the "wrong entity" and demanding same-day telephonic conferral.

The same-day conferral demand was structurally unreasonable:

- Sent at 11:36 PM during holiday weekend

- Impossibly tight deadline challenging even experienced counsel

- Threatened both motion to dismiss AND motion for more definite statement

When combined with Plaintiff's disabilities, structural unreasonableness became catastrophic:

B. Plaintiff's Response: 21 Hours Over 36 Hours (Documented in AI Chat History Database)

Crisis #1: Leidos Corporate Entity Research

- Research Texas alter ego doctrine (multi-factor test)

- Research Fifth Circuit single employer doctrine (four-factor test)

- Research Fed. R. Civ. P. 15(c) relation back requirements

- Determine strategic response (amend? argue alter ego? oppose MTD? all four?)

- Respond to same-day conferral demand with impossibly tight deadline

Crisis #2: All Points Default Research

- All Points missed December 29 answer deadline

- Had to learn FRCP 55 default procedures from scratch

- Research difference between entry of default vs. default judgment

- Draft Motion for Entry of Default

Crisis #3: EEOC FOIA Document Review

- Received 1,721 pages total from two separate FOIA responses on December 29:

  o FOIA #1 (Leidos Charge): 931 pages

  o FOIA #2 (All Points Charge): 790 pages

- Witness statements, position statements, investigation materials

- Required urgent review for Amended Complaint due December 30

Crisis #4: USMS/Clerk Catch-22

- USMS and Clerk's office created a procedural loop requiring simultaneous action from both offices

- Required research and navigation of competing bureaucratic requirements under maximum time pressure

- Added to cognitive load of an already catastrophic multi-crisis day

C. Disability-Specific Impacts

ADHD Response (Anxiety-Driven Hyperfocus Operating at 5-8x Cognitive Inefficiency):

- What counsel could handle in 2 hours of strategic response took Plaintiff 21 hours of exhaustive research (documented in AI Chat History database)

- Decision paralysis (which legal issue to research first?)

- Hyperfocus on one doctrine (alter ego) while losing track of other urgent tasks

- Working memory overload preventing synthesis of research into coherent strategy

- Anxiety-driven research loops (reading same cases repeatedly without retention)

- Physical exhaustion and emotional dysregulation from sustained stress

Trauma Response:

- December 29 is two-year anniversary of workplace assault

- Triggering severe PTSD symptoms that impair cognitive function

Executive Function Impact:

- Tight timeline prevented processing breaks Plaintiff's disabilities require

- Forced real-time decision-making under maximum stress

- Inability to prioritize competing demands

Cumulative Effect:

- Impossible deadline + disability response + trauma trigger + holiday isolation = medical shutdown risk

D. Contrast: What Appointed Counsel Would Have Done

A represented plaintiff would have had counsel respond to Quezada within 2 hours with a strategic email:

- Outlining single employer doctrine

- Requesting reasonable conferral accommodation

- Buying time to research while protecting client's rights

Instead, Plaintiff spent the Christmas-New Year's holiday period managing four simultaneous crises—each requiring hours of research, analysis, and drafting under impossibly tight deadlines—while managing trauma anniversary triggers.

This crisis illustrates the fundamental gap: Plaintiff's disabilities do not prevent her from producing quality written work product when given unlimited time and no adversarial pressure. They prevent her from managing simultaneous multi-track litigation demands under time pressure with sophisticated adversaries—which is what federal litigation requires from day one.

## V. INTELLECT DOES NOT EQUAL EXECUTION

A. What Plaintiff CAN Do

When given unlimited time and no adversarial pressure:

- Research complex legal doctrines

- Write coherent briefs

- Understand sophisticated legal arguments

- Organize evidence systematically

- Draft persuasive motions

B. What Plaintiff CANNOT Do

What federal litigation REQUIRES:

- Manage three simultaneous defense teams employing coordinated procedural tactics while operating at 5-8x cognitive inefficiency ratio

- Respond to real-time conferral demands from opposing counsel representing her traumatizers (Plaintiff's brain will medically shut down and dissociate)

- Process verbal depositions while managing PTSD triggers and auditory processing deficits

- Coordinate discovery across three defendants while parenting alone and job searching (executive function will collapse under cognitive load)

- Sustain compensatory effort through 12-18 months of litigation without medical collapse

C. The Velocity Gap

Represented defendants have counsel to:

- Absorb workload at neurotypical processing speed

- Manage multiple tracks simultaneously

- Respond to tight deadlines without health sacrifice

- Deploy institutional knowledge from prior cases

Plaintiff has a brain that:

- Processes at 5-8x slower rate

- Cannot reliably track multiple procedural threads

- Cannot process verbal information in real time

- Cannot tolerate adversarial interactions without trauma-induced shutdown

- Can only produce quality work by sacrificing health

The gap between what this Motion demonstrates Plaintiff CAN produce (with unlimited time and unsustainable health sacrifice) and what litigation REQUIRES (sustained real-time performance across multiple fronts) is the reason appointment is essential.

## VI. DEFENDANTS COUNT ON THIS GAP

### A. Procedural Complexity as Litigation Strategy

Defendants employ procedural complexity strategically:

- Corporate entity shell games timed for Christmas holidays
- Same-day conferral demands despite documented PTSD
- Indefinite delays on authorized motions creating perpetual uncertainty
- 30-day late Answer without explanation, exploiting bureaucratic delays

These tactics work precisely because they exploit:

- The velocity gap between institutional defendants' litigation machinery and disabled pro se plaintiff's impaired executive function
- The compensation unsustainability—tactics that force exhausting health sacrifice
- The cognitive inefficiency ratio—demands requiring immediate response when Plaintiff needs 5-8x longer to process

### B. The Exhaustion Strategy

Without counsel, Plaintiff must choose:

Option A: Continue sacrificing health to produce adequate filings → inevitable medical collapse before trial

Option B: Protect health by reducing litigation effort → procedural defaults and case dismissal

Defendants win either way:

- Medical collapse → Plaintiff cannot effectively litigate

- Procedural defaults → Case dismissed before reaching merits

With counsel: Case is decided on merits (strong retaliation evidence, smoking gun admissions, comparator treatment, joint-employer coordination)

## VII. GIFTEDNESS MASKING DISABILITY: THE 2e RESEARCH

A. Expected Pattern for Twice-Exceptional Individuals

Research confirms this is the EXPECTED pattern for twice-exceptional individuals:

Giftedness masks ADHD/autism by:

- Enabling rapid learning of compensatory strategies

- Producing academic/professional success that camouflages underlying challenges

- Creating quality output through exhausting invisible labor

Creating:

- "Chameleon effect": Constantly reading micro-expressions, adjusting tone mid-sentence, shapeshifting to fit situations

- Imposter syndrome: Constantly adapting to neurotypical norms creates belief that authentic self is unacceptable

- Health consequences: Physical/mental exhaustion, increased mental health difficulties, autistic burnout, suicidal behaviors

B. Women Work "Three Times Harder"

Research on women with ADHD/autism:

Women work "three times harder than neurotypical colleagues to produce same results"—but nobody sees the struggle behind the achievement.

Application to Plaintiff:

- Each written filing represents a health cost

- Exhaustion, anxiety attacks, delayed self-care

- Worsening psychiatric symptoms

- Teaching herself an involuntary, trauma-triggering law school

- While simultaneously parenting alone, job searching, managing financial crisis

This compensation is NOT sustainable through discovery, depositions, summary judgment, and trial.

## VIII. THE COURT'S ASSESSMENT vs. PRACTICAL REALITY

### A. "Can Present Her Case" Is Technically Accurate

The Court's November 13 assessment based on written EEOC filings: Plaintiff "can present her case" based on quality of written documents.

This assessment is technically accurate: Yes, Plaintiff CAN write a motion by working through the night.

### B. But Practically Unsustainable

The assessment is practically unsustainable: No, Plaintiff CANNOT maintain that pace through months to years of litigation while:

- Parenting as a single parent

- Actively job searching

- Preserving her mental health

- Managing financial crisis

- Responding to three sophisticated defense teams

The 2e dynamic means: Plaintiff's capabilities mask the unsustainable cost of exercising those capabilities without support.

## IX. APPOINTED COUNSEL ELIMINATES HEALTH SACRIFICE

A. Without Counsel: Impossible Choice

Plaintiff must choose between:

1. Destroying her health to access the courts

2. Protecting her health and losing her case

This is not meaningful access under the ADA.

B. With Counsel: Health and Justice

Appointed counsel eliminates the need for Plaintiff to sacrifice her health:

- Counsel operates at neurotypical processing speed (no 5-8x inefficiency)

- Counsel manages adversarial interactions (no PTSD triggers)

- Counsel handles simultaneous tracks (no executive function collapse)

- Counsel responds to tight deadlines (no unsustainable health sacrifice)

- Plaintiff can focus on: parenting, job search, medical treatment, witness testimony

Case is decided on merits, not lost to procedural attrition enabled by disability barriers.

## X. THE TWICE-EXCEPTIONAL PARADOX AS A COURT ACCESS PROBLEM

The twice-exceptional dynamic is not merely a workplace accommodation issue. It is a court access issue.

*Tennessee v. Lane*, 541 U.S. 509 (2004), establishes the principle that meaningful access to judicial proceedings is a constitutional and statutory guarantee. The 2e paradox directly implicates that principle: when a disabled litigant can only produce quality filings by destroying her health—when "access" is available only at the cost of medical collapse—what exists is access in name only.

The Court sees: Polished motions, organized evidence, sophisticated arguments.

The Court does not see: The 21-hour crisis, the sleepless nights, the skipped meals, the worsening psychiatric symptoms, the invisible tax that each filing extracts.

Quality output produced under *Tudor*-level duress and harm is not evidence of meaningful access. It is evidence of how far a twice-exceptional litigant will go to approximate the access that represented parties receive automatically.

Appointed counsel is the accommodation that converts nominal access into meaningful access. With counsel, Plaintiff participates in this litigation on terms that do not require sacrificing her health for every filing. Without counsel, the Court is presented with a fiction: a pro se litigant who "can present her case" only by methods no person should have to sustain.

## XI. CONCLUSION: TWICE-EXCEPTIONAL PRESENTATION COMPELS APPOINTMENT

Under *Tudor v. Whitehall*:

- Technical capability does NOT negate disability

- ADA protects those who perform "under great duress and harm"

- Accommodations serve to reduce burden even when performance is possible

Plaintiff's high-quality written filings do NOT prove lack of disability.

They prove:

1. Cognitive inefficiency ratio: 5-8x longer processing time than neurotypical attorneys

2. Unsustainable compensation: Sleepless nights, hyperfocus binges, health sacrifice

3. December 29 crisis: 21 hours over 36 hours managing a quadruple crisis—concrete example of unsustainability

4. The velocity gap: Quality output WITH unlimited time ≠ sustained real-time performance

5. Defendants' strategy: Procedural complexity exploiting cognitive inefficiency

6. Court access denied in fact: The 2e paradox means "access" comes only at a health cost that no meaningful access standard can tolerate

The Court's assessment that Plaintiff "can present her case" is technically accurate but practically unsustainable. The 2e paradox means Plaintiff's capabilities mask the unsustainable cost of exercising those capabilities without support.

Appointed counsel is the only accommodation capable of bridging the gap between Plaintiff's intellectual output (which the Court sees) and her executive functioning (which the Court does not).

Without counsel, meritorious claims are lost not on the merits, but to medical collapse before trial.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

AMANDA L. KONDRAT'YEV,
Plaintiff,
v.                                                    Civil Action No. 4:25-cv-04785
NASA JOHNSON SPACE CENTER,
LEIDOS HOLDINGS INC., and
ALL POINTS LOGISTICS LLC,
Defendants.

EXHIBIT E

26-Minute Retaliation Timeline +
Supporting Records (Sept. 18–19, 2023)







**ALL POINTS PROPRIETARY AND CONFIDENTIALITY NOTICE:** This message and associated attachments are intended for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential, and exempt from disclosure, under applicable law. Any viewing, copying or distribution of, or reliance on, this message by unintended recipients is strictly prohibited.  If you have received this message in error, you are prohibited from reviewing, copying, distributing or using the information in any medium. Please contact the sender immediately by return email and delete the original message and attachments. In addition, the information contained herein is or may be controlled by the International Traffic in Arms Regulations (ITAR), 22 CFR 120 - 130 and may not be exported or disclosed to a foreign person, whether in the United States or abroad, without prior All Points written approval.

**From:** Kondrat'yev, Amanda L. (JSC-CD211)[Leidos, Inc.] <amanda.l.kondratyev@nasa.gov>
**Sent:** Monday, September 18, 2023 5:20 PM
**To:** Ed Scarborough <escarborough@allpointsllc.com>; Robyn Smith <rsmith@allpointsllc.com>
**Subject:** Targeting by management

Hello,

I believe I am being targeted by management for an unknown reason. At first it was just a Queue Manager that seemed upset with me after an email discussion back in April, then Brent after the incident I reported of him yelling at me, and now Christy is claiming that I didn't ask for permission for things that I did. It is getting worse daily and I went home Friday crying. I just wanted to let you all know because I am worried about losing my job despite my perfect attendance and exceptional work. I really wish I knew what the problem they have with me is, they all pretend to be friendly to my face. Other technicians have noticed and warned me to be careful but I honestly do not know how I could be doing any better. I've included the 30 day dashboard that shows how far ahead of everyone I am (I am the light blue bars on the top of each chart), and the kudos list should be coming out next month for the missing months (someone left the position and has not yet been replaced). Thank you.



Sincerely,

**Amanda Kondrat'yev**
PC Support Technician
NEST / NASA IT
Mobile: (281) 309.6764 | (281) 244.5300
Amanda.L.Kondratyev@nasa.gov



Get Outlook for iOS

---

**From:** Robyn Smith <rsmith@allpointsllc.com>
**Sent:** Monday, September 18, 2023 5:46:16 PM
**To:** Kondrat'yev, Amanda L. (JSC-CD211)[Leidos, Inc.]
<amanda.l.kondratyev@nasa.gov>; Ed Scarborough
<escarborough@allpointsllc.com>
**Subject:** [EXTERNAL] RE: Targeting by management

> **CAUTION:** This email originated from outside of NASA.  Please take care
> when clicking links or opening attachments.  Use the "Report Message"
> button to report suspicious messages to the NASA SOC.

Amanda:

There have been several issues that have been brought to my attention.
While your work and attendance may be exceptional, there is an issue
with your ability to accept direction and decisions.  It has been reported
that you have been combative with management, don't like being told
what to do and that you demand answers when decisions are made that
you don't agree with.  Those types of issues will lead you to feel that
your relationship with management is not going in the right direction.
 The Leidos management team is in charge of the area in which you
work.  You must adhere to and accept all direction and guidance they
give you without exception and with professionalism.  Leidos is our
customer, and we only work at their direction.

Other technicians are your peers, they are not your managers.  Brent
and Christy are your managers and there may be others that I am not
aware of.  You must follow their direction, you must accept all decisions
and you must understand that your job is in jeopardy if you don't.

In your previous email today, you have also stated that you have worked
off the clock.  This is a violation of timekeeping policies and will result in
termination if it continues.  You are an hourly employee and must record
all hours worked and must obtain approval for any overtime hours.
Overtime hours should never be worked if not approved and recorded.

This is to be considered a written and final warning.

*Robyn Smith, SHRM-SCP, CBP*
*Chief Administrative Officer*
*All Points Logistics, LLC*
*190 S. Sykes Creek Parkway, Suite 4*
*Merritt Island, FL  32952*
*321.735.8642 Office*
*321.208.7982 Fax*
*770.235.0163 Mobile*
rsmith@allpointsllc.com
www.allpointsllc.com

From: Kondrat'yev, Amanda L. (JSC-CD211)[Leidos, Inc.]
amanda.l.kondratyev@nasa.gov
Subject: Fwd: [EXTERNAL] RE: Targeting by management
Date: Sep 18, 2023 at 6:33:00 PM
To: amandakondratyev@gmail.com

---

Get Outlook for iOS

---

**From:** Kondrat'yev, Amanda L. (JSC-CD211)[Leidos, Inc.]
<amanda.l.kondratyev@nasa.gov>
**Sent:** Monday, September 18, 2023 6:17:54 PM
**To:** Robyn Smith <rsmith@allpointsllc.com>; Ed Scarborough
<escarborough@allpointsllc.com>
**Subject:** Re: [EXTERNAL] RE: Targeting by management

Thank you, I understand and won't work off the clock
anymore. I felt pressured to do so to meet the demands
last week, but I will stop.

I have a disability/disorder that can make me feel a
strong need to ask questions and for things to make
sense. I do not ever raise my voice or ask rudely or
during inappropriate times, but I do ask questions for
clarity. Is this covered by the ADA? I can provide
documentation if needed.
I am concerned that they may be confusing my
inquisitiveness and requests for clarity with
combativeness. Every day, sometimes several times a
day, there are different instructions. If you ask you get a
different answer from each QM or manager, but if you
don't ask you risk not doing things properly. I am a
perfectionist and never want to be doing things wrong.
Brent and Christy always say to come to them with
questions or concerns, as well as asking the techs to
give suggestions/"there's got to be a better way" in the
end of every weekly meeting where they are explicitly
requesting feedback and suggestions for improvement.
I am not sure why they would ask if they don't actually
want to be offered areas or ideas to improve. I
understand that my feedback seems to be negatively
affecting my job so I can stop participating in this
feedback process anymore if you think that would help
my situation.
Thank you again.

Sincerely,

Amanda Kondrat'yev

**From:** Robyn Smith <rsmith@allpointsllc.com>
**Sent:** Tuesday, September 19, 2023 4:25 PM 0.04785     Document 33-1     Filed 02/26/26 in TXSD     Page 99 of 159
**To:** Kondratyev, Amanda L. (JSC-CD211)[Leidos, Inc.] <amanda.l.kondratyev@nasa.gov>; Ed Scarborough <escarborough@allpointsllc.com>
**Subject:** RE: [EXTERNAL] RE: Targeting by management

CAUTION: This email originated from outside of NASA. Please take care when clicking links or opening attachments. Use the "Report Message" button to report suspicious messages to the NASA SOC.

Amanda:

The Americans with Disabilities Act says employees can qualify as disabled if their physical or mental impairments limit one or more "major life activities". In addition, employers are asked to make reasonable accommodations for employees with disabilities that limit one or more "major life activities". Asking questions is not an issue. Refusing to accept or difficulty in accepting answers seems to be the issue as well as a general consensus that you don't like being told what to do. This is not covered by the ADA and as the employer doesn't require any type of reasonable accommodation.

We expect you to accept the guidance and direction given to you from your Leidos managers at all times. In addition, you may feel that you are not being combative, but that viewpoint is not shared by others.

On June 2, 2023 you provided a note from Dr. Mokkala stating you were under a weight lifting restriction of 20 lbs. for 6 to 8 weeks. A follow on note has not been provided so that weight restriction has been lifted. If you are still under a doctor's care, you will need to provide another note.

Let me know if you have any other questions.

*Robyn Smith, SHRM-SCP, CBP*

*Chief Administrative Officer*

*All Points Logistics, LLC*

*190 S. Sykes Creek Parkway, Suite 4*

*Merritt Island, FL  32952*

*321.735.8642 Office*

*321.208.7982 Fax*

*770.235.0163 Mobile*

*rsmith@allpointsllc.com*

*www.allpointsllc.com*

From: Kondrat'yev, Amanda L. (JSC-IC111)[Leidos, Inc.]
     amanda.l.kondratyev@nasa.gov
Subject: Fwd: Documenting Audit Feedback
Date: Jan 4, 2024 at 12:25:23 PM
To: amandakondratyev@gmail.com

Sincerely,

**Amanda Kondrat'yev**
PC Support Technician
NEST / NASA IT
Mobile: (281) 309.6764 | (281) 244.5300
Amanda.L.Kondratyev@nasa.gov

---

**From:** Kondrat'yev, Amanda L. (JSC-IC111)[Leidos, Inc.]
**Sent:** Wednesday, December 27, 2023 4:54:06 PM
**To:** Wong, Brent C. (JSC-IC111)[Leidos, Inc.] <brent.c.wong@nasa.gov>
**Subject:** Documenting Audit Feedback

Hi Brent,

Thank you for your praise and feedback yesterday regarding the ticket audit for last week. I appreciate you noticing that I did a good job and for the little green astronaut!

**\*\*Out of ~60 tickets evaluated for compliance to the newly implemented standards, only 6 technicians received a PASS. There were 9 total passing tickets, and 3 of the 9 were mine.\*\***

I take great pride in my work and always aim to be thorough, accurate, and compliant with management's requirements and directions. I just wanted to have something to document the occurrence. Thank you! 😊

Sincerely,

**Amanda Kondrat'yev**
PC Support Technician
NEST / NASA IT
Mobile: (281) 309.6764 | (281) 244.5300
Amanda.L.Kondratyev@nasa.gov



**amandakondratyev@gmail.com**

| | |
|---|---|
| **From:** | Kondrat'yev, Amanda L. (JSC-IC111)[Leidos, Inc.] <amanda.l.kondratyev@nasa.gov> |
| **Sent:** | Friday, January 5, 2024 7:59 AM |
| **To:** | amandakondratyev@gmail.com |
| **Subject:** | Fwd: [EXTERNAL] RE: Assaulted at work |

Sincerely,

**Amanda Kondrat'yev**
PC Support Technician
NEST / NASA IT
Mobile: (281) 309.6764 | (281) 244.5300
Amanda.L.Kondratyev@nasa.gov

---

**From:** Ed Scarborough <escarborough@allpointsllc.com>
**Sent:** Thursday, January 4, 2024 1:31:14 PM
**To:** Kondrat'yev, Amanda L. (JSC-IC111)[Leidos, Inc.] <amanda.l.kondratyev@nasa.gov>
**Cc:** Robyn Smith <rsmith@allpointsllc.com>
**Subject:** Re: [EXTERNAL] RE: Assaulted at work

**CAUTION:** This email originated from outside of NASA.  Please take care when clicking links or opening attachments.  Use the "Report Message" button to report suspicious messages to the NASA SOC.

We are suppose to receive it today.

*Regards,*

*Ed*

**Ed Scarborough**
Vice President and General Manager
Florida Operations

**All Points**
190 S. Sykes Creek Pkwy, Suite 3
Merritt Island FL 32952
Office:  321.735.8650
Mobile: 321.501.6005
escarborough@allpointsllc.com
www.allpointsllc.com



**ALL POINTS LOGISTICS, LLC PROPRIETARY AND CONFIDENTIALITY NOTICE:** This message and associated attachments are intended for the use of the individual or entity to which it is addressed, and may contain information that is privileged, confidential, and exempt from disclosure under applicable law. Any viewing, copying or distribution of, or reliance on this message by unintended recipients is strictly prohibited.  If you have received this message in error, you are prohibited from reviewing, copying, distributing or using the information in any medium. Please contact the sender immediately by return email and delete the original message and attachments. In addition, the information contained herein is or may be controlled by the International Traffic in Arms Regulations (ITAR), 22 CFR 120 - 130, and may not be exported, or disclosed to a foreign person, whether in the United States or abroad, without prior All Points Logistics, LLC written approval.

On Jan 4, 2024, at 12:14 PM, Kondrat'yev, Amanda L. (JSC-IC111)[Leidos, Inc.] <amanda.l.kondratyev@nasa.gov> wrote:

You don't often get email from amanda.l.kondratyev@nasa.gov. Learn why this is important

Hello,

Have there been any updates? Please let me know. Thank you!

Sincerely,

**Amanda Kondrat'yev**
PC Support Technician
NEST / NASA IT
Mobile: (281) 309.6764 | (281) 244.5300
Amanda.L.Kondratyev@nasa.gov

---

**From:** Robyn Smith <rsmith@allpointsllc.com>
**Sent:** Tuesday, January 2, 2024 10:20:42 AM
**To:** Kondrat'yev, Amanda L. (JSC-IC111)[Leidos, Inc.] <amanda.l.kondratyev@nasa.gov>; Ed Scarborough <escarborough@allpointsllc.com>
**Subject:** RE: [EXTERNAL] RE: Assaulted at work

**CAUTION:** This email originated from outside of NASA.  Please take care when clicking links or opening attachments.  Use the "Report Message" button to report suspicious messages to the NASA SOC.

Amanda:

From what I understand, NASA has already started an investigation.  We will wait to get the results of their investigation.

**Robyn Smith**, *SHRM-SCP, CBP*
*Chief Administrative Officer*
*All Points Logistics, LLC*
*190 S. Sykes Creek Parkway, Suite 4*
*Merritt Island, FL  32952*
*321.735.8642 Office*
*321.208.7982 Fax*
*770.235.0163 Mobile*
<u>rsmith@allpointsllc.com</u>
<u>www.allpointsllc.com</u>

<image002.png>
<image003.png>

<image005.png>

<image006.png>
<image008.png>

ALL POINTS PROPRIETARY AND CONFIDENTIALITY NOTICE: This message and associated attachments are intended for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential, and exempt from disclosure, under applicable law. Any viewing, copying or distribution of, or reliance on, this message by unintended recipients is strictly prohibited.  If you have received this message in error, you are prohibited from reviewing, copying, distributing or using the information in any medium. Please contact the sender immediately by return email and delete the original message and attachments. In addition, the information contained herein is or may be controlled by the International Traffic in Arms Regulations (ITAR), 22 CFR 120 - 130 and may not be exported or disclosed to a foreign person, whether in the United States or abroad, without prior All Points written approval.

---

**From:** Kondrat'yev, Amanda L. (JSC-IC111)[Leidos, Inc.] <amanda.l.kondratyev@nasa.gov>
**Sent:** Tuesday, January 2, 2024 11:45 AM
**To:** Robyn Smith <rsmith@allpointsllc.com>; Ed Scarborough <escarborough@allpointsllc.com>
**Subject:** RE: [EXTERNAL] RE: Assaulted at work

Hi Robyn,

Happy New Year. Would you like me to write a report or to have the information forwarded from the report? Please let me know. Thank you!

Sincerely,

**Amanda Kondrat'yev**
PC Support Technician
NEST / NASA IT
Mobile: (281) 309.6764 | (281) 244.5300
<u>Amanda.L.Kondratyev@nasa.gov</u>

---

**From:** Robyn Smith <rsmith@allpointsllc.com>
**Sent:** Friday, December 29, 2023 2:24 PM
**To:** Kondrat'yev, Amanda L. (JSC-IC111)[Leidos, Inc.] <amanda.l.kondratyev@nasa.gov>; Ed Scarborough <escarborough@allpointsllc.com>
**Subject:** [EXTERNAL] RE: Assaulted at work

---

**CAUTION:** This email originated from outside of NASA.  Please take care when clicking links or opening attachments.  Use the "Report Message" button to report suspicious messages to the NASA SOC.

---

I will need you to send me a written report of what happened.  Please go ahead and report to Leidos first.

*Robyn Smith, SHRM-SCP, CBP*
*Chief Administrative Officer*
*All Points Logistics, LLC*
*190 S. Sykes Creek Parkway, Suite 4*
*Merritt Island, FL  32952*
*321.735.8642 Office*
*321.208.7982 Fax*
*770.235.0163 Mobile*
*rsmith@allpointsllc.com*
*www.allpointsllc.com*

<image002.png>
<image003.png>

<image010.png>

<image006.png>
<image008.png>

**ALL POINTS PROPRIETARY AND CONFIDENTIALITY NOTICE:** This message and associated attachments are intended for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential, and exempt from disclosure, under applicable law. Any viewing, copying or distribution of, or reliance on, this message by unintended recipients is strictly prohibited.  If you have received this message in error, you are prohibited from reviewing, copying, distributing or using the information in any medium. Please contact the sender immediately by return email and delete the original message and attachments. In addition, the information contained herein is or may be controlled by the International Traffic in Arms Regulations (ITAR), 22 CFR 120 - 130 and may not be exported or disclosed to a foreign person, whether in the United States or abroad, without prior All Points written approval.

**From:** Kondrat'yev, Amanda L. (JSC-IC111)[Leidos, Inc.] <amanda.l.kondratyev@nasa.gov>
**Sent:** Friday, December 29, 2023 4:21 PM
**To:** Robyn Smith <rsmith@allpointsllc.com>; Ed Scarborough <escarborough@allpointsllc.com>
**Subject:** Assaulted at work

Hello,

I was threatened yesterday by another tech, Susana Kane, and was physically assaulted by her today while sitting at my desk.

Per our previous discussion, I am reaching out to you before reporting to Leidos. I am going to report to NASA Security to have some kind of incident report. Please let me know what else needs to be done. Thank you.

Sincerely,

**Amanda Kondrat'yev**

PC Support Technician

NEST / NASA IT

Mobile: (281) 309.6764 | (281) 244.5300

Amanda.L.Kondratyev@nasa.gov

**Agency VPN JSC Teleworker**

This request is for general access to NASA resources for JSC personnel.

New Request | History | Recommend

*Deprovisioned 01/04/2024*



**JSC Physical Access**

New Request | History | Recommend

*Deprovisioned 01/04/2024*

**JSC-Bldg-8 General Entry**

New Request | History | Recommend

*Deprovisioned 01/04/2024*

**JSC-EF-990 Gate Entry**

New Request | History | Recommend

*Deprovisioned 01/04/2024*

All listed under "historical"

Thanks | Perfect, thank yo

Type a message

       

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

AMANDA L. KONDRAT'YEV,
Plaintiff,
v.
NASA JOHNSON SPACE CENTER,
LEIDOS HOLDINGS INC., and
ALL POINTS LOGISTICS LLC,
Defendants.

Civil Action No. 4:25-cv-04785

EXHIBIT F

NASA Office of Diversity and Equal Opportunity
(ODEO) Record (Excerpt)

EEO Counseling Report – EEO Informal Stage

**NOTICE TO PERSONS USING THIS FORM:** When filled in this form contains Personally Identifiable Information and must be protected in accordance with NASA directives for Sensitive But Unclassified Information.

## Complainant's Statement:

Please summarize the aggrieved person's statement below:          Date of Interview: 02/23/2024

Complainant, Amanda Kondrat'yev was made aware by Texas Workforce Commission, while pursuing a claim for unemployment, that her former employer, All Points Logistics, LLC, had alleged they terminated her for falsifying a report of assault against a co-worker. Ms. Kondrat'yev provided a letter she received from Texas Workforce Commission that was sent by an All Points Official, Robyn Smith. In the letter, Ms. Smith states to the Commission that, "NASA Security completed an investigation and determined that Amanda falsified the report and the assault did not happen." Ms. Smith went on to state that, Amanda Kondrat'yev, "was being terminated based on the outcome of the NASA investigation." Ms. Kondrat'yev contends that she never falsified any report, but did report an assault on December 29, 2023 by a co-worker whom she said was yelling at her and threw boxes at her. Ms. Kondrat'yev recounted that, at the time, the NASA Security personnel only asked her and the alleged assailant to go home to cool off over the holiday and to take the matter up again with their management when they returned the following week. Both parties allegedly agreed to this and left the Johnson Space Center of their own accord. Ms. Kondrat'yev is filing as a contingent worker complaint because she does not feel, if true, NASA should have played this role in her termination.

Please see the Aggrieved Individual's statement and supporting documentation (Attachment 1).

## RMO's Statement:

Please summarize the RMO's statement below:          Date of Interview: 04/17/2024

Ms. Robyn Smith is the Chief Administrative Officer for All Points Logistics, LLC., a subcontractor to Leidos, Inc. She states that she manages the administrative functions of the company to include human resources, thereby having the final say in the termination of employees. Ms. Smith stated that her co-worker, Ed Scarborough was notified by Leidos personnel, Brent Wong, that the JSC Security report had determined that "Amanda had not told the truth." in the incident that occurred on December 29, 2023. Ms. Smith stated that she had requested the security report as evidence but was told by JSC Security that they would only provide copies through a subpoena. Ms. Smith claims that Ms. Kondrat'yev had other issues getting along with other employees and therefore, Ms. Kondrat'yev was terminated on January 4, 2024. Ms. Smih stated that the termination notice to Ms. Kondrat'yev was made by Ed Scarborough, another leader in the All Points, LLC organization.

## Witness Statement(s):

Please summarize the Witness's statement(s) below:          Date(s) of Interview: 04/12/2024

Alan Mather, Chief of JSC Security was contacted on April 12, 2024 to provide a copy of the incident report. Mr. Mather provided the report later that same day and his subordinate, Mr. Russ Tucker confirmed incident date and location (building 8). On April 26, 2024, Mr. Tucker (Security Chief) made the following statement about the oincident that occurred on , "Upon arrival one of the parties involved stated that some boxes fell over and she [Amanda Kondrat'yev] felt they were purposefully thrown at her. According to the responding officers the boxes were stacked up on the cubicle partition wall that was between the two parties desks. They appeared to be small in size, like keyboard box size or smaller."

When Mr. Tucker was asked on April 29, 2024 if a JSC Security Officer had determined that no assault had occurred or that Ms. Kondrat'yev had falsified a report, Mr. Tucker stated, "NASA Security never determined, nor communicated that Amanda Kondrat'yev had falsified any report or that any assault did not happen." Mr. Tucker said that the parties involved in the incident both agreed to go home and to take the matter up with management upon return after the holiday.

If multiple witnesses, please capture names and dates of each witness prior to typing their statements in the above section

Attach all supporting documentation when submitting EEO Counseling Report



Did the agency have the ability to discharge the complainant? The Government had the ability to control this employee's access to the NASA Center.

If so, please describe who at the agency had the ability to discharge the complainant and under what circumstances (i.e., for what reasons, if any)? Protective Services for reasons related to security.

### 15. Whether the worker and the agency believe that they are creating an employer-employee relationship.

Was there an intent to create an employer-employee relationship? No

# Robyn Smith

Wednesday, April 17, 2024
11:05 AM
Chief Administrative Officer of the Company
Leads administrative functions including HR.
Final say in the termination of employees All Points Logistics employees wholly
Ed Scarborough was not the most appropriate person to interview. Just NEST, he wasn't onsite, program manager with only specific duties under the sub contract to Leidos.
When the incident happened, Amanda contacted her and notified Leidos. Notified by Leidos that JSC Security was doing the investigation and that the report determined that Amanda had not told the truth, told to Ed Scarborough verbally, by Leidos representative Brent Wong. Smith says All Points never saw the report and requested the report but was told by JSC Security that they would only provide to All Points with a subpoena.  Texas workforce solutions statement made by Ms. Smith on form provided by Texas. Mailed on March 15, 2024, received appeal, and provided via fax additional documents that substantiated statements previously made in support of claims of other altercations on April 1, 2024. Appeal hearing occurred on April 4th but did not result in a determination, likely to have additional time scheduled.
Do you believe that JSC Security said that Amanda Kondrat'yev made false statements?
Leidos (Brent Wong) told Ed Scarborough that Amanda's claims were not true and then asked All Points to have Amanda come get her personal things, while providing with a list of belongings and how they were handled. As soon as Wong told Scarborough, Scarborough told Smith. All Points- on January 4, 2024, Smith made this arrangement with Amanda and told Amanda that they were terminating her employment. Amanda met with an All Points employee at b-110 and retrieved her belongings on January 5, 2024. Amanda's termination was communicated by Ed Scarborough on January 4, 2024. Amanda was paid through January 4 via direct deposit through an All Points operating account. Robyn Smith stated that at no point were they told by JSC Security to terminate this employee. Did Leidos tell you to terminate this employee? No. They just told her to have the employee come get her personal items.

### 1. Whether the agency has the right to control when, where, and how the worker performs the job.

Who does the complainant report to? Ed approved her timesheet and time off but her lead directed day to day and it was Brent Wong determined all directly.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

AMANDA L. KONDRAT'YEV,
Plaintiff,
v.                                                    Civil Action No. 4:25-cv-04785
NASA JOHNSON SPACE CENTER,
LEIDOS HOLDINGS INC., and
ALL POINTS LOGISTICS LLC,
Defendants.

EXHIBIT G

March 25, 2024 Email Chain (Admission)

**Robyn Smith**

| | |
|---|---|
| **From:** | Suratt, Randall T. (JSC-AL111) <randall.t.suratt@nasa.gov> |
| **Sent:** | Tuesday, March 26, 2024 3:01 PM |
| **To:** | Robyn Smith |
| **Cc:** | Mather, Alan T. (JSC-JS111); Miner, Christopher W. (JSC-AL111) |
| **Subject:** | RE: [EXTERNAL] Security Incident Report #JSC106469 |

You don't often get email from randall.t.suratt@nasa.gov. Learn why this is important

The report you are requesting is protected from disclosure to third parties under the Privacy Act, 5 U.S.C. § 552a. Pursuant to current law, 5 U.S.C. 5 552a(b)(n) (release under the order of a court of competent jurisdiction), a requesting party would need to provide us with a subpoena reviewed and signed by a judge having cognizance over the litigation to obtain the release of any records covered by the Privacy Act. I am not sure whether the TWC administrative judge has subpoena power (administrative or otherwise). An alternative is to obtain an appropriate Privacy Act waiver for the release of the records to you signed by the individual(s) named in records sought. Also, verbal testimony to the facts contained in the report is allowable.

v/r

Randall T. Suratt
Acting Chief Counsel/Senior Attorney-Advisor
NASA JSC | Office of the Chief Counsel
2101 W. NASA Parkway | Bldg. 1/416 | Houston, TX 77058
Office: 281-483-1009 | Fax: 281-483-6936 | Email: randall.t.suratt@nasa.gov

**From:** Robyn Smith <rsmith@allpointsllc.com>
**Sent:** Monday, March 25, 2024 1:19 PM
**To:** Suratt, Randall T. (JSC-AL111) <randall.t.suratt@nasa.gov>
**Cc:** Mather, Alan T. (JSC-JS111) <alan.t.mather@nasa.gov>; Miner, Christopher W. (JSC-AL111) <christopher.w.miner@nasa.gov>
**Subject:** RE: [EXTERNAL] Security Incident Report #JSC106469

**CAUTION:** This email originated from outside of NASA. Please take care when clicking links or opening attachments. Use the "Report Message" button to report suspicious messages to the NASA SOC.

Mr. Suratt:

We are requesting a report related to the incident referenced above as part of an unemployment hearing. Initially, Amanda Kondrat'yev was denied unemployment, but has appealed the decision. There is a hearing scheduled for April 3rd. Ms. Kondrat'yev made a claim of physical assault by a coworker. We were informed that JSC Security was investigating. Leidos informed us that Ms. Kondrat'yev was to be removed from the contract. We were not told the actual results of the security investigation. In light of the unemployment appeal, we would like to request access to the portion of the report that declares the findings of the investigation not only for the unemployment hearing, but also for the possibility of any type of wrongful termination claim.

Please let me know if you have any questions.

*Robyn Smith, SHRM-SCP, CBP*
*Chief Administrative Officer*
*All Points Logistics, LLC*

**From:** Mather, Alan T. (JSC-JS111) <alan.t.mather@nasa.gov>
**Sent:** Monday, March 25, 2024 12:03 PM
**To:** Suratt, Randall T. (JSC-AL111) <randall.t.suratt@nasa.gov>; Miner, Christopher W. (JSC-AL111) <christopher.w.miner@nasa.gov>
**Subject:** FW: [EXTERNAL] Security Incident Report #JSC106469

Gentlemen:

PSD has received a request to release a security incident report and would like your determination.

Thanks,
Alan
281 660-5504

---

**From:** Kindred, Christopher M. (JSC-JS411)[Praetorian Standard Inc.] <christopher.m.kindred@nasa.gov>
**Date:** Monday, March 25, 2024 at 10:53 AM
**To:** Mather, Alan T. (JSC-JS111) <alan.t.mather@nasa.gov>, Bouck, Miles K. (JSC-JS711) <miles.k.bouck@nasa.gov>
**Cc:** Tucker, Russ B. (JSC-JS411)[Praetorian Standard Inc.] <russ.b.tucker@nasa.gov>, Lover, David A. (JSC-JS411)[Praetorian Standard Inc.] <david.a.lover@nasa.gov>
**Subject:** FW: [EXTERNAL] Security Incident Report #JSC106469

Chief Mather,

I received the email below requesting the IR attached to this email. I spoke with the requestor, Ms. Smith. She is requesting the IR to be prepared for an unemployment hearing next week with one of the individuals in the report, Ms. Kondrat'yev. Ms. Kondrat'yev was terminated by Liedos after the incident described.

Please advise how you would like to proceed.

Very respectfully,

Christopher M. Kindred
Deputy Chief / SWAT / Security Police Special Operations Unit
NASA Johnson Space Center
2101 NASA Parkway
Houston, TX. 77058
Ofc 281-244-8455
Cell 409-502-8915
Christopher.m.kindred@nasa.gov

---

**From:** Robyn Smith <rsmith@allpointsllc.com>
**Sent:** Friday, March 22, 2024 12:23 PM
**To:** Kindred, Christopher M. (JSC-JS411)[Praetorian Standard Inc.] <christopher.m.kindred@nasa.gov>
**Cc:** Jones, Janae L. [US-US] <janae.l.jones@leidos.com>
**Subject:** [EXTERNAL] Security Incident Report #JSC106469

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

AMANDA L. KONDRAT'YEV,
Plaintiff,
v.                                                  Civil Action No. 4:25-cv-04785
NASA JOHNSON SPACE CENTER,
LEIDOS HOLDINGS INC., and
ALL POINTS LOGISTICS LLC,
Defendants.

EXHIBIT H

NASA OCIO Root Cause Analysis (RCA)
VPN Incident (Oct. 21–22, 2023)
(Escalation #61) (Excerpt)



OFFICE OF THE CHIEF INFORMATION OFFICER

## Information Technology

### OCIO Root Cause Analysis (RCA) for Incident Escalations
### Executive Summary Report
### Controlled Unclassified Information (CUI)

- This template provides a standard format to summarize the results of Root Cause Analysis conducted for Incident Escalations, which are tracked and communicated on the OCIO Operations Center Teams Site.
- This template coincides with a Standard Operating Procedure that defines the steps for requesting and completing a Root Cause Analysis for Incident Escalations.

**Version 0.2**
**Effective Date: Sept 7, 2022**
**CI Number: SMG-2022-003**

**Approval Authority:**

_____          _____

Dan Pierson, Director                                    Date
IT Service Management Office (ITSM)

**Template Revision Log**

| Version | Date | Description | Authors/Editors |
|---|---|---|---|
| 0.1 | 9/6/2022 | Initial Draft for ITSMWG Review | RCA Working Group |
| 0.2 | 9/7/2022 | Reformatted to use OCIO template standards | EPMO |
| | | | |

NOTE: To use this template, enter data to replace red instructions, replace all green examples with actual data for the incident/issues and do not change the black text as it is boilerplate

Reference: OCIO Operations Incident Escalations

| Incident/Issue Subject | <Copy & paste the "Incident/Issue Subject" field from the Incident Escalation Record, and insert URL back to the Incident Escalation Record> | Incident Escalation ID # | <Copy & paste the "ID" field from the Incident Escalation Record> |
|---|---|---|---|
| | | | 51 |

https://nasa.sharepoint.com/teams/OCIOOperationsCenter/Lists/OCIO_Incident_Escalation/DispForm.aspx?ID=51

Details regarding the Incident/Issue Description, Impact, Dates/times, and status can be found within the Incident Escalation record referenced above.

| RCA Requestor | *Bobbie Williams* |
|---|---|
| RCA Facilitator | Dave Torgersen - Leidos QA - Facilitator - Responsible for oversite of the RCA process, creating the executive summary document, and submitting it to NASA. Halie Anthony – Leidos NEST Operations Manager - Responsible and accountable for developing and implementing Corrective Actions. |
| RCA Team members | Halie Anthony – Enterprise Operations Manager<br>Kenneth Merenda – Enterprise Operations Systems Manager<br>Fred Nail – End User Support Manager<br>Thomas Parker – Active Directory Engineer<br>Christy Murray – JSC COM<br>Cris Holderman – IT Security Manager<br>Patrick Lumpkin – Vulnerability Management Lead<br>Brian Lynn -- Deputy Program Manager<br>Amanda Kondrat'yev - Tech |
| Problem Statement | *The object in question:*<br>Multiple personnel lost VPN connectivity.<br>*The expected condition/behavior*<br>None as this was not a planned change.<br>*The current condition/behavior*<br>Windows systems that connected to the NDC domain, either at a NASA location or via a NASA VPN, during the time the active directory group was changed would have stopped applying group policy objects (GPOs) that were scoped to the group, including a GPO for printer settings which applied configurations that the NASA VPN requires to be in place before a client VPN connection can be established. As a result, remove Windows systems that stopped applying these GPO's were unable to rec |



12



establish a VPN connection. To restore VPN connectivity, NEST used BigFix to deploy the required print GPO settings to all NEST devices to ensure all NEST devices, which then allowed those systems that GPOs were removed to be able to connect to the VPN. Additionally, NEST identified and corrected the active directory group misconfiguration. After the group was reconfigured, systems that connected to the NDC domain, either at a NASA location or via a NASA VPN, were able to re-apply the GPO's needed for VPN connectivity and normal operation.

**When incident occurred:** 21 Oct 2023          **Location of incident:** Agency wide

**Incident severity:** Minor – This incident happened after normal business hours (Saturday) and was corrected before normal business hours on Monday.

**Focus of RCA, what is being evaluated:**

The focus of this RCA is what cause of users to not being able to establish a VPN connection.

NOTE: Some RCA processes only identify Proximate and Intermediate Causes and not find a "Root Cause", which is defined as a systematic or organizational wide factor. This section should use specific and accurate descriptions of what occurred rather than negative and vague words.

**Cause and effect relationship:**

An active director group which contained NEST Windows 10 computer objects and was used for group policy security filtering was inadvertently changed from a security group to a distribution group, resulting in some group policy objects to be removed from the systems to which they were assigned.

The tech that made the modification was troubleshooting a device problem and tried changing the group type not knowing the impacts it would have to all systems assigned to the GPO.

**Description of the incident**

On Saturday 21 Oct 2023, the ESD began receiving calls stating they were not able to connect to the VPN and were receiving a popup that they were not meeting the ED-21-04 for the print policy. This policy had previously been deployed to all WCS systems so no one should have received that popup.

On Sunday 22 October 2023, approximately 11am CST, Security started to investigate with operations, NCAD, Aegis, and Tier 2 to identify the issue for the non-compliant pop ups. At 5 pm CST on Sunday, Tom Parker was able to identify that the issue was related to a modification to our active directory group for NEST Windows 10 computers that changed it from a security group to a distribution group, which resulted in all group policies that used that group for security filtering to be removed from systems. Leidos verified and validated this finding with the NCAD team as the reason the devices were not receiving the print group policy.

At about 7:00 PM on Sunday, October 22, 2023, Tom made a change to revert the active directory group back to a Security Group. Systems that did not connect to the VPN during Saturday 12:00pm – Sunday 7:00pm were restored back to the correct configuration when they reconnected to the NDC domain.

**Identify the preceding system cause of the error or procedure violation:**

1. The level of permissions held by the tech are needed to perform other functions of the job. The actions the tech took were not within her normal tasks and therefore was not trained in the area of GPOs and security groups.

Cause Statement

Commented [DT1]: What happened

Commented [DT2]:



For each specific finding/cause:

**Enter remediation plan for each specific finding/cause**

The NEST Cybersecurity team has reviewed the GPO permissions and are not going to be able to tighten permissions as they are granted to everyone that has DRA access and it cannot be changed. The cybersecurity team is reviewing the technicians to ensure that everyone who has permissions is needed. The cybersecurity team is presenting at the technicians "Tech Talk" meeting to provide training and a knowledge exchange on active directory operations.

**Remediation Plan Description**

*< Enter the name, position, organization responsible for ensuring the recommendation/action item is accomplished>*

*< Enter the estimated date of when the remediation/action items will be implemented or complete>*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

AMANDA L. KONDRAT'YEV,
Plaintiff,
v.                                                    Civil Action No. 4:25-cv-04785
NASA JOHNSON SPACE CENTER,
LEIDOS HOLDINGS INC., and
ALL POINTS LOGISTICS LLC,
Defendants.

EXHIBIT I

All Points EEOC Position Statement +
Scarborough Attestation (Excerpt)

**reviewed, Leidos repeatedly misrepresented the facts and evidence and failed to meet to resolve the issue as they had told security.**

All Points has no knowledge of the events written in this paragraph.

**Both companies have made false statements to and about me. I've been unable to find work due to the damage to my reputation and defamation of character. My family and I have suffered tremendously. I would like to pursue all legal actions and remedies available under federal and state, both punitory and compensatory, for all the injustices that have occurred.**

All Points has made no false statements about Amanda. All Points has received no calls or inquiries regarding Amanda's employment and has received no requests for recommendations for employment. All Points has taken no action that would damage Amanda's reputation, and All Points has taken no action that would prevent Amanda from being employed.

**I believe I was sexually harassed, subjected to different terms and conditions, denied reasonable accommodations, retaliated against and terminated based on my Sex, Female, disability and participating in a protected activity, in violation of the Americans with Disabilities Act of ADA 1900 (ADA) and Title VII of the Civil Rights Act of 1964.**

Amanda Kondrat'yev was not discharged in retaliation for engaging in any protected activity under Title VII of the Civil Rights Act. She was not terminated based on her sex nor her disability. Documentation shows evidence of All Points management and Leidos management attempts to work with Amanda and guide her through acceptable behavior in the workplace. Also included for reference is an email received on November 27 from Christy Murray to Ed Scarborough and Robyn Smith. This email is included as *Attachment 17 – Observed Negative Behavior.*

Amanda Kondrat'yev was terminated because Leidos requested we retrieve her personal belongings and remove her from the contract. Leidos stated NASA security was present while her personal belongings were being gathered. It was All Points understanding that Amanda was being removed from the contract because of the NASA Security investigation regarding the assault claim.

All Points made several requests to Leidos and JSC Security to obtain a copy of the report but was never able to get a copy. Please see emails as attached below:

*Attachment 18 – JSC Security Report regarding Amanda Kondrat'yev*
*Attachment 19 – JSC Security Report regarding Amanda Kondrat'yev 2*
*Attachment 20 - JSC Security Report regarding Amanda Kondrat'yev 3*
*Attachment 21 – Security Incident Report #JSC106469*

A Sworn Attestations have been included in Documentation from Ed Scarborough, Vice President/General Manger.

I certify I am an officer of the company and authorized to speak officially on behalf of All Points Logistics, LLC regarding this matter.

Sincerely,

*Robyn Smith*

Robyn Smith
Chief Administrative Officer

190 S. Sykes Creek Parkway, Suite 4     Merritt Island, FL 32952



November 21, 2024


U.S. Equal Employment Opportunity Commission
Houston District Office
1919 Smith Street, 6th Floor
Houston, TX 77002


RE:     All Points Logistics LLC Position Statement
        EEOC Charge Number:  460-2024-04943


**SWORN ATTESTATION**


I, Charles Edwin (Ed) Scarborough, Sr. Vice President and General Manager for the NEST contract do hereby attest to the accuracy of facts presented in All Points Logistics, LLC Position Statement that has been provided in response to EEOC Charge Number: 460-2024-04943.


Signed:


C E Scarborough

Charles Edwin Scarborough

21 NOV 2024

Date


190 S. Sykes Creek Parkway, Suite 4     Merritt Island, FL 32952

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

AMANDA L. KONDRAT'YEV,
Plaintiff,
v.                                                    Civil Action No. 4:25-cv-04785
NASA JOHNSON SPACE CENTER,
LEIDOS HOLDINGS INC., and
ALL POINTS LOGISTICS LLC,
Defendants.

EXHIBIT J

Texas Workforce Commission Hearing

TWC case3719044a1h1r1  4-3-24.mp3

**TWC case3719044a1h1r1 4-3-24**

Dec 30, 2025 at 6:00 AM ▶ **Play** Audio · 40m

Transcript

All points, this is Robin. Hi, Ms. Smith, I'm hearing
today, is anyone else participating today in...

All points, this is Robin.
Hi, Ms. Smith, I'm hearing  today, is anyone else
participating today in the  hearing on behalf of the  employer
besides yourself?
No, no one no one else.
All right, please hold my head  up the rest of the call.
Thank you.
Okay.
Hello?
Hi, Ms. Kondra, yeah, this is  the Texas workforce  commission.
Employment  hearing today.
John Barker, David Kram,  Jordan Holland, and Jesse  Smith.
Is there anyone else?
Uh, no, that's all.
All right. And if you have me  on speaker, can you please  take me off
of speaker?
It's giving some feedback  onto the line.
Thank you. Um and.
Yes, and Miss Condra, you  have, um, I, because.
Yes, um, Officer Keith, you  are, you're breaking up a lot  on my end
of the phone as
well.
Okay. Can you hear me better  now?
Yes, so far that is better, yes. Okay.
Please, um, let me know if I  am at any point uh, you're not  able to
understand me, okay?
Okay, okay.
All right, um Ms. Condra, you  have.
I need a primary
representative for you.
The  primary  representative is  the person who can question  witnesses
and handle
procedural matters such as  reviewing and objecting to  documents.
Who going to be the primary  representative on your behalf  today?
Um, it can't be me.
Yes, it can be yourself.
Oh, okay.

It would be amazing.
All right. Thank you.
I'm gonna go ahead and  contact the rest of your witnesses.
Okay, thank you.
And you broke up when you  listed all of the witnesses.
Can you list those witnesses  again?
I will in a moment, Mr. Barker.
Um Ms. Smith I will list them  in a moment, okay?
After I have everyone,  everyone may not answer.
Uh, Miss Hondra, you have  John Barker's not answering.
I going to give him I'm going  to go ahead and move on to  the next
person if you want to  contact him and let him know  that I'm trying to
contact him.
He deny it.
Hello?
Hi, Mr. Krem, this is Haring  Officer Keith of the Texas Workforce
Commission. I'm conducting the  unemployment hearing today
for Amanda Kondra Yev. Can you please hold why I set  up the
rest of the call?
Okay.
Thank you.
Please leave your message  for 40945721.
All right, Ms. Condra.
Yeah, Jordan Holland also is  not answering if you want to  give them a
contact.
Uh, please hold while I set up  the rest of the call.
Hello.
Hi, Mr. Smith, this is Hearing  Officer Keith from the Texas Workforce
Commission,  scheduled to conduct the  unemployment hearing today
on behalf of Amanda Kondra  EF.
Uh can you please hold why I  set up the rest of the call?
Sure.
All right.
Uh, Ms. Condra, have you  heard back from Mr. Barker  and uh,
Ms. Holland?
Uh, yes, uh, Mr. Barker said 2 called him back, um, and um,  I'm checking
with Jordan.
All right I will attempt to  contact him again.
Contacting Mr. Barker now. This John.
Hi Mr. Barker.
This is hearing officer Keith  with the Texas workforce  commission.
Conducting the  unemployment hearing  today.

Okay.

All right, um, and Ms. Condra,  have you heard back from,  um, Ms. Holland?

Um, I think if we could just try  him one more time.

All right.

Please leave your message  for 40945. Answering?

All right, um, Mr. Barker, um,  Mr. Kreme and Mr. Smith,  could you please mute  yourself until I, um, come to
you to get testimony?

I'll let you know whenever I  am ready for you to take  yourself off
of mute.

Alright.

We're on the record in appeal  number 371-9044.

I'm hearing Officer Keith with  the Texas workforce
commission in this hearing is  being conducted on April 3rd,  2024 at 915
AM via  conference call originating  from Floresville, Texas, and
this hearing is being digitally  recorded to preserve the  record.

Present is the claimant  Amanda Kondra Yev with last  4 digits of Social
Security  number is 8866.

Is that correct, Ms. Condra,  yes?

Yes.

All right, the employer's name  uh also present on behalf of  the claimant
today are John  Barker, David Krem, and Jesse Smith.

The employer's name in this  case is all points logistics,  present on
behalf of the  employer today is Robin  Smith.

The employer account  number on file is  133-161538.

Is that correct, Miss Smith? Yes.

All right.

Thank you.

We mailed you a notice of  hearing packet, notice and  hearing
packet.

Did you receive that Ms.  Smith?

Yes.

And Ms. Condra. Did you  receive that?

Ms. Conjure, yeah.

I'm sorry, I was on mute.

Uh, yes, yes, I did and um, uh, I  just heard back from uh,  Jordan thing
that he, uh, just  out of the meeting now.

Okay um I will contact him  later on in the hearing.

I'm taking administrative  notices a notice and hearing  packet were
mailed to and  received by the parties.

Did you send any additional  document for today's hearing  that are not

already included  in the packet in this contract yet?

I did.

I submitted, um, fax  documentation, evidence, uh,  packet on Sunday and I  provided it to, uh, both uh,  your office and all points.

Okay, one moment.

Okay, and we did receive that,  uh, Miss Smith, did you  receive that?

I did, yes.

Okay and Ms. Smith, did you  send any additional  documentation for today's  sharing that we're not  already included in the  hearing packet?

Yes, there was document, got  documentation faxed on  Monday.

All right. And did you send  that to the claimant?

It was mailed to her. To her address in Houston.

Ms. Condra, yeah. Did you  receive that No, I did not.

All right. Um what is relevant  in the documentation that  you submitted Ms. Smith?

Um, I think most of it seems  to be very similar copies of  emails that were between us  and Amanda.

Um.

It did not include some of her  documentation that she had  from customers or anything,  but I think most of the emails were the same.

Um.

I don't, I didn't because.

Okay, so, um, because you  didn't send it to Miss Condra,  yeah, then just for, um, future,  you do need to submit all of  your additional correspondence that you  would like to be submitted for  evidence to the claimant as  well, just like Miss Condra,  you have did, and I know you  mailed them, but since Miss  Condra, you have did not receive them, um, it may  delay us a little bit today,  because she does have to  receive them before I can  submit them into evidence.

Um, Ms. Smith, because you  believe these are, um,  duplicate.

Do you want to go ahead and  submit them or do you want  to just continue with what Ms.  Condra EF has submitted?

I can submit them.

Um I don't have a fax number or anything for her.

How do I need to submit  them?

Um so all I had on the hearing  notice was her physical  address.

There was not anything on  the hearing machine for her,  yeah.

So I'm I'm asking you.

I'm asking you, Ms. Smith, if  you, if you think they are the same documentation.

Do you want to continue with  just hers?

Or are you not sure whether  or not they're the same?

I did not go through verbatim  to look to see if they were  exactly the same.

It appeared similar.

Okay.

So I've gone.

I think I did have...

Yeah, I I do think maybe I have  a couple of things.

Um, that maybe we're not in  there, but I can email that.

I could scan an email if um if I  can get an email address to  send it to Amanda if that  would uh work since mail has  not delivered there yet.

Okay and um you would have  to go ahead and scan them.

Yes, I would have to scan them real quickly and then  send them by email.

Okay, and Ms. Kondra, you  have are you able to receive  this documentation via  email?

Yes, um, also as is, obvious in,  in my evidence, uh, the  employer has had my email  address the entire time, as  well as uh, a fax number  should have been on the fax  that they received with the,  with the evidence that I sent.

All right. Um so are you able to receive them?

I email would probably be the  most quick.

However, I am concerned  because of the amount of  witnesses today that we are  gonna have to reset for an  additional time.

One moment while I check to  see my availability for the.

Next hour because I do have  another hearing.

Yeah.

Okay.

We can go ahead and uh  miss. Condra, yeah, or Miss Condra,  yeah, can you go ahead and  give Miss Smith your email  address so she can scan  that documentation over?

It's my 1st and last name?

Without the apostrophe at  gmail dot com.

Okay, all right, give me 12nd.  Scan it right now.

All right.

I'm gonna go ahead and  continue. So we can try to get  as much done in the 30  minutes that we do have.

Um.

All right, this hearing came  about from an appeal that  was filed on February 22nd,  2024 by the claimant to a  termination that was dated February 9, 2024.

Which ruled that the claimant  was discharged for from last  work for connected  misconduct under section  207.044 of the Texas

unemployment compensation act.

That's termination also ruled that the employer would not be subject to charge back as a result of the claim.

The 1st issue today is whether or not the claimant was separated from last work as a result of discharge work connected misconduct or voluntarily quote without work connected good cause.

And the 2nd issue is whether or not the employer's account should be charged back as a result of the claim.

I am going to begin taking background information and then I'll begin taking full testimony from the side.

It appears initiated the separation.

I will then question the other side of the pool.

You do have the right to testify and to call witnesses and question them.

You also have the right to question the other party and its witnesses.

You have the right to present documents for evidence, the documents are admitted.

It is so that they can be discussed.

Testimony regarding the contents will be taken once the document is admitted, but I ask that you not refer to documents, not previously disclosed.

And do not prompt the testimony of any witnesses that the parties have more than one person participating as a witness.

They have the right to invoke the rule, which means that the additional witnesses will be restricted from hearing testimony until it is their time to testify.

If you wish to invoke this right, please let me know.

Following the hearing, I will be issuing a written decision, and you will have 14 days to appeal that decision, from the date that it is mailed, not the date that you receive it.

For that reason, it's important that I have the correct mailing address in this contract.

Yeah, what is your current mailing address?

Excuse me, it's 2305 Bay Area Boulevard, apartment 1606.

Houston, Texas, 77058.

I have 2305 Bay Area Boulevard, apartment 1606 Houston, Texas, 77058, is that correct?

Yes.

All right, and miss Smith, what address would you like the employer's copy to go to? 190 South?

Sykes Creek Parkway Suite 4 Merritt Island, Florida, 32952.

I have 190 South Sykes Creek  Parkway suite 4 Mare Island,  Florida, 32952 is that  correct?

Yes.

Okay, at this point, do either  of you have any questions  about how I will be conducting today's hearing? I do not.

I, I, I actually, um, I, I know that  the, the hearing, notice, had  said that I, I have to provide  the evidence with at least 2  full business days, um, so that they were able to review  it. Um, I, I just, I just, wanted to,  to make sure that it was very  clear that I am not being  provided the same. Uh. Necessary time.

Um, one question, Ms.  Condra, yeah.

And, um, and, and I, I think  that this is, something that  goes along with what has  been, um, what I have provided, that, that shows that, like how, how they, at all  points have just completely disregarded the, the, the  rules, um, And are not. Not playing fairly basically.

Yes, I I understand that. Is that an objection?

Um, like I, I still haven't gotten  any, any documentation. I don't know if it's, uh, like in  my best interest to proceed  right now.

Uh, but I do, I know, I do know  that people are taking time  out of their, their days to to be  witnesses so um if you think  that that, that we can. Yes ma'am.

I tell you what, we can, um. We can disregard my  documentation. It's not necessary for this  hearing.

Okay, all right, then we will go  ahead and continue.

Do you have any questions  now?

Ms. Condria?

Uh no.

Okay, all right. Uh I'd like to  admit the hearing packet in  its entirety, is there any  objections to admitting the  hearing packet into evidence,  Miss Smith?

No.

No.

Miss Condra, yes.

No.

All right, with no objections, I ruled at the hearing packet,  pages 18 through 19 is  admitted into evidence is  exhibit number one.

I'd like to admit, the additional  correspondence from the  claimant, is there any  objections to admitting the,  uh, additional  correspondence from the claimant, Miss Smith.

No.

Ms. Condra, yes.

No.

All right, with no objections. I ruled that the additional  correspondence pages one  through 26 is admitted in  evidence is exhibit number  two. Pages one through 261  moment.

This point I'm gonna swear  everyone in.

Do you solemnly swear or  affirm that the testimony you're about to give in this  hearing is the truth under  penalty of perjury?

Miss Smith?

Yes, I do.

Ms. Condra, yes.

I do.

Uh Mr. Barker, if you could  please unmute yourself.

Yes, I do.

And uh Mr. Crim.

Yes, I do.

Mr. Smith.

Yes, I do.

All right.

Um, do you want me to go  ahead and contact Mr.  Holland, Ms. Condra, yeah?

If you could, please, thank  you.

Can I ask a question for just a moment?

Um, one moment, Ms. Smith,  Ms. Smith, hold on, uh, come  back to you, Mr. Holland.

Yes, hello.

This is hearing Officer Keith  in the Texas Workforce  Commission. Scheduled to  conduct the unemployment  hearing today. I'm gonna swear you in.

Do you solemnly swear or  affirm that the testimony you're about to give in this  hearing is the truth under  penalty of perjury?

Yes, ma'am.

All right.

Uh, everyone, please hold Ms.  Smith.

What is your question?

Um, I am aware of who David  Kramm and Jordan Holland  are. I am not uh aware of who John Barker and Jesse Smith  are as it relates to this case.

Can I have who the definition  of who they are?

So, John.

Go ahead, Mr. Holland.

John Barker is a cue manager  out here. He worked with uh the  claimant. Uh, same with Jesse Smith. Jesse Smith works in a  different area. He

now heads up mobility  services.

Okay, who do they who do  each of them work for?

Yes, who do each of them  work for?

So to my knowledge, John  Barker should be working  with LIDOS directly?

I don't know who is uh the  person who hired Guthie Smith.

Uh John Barker works for  Tech 5.

Okay, and Jesse Smith works  for who?

Sea rip solutions.

Seabrook?

Okay.

Alright.

Does that answer your questions?

Ms. Smith?

It does, yes thank you.

Okay, all right.

Ms. Smith, please state your  1st and last name, spell them  and give your date of birth  and job title for the record.

Robin, R 0 B Y N, Smith, S M I  T H, ███████, 1964, and I'm  the chief administrative  officer of all points and a minority owner of all points.

Alright.

Ms. Kondra, yeah can you  please state your 1st and last  name spell it give your date of  birth for the record?

Yes uh it's Amanda uh uh A M  A N D A K 0 N D R A T apostrophe Y E V and my  birthday is ████████ 1984.

Was, was there any, Mr.  Parker?

Sorry, go ahead.

Mr. Barker's 1st name, last  name, date of birth and  relevance to the case.

Uh, John Barker, J 0 H N.

B A R K E R, uh, date of birth ███53.

Uh, and I was, asked by  Amanda to, if I would, testify  in the case, to, my experience  with working.

Uh, Mr. Mr. Barker, can you  please just state your, the relevance?

Like how, how are you related  to Ms. Condra, you have  supervisor, coworker?

Uh I was a QM or the manager  over the space bar which she  worked under, for, all right.

Thank you. Uh Mr. Kramm.  Can you please do the same?

Sure.

Uh, David, D A V ID, Cram, K R  E M M. My date of birth is ████ 1991.

My relevance is, I was a  coworker of Amanda, and I  got to fitness
and C  everything.

All right, and Mr. Holland.

Was that Mr. Holland that just  spoke?

Yes.

Mr. Holland, please go ahead  and state your 1st last name  spell it and
give your date of press for the record.

Jordan Holland, J 0 R, D A N,  H 0 L L A N, ████████ 1995,  coworker
of the claimant.

And Mr. Smith.

Uh, J E S S E S M I E H uh, date   of birth, uh, ████████ 1977 uh,
coworker of Amanda.

Alright, thank you.

All right, is everyone has  anyone been missed on the  swearing in?
Okay.

We're gonna go ahead and  move into background  questions at this
point I'm  gonna start with you Ms.  Kondra, yeah, what rate is of
employment with the  employer?

I'm sorry. Can you say that  one more time?

What were your dates of  employment with the  employer?

Um, from September 16th
2022 to January 5th of 2024  is when I turned in my badge.

All right and did you work on  January 5th?

Uh no.

All right. And what was the  last day that you worked?

Uh the 4th.

Alright.

Between the day you last  worked and the day that you  filed your initial
claim for unemployment did you work  for anybody else?

No.

All right. And what was your  last job title?

Uh PC support technician?

And who was your last  immediate supervisor?

Immediate supervisor with  the um Brent wall.

Please uh repeat that.

Brent uh Wong is B R E N T W  O N G. All right.

And what type of business is  all point logistics?

It's a subcontractor for um,  which is a contractor for  NASA.

All right. And what was your  ending rate of pay?

Um.

I, uh, I think it was 28, 30 an  hour plus um, plus like, about
$4.50 in like health benefits.

Alright, and that's 2 do- $28.30 an hour, is that  correct?
Uh, it, it should have been  right around there. I don't have a,
uh, a current.
All right, were you full time or  part time?
I was full time.
Did you quit or were you discharged?
I was discharged.
All right and I'm going to go to  the employer at this point.
Ms. Smith Do you agree with  the information that the  claimant gave as
to her dates  of employment, her rate of  pay and her job title?
I do agree with everything  except the last day worked.
Um, we have a termination  date of 14 and I believe that
Amanda had been sent home  for those last couple of days,  possibly the
3rd and 4th and  did not work those days due  to the pending
investigation  at JSC.
And so what was the last day  that you have us, her last  word?
Oh, I believe it was.
Miss Condra, yes, please  don't interrupt.
Thank you.
Ms. Smith, sorry about that.
To my knowledge, um, she  was sent home during the
investigation, um, I don't  know of any remote work  going on at
that time.
Okay, but Ms. Smith, do you  have the date?
I believe it was the 2nd it  would have been the date  that she.
Um said that she had been  assaulted at war.
All right.
Thank you, Ms. Smith, and did  the claimant quit or was she  discharged?
She was discharged.
All right, since both parties  have indicated the claimant  was
discharged. Going to  begin with the employer.
Uh Ms. Smith, who  discharged the claimant?
Ed Scarborough. Our program manager for this  contract.
And uh just for the record I  am beginning testimony now.  Uh and was
anyone else  present for the discharge?
Um I, I believe it was done by  phone at Scarborough was  not there
physically he's not  in that location.
I believe it was conducted by  telephone.
Okay and what day was it conducted?
On the 4th January 4th all  right, and was anyone else  present on the
phone call  besides Ed Scarborough and  Amanda Kondryev?
Not that I'm aware of.

All right. Do you know what  was told to the claimant at  that point?
I believe it was just told that  the results of the JSC  investigation um were not  favorable and that her term her employment was being terminated.
And that she was to turn in  her badge and pick up her  personal belongings that  they had already been boxed  for her.
Okay.
When did the investigation  start?
I believe the date of the claim  was December 29th.
Um let me look at the documentation.
Yes.
Okay.
And um, going back to  January 4th this phone call.
Um was there a final incident  that led to her discharge?
Yes.
Okay, and what was that final  incident and when did it  occur?
So I believe it occurred on  Friday, December 29th. There was a claim that  Amanda she made that had  been, she had been assaulted  by another tech. And she reported it to JFC  security and to Lidos and to  us. And JSE security proceeded  with an investigation. And that was the, the investigation is what was the final instance that led to the termination.
Okay and um was the claimant interviewed during  the investigation?
JFC security conducted the  interview. I mean conducted the investigation. All points did not conduct the  investigation.
Do you know if the claimant  was interviewed during the investigation?
I do not know.
Alright.
And why was the claimant  discharged?
Because it was determined  that the claim that she was  making against the other  employee JSC securities  investigation determined that  claim was not true. And there had been several,  just, issues with Amanda in the past over the, 3 or 4  months preceding that, that  led to LIDOS and all points in  combination, determining  that she could no longer be  on the contract.
And what were the past  issues?
Um, an inability to work with  management at times when  she would be asked to do  certain things if she did not  agree she would be, um, combative. Uh, she was combated with me before about it, and so, in talking with Amanda, you  could tell that if, she, she did  not.
There was certain exchanges  with her managers. That she did not do well with. Um, there had been several  meetings with her between  LIDO

management, all points  management. Um, there had been times  when, she was, um,  disciplined for either not attending meetings as she should, not following up on  tickets as she should, or, um,  she had actually also been  told she had, said that she  had worked overtime without,  without putting it on her  timesheet, working off the  clock, she had been  disciplined for that as well.

Okay. And had she ever received  any previous written or verbal warnings?

The written part would have been in emails and there were  several verbal conversations.

Yes Okay. When were those emails  written and what were they  about? So that was in the documentation that I did  send, so there was email exchange in July of 2023, um,  regarding a meeting that had  been held between her and  her supervisor Brent Wong  and uh, some other uh, management and HR, from  LIDOS, and that, uh, there was follow up with that email  saying, you know, to  recognize that you have a  certain channel to go through  when you have issues.

And to reach out to us 1st so  on and so forth in those  emails and then also to not  that uh it was agreed in that  meeting.

That certain aspects of that  conversation were to be kept  within that meeting, and then  there was um evidence  through email that she had been sharing information of that meeting to others, so she  was again told, that she was  not to share information  about that meeting outside with other coworkers or other  companies, um.

Then there was some additional correspondence  regarding the uh in September after she had  stated in an email that she was working off the clock. There is an email from me to  her, stating that as an hour employ- hourly employee,  she's not allowed to work off the clock.

She must do us. She must clock her overtime  in, and of course, overtime has to be approved. That was in a written email.

Um, I also had a conversation  with her in September, right  around September 19th. Uh, a verbal conversation  about how to work with her managers, um, accept  direction from her managers, even if she felt like she wasn't  in agreement with it, that,  what her managers were  telling her to do was the final  word.

Um, there was also some  correspondence that continued. Into. Into the end of September  about tagged up meetings  that uh she had not been  attending that came from her  supervisor.

Um, and then, there was nothing further after that, it seems like things were going pretty well.

Well during October and November until the incident in December happened.

All right, and um, Ms. Smith, do you have anything else you'd like to have that you haven't already stayed at this time?

Um. Not at this time now.

Um and.

But during those warnings, was the claimant ever notified that her job was in jeopardy?

Uh yes she was.

Okay.

All right, and...

Go ahead.

I was gonna say there was an email regarding um I had sent Amanda an email asking for some information. She did not respond.I followed up. She did not respond again. And this was in August and she received an email from Ed stating that failure to respond to email from senior management could result in disciplinary action.

The information that I told her on the phone when I had the conversation with her in September, was, was directed at her ability to get along with management and that if she was unable to that she might would lose her job over it.

All right. Do you have anything else you'd like to have that hasn't already been stated?

Not, not, not at this time?

All right, Ms. Condra yet? Do you have any questions for Miss Smith at this time?

Um. Um, yeah, uh, are we allowed to be referencing emails that are not that were not provided, uh, as evidence?

Okay, so um.

Do you have any questions for Ms. Smith? I'll give you the opportunity to ask me questions in a moment.

Okay.

Um. Yes Ms. Smith. Do you think that work is a major life act activity?

Okay 11 moment.

Uh I'm gonna I'm sorry Ms. Condra, yeah, for interrupting you.

We've come to.

I I'm out of time.

I have another hearing that's getting ready to start.

And um, this is going to be going to have to be our stopping point since you do have questions for this contract.

Yeah.

I am going to go ahead and um, just ask you to please, um, write down all of your questions that you have. Um, so that you can, because that's where we're going to start when we come back for the next hearing.

Okay?

Okay.

Um so it's gonna be reset. I'm gonna send a reset request and we'll have to do this all again on another day just because we ran out of time for this scheduled hearing.

Um, is there any questions from Ms. Smith and Ms. Kondreyev?

I don't have any.

Okay, Ms. Condra, yeah.

Do you have any questions?

Um, not really at this time.

Okay, all right. And um, just so everyone's aware, that additional fax, Ms. Conduct, you have that Ms. Smith was talking about, that's going to be sent to you in the new herring packet. Going to both get a new hearing packet and it's going to have all of this additional documentation in it.

Thank you so much for calling in today and we will, um, continue this hearing at the new scheduled time to be determined, um, by our office.

Okay, thank you.

All right, thank you.

Bye bye.

Bye bye.

TWC case3719044a1h2r2 5-2-24.mp3

Yeah.

Hi, Ms. Smith.

All points, this is Robin.

Hi Ms. Smith.

This is hearing Officer Keith from Texas workforce commission. I was scheduled to conduct your unemployment here today. Is anyone else participating on behalf of the employer besides yourself?

No, no one else.

All right, thank you ma'am. Please hold the rest of the cold.

Okay.

Hello?

Hi, Ms. Condra. Yeah, this is hearing Officer Keith with the Texas workforce commission. I'm scheduled to conduct your an appointment hearing today.

Yes, I'm ready.

Um, I just wanted to see, there's several people listed on the line for you. I have Blair Castro, John Barker, David Kram, Jordan Holland, and Jesse Smith. Are there is there anyone else supposed to appear today on behalf of yourself besides the people I just listed?

Uh just just um.

Okay and is there anyone that's not appearing today?

I don't want to call people and waste our time if um there's people that won't be appearing.

Um, they, they all confirmed yesterday, so it, they should be available.

Okay.

All right. Um please be ready to contact them if they don't answer. And contacting this castro. I've been forwarded to an automatic voice message. Gastro is not answering.

I'll I'll message her now.

Your call has been forwarded.

Hello?

Hi Mr. Barker.

Say again?

Mr. Mr. Barker, this is hearing officer from Texas workforce commission, I'm scheduled to conduct the unemployment hearing today for Amanda Condra, you have.

Okay.

Can you please hold while I set up the rest of the call, go ahead and mute yourself until I talk to you specifically, thank you.

Hello?

Hi, Mr. Crumb, this is Hearing Officer Keith from the Texas Workforce Commission. I'm conducting the unemployment hearing today. Can you please mute yourself until I speak to you?

Yes, ma'am.

Thank you.

Good morning.

Mr. Holland, this is hearing Officer Keith from the Texas Workforce Commission.

I'm scheduled to conduct your unemployment, the unemployment hearing today for Amanda Kondrat, yes. Can you please mute yourself until I speak to you?

Yes, ma'am.

Thank you.

Hello?

Hi, Mr. Smith, this is Haring Officer Keith from the Texas Workforce Commission.

I'm scheduled to conduct the unemployment hearing today. Can you please, um, meet yourself why, uh, until I speak to you specifically?

All right thank you.

Miss contract, yeah, you were the primary representative in the last hearing. Will you remain being the primary representative today?

Um, Blair is supposed to, to be the primary representative this time, um, and she said, sorry and to try again.

I will try her one more time.

I've already tried twice Hello?

Hi Ms. Castro.

Hey, good morning.

This is hearing officer case with the Texas workforce commission.

What is your relation to the claimant?

Hi, she asked me to be here today to assist her as her representative.

Okay um did you work with the climate?

No.

Okay.

All right um, I will put you down as a representative. Will you be testifying at all today?

No, just asking questions and uh making getting clarity on things just so just there to ask questions pretty much.

All right one moment.

I believe I have everyone signed in now.

Okay.

All right.

Hey, thank you, everyone, for holding. Well, I swore everything out. I wanna make sure that I have everyone who is here. Listed, have. All right. We're on the record and appeal number 371904 form hearing officer Keith, Texas workforce commission in this hearing is being conducted on May 2nd, 2024 at 730 AM via conference call originating from Floresville, Texas.

This hearing is being digitally recorded to preserve the record, and it is a continued hearing, um, due to additional time needed from a previous hearing. Present is the claimant, Amanda Elcondra, yeah, with last 4 digits of social security number, is 8866. Is that correct, Misconduct, yes?

Yes.

All right thank you.

Also present today on behalf of the claimant are John Barker, Blair Castro, David Krem, Jordan Holland and Jesse Smith. The employer in this case is all points logistic, today present on behalf of the employer is Robin Smith. And the employer account number on file is 133-161538. Is that correct, Miss Smith?

Yes.

Did you receive the hearing packet for today, Ms. Condrev?

Yes.

Ms. Smith, did you receive that?

Yes.

Okay. I'm taking administrative notices and notice and hearing package on mail too and receive 5 parties. Did you send any additional documents for today that weren't included in the packet in this contract yet?

I I did.

That were not included in the hearing packet?

Uh, yes, I submitted additional information um, uh, with with 2 business days to uh, for it to be reviewed.

And how did you submit it?

Um through fax?

Do you know what fax number you sent it to?

Sure, let me let me pull that up.

And are you sure it's not? In the hearing packet that was sent to you?

Uh, yes, it was additional information.

That was not included in the new hearing packet.

Uh, correct.

It was submitted uh in, it was in the middle of the night about 2 days ago?

Okay, just 12nd. We did not. We did not receive it on our end.

Did you also send it to the employer?

I did.

Okay Ms. Smith, did you receive the additional documentation from the claimant?

Yes, I did.

What is the additional documentation misconduct is?

Uh, let me, pull it up, um, let's see, tell me briefly why.

Um, it was uh, the updated information with like, um, updated wage information and, um, there was a meeting where in October, the, uh, management had talked about how there was going to be, uh, somebody that was going to need to be laid off. Um, there was also another meeting that, that the management had, had designated that they could be reached out to directly, uh, there or, uh, Robin was the contact, like if I was having a problem with Brick.

Um, Ms. Ms. Condra, yeah.

Could you just, could you just, um, briefly state why the information is relevant to your actual separation, just very briefly.

Sure.

Sure, um, it, it shows that, um, that any thing that, that, uh, that Robin had said that, um, that it was not true, um, or was not the complete information, so it was just giving a better, better view of what was happening.

Okay, and your, are you, is that in response to her testimony?

Um, in, in response to your testimony.

Also, she had submitted, uh, additional information saying that I had not, um, disclosed my disability at any and that is not true.

Are you able to email that information?

Uh ye- yes I can.

Okay um please email it to me. I'm gonna give you the email address. It's appeals A P P E A L S dot evidence. At T W C dot Texas T E X A S dot gov. If you'd like, please repeat that.

Uh, yes, appeal dot evidence at TWC dot Texas dot gov.

Yes, and Texas is spelled out and appeals has an S on the end.

Okay, give me just a moment.

Officer Keith. The documentation that I received is from a meeting that occurred on April the 7th of 2023.

Which is prior to any of the activity that happened with Amanda in all points.

Is that correct, Miscondra, yes?

Um, it is relevant information, um, and and as well as, uh, I had notified that, I had notified Robin, that's.

Hold on, Miss Condra, yeah, Miss Condra, yeah.

Is it true that the information is from an from a meeting in April of 2023?

Um, well that is when I 1st started reaching out about the problems I was having.

Uh, but yes, it was from management telling.

Okay, hold on, Miss, please don't interrupt.

Please don't interrupt.

==Miss Condra, yeah. I need you to listen and this is going to be throughout the hearing. Um, I know there's certain things that you want to state, um, and that you think are important for me to hear, but I need you to listen very carefully to the question that I'm asking to make sure that I'm, um, getting the correct answer for the record. Um, so I don't want you to accidentally state something that wasn't the answer to the question because you didn't listen to the question. Okay? So I just want to make sure that you listen carefully to the question.== The question is, is the information from a meeting? In April of 2023.

Uh that is one part of the information that I submitted.

Okay and is the other part from later dates?

Uh yes.

Okay, thank you.

Ms. Smith, do you have any other comments?

Um, yes.

So, the information that I received, if I received the correct information that uh Amanda is gonna email you, is a recording of a meeting.

That occurred with Brent, on April 7th of 2023, which is prior to all points becoming involved around the end of August, September timeframe with, the issues that were going on.

Um, the other, just to make this, hold on, miss, miss. Ms. Smith, um, just to make this less confusing. I'm going to go ahead and ask that Ms. Condra. Send the documentation to me and you in the same email. Um, could you please provide Ms. Kondra?

You have your email address, Ms. Kondra?

When you send the email, can you make sure that you send it to both of us at the same time and also make sure that you include the case number and you can include hearing Officer Keith and the subject line as well?

Um, Ms. Smith, please go ahead and give Ms. Kondra, you have your email address.

It is R. Smith, R S M I T H. At all A L L points P 0 I N T S L L C dot com.

That is Condra, yes?

Uh I I got it, yes.

Can you repeat it just to make sure that it's the correct email address?

Sure. Uh R Smith at all points LLC dot com.

I'm gonna go ahead and continue.

I understand that you both have some concerns about this information, and I'm gonna continue through the beginning portion of the hearing just because we have a lot to get through. Um, before we, um, before we start even taking testimony or even admit this information into evidence. So I'd like to go ahead and continue until Ms. Conduct can get that information sent to us, okay?

Okay.

All right. So this, hearing came about from an appeal that was filed by the claimant on February 22, 2024 to a determination dated February 9, 2024. And that determination found that the claimant was disqualified from receiving benefits because she was discharged from last work, but were connecting misconduct. And that the employer would not be subject to charge back as a result of the claim. 1st issue today is whether or not the claimant was separated due to, as a result of discharge for connected misconduct or voluntarily quote without work connected, good cause, and the 2nd issue is whether or not the employer's account should be charged back as a result of the claim. I'll begin by taking background information and then I'll begin taking. Uh, and I've already taken background information. So actually today, I'll begin by, um, finishing with the questions I have for the employer and then allowing the claimant to question the employer. And then, um, it will be the claimants opportunity to give testimony and then the employer will have the opportunity to question the claimants.

You have the right to testify and call witnesses and question them.

You also have the right to question the other party and its witnesses.

You have the right to present documents for evidence if documents are admitted.

It's so they can be discussed, testimony regarding the contents will be taken once the document is admitted, but I ask that you not refer to document, not previously disclosed, and do not prompt the testimony of any witnesses, if the parties have more than one

person participating, they have the right to invoke the role, which means that additional witnesses would be restricted from hearing testimony, until it is their time to testify. If you wish to invoke this right, please let me know.

But I'm there, I'll be issuing a written decision in which you are 14 days to appeal from the date. It is mailed the day that you receive it. For that reason, it's important that I have the correct mailing address. I'm gonna go ahead and read the addresses. Since you gave them to me last time and just make sure that they are still correct. Misconduct, you have, is your current address. 2305 Bay Area Boulevard, apartment 1606 Houston, Texas 77058.

Yeah.

And Ms. Smith is the correct address for the employer 190 South Sykes Creek Parkway Suite 4 Mayor Island, Florida 32952.

Yes.

All right. Thank you at this time.

Do you have any questions about how this hearing is going to be conducted, Ms. Condra, yeah?

Uh not at this time no.

Ms. Smith.

No.

All right.

And um, I'm gonna wait to admit the hearing packet. And the other information until after we have received the additional documentation from the claimant, misconduct. Yeah, did you get a chance to mail, email that, yeah?

I have, yes.

Right?

Did you receive it?

Miss Smith?

Yes.

Okay.

Is that the same document that you had um received already?

Let me look real quick.

I didn't um, I saw that it came through, but I didn't pull it up.

Just wanna make sure that it's the correct information.

Okay.

I have 3 different emails, Ms. Contract. Which one is the correct one?

Um the 1st one I had sent to you. Uh it's got the, the, the documentation on it. The 2nd one I tried to send it to both of you without it and then the the 3rd one I got the the attachment on and sent to both of you. So either the 1st one or the 3rd one should have the packet attached.

I will open the 2nd one.

And one moment while my computer is loading that um. Okay, do you have any objections to admitting the hearing packet into evidence, Miss Condra, yes?

Uh, no

uh, Ms. Smith, do you have any objections?

No, all right, with no objections, I ruled that the hearing packet is admitted as evidence is exhibit number one.

Do you have any objections to admitting the, um, additional correspondence into evidence?

Miss Smith?

No.

Okay, and Miss, um, Miss, do you have any objections to admitting your additional correspondence into evidence?

Okay, all right.

At this point. I'm gonna go ahead and swear everyone in. Oh, and when the objections I rolled is, I, I, don't know if I did start it, but I'm gonna make sure that I get it in there, uh, with no objections, I will, but the additional correspondence is admitted and evidence is exhibit number too. I'm gonna swear everyone in now. Um, Miss, Kondra, yeah, please state your 1st and last name, spell your 1st and last name and give your date of birth for the record.

My name is Amanda Kandratya, A M A N D A, K 0 N D R A T, apostrophe Y E Z. Um, and my, my date of birth is ██84.

And do you solemnly swear our firm that the testimony that you're about to give in this hearing is the truth under penalty of perjury?

I do.

Ms. Castro, do you swear?

Yes.

Mr. Barker, do you swear?

Yeah.

Mr. Kram, do you swear?

Yeah.

Mr. Holland, do you swear?

Yes.

Mr. Smith, do you swear?

Oh, yeah.

And Ms. Smithy, where?

Yes.

Okay, um, Miss Castro, please date your 1st and last name, give your date of birth, for the record, correct?

Flair Castro.

B L A I R, Castro C A S T R 0, date of birth, ██87.

Mr. Becker.

You may be on mute, Mr. Barker.

Mr. Barker.

I'm sorry, what, what was the question?

Please state your 1st and last name, date of birth and uh, spell your 1st and last name.

John Barker, J 0 H N.

B A R K E R ▓ 53.

Uh Mr. Holland, please do the same.

Jordan, Colin, ▓▓▓▓ 1995.

Thank you uh Mr. Krem, please do the same.

David Crim, T A V I D, K R E M M, date of birth is ▓▓▓ 1991.

Mr. Holland. Can you please also spell your 1st and last name for the record?

I don't think we got that.

Of course. J 0 R D A N. H 0 L L A N.

Smith, please spell your 1st and last name, give your date of birth and state your 1st last name for the record.

Uh, Jesse Smith, J, E, S, E, and I, T, ▓▓▓▓ 1970s.

Okay, and Miss Smith, can you please give your date of birth, job title, 1st and last name? It's about your 1st and last name.

Yes, it's Robin, R 0 B Y N, Smith, S M I T H. I'm the chief administrative officer, and minority owner of all points, logistics LLC. My date of birth is ▓▓ 64.

Thank you.

All right. Okay, um, we ended the, at this point, I'm going to go ahead and go into separation testimony. At the last hearing, we had almost concluded the employer's testimony. I do have one more question for the employer, um, one moment.

Miss Smith. Was the claimants behavior that led to her discharge? Um, did it violate any company policies?

Um, yes.

Okay, and which policy was that?

Conduct policies that are in our employee handbook, we have um codes of conduct.

I can pull up our handbook and list some of the things that are listed there.

Give me just a 2nd.

Was the claimant aware of the policy that she violated it?

There had been several conversations and I had had some conversations and there were some emails and some meetings about how to interact with your management and how to follow your management's lead and guidance. And that was the main.

Had she ever been given the handbook with the policies in it?

Yes, when every employee is hired. They sign a document stating that they know where the handbook is, it's kept on our ADP employee site, so the employees can access it at any time.

Okay and please let me know specifically in the conduct policy or what the claimant violated.

I'm scrolling through right now.

And specifically...

I'm sorry...

No, go ahead.

The final incident, I have as December 29th, when the claimant stated that she was assaulted by another technician, and um, the investigation, um, that she was discharged as a result of that investigation.

So I'm specifically wondering if there's any policies that she violated with that behavior. Um, falsifying a complaint. There is a list in our employee handbook that are guidelines for appropriate conduct, falsifying information is one of those insubordination is also one of those, um those would be the probably the main issues that were, um, concerned here. MS Smith. Do you have anything else that you'd like to add that you haven't already stated?

No not at this time.

Okay miss Castro. Do you have any questions for Ms. Smith?

Yes, I have several questions. Um wanted to start with. Ms. Smith. Could you talk a little bit about Ms. Condratyev's title change and when that occurred and why that occurred?

I don't have any record of her title changing.

She was a personal computer support technician during the time that she worked here. I don't have any record of a title. Change.

All right, okay.

Please continue with your questions.

Miss Castro.

Um, can you specify how many times that you came to Texas?

I don't typically travel to Texas.

Our employees are all over the country so I I don't I I travel to Texas once maybe every 3 or 4 months. And I don't have a badge to get on center, so I typically don't go to any of the centers when I'm traveling.

Okay.

Uh, were there any performance issues with Ms. Condra, you have job duties? And what were those?

There was no, there were no performance issues and no performance issues were claimed in this, in this, in, in this termination.

What did you do to initially investigate when she brought forth her complaints?

Which complaint?

The initial assault that took place.

Allegedly.

We were, we were, um, she let us know about it, and she also let, the prime contractor know about it, and then she went to NASA security, the, from what I understand, and then NASA security took over the investigation, so all points was not in the investigation, and nor was Lidos. NASA security performed the investigation.

Okay.

I am looking at the documentation you sent about the disability status declaration.

Um, one moment, one moment, Ms. Castro, if you are referring to the hearing packet, can you please refer to, you'll see on the top left corner, you'll see um, a number and letter. Can you please state the page number that you're referring to before you continue?

I believe this was sent after the packet itself, um, from Miss Smith.

I didn't send any, Ms. Castro, Ms. Smith didn't send any additional documentation.

Ms. Condra. Yes, did.

Is that what you're referring to?

No, I did. I did send an additional page. I sent a fax on April 24th, that was an additional one, the, the fax was a total of 2 pages, and it was just one page of documentation concerning, um, Is that not in the hearing packet?

Um, that was separate.

No, it was, I was sent this after the 2nd hearing packet arrived, and then it stated if you wanted to send any additional documentation, you could, so after the 2nd hearing packet arrived. I did send one page.

Okay, all right.

Thank you, Miss Smith.

I did not realize that you had sent. Did I ask you earlier if you had sent any additional documentation, Miss Smith?

I thought you did, but there's been some questions you didn't.

No, I did not say I didn't. I said I, I did or.

And this contract, yeah, you received that?

I I did.

Okay. I did not receive that either.

Ms. Smith Are you able to email that to me at this point?

Yeah hold on just a 2nd.

I can, you just, sorry. Can you just um respond in the previous email that um Miss Condra Yevson with the document?

Yes.

Before we refer to the document, I need to have it admitted into evidence that is why I am um stopping everything and interrupting both of you.

Not sure why neither of the documentations for either one of us went through, but I just sent it to you right now. So you should get it shortly.

Okay, and um, do you have any objections to admitting that additional document and 2 evidence, Miss Smith?

No.

And Ms. Contract you have. Have any objections?

Um, I'm opening it. Just want to verify that it's the same.

Okay.

Uh no, I have no objection.

All right with no objections. I ruled that this additional documentation from the employer is admitted in evidence is exhibit number three.

Okay, Ms. Castro, please, um, continue and just keep in mind, um, when you're asking questions, if you refer to any documentation, please just state which documentation you are referring to, and what page if there's a page on it?

Um, go ahead.

Yes, um, in reference to exhibit 3 the one page document, the disability section. It says section 503 disability status. Um, I just wanted to ask, it, on your end, this says, view the

invitation to self identify as an individual disability. No. So does that mean Ms. Condra, you have did not see this invitation and then she did not specify her disability status, that is correct.

Right?

So I'm not sure I understand your question, but when employees in come on board. They go through a process within ADP. It's an electronic process, they identifies, you can see. They identify as a female, they identify their race. They identify whether they are a veteran and they identify whether they have a disability. The answer to the question there is no. To the disability question. The answer is no, an ADA disability, the answer is none, and those would have been, that would have been information Amanda would have put into the system. And that was upon her hire.

Is that a mandatory disclosure for every employee? Or optional?

I do not believe you can leave it. I do not believe it is optional. You have to either answer the questions or decline like she did up under the protected veteran set status. I declined to self identify. You can't just skip it. You cannot just skip through it.

In reference to exhibit 3.

I'm seeing that it looks like she viewed the invitation to self identify. Um answered no and did not specify any disability and you're saying that that was mandatory.

Correct.

Okay.

Any more questions?

Go ahead.

Oh yes, just a couple more um.

Sorry just a moment.

Um, at any point, did Ms. Kendra, you have request ADA accommodations or make you aware after that, that she was unsure or thought she may have a disability that she initially did not disclose that later would like to?

She presented a doctor's note? At one point in time for lifting restrictions and we accommodated that and so did Lidos with her lifting restrictions and that was a a few weeks of a process and then that ended during one of our conversations. She, let's see, I, I have the email here. She stated in a conversation to me after we had begun to have the conversations of how she needed to interact with her management and how she needed to take their guidance. She did tell me that she says I have a disability that let me get to the email real quick. She said it was in an email where she had been told not to work off the clock anymore. Um and she said, I have a disability disorder that can make me feel a strong need to ask questions for things that do not make sense. I do not ever raise my voice or ask rudely, but I do ask questions for clarity. Is this covered by the ADA? And she did not formally present, other than in that email, and I said it's absolutely fine to ask questions in a response to her. But that combativeness refusing to accept or difficulty in accepting answers is not something that would be covered by ADA.

Okay, so there was never any formal request for ADA accommodation is what you're saying?

No. No, there was not.

But she did question if that was covered under the 88 which you replied no.

Yes.

Correct.

Okay.

No, well, what I, what I required was, the ADA says employees can qualify as disabled if their physical or male impairments limit one or more major life activities. Asking questions is not an issue. Refusing to accept or difficulty in accepting answers is what seems to be the issue as well as a general consensus that you don't like being told what to do. That didn't necessarily fall under the ADA. But at the time, she still had not submitted any type of formal request for accommodation or for a disability.

Um.

Switching gears a little bit, can employers change any onboarding paperwork? Or is it the hourly?

One moment, one moment, one moment.

Miss Castro?

Um, please, um, keep your questions relevant to the separation issues.

So, for example, um, relevant to the disability.

Hold on, hold on, Ms. Castro, for example, and this, um, and this question, um, please make sure that you state this employer and not just employers in general.

Okay. Um in relevant to the disability disclosure. Is it possible for all points management to change any onboarding paperwork? Or is that more of the hourly employees duty to update the records after a disability may have been disclosed? Who would be the person to update those records if one was brought forward?

Me.

Okay.

Uh did you investigate any complaints that were made about the work environment initially from Miscondratia?

I'm not sure what you mean about the work environment.

Any of the altercations or inappropriate remarks uh from other employees, the brunches and those things of that nature that were assessed previously.

I'm still not sure I'm following what you're asking me.

If I investigated the workplace environment, I I'm not. I don't I'm not sure what you're asking me.

There's one moment, one moment.

Ms. Smith.

Ms. Castro can you please clarify your question?

I mean, I'm sorry, Ms. Castro. Please clarify your question.

Okay, yes.

Um. In reference to the complaint from Dan Murphy.

I believe it was, um, there was a meeting, I believe.

Can you talk a little bit about that?

Hold on, Ms. Castro.

Can you, can you ask um, less of a broad? Can you ask a more? Uh pointed question please?

Yes.

Brent um the employee Brent.

Can you speak as to why, um, his status right now is his current employee, and were there any complaints made about him?

Brent, who?

I cannot recall his last name at this moment.

Um, okay, 12nd.

Ms. Castro why is Brent relevant?

I w- I would let uh Ms. Kondratya speak to that as she has more details on the situation.

Okay um do you have any other questions?

No, not at this time. Who is um Brent? Why is he not?

Brent Wong. Brent Wong is uh the immediate supervisor that uh I worked under at JSC. Uh, he's a former employee of all points, current employee of the prime contractor Lidos. Um, he is relevant. Because I had, um, started complaining about him, um, there was an incident in, on July, the 12th that resulted in a meeting on July 13th with Litos and and all points, um, that, where he admitted to wrongdoing, and, um,

okay, one moment, Miss, Miss Castro, what is your question?

About Mr. Wong?

I just wanted to ask. Ms. Smith if, um, Ms. Kondrat, you have ever notified about any problems or the outcome.

Can you please ask it like that then? Um so that we have more specific, um more specific question.

Yes, was Ms. Kendra, you have ever notified of problems with Mr. Wong or asked for her side of the incident, which resulted in the meeting on July 13th?

We were called into that meeting. And that was uh what the discussions were about all points was a listener in that meeting, and I do believe that Brent and Amanda both talked about the issues they were having with each other. Hearing that meeting.

Have any additional questions, Ms. Castro, for the employer?

Um, no, not this time.

All right. Um we're gonna go ahead and move on to the claimant side of the testimony. We are um starting to run low on time.

I just want to remind everyone, um, if we can't get through this hearing again today, we will have to reset to another day to make sure that we get all the testimony, um, that both parties are wanting to, that is all relevant testimony.

I'm going to start with Ms. Condra. You have? Miscondra, yeah.

Yes.

Um, were you? Uh, did you report that you were assaulted by another technician on December 29, 2023? Did you report that to your employer?

I did.

Okay, and were, when did the assault happen?

Um, it happened on the 29th. It was uh, an overflow from uh, like previous, um, incident with the, with the same employee on the 28th? That just. So it, the, it's not all.

Hold on, uh Ms. Condra. Yep. I just want to make sure that I have this correct.

Um, you were assaulted on the same day that you filed a report.

Is that correct?

Correct?

And you were also assaulted prior to that.

Um, yes, I was firmly assaulted on the day before, uh, by the same tech, who, um, had said, that she was going to be my new Brent, because she was yelling at me, uh, like Brent had been seen doing regularly.

And what was this person's name?

Uh Susanna Kane?

Okay, and she yelled at you?

Uh, yes, she yelled at me.

What was her child?

Uh she was very angry and it was very sudden and unexpected.

And um, on the, and that was on the 28th, is that correct that she yelled at you?

Uh, on the 28th and 29th.

Okay, on the 29th did she physically assault you at all?

She did.

Okay, okay.

What did she do on the 20? What was the physical fault?

She knocked over boxes um from my uh cart that was between our desks onto my lap while I was working.

Okay, and did she purposefully knock them over?

Yes, she did.

Was she yelling at you at the time that she knocked the boxes over?

Yes, she did, and I was also at the phone on the time, and I had even included in my, uh, police report that there should be a voicemail because I was too distracted to hang up, um, that, that should have had, caught everything.

Um, and. What was the on the 29th when she knocked the boxes over, what was her demeanor?

She was very, very angry. Like I was trying to, I was trying to, to talk on the phone and and she walked up because I had said something to the queue manager that locked up because she and a couple other employees had been loud, um, and then she started screaming that, that, uh, well, nobody knows you were on the phone, uh, and then just yelling. And I, I, I told her that you already threatened me yesterday, like, what are you going to do to me? Uh, and and she stood up and knocked the boxes over. And I said, and that's assault, and then I walked to, uh, the Q manager's office to get away, um, where it was dark and alone.

And um, were you discharged eventually um, on January 4th, 2024 because of this complaint that you filed?

Um, yes, I was, I was told to uh, work remotely, um, until the the 4th and then I went and turned in my equipment on the 5th.

Okay, um, I just want to make sure that this is, um, clear.

Ms. Condra, yeah.

Yeah, please listen carefully to the question that I'm asking you, okay?

Um were you discharged because of the complaint that you filed?

Yes.

Thank you.

And did you falsify that complaint?

No.

All right. And were you ever interviewed regarding the incident?

Um, I was told by security that, um, I had the option of, of them starting an investigation, and, but they would have to take mine and Susanna's badges, and we wouldn't be able to work, um, or the other option was wait until after the new year holiday. Uh come back and see if management can handle uh the situation without security.

Were you ever interviewed by management regarding the situation?

No.

So the only time you ever stated your side of the story was the initial complaint, is that correct? That correct?

Correct.

All right.

Okay. Do you have anything else you want to add that you haven't already stated in this contract, yes?

Um yeah. I would just like to, to touch base, um, on some of the evidence that I had submitted just to make sure that it was all, all in there, on, um, evidence, on page 15 B, uh, from September 18th, I mentioned that I was being targeted by management.

Um. The, there was the, um, let's see, the, the, the meeting that we had had about Brent Long in July, um, that, immediately followed with more retaliation from one of Brent's friends, which is this, this email that is, uh, that was submitted by. By Robin that is on page.. 31nd. Oh, okay. I'm sorry, it's page 39 B. Uh this is on July 19th and Daniel Murphy is um he's also he also is a former all points employee uh that is was hired because he was Brent's friend and fast tracked to uh LIGOS management. Um, and it is, like the, the meeting was on the 13th and then all of a sudden I have a complaint from the 19th, uh, which also, Also explains how I was, um, Helpful uh in there and but but it mentions my shaking which is one of the uh things that I submitted in this newest packet. Um I do have fine tremors. Um, so like shaking is not something that I can tr- control. Um. But as far as, like, I had been talking about, having the disability, um, it wasn't just after I had gotten complaints and it was, like, I never had any complaints, from management until I started talking about how they were not treating me properly.

And I, I did disclose my disability, um, offered medical documentation and, uh, and in, in the response that she had submitted back. Uh, Robin had said that, um, that the ADA only covers disability, that, severely impact, life activity, and work is, definitely a big, um, big work, major life activity, um, that's on page 50 B.

Ms. Condra, you have, um, so after hearing all of the testimony so far, I am going to ask that you, um, not refer to the disability. It's not uh relevant to your actual separation at this point. So you don't need to refer to it. I understand that that's important information. It's just, um, we don't need that for today's hearing, but please continue with the other information that you have that you'd like to add that you have not already stated.
Okay.

Um, may, may I, uh, may I mention that, that this is, is, is not just a single incident?
It is a pattern of harassment that that escalated continuously until, um, like.

Like the, the targeting, it went from, from my workplace to, to Robin when I reported, which she is, the contact, uh, in, in the 1st page of my evidence that I had submitted, uh, 13 B. Her title is Chief Human Resource officer. Um, in the packet that I had submitted, um, a couple days ago. Um, there was a meeting from April where, where Brent Wong had said that we could go to Lidos, or if we were with all points to contact Robin, if we were having problems with him. Uh and this is all tied together because of the, the fact that the person that attacked me. Uh, was doing it, specifically saying that she was my new Brent, and and and that's, it's all, it's, it's all tied together, and I feel like, the ignoring of my request for accommodation. Uh, which, which my disabilities do include, uh, different, different problems with, and and I, and I did disclose that, but, um, that, that, she just completely, ignored. And and I also submitted where, according to, um, employment laws, and office of disability employment policy, on 33 B, there are many accommodations for employees with mental health conditions, uh, which include, uh, on 34 B, this management, supervision, um, and then there's several. There's several different steps that they they could have done that they fail to do, which led to an escalating hostile environment. And eventually, physical assault.

And uh Ms. Condra. Were you ever insubordinate at any point?
I, I do not believe so. I ask questions for clarity. Um, but I do not. I'm not insubordinate.
All right, and do you have anything else you'd like to add that you haven't already stated, Ms. Condrey is?

Um, not at, not at this time.

All right, Miss Castro. Do you have any questions for Ms. Kondra yet?
Um, I do want to, um, clarify that I have taken careful notes and this hearing has been recorded, so please do not have her repeat any testimony. She's already given. However, if you have any questions that um, she hasn't already stated. Please go ahead and ask Ms. Castro.

No, not at this time.

I think we're ready to move on to witnesses. All right, Ms. Smith, do you have any questions for Ms. Kondra, you have?
No.

All right.

Um, we're gonna go ahead and um, Miss Condrajiev, were any of your witnesses present during any of the actual altercations with Suzanne on the 28th or the 29th of December?
Um, yes, uh John Barker.
Okay.

Mr. Barker.

Yeah.

Um, to your knowledge was the claimant ever insubordinate? Did you ever see the claimant, um, act in an insubordinate manner?

Uh, no.

Right? And on December 28th, were you present when the claimant was uh talked to or yelled at by Susanna?

No.

All right, on December 29th were you present? December 29th? No, when when they have the altercation. Yes.

No, I didn't get in there until after it was over and nobody was talking.

Okay, so you didn't see any of the actual events occur. Is that correct?

That's correct.

All right.

Mr. Barker Do you have anything you'd like to add that has not been stated again? Um, I will be cutting um, and interrupting where testimony is being repeated. However, is there anything that you would like to add, Mr. Barker, that you that has not been stated?

Uh, the only thing that is that. Uh. Amanda worked under me for several months at the space bar and I never had any problem with getting her to do what I asked her to.

All right. Ms. Castro Well, one moment. Mr. Barker do you have anything else you'd like to add that you haven't already stated?

No.

All right. Ms. Castro do you have any questions for Mr. Barker?

Yes, very briefly.

Mr. Barker did you walk over after Susanna had knocked the boxes over? Did you see the aftermath of that?

Uh yes. I walked over. After I heard there was an altercation in there.

After you walked over. What was your impression at that time of Ms. Condra, you have disposition?

With her what?

I'm sorry. With her disposition. How how was she behaving after the incident?

Uh she didn't say anything she got up and left at that point.

Okay.

Did you ever feel as though or say to Ms. Kondratyev that management may be looking for a reason to get rid of her.

No, I don't think so.

And did you witness the incident with Brent that um was reported to Lidos on 712.

Yeah.

Can you talk a little bit about what you witnessed at that point?

Uh. All I can. Say is, I felt that Brent was overly aggressive and hostile. Uh, at that point in time.

Okay, thank you. That's all I have.

Right, Ms. Smith, do you have any questions for Mr. Barker?

No.

Okay, um Mr. Kramm.

Do you have anything you'd like to add that has not been stated already? Uh that is relevant to the altercation?

Yes.

I was not there present for the altercation? But, um, I can, uh, confirm that, uh, the person she has the altercation with, uh, does get, uh, upset a lot of the times, and I, uh, that, that's the only thing that I have to add is that, uh, I, think that. If the situation did get out of hand and uh.

Okay.

Do you have anything else you'd like to add, Mr. Crum that you haven't already stated?

Um, can I explain a little bit um, the feeling of targeting?

Um, I don't believe that it's necessarily relevant to, um, you, you can because it is relevant. However, I don't know if it's necessary, if you'd like, go ahead.

Uh, so, I have seen, uh, points where Brent would come out of his office and he would specifically go up to Amanda and uh, tell her that she couldn't, uh, be at her desk on a lunch break or put her head down. And whenever other people were doing it, uh.

I don't know if I have anything other that is relevant at the moment.

Um, Ms. Cash, are do you have any questions for Mr. Krim?

Just very simply um. Can you attest to Ms. Kondratya's character and her work ethic? What was your experience with her?

Yeah, um, she was a great coworker. I know she, uh, I at least I had gotten along with her really well. And I never once had any issue with her, um, when I was on the meeting, I never felt like she was being competitive. Uh, I felt she asked questions and uh, that. That's what I can assess to. I didn't have any issues with her.

Do you have any other questions, Ms. Castro?

No.

Okay, Ms. Smith, do you have any questions for Mr. Krem?

No.

Mr. Holland, do you have anything else you'd like to add that has not been stated?

I can only apply to the claimants character um I was not present during the alter case when I had been working in a separate department at that time.

Holland, do you have anything else you'd like to add that you've already that you haven't already stated?

Um, similar to my coworker, Mr. Crim. I've never had a problem with Ms. Kondretchev. Her performance was always exemplary, within our work group. Uh, I will state that, as well, we do work in the environment, so it was brought up by current, that many of them out of plan, targeting, and a high stress work environment are pertinent to the coast. Things must have gone out of hand, and I do believe that we've got her clients hold some way.

Okay.

Do you have anything else you'd like to add that you haven't already stated?

No.

All right. Uh Ms. Castro, do you have any questions for Mr. Holland?

Nope, he covered all.

All right, Ms. Smith. You have any questions for Mr. Holland?

No, I don't think so.He was a little difficult to understand, but I don't think I have any questions.

All right Thank you. Mr. Smith. Mr. Smith, do you have anything you'd like that that's not been stated?

No, no, just kind of. It was already...

It's hard to I'm not able to understand you, Mr. Smith.

You hear me now?

Yes, I can hear you now.

Thank you. All right. Uh just to confirm what the other people were saying uh she was a good technician uh reliable. I didn't witness the thing with Susana. Uh, but it is a loud and stressful environment like what you said.

All right.

Do you have anything else you'd like to add that you haven't already stated, Mr. Smith?

Uh, no, I don't think so.

All right, Ms. Castro, do you have anything yet? Like to ask, Mr. Smith?

Um no.

Ms. Smith, do you have any questions for Mr. Smith?

No.

All right. At this point, we've concluded taking all the testimony and is there anything else that you'd like to add that's not been stated, Ms. Castro?

Um, no, I just wanted to reiterate that 3 of the last 3 witnesses, um, have stated the environment was a tense work environment, stressful and. And that they believe it.

I'm sorry, Ms. Castro.

I'm not going to, unfortunately, uh, I'm not going to allow you to repeat that testimony or reiterate any testimony. Um, I'm sorry to interrupt you on that. Unfortunately, um, is there anything else you'd like to add that's not been stated?

No, I think we're fine.

Miss Castro?

All right.

And Ms. Smith.

Is there anything you'd like to add that's not been stated?

No.

All right. I'm gonna issue a written decision that's gonna be.

Ms. Hondry, yes.

I'm sorry.

Hi, thank you.

Um I just wanted to um to add that the the last piece of information that I submitted to you um that you got in the email today uh is an email where after our 1st hearing.

Robin reached out to 2 of my witnesses and had told them not to talk about certain things because they didn't need to be brought up uh during a hearing and I believe that that is witness tampering.

Do you have anything?

Can I respond?

One moment.

Ms. Condra. Yeah, do you have anything else you wanted to add that you haven't already stated?

Um aside, aside from that, no.

Miss Smith. Uh I'm gonna give you the chance to respond but 1st I have to give you the opportunity to ask her a question. Do you have any questions for her, Ms. Smith?

No.

All right. Um, what would you like to? Is there anything you'd like to add that hasn't been stated, Miss Smith?

I will respond to what she just stated and then I can ask Mr. Crim and Mr. Holland.

A question? Um, I reached out to them. I I'm getting an ego. I don't know if everybody else is.

All right. One moment, Ms. Smith. Um can you hear me Can you hear me?

Yes, I can hear you.

Okay, that's better.

I don't hear the echo now if you can hear me.

One moment, one moment. Can everyone aside from, um, Ms. Condra, Ms. Castro and Ms. Smith, please mute themselves, so that there's no echo. Um, I do want to state that we will potentially need to reset this hearing, um, because we are at the end of time.

I'm gonna go ahead and let Ms. Smith respond. Ms. Smith, go ahead.

So in the 1st hearing, I was not aware until the hearing started that 2 of the other employees of all points would be on the call. When the hearing was finished, I did reach out to those 2 to ask them if they could have a call with me because I wanted to understand if they had witnessed the event, the final event that took place, the physical assault. They both stated they had not witnessed that event, and since I was not a part of that investigation, and NASA security did it. I didn't know who were witnesses. So that is why I asked for a call with them. We did talk for a few minutes. I in no way instructed them not to share certain things. As a matter of fact, I encouraged them that if they wanted to be a character witness for Amanda and felt that they should do that.

That is perfectly fine and that they should. There was no witness tampering. I wanted to see if they had witnessed the event. And they are our employees. Okay.

Um, did you want to ask questions to them as well?

I could ask Mr. Crim and Mr. Holland both if they believe that I asked them in any way not to share any type of information either during this hearing or with Amanda.

If you want to do one moment, one moment. Did you want to do that, Ms. Smith?

Yes.

Okay um and who was the 1st please repeat the name of the witness.

David Cramm?

I would ask did I ask him to do anything that would be considered witness tampering?
Mr. Krumm?
Um, during the meeting the only thing that was brought up was not to, uh, our things weren't relevant to the unemployment hearing, um, about the workplace environment.
And Ms. Smith, um did you have any other questions for Mr. Krumm?
No.
All right. And then who was the other person that you wanted to ask questions to?
Jordan Holland?
The same question.
If I in any way instructed him.
I will respond and say that none of the questions at the time of that call would, uh, be considered witness tampering, if anything, she was just asking for us to be more clear in our statements, do what is pertinent for the case, and not bring up things that did not have to do with the case. That is absolutely fine.
All right.
Do you have any other questions for anyone, Ms. Smith?
No.
All right, um, do you have anything else you'd like to add, Ms. Smith, that you haven't already stated?
No, I don't.
All right. Um, Ms. Kondra, Ms. Kasra did you have any questions for Ms. Smith?
No.
All right. Um at this point, is there anything else you'd like to add that hasn't been stated, Ms. Castro?
No, right?
This point we have concluded the separation testimony and the hearing it has been concluded. I'm gonna issue a written decision that's gonna be mailed out as soon as possible. Remember that you have 14 days uh to appeal the decision if you choose to do so, we do encourage you to place continue to use all available resources to return to work. Including work in Texas.com and your local workforce solutions center. Remember, it's your responsibility to keep all information such as your mailing address, your email, and your preferred payment methods up to date. The time is now 851 AM and we are joined.
Thank you for participating today.
Thank you.
Thank you.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

AMANDA L. KONDRAT'YEV,
Plaintiff,
v.
NASA JOHNSON SPACE CENTER,
LEIDOS HOLDINGS INC., and
ALL POINTS LOGISTICS LLC,
Defendants.

Civil Action No. 4:25-cv-04785

EXHIBIT K

ADA/Sex Comparator: Brent Wong Promotion



**Brent Wong**

32m · 

I've accepted a new role at work. In my new role, I'll be analyzing and trying to resolve problems that can have an effect on our entire organization and agency. An additional upside is that it's a 100% remote position, and I won't be traveling 50 miles a day anymore!

 Dan Murphy + 42

5 comments

 Like           Comment           Copy