## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

AMANDA L. KONDRAT'YEV,
Plaintiff,
v.

NATIONAL AERONAUTICS AND SPACE
ADMINISTRATION ("NASA");
LEIDOS HOLDINGS, INC.;
LEIDOS, INC.;
LEIDOS INNOVATIONS CORPORATION;
ALL POINTS LOGISTICS, LLC;
TEKFIVE;
SEABROOK SOLUTIONS;
BRENT WONG;
CHRISTY MURRAY;
ED SCARBOROUGH;
ROBYN SMITH;
SUSANA KANE;
JOHN WALTERS;
DANIEL MURPHY;
TRAVIS MCFARLAND;
BRIAN LYNN;
CRISTIAN GARCIA;
TRISTIAN CASTRO; and
CAROLYN DIANNE BRIEF,
Defendants.

Civil Action No. 4:25-cv-04785

**FIRST AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

**JURY TRIAL DEMANDED**

---

**NOTE TO THE COURT:** Plaintiff is proceeding pro se after diligent but unsuccessful

efforts to obtain counsel, including formal requests to Lone Star Legal Aid and multiple

private employment attorneys. Plaintiff has reviewed Judge Hanks' Standing Court

Procedures (S.D. Tex. Jan. 7, 2022) and understands this Court's preference for

professional standards and procedural compliance.

**ACCESSIBILITY NOTE:** Plaintiff has documented disabilities (ADHD, Autism Spectrum Disorder, PTSD, back injury with lifting restriction) and has previously filed a Renewed Combined Motion for Appointment of Counsel and ADA Accommodations (ECF No. 32, filed February 25, 2026, as corrected by ECF No. 33 (Notice of Errata and Filing of Exhibit Package, Feb. 26, 2026) and the Second Notice of Errata and Supplement (filed March 8, 2026)). That motion and its corrections remain pending and set forth Plaintiff's full accommodation package (written-submission modality, written agenda in advance, scheduled breaks, written confirmation of deadlines/orders, written conferral where permitted, and permission for a support person).

---

**Compliance with Judge Hanks' Standing Procedures:**

- **Page Limits:** This Amended Complaint is a pleading under Fed. R. Civ. P. 7(a), not a motion, and therefore is not subject to the 25-page limit in Section 7.A of the Standing Procedures. *See* Fed. R. Civ. P. 8(a).

- **Professional Standards:** Plaintiff has endeavored to meet professional standards for federal court filings despite pro se status and documented disabilities.

- **Evidence-Based Pleading:** All factual allegations are supported by specific evidence citations or marked as "on information and belief" where appropriate.

**Evidence Detail:** Plaintiff has provided detailed factual allegations with specific evidence citations to assist the Court in evaluating this case. While pro se pleadings are liberally construed under *Haines v. Kerner*, 404 U.S. 519, 520 (1972), and *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam) (pro se pleadings held to less stringent

standards than formal pleadings drafted by lawyers; factual allegations must be construed in plaintiff's favor), Plaintiff has endeavored to meet professional standards given the complexity of this employment discrimination case and the significant legal and factual issues presented. A pro se plaintiff's failure to cite every applicable statute or doctrine does not forfeit claims arising from the same operative facts when the pleading puts defendants on notice of the factual basis for liability.

**Administrative Exhaustion:** Plaintiff filed charges with four separate federal and state agencies (TWC, EEOC, OFCCP, NASA ODEO) within months of termination, received Right to Sue notices, and has fully exhausted all required administrative remedies.

**Basis for Amendment:** This First Amended Complaint is filed pursuant to Fed. R. Civ. P. 15. To the extent any claim, defendant, or factual allegation requires leave of Court under Rule 15(a)(2), Plaintiff respectfully requests that leave be granted, as "[t]he court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). To the extent any claim relates back to the original Complaint filed October 1, 2025, Plaintiff invokes Fed. R. Civ. P. 15(c)(1)(B) and the common-nucleus-of-operative-facts standard.

**Intersectional Framework Notice:** Plaintiff is an Asian American woman with documented disabilities. Plaintiff pleads discrimination claims at the intersection of race, sex, national origin, and disability as a protected subgroup under *Jefferies v. Harris County Community Action Ass'n*, 615 F.2d 1025, 1032–34 (5th Cir. 1980) (recognizing intersectional subgroups as a distinct protected class for Title VII purposes because "recognition of [the subgroup] as a distinct protected subgroup... is the only way to identify and remedy discrimination against [that subgroup]"). Plaintiff asserts that her

claims must be analyzed through this intersectional lens and that evidence of discrimination against her subgroup cannot be defeated by evidence of non-discrimination against any single protected class in isolation.

**ADA Accommodation Notice (Written-First Modality):** Plaintiff respectfully notifies the Court that as a pro se litigant with documented disabilities (ADHD, autism, PTSD, anxiety, depression, and back injury with physician-ordered lifting restriction), Plaintiff requires accommodations during litigation proceedings. Consistent with *Tennessee v. Lane*, 541 U.S. 509, 522–24 (2004) (recognizing meaningful access to judicial proceedings as a fundamental concern), SDTX's designation of Communication Access Coordinators, and the Court's inherent authority to manage its proceedings fairly, Plaintiff's primary requested accommodation modality is **written submission** — participation in hearings, conferences, and proceedings via written briefing or written agenda in lieu of in-person, telephone, or video appearance — to the extent the Court determines that oral participation is not strictly required. Written participation is not a preference; it is the communication modality most consistent with Plaintiff's documented disabilities. Real-time verbal interactions with adverse parties trigger PTSD symptoms including freeze responses, dissociation, and cognitive shutdown that render oral participation medically unsafe and procedurally ineffective. Where the Court determines that real-time participation is required, Plaintiff requests that written conferral and written submission remain the default format, with oral participation used only when the Court finds it strictly necessary. The specific accommodation package is set forth in Plaintiff's concurrently-filed (or previously-filed) Renewed Combined Motion for Appointment of

Counsel and ADA Accommodations, as corrected by the Notice of Errata (ECF No. 33). Plaintiff has made diligent efforts to prepare this Amended Complaint to professional standards while managing disability-related barriers including:

(1) **Executive Function Limitations:** ADHD and autism substantially limit Plaintiff's ability to manage complex multi-step procedural requirements, particularly when combined with the emotional demands of reliving traumatic workplace events through legal drafting.

(2) **Processing Challenges:** Plaintiff's disabilities affect her ability to process complex legal procedures and rules simultaneously with substantive legal research, evidence organization, and document preparation.

(3) **EEOC FOIA Files Processing:** Plaintiff received 1,721 pages of EEOC investigation files from two separate Freedom of Information Act requests (FOIA Nos. 460-2025-019437 and 460-2025-019438) containing witness statements, employer position statements, and investigative materials that required careful review and integration. Plaintiff has completed extensive substantive work (drafting, citation verification, evidence vault organization with 445+ items) and respectfully requests liberal construction in light of her pro se status and documented disabilities.

**VERIFICATION NOTE TO THE COURT (CITATIONS):** A subset of the legal authorities cited in this Amended Complaint carry the inline notation "[verification pending — Plaintiff will supplement within 14 days]." Plaintiff includes this notation because she has performed her own pre-filing legal-research review of each cited authority and reasonably believes each citation supports the proposition for which it is

offered, but has not yet completed independent Westlaw/Lexis citator verification of every pin-cite, parallel-citation, and subsequent-history-treatment field. Within fourteen (14) days of the date of this filing, Plaintiff will file a Notice of Supplementation correcting any citation that fails final independent verification, withdrawing any authority that proves unsupportive, and substituting authorities of equivalent or greater authority where appropriate. All factual assertions in this Amended Complaint are supported by Plaintiff's personal knowledge or by documents identified by EV-number in Plaintiff's Evidence Vault, all of which are within Plaintiff's possession and producible in discovery. Plaintiff respectfully submits this notation as a Rule 11(b) record of pre-filing inquiry consistent with the Fifth Circuit's recognition that pro se litigants exercising reasonable diligence may complete legal research on a continuing basis after filing.

## TABLE OF CONTENTS

**I. Introduction**

**II. Parties**

**III. Jurisdiction and Venue**

**IV. Exhaustion of Administrative Remedies**

**V. Factual Allegations**

- A. Plaintiff's Employment and Performance

- B. Plaintiff's Disabilities

- C. Accommodation Requests and Denial Without Interactive Process

- D. Sexual Harassment and Early Protected Activity

- E. The November 2023 VPN Event and Selective Discipline

- F. Assault, Investigation Without Witness Interviews, and Termination

- G. Post-Hearing Witness Tampering Call Reveals Disparate Treatment, Papering Strategy, and Hidden Complaints

- H. False Attestations by Remote HR Management

- I. Pattern of Impossible Standards, Selective Enforcement, and Obsessive Surveillance

- J. Pretext: No Written Termination Notice and Shifting Explanations

- K. Joint Employer Control and Workforce Fragmentation

- L. Leidos Single Integrated Enterprise and Alter Ego Liability

**VI. Causes of Action**

- Count I – ADA Disability Discrimination (All Points & Leidos)

- Count II – ADA Failure to Accommodate (All Points & Leidos)

- Count III – ADA Retaliation (All Points & Leidos)

- Count IV – Rehabilitation Act Violation (NASA)

- Count V – Equal Pay Act (All Points & Leidos)

- Count VI – Title VII Sex Discrimination (All Points, Leidos & NASA)

- Count VII – Title VII Sexual Harassment (All Points, Leidos & NASA)

- Count VIII – Title VII Retaliation (All Points, Leidos & NASA)

- Count IX – Assault and Battery (Susana Kane)

- Count X – Defamation Per Se (All Points & Leidos)

- Count XI – FLSA Retaliation (All Points & Leidos)

- Count XII – Federal Contractor Whistleblower Protection (All Points & Leidos)

- Count XIII – Intentional Infliction of Emotional Distress (All Points, Leidos, Individual Defendants)

- Count XIV – Civil Conspiracy (All Defendants)

- Count XV – Tortious Interference with Prospective Employment (All Points & Leidos)

- Count XVI – Negligence (All Points & Leidos)

- Count XVII – 42 U.S.C. § 1981 Race Discrimination (All Points & Leidos)

- Count XVIII – 42 U.S.C. § 1981 Retaliation (All Points & Leidos)

- Count XIX – 42 U.S.C. § 1981 Interference with Contract Rights (All Points & Leidos)

- Count XX – Negligent Hiring, Supervision, and Retention (All Points, Leidos, TekFive & Seabrook Solutions)

- Count XXI – Fraud / Fraudulent Misrepresentation (All Points, through Robyn Smith as Agent)

- Count XXII – 42 U.S.C. § 1985(3) Civil Rights Conspiracy (All Defendants)

- Count XXIII – Promissory Estoppel (All Points & Leidos)

- Count XXIV – Rehabilitation Act § 504 (Damages — APL & Leidos Entities)

- Count XXV – Title VII Race Discrimination (All Points & Leidos)

- Count XXVI – ADA Hostile Work Environment (All Points & Leidos)

- Count XXVII – Retaliatory Hostile Work Environment (All Points & Leidos)

- Count XXVIII – *[Reserved — withdrawn pre-filing 2026-04-23; preserved for Rule 15 leave to amend]*

- Count XXIX – Title VII Federal-Sector Discrimination (Against NASA)

**VII. Damages**

**VIII. Prayer for Relief**

**IX. Jury Demand**

## I. INTRODUCTION

1. This is an employment discrimination and retaliation case arising from Plaintiff's termination as a PC Support Technician at NASA Johnson Space Center through federal contractors All Points Logistics, LLC and Leidos Holdings, Inc. Evidence references throughout this Complaint correspond to items in Plaintiff's Evidence Vault, a comprehensive database of exhibits that will be produced in discovery and are available for the Court's review.

2. Plaintiff alleges violations of Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act, and the Rehabilitation Act of 1973. As to Defendant NASA, Plaintiff pleads disability discrimination and retaliation under the Rehabilitation Act (Count IV) because the Rehabilitation Act is the applicable federal statute governing disability discrimination by federal executive agencies in this posture. Federal agencies independently assessed Plaintiff's allegations and deemed them "dual filed" under multiple overlapping federal anti-discrimination statutes, confirming the serious, multi-faceted nature of Defendants' conduct.

3. On December 28–29, 2023, Plaintiff reported a workplace assault by coworker Susana Kane to NASA Security and management. On January 4, 2024—three (3) business days later (six calendar days including New Year's Day holiday and weekend)—Defendants terminated Plaintiff (NASA Access Deprovisioning Jan 4 2024) based on a "false report" narrative adopted without interviewing Plaintiff, key witnesses, or obtaining the NASA Security Report. Despite having January 2 and 3 available to conduct a legitimate investigation, Defendants never interviewed Plaintiff or obtained the NASA Security Report during those two work days.

4. Despite using a November 2023 "VPN security event"—a network configuration incident involving multiple employees—as a basis to strip Plaintiff of overtime and subject her to hostile interrogation, Defendants never cited this incident as a termination reason in any record, before or after the fact. Male coworkers who participated in identical work, and other male employees who committed serious security violations, were not immediately terminated.

5. Plaintiff seeks back pay, front pay, compensatory and punitive damages, injunctive relief, and attorney's fees.

## II. PARTIES

1. Plaintiff **AMANDA L. KONDRAT'YEV** resides in Harris County, Texas.

2. Defendant All Points Logistics, LLC is a Florida LLC with principal office at 190 S. Sykes Creek Parkway, Suite 4, Merritt Island, Florida 32952. Service: registered agent Susan Schmidt at same address.

3. Defendant Leidos Holdings, Inc. is a Delaware corporation with principal office at 1750 Presidents Street, Reston, Virginia 20190. Service: The Corporation Trust Company, 1209 Orange Street, Wilmington, Delaware 19801.

4. Defendant Leidos, Inc. is a Delaware corporation and wholly owned subsidiary of Leidos Holdings, Inc., operating as the actual employer managing day-to-day operations at NASA JSC. Service: The Corporation Trust Company, 1209 Orange Street, Wilmington, Delaware 19801.

5. Defendant Leidos Innovations Corporation is a Virginia corporation and wholly owned subsidiary of Leidos Holdings, Inc., named to prevent corporate liability evasion given the complex structure. Service: The Corporation Trust Company, 1209 Orange Street, Wilmington, Delaware 19801. All three Leidos entities operate as a single integrated enterprise under alter ego and single employer doctrines.

6. Defendant **TekFive** is a subcontractor on NASA Contract No. 80NSSC19D0001. Service: via U.S. Marshals upon obtaining current address. TekFive is named because its employee John Walters participated in the coordinated conspiracy to manufacture false complaints against Plaintiff.

7. Defendant **Seabrook Solutions** is a subcontractor on NASA Contract No. 80NSSC19D0001. Service: via U.S. Marshals upon obtaining current address. Seabrook Solutions is named because its employee Susana Kane assaulted Plaintiff on December 28-29, 2023, triggering Plaintiff's termination three business days later.

8. Defendant NASA Johnson Space Center is a federal agency owning and operating NASA Johnson Space Center in Houston, Texas.

9. Defendant Brent Wong was Service Delivery Lead and Plaintiff's direct supervisor at NASA JSC through Leidos. Wong is no longer employed by Leidos as of 2025. Last known workplace: 2101 E NASA Parkway, Building 8, Houston, TX 77058. Service via U.S. Marshals upon obtaining current address.

10. Defendant Christy Murray is Center Operations Manager and was Plaintiff's direct manager at NASA JSC through Leidos. Current workplace: 2101 E NASA Parkway, Building 8, Houston, TX 77058. Service via U.S. Marshals upon obtaining current address.

11. Defendant Ed Scarborough was VP of Operations for All Points, authorized termination, and signed false sworn statements despite never visiting the worksite. Service via U.S. Marshals at All Points, 190 S. Sykes Creek Parkway, Suite 4, Merritt Island, FL 32952.

12. Defendant Robyn Smith was Chief Administrative Officer/HR for All Points, issued the retaliatory Final Warning, categorically denied ADA accommodation with false legal statement, and testified at TWC hearing despite never visiting the worksite. Service via U.S. Marshals at All Points, 190 S. Sykes Creek Parkway, Suite 4, Merritt Island, FL 32952.

13. Defendant Susana Kane was a PCST at NASA JSC through Seabrook Solutions (subcontractor). Kane worked for the same subcontractor as coworkers Jesse Smith and Leo Skelly. On information and belief, Kane made statements claiming she was paid more than other PC Support Technicians on the NASA NEST contract, which if true would constitute systematic wage discrimination under the Equal Pay Act and

Fair Labor Standards Act. Last known workplace: 2101 E NASA Parkway, Building 8, Houston, TX 77058. Service via U.S. Marshals upon obtaining current address.

14. Defendant John Walters was a PCST at NASA JSC through TekFive (subcontractor). Walters manufactured a false complaint on November 27, 2023 to build a termination case against Plaintiff (Walters Observed Negative Behavior Email Nov 27, Walters Negative Behavior Nov 27, Negative Behavior Memo). Last known workplace: 2101 E NASA Parkway, Houston, TX 77058. Service via U.S. Marshals upon obtaining current address.

15. Defendant Daniel Murphy was employed at NASA JSC, first through All Points then through Leidos. Murphy filed a manufactured complaint against Plaintiff (Murphy Complaint Email Jul 2023) and was promoted. Last known workplace: 2101 E NASA Parkway, Building 8, Houston, TX 77058. Service via U.S. Marshals upon obtaining current address.

16. Defendant Travis McFarland was a PCST and later Queue Manager at NASA JSC. McFarland's employer of record at the relevant time is unverified pending discovery (Plaintiff's recollection: historically Tekfive); Plaintiff understands McFarland continues to work at NASA JSC. McFarland participated in disability harassment (Black Friday Deployment List) and post-termination retaliation (Parking Lot Surveillance Photo). Last known workplace: 2101 E NASA Parkway, Building 8, Houston, TX 77058. Service via U.S. Marshals upon obtaining current address.

17. Defendant Brian Lynn was Deputy Program Manager at NASA JSC through Leidos. Lynn participated in the hostile "security interview" and conspiracy to manufacture

pretextual justifications (NASA OCIO Root Cause Analysis - VPN Incident, VPN Incident 001). Last known workplace: Leidos, 1750 Presidents Street, Reston, VA 20190, or 2101 E NASA Parkway, Building 8, Houston, TX 77058. Service via U.S. Marshals upon obtaining current address.

18. Defendant Cristian Garcia was a PCST at NASA JSC through Leidos. Garcia gave a materially false witness statement to NASA Security regarding the December 29, 2023 workplace incident (Garcia Witness Statement - Kane Incident, Cristian Garcia). Last known workplace: 2101 E NASA Parkway, Building 8, Houston, TX 77058. Service via U.S. Marshals upon obtaining current address.

19. Defendant Tristian Castro was a PCST at NASA JSC through Leidos and Daniel Murphy's girlfriend. On August 23, 2023, Castro manufactured a false complaint against Plaintiff, inventing a phantom rule requiring Castro's permission to close delivery tasks, then escalating to management (Christy Murray) to build a pretextual termination case against Plaintiff (Castro Murphy Teams Chat). Last known workplace: 2101 E NASA Parkway, Building 8, Houston, TX 77058. Service via U.S. Marshals upon obtaining current address.

20. Defendant Carolyn Dianne Brief (full name Carolyn Dianne Brief) was Human Resources Business Partner (HRBP) for Leidos at NASA JSC. Brief coordinated directly with All Points HR (Robyn Smith) regarding Plaintiff's employment, including participating in the July 13, 2023 joint employer conference call where Defendants first discussed Plaintiff's harassment report (see Witness John Barker), and conducting follow-up verbal conversations with Smith between July 13 and

September 18, 2023 regarding Plaintiff's "difficulties on the job" — as admitted in All Points' own Position Statement (Bates APL_000005–000013; APL EEOC Position Statement). Despite this direct involvement in employment decisions affecting Plaintiff, Brief's role was concealed from Plaintiff and omitted from initial disclosures. Email: carolyn.d.brief@leidos.com. Office: 281-283-4399. Last known workplace: Leidos, 2101 E NASA Parkway, Houston, TX 77058. Service via U.S. Marshals upon obtaining current address.

21. All Points, Leidos, TekFive, and Seabrook Solutions maintained a joint employer relationship with respect to Plaintiff's employment through the coordinated NASA NEST contract structure, as detailed in Section V.K below.

**NOTE:** Individual defendants (¶¶ 9-20 above) are named for state-law claims only (Counts IX-X, XIII-XVI, XX-XXI, XXIII) and for the federal civil rights conspiracy claim under 42 U.S.C. § 1985(3) (Count XXII). All other federal claims (Counts I-VIII, XI-XII, XVII-XIX) are asserted only against corporate and governmental entities per *Ackel v. National Commc'ns, Inc.*, 339 F.3d 376 (5th Cir. 2003).

### III. JURISDICTION AND VENUE

### Subject-Matter Jurisdiction

1. **Federal Question Jurisdiction.** This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 over Plaintiff's claims arising under the following federal statutes: Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq. (Counts VI, VII, VIII, XXV, and — via the retaliatory-HWE theory — Count XXVII); the Americans with Disabilities Act, 42 U.S.C. §§ 12101 et seq. (Counts I, II, III, XXVI,

and XXVII); the Rehabilitation Act of 1973, 29 U.S.C. § 794 (Counts IV and XXIV); the Fair Labor Standards Act and Equal Pay Act, 29 U.S.C. §§ 206, 215, 216 (Counts V and XI); the Federal Contractor Whistleblower Protection Act, 41 U.S.C. § 4712 (Count XII); and the Civil Rights Acts of 1866 and 1871, 42 U.S.C. §§ 1981 and 1985(3) (Counts XVII–XIX, XXII, and XXVII).

2. **Civil Rights Jurisdiction.** This Court has additional subject-matter jurisdiction under 28 U.S.C. § 1343(a)(3) and (a)(4) over Plaintiff's claims to redress deprivation of rights secured by the Civil Rights Acts of 1866 and 1871 (42 U.S.C. §§ 1981 and 1985(3)).

3. **Declaratory Relief.** This Court has jurisdiction to grant declaratory and further relief under 28 U.S.C. §§ 2201 and 2202.

4. **Supplemental Jurisdiction.** This Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) over Plaintiff's state-law claims (Counts IX, X, XIII, XIV, XV, XVI, XX, XXI, XXIII, and XXVIII), which arise from the same case or controversy as the federal claims — a single, integrated course of discrimination, harassment, retaliation, and post-termination reputational injury at NASA JSC. No ground for declining supplemental jurisdiction under § 1367(c) is present.

## Venue

1. **Title VII / ADA / Rehabilitation Act Venue.** Venue is proper under 42 U.S.C. § 2000e-5(f)(3), made applicable to Plaintiff's ADA claims by 42 U.S.C. § 12117(a) and to her Rehabilitation Act claims by 29 U.S.C. § 794a(a)(1), because: (a) the unlawful employment practices alleged were committed within this judicial district

(at NASA Johnson Space Center, Houston, Harris County, Texas); (b) the employment records relevant to such practices are maintained and administered within this district; and (c) Plaintiff would have continued working in this district but for the unlawful conduct.

2. **FLSA / EPA Venue.** Venue is proper under 29 U.S.C. § 216(b) and 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to Plaintiff's FLSA (Count XI) and Equal Pay Act (Count V) claims occurred in this judicial district, including Plaintiff's work hours, pay administration, and retaliatory discipline.

3. **General Venue.** Venue is otherwise proper under 28 U.S.C. § 1391(b)(2) and (e) because (a) a substantial part of the events and omissions giving rise to Plaintiff's remaining claims occurred in this judicial district; (b) Plaintiff resides in this district (Harris County, Texas); and (c) Defendant NASA is a federal agency with substantial and continuous operations in this district.

### Personal Jurisdiction

1. **NASA.** This Court has personal jurisdiction over Defendant NASA Johnson Space Center pursuant to Fed. R. Civ. P. 4(k)(1)(C), which authorizes nationwide federal service of process, and because NASA JSC is physically located and operates continuously in this district.

2. **Texas-Based Defendants.** This Court has personal jurisdiction over the individual defendants who reside or work in Texas pursuant to Tex. Civ. Prac. & Rem. Code §§

17.042–.045 (Texas long-arm statute) and Fed. R. Civ. P. 4(k)(1)(A), and because each such defendant's tortious acts at NASA JSC are the direct subject of this suit.

3. **Out-of-State Corporate Defendants.** This Court has specific personal jurisdiction over All Points Logistics, LLC (Florida), Leidos Holdings, Inc. (Delaware), Leidos, Inc. (Delaware), Leidos Innovations Corporation (Virginia), TekFive, and Seabrook Solutions because each purposefully availed itself of the privilege of conducting activities in Texas by staffing and performing work under NASA Contract No. 80NSSC19D0001 at NASA Johnson Space Center; Plaintiff's claims arise directly from that Texas-based employment relationship; and the exercise of jurisdiction comports with traditional notions of fair play and substantial justice. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985) [verification pending — Plaintiff will supplement within 14 days]; *Int'l Shoe Co. v. Washington*, 326 U.S. 310 (1945) [verification pending — Plaintiff will supplement within 14 days]. Each out-of-state corporate defendant has continuous, systematic, and substantial Texas contacts through multi-year NEST-contract performance at NASA JSC.

4. **Out-of-State Individual Defendants.** This Court has specific personal jurisdiction over out-of-state individual defendants (including Ed Scarborough and Robyn Smith, Florida) because each (a) purposefully directed acts at Plaintiff in Texas — including issuing or authorizing the September 18, 2023 Final Warning, authorizing the January 4, 2024 termination, and submitting sworn statements to Texas agencies (TWC) concerning Plaintiff's Texas-based employment — and (b) caused foreseeable injury in Texas through defamatory statements aimed at Plaintiff's Texas

employment and reputation. *Calder v. Jones*, 465 U.S. 783 (1984) [verification pending — Plaintiff will supplement within 14 days] (effects test); *Walden v. Fiore*, 571 U.S. 277 (2014) [verification pending — Plaintiff will supplement within 14 days].

5.  **Pendent Personal Jurisdiction.** To the extent personal jurisdiction over any individual defendant may be challenged as to any specific state-law claim, the Court may exercise pendent personal jurisdiction because each such claim arises from the same common nucleus of operative facts as the federal claims over which personal jurisdiction is unchallenged. Severance or dismissal would impair judicial efficiency and risk inconsistent outcomes. *ESAB Grp., Inc. v. Centricut, Inc.*, 126 F.3d 617 (4th Cir. 1997) [verification pending — Plaintiff will supplement within 14 days].

## Article III Standing

1.  **Concrete Injury; Causation; Redressability.** Plaintiff has suffered concrete, particularized, and actual injury in fact — including lost wages and benefits, lost earning capacity, lost Public Trust clearance value, medical expenses (including TMS treatment), emotional distress, and damage to professional reputation — caused directly and proximately by Defendants' conduct alleged in this Amended Complaint, and redressable through the legal, equitable, and declaratory remedies sought in the Prayer for Relief. Plaintiff accordingly satisfies Article III. *Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016) [verification pending — Plaintiff will supplement within 14 days]; *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) [verification pending — Plaintiff will supplement within 14 days].

## IV. EXHAUSTION OF ADMINISTRATIVE REMEDIES

**PLAINTIFF HAS FULLY EXHAUSTED ALL REQUIRED ADMINISTRATIVE REMEDIES**

1.  Plaintiff timely filed charges with the EEOC and Texas Workforce Commission arising from the conduct in this Complaint.

2.  Plaintiff also filed complaints with the U.S. Department of Labor's OFCCP and NASA's Office of Diversity and Equal Opportunity concerning discrimination, harassment, retaliation, and denial of accommodations.

---

**All Points Cannot Claim Lack of Notice—Four Separate Federal and State Agencies Investigated:**

1.  **OFCCP Complaint (Case No. I00311965):** Plaintiff filed complaint with U.S. Department of Labor Office of Federal Contract Compliance Programs on February 13, 2024 (OFCCP Complaint Feb24), alleging discrimination based on **race, sex, disability, and retaliation** on or about January 4, 2024, October 2, 2023, and August 1, 2023. OFCCP has jurisdiction over federal contractors under Executive Order 11246 (race/sex), Section 503 of Rehabilitation Act (disability), and dual-filing authority under Memoranda of Understanding with EEOC for Title VII and ADA claims.

2.  **OFCCP Dual-Filing and Cross-Agency Coordination:** On July 3, 2024, OFCCP formally notified All Points Logistics that Plaintiff's complaint was deemed "dual filed" under Executive Order 11246 (race/sex discrimination), Section 503 of the

Rehabilitation Act (disability), Title VII (via MOU with EEOC), and ADA Title I (via MOU with EEOC). OFCCP coordinated with EEOC, TWC, and NASA ODEO, confirming that Plaintiff's allegations implicated multiple overlapping federal protections. OFCCP closed and referred the matter to EEOC and TWC as "better suited for investigation and resolution"—not because the claims lacked merit, but because sister agencies had more investigative resources for overlapping statutory violations.

3. **OFCCP Record Preservation Order to All Points:** In its July 3, 2024 Notice to All Points, OFCCP specifically warned: "OFCCP and EEOC regulations require you to retain all records pertinent to this complaint and ensure that there is no retaliation because of this complaint." (OFCCP Notice APL Jul24; see also OFCCP Dual-File Notice) This formal notice establishes that All Points had clear notice of **race discrimination allegations** as of July 3, 2024—eight months before All Points filed its Answer claiming race discrimination was outside the scope of administrative charges.

4. **EEOC Charge 460-2024-04943 (All Points):** Plaintiff filed formal EEOC Charge of Discrimination against All Points Logistics, LLC on October 10, 2024 (signed Form 5; EEOC Charge Oct 2024; short Form 5A = EEOC Charge APL), alleging disability discrimination, retaliation, and sex discrimination (sexual harassment, hostile work environment). EEOC dual-filed with Texas Workforce Commission. Right-to-sue letter issued July 3, 2025. Plaintiff filed suit October 1, 2025 (within 90-day deadline). FOIA Request 460-2025-019438 for complete charge file received

December 30, 2025 (790 pages of investigation materials; FOIA Determination APL); companion FOIA 460-2025-019437 for Leidos charge 460-2024-09354 received same day (931 pages; EEOC FOIA Determination Letter).

**TWC Case 3719044:** Plaintiff filed Texas Workforce Commission charge on January 23, 2024. TWC conducted three formal unemployment appeal hearings with sworn testimony: April 3, 2024 (TWC Hearing Transcript - April 3, 2024), May 2, 2024 (TWC May 2 Hearing Pt 2), and June 6, 2024 (TWC Hearing Transcript - June 6, 2024). All Points representatives Robyn Smith and Ed Scarborough testified under oath, submitted position statements, and had full opportunity to defend against Plaintiff's allegations. The **official record is the TWC audio**, and TWC did not provide a written transcript, so any "exact words" are supported via timestamp pin-cites to the audio rather than relying on auto-transcriptions.

1. **NASA ODEO Complaint NCN-24-JSC-00038:** Plaintiff filed complaint with NASA Office of Diversity and Equal Opportunity in February 2024 (NASA ODEO PRE-00047-2024 Intake). NASA ODEO issued Counselor's Report documenting Plaintiff's allegations of discrimination, harassment, retaliation, and denial of accommodations by NASA and its contractors.

---

**Defendants Had Actual Notice of All Claims:**

1. The coordinated investigation by four separate federal and state agencies—OFCCP, EEOC, TWC, and NASA ODEO—provided All Points, Leidos, and NASA with comprehensive notice of Plaintiff's allegations spanning race, sex, disability,

retaliation, harassment, and denial of accommodations. The OFCCP dual-filing determination specifically identified race discrimination as within scope. All Points cannot now claim surprise or lack of notice regarding any basis of discrimination alleged in this Complaint.

2. Plaintiff received Notices of Right to Sue from EEOC and filed her initial complaint on October 1, 2025. **Plaintiff has fully exhausted all required administrative remedies under Title VII, the ADA, and the Rehabilitation Act.**

---

**Dual-Agency Suppression of Race Discrimination Claims — Equitable Tolling, Estoppel, and Scope of Charge:**

To the extent any Defendant argues that Plaintiff's race, color, or national-origin claims were not preserved in the signed administrative charges, that gap was created by the investigating agencies themselves, not by Plaintiff. Two separate federal agencies — NASA's Office of Diversity and Equal Opportunity (ODEO) and the U.S. Equal Employment Opportunity Commission (EEOC) — acted to strip race-related bases from Plaintiff's formal filings despite her having raised them at intake.

1. **NASA ODEO — Blake Directive (May 21, 2024):** Plaintiff's NASA Form 1882 EEO Intake (Feb. 22, 2024) expressly checked **Race (Asian), Color (Asian), and National Origin (Korea)** as bases of discrimination. During the formal Final Interview for Case No. NCN-24-JSC-00038 on May 21, 2024 (Microsoft Teams, 9:30 AM CDT — a meeting confirmed by Blake's 10:12 AM CDT follow-up email that same day), Robert F. Blake, Deputy Director of JSC-ODEO and the EEO

Counselor of record, personally walked Plaintiff through the NASA Form 1355P (formal complaint) and directed her to remove the Color and National Origin checkboxes, telling her she was "basically the same color" — a statement Plaintiff recollects based on her personal knowledge and will memorialize in her forthcoming Declaration. The resulting NF1355P filed three days later (May 24, 2024; ODEO Formal Complaint) reflects both bases stripped. Plaintiff relied on the apparent authority of the Deputy Director of the agency charged with protecting her rights. See Dual-Agency Race Claim Suppression (Blake ODEO + EEOC).

2. **EEOC — Race Box Stripped Between Inquiry and Signed Charges:** Plaintiff's EEOC Online Inquiry on Charge 460-2024-04943 (submitted April 16, 2024) expressly identified **Race** as a Reason for Complaint alongside Sex, Disability, and Retaliation. Between April 2024 and October 2024, EEOC staff circulated multiple draft-charge notifications to Plaintiff (Sept. 19 – Oct. 7, 2024; EEOC APL Draft Charge Notifications Sep-Oct 2024) during which the Race basis was removed. The signed EEOC Form 5 (Oct. 10, 2024) on Charge 460-2024-04943 (All Points) reflects only Sex, Disability, and Retaliation checked; Race is absent. The same pattern appears on the signed EEOC Form 5 (Oct. 30, 2024; EEOC Leidos Charge Signed Email) as amended Nov. 18, 2024 (EEOC Leidos Amended Charge Confirmed) on Charge 460-2024-09354 (Leidos).

3. **EEOC Investigator Discouragement:** EEOC investigators handling Plaintiff's charges told her orally that the Asian race discrimination claim was "too hard to prove unless it was blatant" and that there was "not enough evidence" to pursue it —

statements Plaintiff recollects based on her personal knowledge and will memorialize in her forthcoming Declaration. That discouragement accompanied and explains the removal of the Race basis from the signed charges.

4. **EEOC-Directed Charge Split:** The Leidos charge (460-2024-09354) exists as a separate administrative matter only because the EEOC investigator assigned to the APL charge (460-2024-04943) directed Plaintiff to file a second charge rather than continue investigating Leidos conduct within the original inquiry. Plaintiff's April 16, 2024 online inquiry described a single, integrated course of conduct at NASA Johnson Space Center involving both contractors jointly (including Brent Wong's July 2023 conduct reported to Leidos and All Points together). EEOC — not Plaintiff — controlled the administrative division of that conduct into two charge numbers.

5. **Legal Effect — Equitable Tolling, Estoppel, and Scope of Charge:** Title VII's charge-filing requirement is a non-jurisdictional claim-processing rule subject to waiver, estoppel, and equitable tolling. *Fort Bend County v. Davis*, 587 U.S. 541, 139 S. Ct. 1843 (2019). The Fifth Circuit applies equitable tolling based on "the EEOC's misleading the plaintiff about the nature of her rights." *Melgar v. T.B. Butler Publ'g Co.*, 931 F.3d 375, 380 (5th Cir. 2019), and where "an employee seeks information from the EEOC, and the organization gives the individual incorrect information." *Manning v. Chevron Chem. Co.*, 332 F.3d 874, 881 (5th Cir. 2003). Most recently, the Fifth Circuit held that agency mismanagement short of intentional deception suffices. *Weathers v. Houston Methodist Hosp.*, No. 23-20536 (5th Cir.

Sept. 4, 2024). Independently, the scope-of-charge doctrine permits suit on any claim that "can reasonably be expected to grow out of the charge of discrimination," including claims EEOC should have investigated. *Pacheco v. Mineta*, 448 F.3d 783, 789 (5th Cir. 2006); *Sanchez v. Standard Brands, Inc.*, 431 F.2d 455, 466 (5th Cir. 1970). Because Plaintiff raised race at intake on every filing and the agencies themselves stripped or redirected those bases, exhaustion is satisfied, equitably tolled, or defendants are estopped from asserting the gap they (through the agencies) helped create.

6. **Section 1981 Independent of Exhaustion:** Plaintiff's claims under 42 U.S.C. § 1981 (Counts XVII–XIX) are not subject to any EEOC exhaustion requirement and proceed on their own independent statutory footing. *Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454, 460 (1975).

---

**6a. Continuing Violation Doctrine—All Conduct Timely:** Defendants' discriminatory and retaliatory conduct constitutes a continuing violation spanning from July 2023 (first protected activity—harassment report) through January 2024 termination and continuing through January 5, 2024 post-termination retaliation and beyond (false sworn statements to government agencies through July 2024). Under the continuing violation doctrine recognized by the Supreme Court in *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101 (2002), hostile environment claims are continuing violations where the statute of limitations runs from the last act in the pattern, not the first. The Fifth Circuit applies this doctrine where discriminatory acts are part of one ongoing course of conduct. *Heath*

*v. Bd. of Sup'rs for S. Univ. & Agric. & Mech. Coll.*, 850 F.3d 731 (5th Cir. 2017) [verification pending — Plaintiff will supplement within 14 days] (hostile work environment); *see also Morgan*, 536 U.S. at 117 (confirming continuing violation doctrine applies to HWE claims).

Here, Defendants' conduct formed a unified pattern of discrimination and retaliation: (1) July 2023 sexual harassment and immediate retaliation (Daniel Murphy complaint 6 days later, anonymous accusation 14 days later); (2) September 2023 ADA accommodation denial and 26-minute retaliatory Final Warning; (3) November 2023 VPN incident used for selective discipline; (4) December 2023 assault and 3-business-day retaliatory termination; (5) January 5, 2024 post-termination hostile equipment return and false theft accusation; (6) February-July 2024 false sworn statements to four government agencies to destroy professional reputation. Each act was part of a continuing course of discriminatory and retaliatory conduct designed to punish Plaintiff for protected activities and ultimately remove her from the workplace.

The statute of limitations therefore runs from the last act—at minimum January 5, 2024 (post-termination retaliation) and arguably July 3, 2024 (date All Points received OFCCP notice yet continued submitting false statements)—bringing all prior related conduct within the timely filing period. Even conduct from July 2023 is timely under the continuing violation doctrine because it was part of the same ongoing discriminatory pattern that culminated in January 2024 termination and continued through post-termination retaliation.

1. **Pro Se Status:** Plaintiff proceeds pro se after unsuccessful efforts to obtain counsel. She filed administrative charges with four agencies (TWC, OFCCP, NASA ODEO, EEOC) within months of termination despite extreme financial hardship, single-parent responsibilities, and documented disabilities (ADHD, PTSD, depression, anxiety, autism, and back injury with lifting restriction) affecting executive function. Plaintiff requests liberal construction of any technical deficiencies pursuant to *Haines v. Kerner*, 404 U.S. 519, 520 (1972).

---

## V. FACTUAL ALLEGATIONS

### V.A — Plaintiff's Employment and Performance

1. Plaintiff began working as a PC Support Technician ("PCST") at NASA Johnson Space Center ("JSC") on September 19, 2022. Plaintiff was directly employed by Defendant All Points Logistics, LLC ("All Points"), which served as subcontractor to Defendant Leidos, Inc. ("Leidos"), the prime contractor on NASA's End-user Services and Technologies (NEST) contract, Contract No. 80NSSC19D0001. Plaintiff performed daily computer support for NASA personnel under the direction and supervision of both Leidos management and NASA government employees. (New Hire Transmittal; ODEO Counselors Report)

2. Plaintiff held a NASA Public Trust clearance requiring completion of an FBI background investigation, with elevated hazardous area access at Johnson Space Center — credentials issued by NASA, not by Plaintiff's nominal employer All Points. Plaintiff's NASA government ID badge (Amanda at NASA Workstation -

Badge Visible) and Leidos hazardous access badge (Leidos Hazardous Access Badge Photo) confirm full (not interim) clearance status. The successful completion of a federal security investigation during employment independently establishes Plaintiff's qualifications and trustworthiness, and undermines any post-hoc "security concern" pretext for termination.

3. Plaintiff consistently met or exceeded performance expectations. Prior to engaging in protected activity, she received no legitimate performance-based discipline justifying termination.

4. **December 27, 2023 Ticket Audit: Top Performer Eight Days Before Termination.** On December 27, 2023—just eight (8) days before her January 4, 2024 termination—supervisor Brent Wong praised Plaintiff's performance in a ticket audit via email. Out of approximately 60 tickets evaluated under newly implemented compliance standards, only 6 technicians received passing grades, with only 9 total passing tickets across the entire team. Plaintiff held 3 of those 9 passing tickets, making her objectively the top performer in the audit. Plaintiff responded professionally: "I take great pride in my work and always aim to be thorough, accurate, and compliant with management's requirements and directions." This creates temporal impossibility for legitimate performance-based termination: an employer does not praise an employee as the top performer one week, then terminate that employee for performance or security reasons the next week. The eight-day gap between documented top performance and termination proves the termination was pretextual. (Audit Feedback Email Dec 27)

5.  **After-Acquired Evidence Does Not Apply:** Defendants cannot rely on any alleged misconduct discovered after termination to justify the termination decision. The termination was based solely on the December 28-29, 2023 assault report, which Defendants characterized as a "false report." Any evidence Defendants claim to have discovered after January 4, 2024 is legally irrelevant to whether the stated reason for termination ("false report") was pretextual.

6.  **Alternative Pleading—After-Acquired Evidence Cannot Bar Liability:** Even if Defendants claim to have discovered alleged misconduct after January 4, 2024 termination, the after-acquired evidence doctrine does not bar liability or defeat Plaintiff's claims. *McKennon v. Nashville Banner Publ'g Co.*, 513 U.S. 352, 360 (1995), holds that after-acquired evidence may limit remedies (by cutting off front pay at the point misconduct was discovered), but **cannot provide a defense to liability** for the discriminatory termination decision itself. The Fifth Circuit consistently applies *McKennon*: after-acquired evidence "does not shield an employer from a suit for discrimination," but may only "limit the available relief." *Sellers v. Delgado Cmty. Coll.*, 902 F.2d 1189, 1193 (5th Cir. 1990).

7.  Moreover, Defendants' December 27, 2023 praise email (8 days before termination, calling Plaintiff top performer with 3 of 9 passing tickets in audit of 60 tickets) and 59 Kudos awards in 2023 alone establish Plaintiff's performance was **excellent at termination**—precluding any legitimate after-acquired performance justification. Defendants admitted Kudos were "the only thing" they received about performance, meaning they had no performance basis for termination on January 4, 2024, and any

subsequently "discovered" performance issues are manufactured post-hoc rationalization. After-acquired evidence cannot apply where the employer's own contemporaneous records prove excellent performance at the time of the adverse action.

### V.B — Plaintiff's Disabilities

1. Plaintiff has diagnosed disabilities substantially limiting major life activities including concentration, executive function, working, learning, lifting, carrying, performing manual tasks, and processing complex verbal instructions:

   a. **ADHD:** On November 2, 2022, Plaintiff disclosed her ADHD diagnosis to supervisor Brent Wong and manager Christy Murray, explaining she manages the condition with medication. Both supervisors responded positively, stating "We have ADHD too."

   b. **PTSD, Depression, and Anxiety:** Plaintiff disclosed these conditions and provided medical documentation during employment. After termination, Plaintiff's conditions worsened, requiring intensive psychiatric treatment including transcranial magnetic stimulation (TMS). On November 15, 2024, Plaintiff's provider issued a prescription for an Emotional Support Animal, objective medical evidence of ongoing, serious disability-related impairments.

   c. **Autism Spectrum Disorder:** Plaintiff was formally diagnosed with ASD on March 10, 2025. Although diagnosed after termination, the symptoms and functional

limitations were present throughout employment and contributed to her need for accommodations.

d. **Back Injury / Lifting Restriction:** On June 2, 2023, Plaintiff's treating physician Dr. Mokkala issued a medical restriction limiting Plaintiff to lifting no more than 20 pounds for 6 to 8 weeks due to back pain and related medical conditions. This physical impairment substantially limited major life activities including lifting, carrying, and performing manual tasks required of the PCST position. All PC Support Technicians on the contract, including Plaintiff, rotated through Spacebar assignments as part of standard work distribution. The modified-duty accommodation issue is not that Plaintiff received no Spacebar time — it is that Plaintiff was not permitted to remain at the Spacebar as a modified-duty accommodation when she formally requested one under the ADA, while William Figueredo's extended Spacebar presence was informally permitted without ADA process and without the denial Plaintiff received ("This is not covered by the ADA"). The restriction would have naturally expired on or around mid-July 2023, but was never formally addressed at its natural expiration. Instead, Robyn Smith first invoked and formally declared the restriction "lifted" in her September 19, 2023 email — more than two months after the restriction would have naturally lapsed — in the same email that categorically denied Plaintiff's ADA accommodation request and issued the retaliatory Final Warning. Smith's email states verbatim: "On June 2, 2023 you provided a note from Dr. Mokkala stating you were under a weight lifting restriction of 20 lbs. for 6 to 8 weeks. A follow on note has not been provided so that

weight restriction has been lifted." The timing — invoking a long-lapsed restriction in the same email as the ADA denial and retaliatory Final Warning — constitutes direct evidence of retaliatory pretext. Following the removal of this accommodation, Defendants intentionally assigned Plaintiff large, physically demanding deployments and denied her the ability to swap assignments with other technicians—a practice routinely permitted for male comparators. Male comparator William Figueredo was permitted to remain at the Spacebar indefinitely without any formal ADA documentation, while Plaintiff's documented medical restriction was used against her as a basis for adverse action. Plaintiff was too afraid to seek renewal of the restriction despite it remaining medically necessary, because Defendants' hostility toward her accommodation requests made clear that further requests would result in additional retaliation.

**Disability Stereotyping—Management Used Autistic Communication Traits to Justify Adverse Treatment:** Management's characterization of Plaintiff as "combative," "difficult," and "unable to accept answers" reflects disability-based stereotyping of autistic communication style, not legitimate performance concerns. Research documents that autistic people are frequently stereotyped as "argumentative," "pedantic," "always needing to be right," or "combative" when they engage in literal communication, seek precision in language, or request clarification—core autistic traits, not personality defects.

Dr. Whaling's March 2025 autism evaluation explicitly documents this pattern in Plaintiff's case: "She reported frequent misinterpretations in conversation as she can often

focus on precise wording which others tend to find 'pedantic.' She reported, 'Words mean things. Why else would they be there?'" This clinical documentation proves that the behaviors management labeled as "combative" were autism-related communication differences present throughout employment, not defiance or poor attitude.

**Research Documenting the Stereotype:** A comprehensive 160+ source research synthesis documents that 76% of individuals with Asperger syndrome exhibit pedantic speech patterns—the exact trait Dr. Whaling documented in Plaintiff and the exact behavior management labeled "combative." The "double empathy problem" research demonstrates that communication difficulties between autistic and neurotypical individuals are bidirectional, yet the burden of adaptation falls overwhelmingly on autistic employees. Neurotypical people argue to win; autistic people seek accuracy and clarity. When Plaintiff asked clarifying questions or requested written instructions— behaviors consistent with autism's need for explicit communication—management misinterpreted these disability traits as defiance or argumentativeness. This misinterpretation is a documented pattern: employers routinely mislabel autistic communication traits as "attitude problems" rather than recognizing them as disability-related differences protected under the ADA.

**Twice-Exceptional (2E) Profile Defeats "Too Competent to Be Disabled" Defense:** Plaintiff is twice-exceptional: gifted cognitive ability coexisting with multiple disabilities (ADHD, ASD, PTSD). This is legally significant because Defendants will predictably argue that Plaintiff's documented high performance (top performer in ticket audit, 59 Kudos in 2023) proves she was not substantially limited by her disabilities. The 2E

research literature demonstrates the opposite: gifted individuals with disabilities routinely mask functional limitations through compensatory strategies, making their disabilities invisible to employers until those strategies are overwhelmed—exactly what happened when Plaintiff's workload, hostile environment, and accommodation denials exceeded her compensatory capacity. High performance does not disprove disability; it proves masking, which is itself a documented cost of unaccommodated disability.

**Three Independent Legal Pathways to ADA Protection:**

**Path 1—Actual Disability During Employment:** ASD symptoms were present and substantially limiting during Plaintiff's employment, even without formal diagnosis. Courts protect employees based on symptoms and functional limitations existing during employment, not timing of diagnosis. Plaintiff's need for written instructions (vs. verbal-only), difficulty with unwritten/changing rules, focus on precise language, and sensory sensitivities to hostile interrogation environments were all autism traits that existed throughout her 16-month employment. Post-diagnosis documentation proving pre-existing conditions is recognized evidence.

**Path 2—Regarded As Disabled:** The ADA protects individuals the employer perceived as disabled, even without formal diagnosis. Daniel Murphy's complaint referenced Plaintiff's "shaking" (fine tremors—ADHD/PTSD/anxiety/medication symptom), proving employer perceived disability symptoms. Management's characterization of Plaintiff as "combative" and having "limitations" (can't accept answers, asks too many questions) constitutes disability-based stereotyping—treating Plaintiff as if she had disabling

communication or processing limitations. Perceived disability = ADA protection regardless of diagnosis timing.

**Path 3—Interactive Process Violation:** Once Plaintiff requested accommodations on September 18, 2023, Defendants had a mandatory duty to engage in interactive process under the ADA. Categorical denial without any discussion = per se violation. Diagnosis timing is irrelevant—the accommodation request itself triggered Defendants' legal obligations, which they violated by refusing to engage in any dialogue whatsoever.

## V.C — Accommodation Requests and Denial Without Interactive Process

1. Throughout 2023, Plaintiff repeatedly requested written SOPs for high-stakes technical tasks, particularly VPN-critical Active Directory group assignments. Defendants never provided written SOPs or discussed alternatives.

2. **July 27, 2023 Anonymous Accusation (Robyn Smith Asking If Hiring Accusation Email):** On July 27, 2023—14 days after Plaintiff reported Brent Wong's sexual harassment—All Points HR Robyn Smith accused Plaintiff of complaining about mistreatment, demanding written response by end of Friday but refusing to identify the accuser. Male employees freely discussed job searches without discipline. Robyn's own email admitted Plaintiff had told HR "everything had improved and was going very well," contradicting the anonymous accusation—proving pretext. After reporting harassment July 12-13, Plaintiff immediately saw retaliation (Daniel Murphy's complaint July 19, this accusation July 27). She was approaching her 1-year anniversary while trying to escape an abusive marriage, and

was terrified. When HR asked if things were improving, she said yes out of fear. By September 2023, it was obvious things hadn't improved.

3. **September 18, 2023 All-Day Retaliation—Four Hostile Actions:** September 18, 2023 was Plaintiff's one-year work anniversary, a milestone she was proud of. **By this date, Plaintiff had earned 58 Kudos customer satisfaction awards during her first year of employment (September 19, 2022 through September 18, 2023)**, demonstrating consistently excellent performance throughout her tenure. That morning, NASA customer Spencer S. Searway submitted another Kudos award praising Plaintiff as "awesome as always"—objective third-party recognition through the system management admitted was their "only" performance data source.

4. **2:21 PM – First Hostile Action:** Supervisor Brent Wong sent threatening email about "7 Day Neglected List," demanding response by next business day. This occurred 2 hours 59 minutes **before** Plaintiff's 5:20 PM protected complaint, proving Wong was manufacturing documentation against Plaintiff throughout the day. Combined with witness Reonte's statement that Wong was "building a case," the 2:21 PM email shows premeditation—creating a paper trail of manufactured performance issues before Plaintiff even sent her accommodation request. (Neglected List Email)

5. **5:20 PM – Protected Activity (Sept 18 ADA Disclosure Email):** Plaintiff emailed All Points HR explicitly mentioning her "disability/disorder," asking "Is this covered by the ADA?", offering medical documentation, and reporting off-the-clock work pressure. The tone was calm, professional—textbook accommodation request.

6. **5:46 PM – Second Hostile Action (26 minutes later):** Robyn Smith issued "Final Warning" for "combative behavior" with no prior progressive discipline. **The Final Warning specifically used Plaintiff's off-the-clock disclosure as a basis for discipline:** "you have also stated that you have worked off the clock. This is a violation of timekeeping policies and will result in termination if it continues." This transformed Plaintiff's FLSA-protected complaint into a basis for discipline— punishing the reporter for the very violation she reported, rather than investigating the systemic wage theft she disclosed. The 26-minute response time proves coordination: Brent's 2:21 PM setup email alerted Robyn that Plaintiff might complain; Robyn had discipline ready or was standing by to immediately retaliate. Discovery will prove this coordination.

7. **6:17 PM – Third Hostile Action:** Plaintiff submitted formal written ADA accommodation request with medical documentation, requesting: written SOPs, predictable scheduling, adjustments to reduce sensory overload.

8. **September 19, 2023 – Fourth Hostile Action:** Robyn Smith categorically denied Plaintiff's request with legally false statement: "This is not covered by the ADA and as the employer doesn't require any type of reasonable accommodation." (Robyn ADA Denial)

9. **Legal Significance:** Four hostile actions in 24 hours prove retaliation: (1) Premeditation—2:21 PM email shows targeting before protected complaint; (2) Extraordinary 26-minute proximity; (3) Escalating pattern punishing ADA rights

assertion; (4) No legitimate basis—no performance concerns, no progressive discipline, no good-faith accommodation process.

---

### V.D — Sexual Harassment and Early Protected Activity

1. Beginning in July 2023, supervisor Brent Wong created a pervasive sexually hostile work environment:

   a. **Twin Peaks "Lingerie Day" culture:** Wong organized weekly Wednesday lunches at Twin Peaks (themed restaurant with revealing server attire), encouraging male employees to attend and make sexually explicit comments about servers in Plaintiff's presence.

   b. **Sexually objectifying content:** Wong 3D-printed sexualized anime models and brought them into the shared workspace and displayed them in his office, called Plaintiff into his office alone to show her inappropriate content on his computer, and used work computer to view/purchase such material on Patreon.

   c. **Sexually explicit comments:** Made comments about masturbation and "massage parlors with happy endings" in mixed-gender workplace settings.

   d. **Sexualizing Plaintiff to coworkers:** Repeatedly told male coworker John Riley that Riley and Plaintiff had slept together, spreading false sexual narratives about Plaintiff.

   e. **Unwanted proximity and appearance comments:** Stood unnecessarily close to Plaintiff, made comments on her clothing/appearance despite dress code compliance.

f. **Predatory conduct:** Became nicer when he overheard Plaintiff had marital difficulties, returned to harassment when she didn't divorce—demonstrating gender-based predatory behavior.

g. **Exclusion from workplace culture — denial of NASA official portrait:** Wong and Murray arranged official NASA portrait photography sessions for themselves and friends and displayed those NASA portraits as their Microsoft Teams profile pictures, while repeatedly denying Plaintiff access to the same benefit despite multiple documented requests. When Plaintiff inquired directly about obtaining an official NASA portrait, Wong and Murray redirected her to contact NASA personnel independently rather than arranging the session as they had for themselves and the coworkers in their social circle. When Plaintiff followed up with the referred NASA contacts, she was told her organizational classification (contractor routing / assigned org coding) did not make her eligible for an official portrait session. Plaintiff then offered to pay for the portrait herself and was still denied. The denial — notwithstanding Plaintiff's documented requests, her willingness to pay out of pocket, and her identical work location, NASA badge credentials, and day-to-day working relationships relative to coworkers who received portraits and displayed them as visible status-symbol Teams profile pictures — reflects sex- and disability-based exclusion from a workplace benefit freely extended to male and non-disabled comparators.

h. **Pattern affecting multiple women:** Per Plaintiff's EEOC/OFCCP complaint, "at least two other females on the contract now have also reported my supervisor Brent Wong" for similar conduct.

i. **Exclusion from advancement — Queue Manager role given to supervisor's personal friend without interview; written on-site rule not enforced against his circle:** Defendant Wong served as Leidos Service Delivery Lead on the NEST contract during all relevant times. On June 13, 2024, Wong confirmed in writing to the entire NEST distribution list that the Queue Manager position is not a separate title but "a shift in workload" billed to a PC Service Technician, and that a PCST performing a Queue Manager workload "would need to be on-site 100%." (Wong email, June 13, 2024, "Re: JSC Queue Management Position Available.") On October 20, 2022 — approximately five weeks after Plaintiff's September 19, 2022 hire as a PC Service Technician — Defendant Murray announced a competitive Queue Manager selection (Jasmine Stevens), describing a formal interview process in which candidates demonstrated "courage for putting their names into the hat" and had to "sit in an interview and talk about yourselves." (Murray email, October 20, 2022, "Congratulate our New Queue Manager!") Two weeks later, on November 1, 2022, Murray announced Defendant Daniel Murphy as the new Queue Manager for JSC *without a fresh interview process*, stating that the selection recycled prior materials: "We took the notes from the past interview process to continue that path!" (Murray email, November 1, 2022, "Congratulations Abe and Dan!") On information and belief, Defendant Murphy is a close personal friend of Defendant Wong outside

the workplace — a fact known to Plaintiff through direct workplace observation of their shared social network and common outside-work hobby interests, including their mutual patronage of the same local game shops. On information and belief, this same outside-workplace social network includes additional Leidos/NEST-associated individuals with whom Wong and Murphy shared those interests, and whose workplace treatment Plaintiff observed to reflect the same favoritism pattern alleged herein. Plaintiff, who held the same PCST billet and therefore the same baseline eligibility, was not offered an October 2022 Queue Manager interview and was not informed of the November 2022 selection decision, notwithstanding her documented performance exceeding that of non-disabled, non-Asian-female comparators. In practice during Plaintiff's employment, Defendant Murphy and other employees in Wong's social circle did not work on-site 100% of the time, notwithstanding Wong's written certification that the position required it. On information and belief — based on post-termination information relayed to Plaintiff — Defendant Tristian Castro presently continues to work on the NEST contract at NASA JSC on a remote basis, a rule-exemption Plaintiff was never offered during her employment notwithstanding her documented disabilities and repeatedly-requested reasonable accommodations. The mechanism by which Castro's remote-work exemption was arranged is not within Plaintiff's personal knowledge and is an appropriate subject for discovery. The combination of (i) Wong's written on-site rule, (ii) his departure from that rule during Plaintiff's employment for members of his social circle, (iii) the conferral of a Queue Manager role on Wong's friend without a fresh interview while other

candidates were required to interview, and (iv) the continuing post-termination extension of a remote-work exemption to at least one co-defendant is itself probative of pretext and of sex-, race-, and disability-based discriminatory animus under *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133 (2000) [verification pending — Plaintiff will supplement within 14 days].

2. On July 12-13, 2023, Plaintiff reported Wong's harassment to Robyn Smith (All Points HR), Ed Scarborough (All Points VP), Wong himself, and Christy Murray (Leidos Manager). Plaintiff specifically requested to file a formal harassment complaint because the conduct was severe. Robyn Smith confirmed the formal complaint process and proceeded with a formal meeting on July 13, 2023, conducted via conference call. Critically, Leidos HRBP Carolyn Dianne Brief participated in this July 13, 2023 conference call — as later admitted in All Points' own Position Statement: "All Points was asked to attend a meeting via conference call on July 13, 2023, at 3:30 central time... It was during this call that we were first made aware there were issues between Amanda and Brent Wong." (Bates APL_000005–000013, APL EEOC Position Statement). The Position Statement further admits that "Between the period of July 13 and September 18, Robyn Smith and Dianne Brief (Leidos HR) had a couple of verbal conversations regarding Amanda's difficulties on the job" — proving Leidos HR was directly involved in employment decisions affecting Plaintiff from day one of her harassment report, despite Defendants' subsequent attempts to conceal Dianne Brief's role. Witness John Barker observed Wong yelling at Plaintiff. After the July 13, 2023 formal meeting, Brent Wong

texted Plaintiff an apology for his harassment conduct—contemporaneous evidence corroborating that the harassment occurred and that Wong acknowledged it before later denying responsibility. (Brent Wong Texts - Harassment Apology & Riley Torture)

3. **Disparate Treatment in Complaint Process — Selective Suppression of Multi-Channel Complaint Record:** Immediately following Plaintiff's July 2023 protected activity, Ed Scarborough (All Points VP) and Robyn Smith (All Points Chief Administrative Officer) restricted Plaintiff from making formal complaints to Leidos HR without first going through them — stating that All Points was "a real company," referring to themselves — and further directed Plaintiff not to discuss what Brent Wong had done, while Wong faced no equivalent restriction. To Plaintiff's knowledge, this restriction was imposed on Plaintiff alone; no other All Points subcontractors with whom Plaintiff worked were subject to the same limitation. The restriction was imposed in direct response to Plaintiff's July 2023 protected activity and applied exclusively to Plaintiff, constituting selective suppression of her ability to create a multi-channel complaint record. By requiring Plaintiff to route all protected activity through All Points HR — the same entity that issued the retaliatory Final Warning 26 minutes after her accommodation request, and the same entity that terminated Plaintiff three business days after her December 29, 2023 assault report — Scarborough and Smith ensured that Plaintiff's protected activity remained under their control. This restriction remained in effect on December 29, 2023 and shaped how Plaintiff was able to report the Kane assault: Plaintiff reported through NASA

Security and All Points management (Scarborough), but did not make a formal Leidos HR complaint because of the standing restriction. According to witness John Riley, harasser Brent Wong faced no equivalent restriction and frequently discussed Plaintiff's complaint with Riley at will, including during Riley's job interview process — allowing the harasser to control the workplace narrative while the victim's complaint remained routed through the single All Points channel. This disparate treatment — directing the victim to a single HR channel controlled by the same actors who would later issue retaliatory discipline, while allowing the harasser unrestricted workplace discussion — demonstrates discriminatory enforcement that favored the harasser over the victim and corroborates the Cat's Paw and joint-employer retaliation theories pleaded herein.

---

### V.E — The November 2023 VPN Event and Selective Discipline

**Context:** Weekend overtime shift: Kondrat'yev, Ryan Sauer, and Jordan Hollan worked together to solve urgent computer deployment blockage when automated VPN provisioning system failed to assign required Active Directory group—a system failure, not worker error. No management on site, no documentation provided to workers, no training provided. Three workers used verbal instructions from Sauer based on his experience to manually add AD group. Kondrat'yev initially praised by supervisor Jasmine Stevens for this problem-solving. (ODEO Counselors Report)

1. **Equal Participation:** All three workers participated equally using same manual method on same machines—their own initiative to work around failed system.

Defendants never provided written SOPs despite Plaintiff's prior accommodation requests.

2. **False Statements to NASA:** Leidos managers Murray/Lynn falsely told NASA: (a) Leidos held formal AD/VPN trainings (none occurred); (b) that week's "tech meetup" covered the AD/VPN issue (provably false—Teams recordings show it was about Print Services); (c) Plaintiff received 1-on-1 training (never occurred). These false statements shifted blame onto workers for system failure while concealing Defendants' denial of Plaintiff's accommodation requests. The formal Root Cause Analysis (RCA) investigation further proves selective targeting and false statements: only Plaintiff was subjected to the RCA process, while comparators Sauer and Hollan—who performed the identical VPN work—were not. The RCA documented that Christy Murray formally participated in the NASA investigation, and that Brian Lynn made false representations to NASA during the process, including claiming formal trainings that never occurred. (NASA OCIO Root Cause Analysis - VPN Incident)

3. **NASA's "Unknown by the Government" Answers Contradict Its Own Investigation Records.** In April 2024, NASA Contracting Officers Richard Amiot and Lee Hester responded to ODEO Counselor Robert F. Blake's Contingent Worker Analysis (ODEO Case No. NCN-24-JSC-00038) by answering "Unknown by the Government — Refer to Leidos contract employer" to nearly every question about Plaintiff's work conditions, supervision, training, and daily activities. Yet NASA's own records destroy these denials: the NASA OCIO Root Cause Analysis (NASA

OCIO Root Cause Analysis - VPN Incident), conducted in October 2023—six months *before* the "Unknown" answers—lists Plaintiff by name as a "Tech" participant in a formal NASA-directed federal investigation under NASA SOP SMO-2022-003. NASA cannot credibly claim a worker is "Unknown by the Government" when that same government conducted a formal investigation listing the worker as a named participant, applied NASA-specific standard operating procedures to her work, and documented findings about her training and task assignments. The RCA proves NASA had direct, documented knowledge of Plaintiff's role, duties, supervision, and work conditions—the very subjects NASA claimed were "Unknown." (NASA OCIO Root Cause Analysis - VPN Incident; ODEO Counselors Report)

4. **Agency-Provided Benefits Further Destroy the "Unknown" Defense.** The ODEO Contingent Worker Analysis further documented that Plaintiff "used the clinic when she fell off a NASA bike" (Question 12)—establishing that NASA provided Plaintiff with agency benefits (JSC medical clinic access, NASA-owned equipment for daily use) typically reserved for government employees or workers under direct government control. An employer that provides its own medical clinic and equipment to a worker cannot simultaneously claim that worker is "Unknown by the Government." (ODEO Counselors Report, Question 12)

5. **Robyn Smith's Admissions Confirm NASA Control.** During the same ODEO Contingent Worker Analysis, All Points HR Director Robyn Smith admitted that Plaintiff's "ichiban" (best/top performer) recognition came from "the government

customer," that NASA controlled the physical workspace layout, and that contract workers followed NASA's operational procedures—each admission independently establishing government direction and control over Plaintiff's daily work. Combined with NASA's own RCA investigation records, these admissions establish that NASA exercised the degree of control over Plaintiff's work sufficient to establish joint employer liability, rendering NASA's "Unknown by the Government" answers not merely incorrect but knowingly false. (ODEO Counselors Report; NASA OCIO Root Cause Analysis - VPN Incident)

6. **Hostile "Security Interview":** Management arranged meeting described as "Tech Meetup" but actually conducted hostile interrogation of Plaintiff (led by Murray/Lynn), questioning her as if she intentionally caused outage—despite equal participation by three workers, no training provided, and denied accommodation requests.

7. **Selective Overtime Cancellation:** Brent Wong cancelled Plaintiff's overtime. On information and belief, Sauer and Hollan continued receiving overtime.

8. **Never Cited as Termination Reason:** Defendants never cited VPN event as termination reason—not in contemporaneous records, TWC filings, EEOC submissions, or any document. Plaintiff worked weeks afterward without discipline. Failure to cite this incident (despite using it to strip overtime and conduct hostile interrogation) + favorable treatment of comparators = evidence of pretext. If legitimate security concern, they would have cited it. They didn't—because real reason was retaliation.

## V.F — Assault, Investigation Without Witness Interviews, and Termination

**December 28-29, 2023 Escalation:** Dec 28 (Thursday): Susana Kane threatened Plaintiff in front of Leidos manager Christy Murray, stating she'd be Plaintiff's "new Brent" (yelling reference). Murray witnessed, took no action. Dec 29 (Friday): Kane escalated to physical assault. Plaintiff was on phone with NASA user; call went to voicemail but remained connected, accidentally recording assault. (Ryan Fisher Discord - Assault Audio)

**Witnesses Present Dec 29, 2023:** John Riley (Peripheral Equipment Operator, Seabrook Solutions), Ryan Fisher (Peripheral Equipment Operator, Leidos, Brent Wong's friend—corroborated hearing "raised voices"), John Barker (Queue Manager). All physically present on-site. (Ryan Fisher Discord - Assault Audio)

**Cristian Garcia's False Statement:** Garcia actively horseplayed WITH Kane during assault (confirming proximity), yet told NASA Security his "back was turned" when Kane hit Plaintiff with boxes. Binary proof of perjury: (1) he saw it but lied, OR (2) he didn't see it but gave false witness testimony anyway. Either way, statement demonstrably false. Defendants relied on the false statement to claim "no assault occurred" and justify termination. **Jose's Repeated Complaints About Kane's Sexual Harassment:** On information and belief, coworker Jose repeatedly told Susana Kane and others that Kane's loud sexual moans in the workplace made him uncomfortable and were inappropriate. Rather than stopping after being directly told her conduct was unwelcome and inappropriate, Kane appeared to engage in the behavior more frequently—

demonstrating deliberate, retaliatory sexual harassment. Management never properly addressed this ongoing sexual misconduct despite Jose's repeated objections, demonstrating a pattern of failing to address workplace sexual harassment and creating a sexually hostile work environment that affected multiple employees. The audible and deliberate nature of Kane's conduct—continuing and escalating despite direct complaints—establishes the severity of the hostile environment and Kane's pattern of hostile and retaliatory behavior. (Ryan Fisher Discord - Assault Audio)

**NASA Security's Coercive Choice (Dec 29):** Security officer gave Plaintiff binary choice: (1) NASA investigates, both employees lose badges/paychecks during investigation (Plaintiff couldn't afford rent/child support), OR (2) allow management to "work it out after Jan 1 holiday," both continue working. Plaintiff chose Option 2, trusting management's promise. **That promise was false.** Instead of working it out, Defendants isolated Plaintiff, refused to interview her, terminated her Jan 4—three business days later.

**Immediate Isolation (Dec 29):** Told to "cool off over weekend." NASA Security walked Plaintiff out of Building 8 to her car—treating assault victim like security threat. Plaintiff isolated; Kane (aggressor) remained at work. On information and belief, on **Jan. 2, 2024 (the next business day, given the New Year's Day federal holiday)**, Plaintiff was still listed as telework/no-deployments while Susana Kane had onsite scheduling (see "Deployment Assignments 1-2-24" and "Roll call 01-05" forwards from David Kremm, sent Feb. 9, 2026 from david.a.kremm@nasa.gov). This disparity supports retaliatory animus and disparate treatment.

**Immediate Suspension (Dec 29, 4:39 PM):** Ed Scarborough (All Points VP) voicemail: "Amanda, this is Ed Scarborough from All Points. We need you to stay home until we figure this out." Immediate suspension within hours of protected workplace violence report.

**Predetermination (Dec 30):** Scarborough internal email: "Christy told them nothing happened." This demonstrates predetermination—Murray wasn't present during assault, so statement couldn't be based on personal knowledge. (Ed Scarborough Smoking Gun)

**Investigation Deficiencies—What Defendants Did Not Do:**

- Never interviewed Plaintiff
- Never interviewed witnesses John Riley, Ryan Fisher, or John Barker (all physically present Dec 29)
- Never obtained NASA Security Report before, during, or after termination (Robyn Smith's March 25, 2024 admission: "We were not told the actual results of the security investigation")
- Never preserved or reviewed Microsoft Teams audio recording Plaintiff identified
- Never reviewed security camera footage or access logs

**March 25, 2024 Post-Termination Coordination (Christopher Kindred Email - NASA Joint Employer Coordination, NASA Acting Chief Counsel Suratt - Formal Subpoena Required, NASA Chief of Protective Services Escalation):** Robyn Smith (All Points HR) requested NASA Security incident report for Plaintiff's April 3 unemployment hearing. Internal NASA chain:

- **10:53 AM:** NASA Deputy Chief Kindred forwards request to Chief of Protective Services, noting "Ms. Kondrat'yev was terminated by Leidos" (proves NASA actual knowledge)
- **12:03 PM:** Chief Mather escalates to NASA Acting Chief Counsel
- **1:11 PM:** Acting Chief Counsel Suratt responds directly to Robyn, citing 14 CFR 1263.103: "please provide formal demand per Part 1263" (get a subpoena)

**Legal Significance:** Same-day coordination from NASA Security Deputy Chief → Chief → Acting Chief Counsel responding directly to contractor HR about terminated employee's unemployment hearing proves joint employer relationship and institutional coordination. Robyn sought report to use **against Plaintiff**—turning Plaintiff's own assault report against her—demonstrating continuing retaliation beyond termination.

**Robyn Smith's March 25 Admission:** "We were not told the actual results of the security investigation." Proves Defendants terminated Plaintiff Jan 4, 2024 without knowing what NASA Security found, yet told government agencies under oath "NASA Security determined Plaintiff falsified the report"—knowing falsity. (Robyn Not Told Results)

**Robyn Smith Q&A in NASA ODEO counseling record (ODEO Counselors Report):** The NASA ODEO record reflects that **Robyn Smith (All Points)** stated that **JSC Security did not tell All Points to terminate Plaintiff**, and, when asked whether **Leidos told All Points to terminate Plaintiff**, Smith answered **no**, describing the request as limited to collecting Plaintiff's personal belongings. This creates the same "conflicting story" point documented in All Points' EEOC position statement: a narrower "collect

belongings / remove from contract" narrative versus later "termination instructed" framing.

**NASA Security's Actual Findings:** NASA Security properly investigated, interviewed Plaintiff, documented her account, and prepared NASA Security Incident Report JSC106469 (Security Incident Report). In her official statement to NASA Security, Susana Kane admitted physical contact ("I barely touched the box"), destroying Defendants' subsequent "false report" narrative. Kane's statement also reveals she had already contacted management before the assault report was filed—establishing that supervisors had prior notice of the conflict before Plaintiff's protected activity was formally recorded. NASA Security recommended both Plaintiff and Kane return to work after holidays. Defendants brought Kane (aggressor) back, terminated Plaintiff (victim).

**January 4, 2024 Termination (NASA Access Deprovisioning Jan 4 2024):** Six calendar days after assault report-but only **three business days** with **two intervening work days** available for investigation. Demonstrating temporal impossibility of good-faith investigation.

- **Dec 28-29 (Th-F):** Assault reported. Office minimally staffed (holiday season).
- **Dec 29, 4:39 PM:** Scarborough suspends Plaintiff via voicemail
- **Dec 30-31 (Sa-Su):** Weekend/New Year's Eve
- **Jan 1 (M):** New Year's Day federal holiday
- **Jan 2-3 (Tu-W): Only two work days for investigation—Defendants did ZERO investigation either day:** never interviewed Plaintiff, never interviewed witnesses,

never obtained NASA Security Report, never reviewed Teams recordings/footage. Office minimally staffed; Defendants never waited for normal operations to resume.

- **Jan 4 (Th):** Termination executed

An employer properly investigating workplace violence over holidays would: (1) use two available work days to interview complainant, obtain security report, interview witnesses; OR (2) wait for normal staffing. Defendants did neither. Narrative adopted Dec 30 (Murray's false statement) remained unchanged through two work days that could've been used for investigation.

**Clearance Impact Analysis:**

**What Plaintiff Lost:**

- **NASA Public Trust Clearance** (Plaintiff's NASA government ID badge (Amanda at NASA Workstation - Badge Visible) and Leidos hazardous access badge (Leidos Hazardous Access Badge Photo) prove she held full—not interim—clearance with elevated hazardous area access at JSC, credentials issued by NASA and Leidos respectively, not by Plaintiff's nominal employer All Points—further evidencing joint employer control)

- **Clearance status post-termination: Unknown** (no formal revocation notice received)

- **Job search pattern suggests possible clearance issues**: Multiple interviews but no offers despite qualifications

- **Market impact:** 60-70% of aerospace/defense jobs require some level of clearance

**No Notice—Plaintiff Actively Working:** Plaintiff was logged in teleworking when access suddenly cut—no phone call, email, Teams message, nothing. Abrupt loss caused panic. Plaintiff sent multiple emails, made multiple calls trying to reach someone. No one responded. **Plaintiff had to chase down Ed Scarborough** to learn she'd been fired. Forced to pursue them for answers about her own employment status—maximizing humiliation and distress.

**January 5, 2024 Post-Termination Retaliation—TWO Coordinated Events:**

**Morning: January 5, 2024 Post-Termination Ambush.** The day after termination, Ed Scarborough directed Plaintiff to return equipment. When Plaintiff arrived with witness Andreiy for safety, three people were waiting in coordinated surveillance: Brent Wong, Travis McFarland (approaching from different direction), and Ryan Fisher (Brent Wong's friend and loyal ally). The encounter took place outdoors in cold weather rather than in a private office. Brent Wong falsely accused Plaintiff—in front of multiple witnesses—of stealing her NASA badge, forcing Plaintiff to display her backpack contents like a suspected criminal.

**Afternoon (2:33 PM): NASA SharePoint Staff Meeting Announcement & Instructions Not to Discuss (Brent Staff Meeting Transcript - Termination Announcement Jan 5):** Later that same day at 2:33 PM, Brent Wong (Leidos supervisor) announced Plaintiff's termination to the JSC_WSTF Field Services staff meeting via Microsoft Teams meeting recorded on NASA SharePoint infrastructure (filename: "JSC_WSTF Field Services Staff Meeting-20240105_143327"). The recording shows Wong stating: "Amanda is no longer on the contract...we not discussed this...should

remain private." This announcement occurred on NASA's secured infrastructure using NASA's recording systems, demonstrating joint employer coordination between NASA, Leidos, and All Points. The explicit instructions not to discuss the matter—"we not discussed this...should remain private"—constitute witness tampering under 18 U.S.C. § 1512, as Wong was instructing potential witnesses not to discuss Plaintiff's termination or the circumstances surrounding it. The coordination of TWO hostile post-termination events on the same day—morning hostile ambush with false accusation, afternoon instructions to witnesses not to discuss the termination via NASA infrastructure — demonstrate retaliatory animus extended beyond termination and demonstrates consciousness of guilt.

---

### V.G — Post-Hearing Witness Tampering Call Reveals Disparate Treatment, Papering Strategy, and Hidden Complaints

On April 24, 2024, All Points HR Director Robyn Smith contacted witnesses David Kremm and Jordan Hollan in a post-TWC hearing call. This call—itself potential witness tampering under 18 U.S.C. § 1512, occurring between TWC hearing sessions—revealed critical evidence of disparate treatment and pretext that Defendants could not have anticipated would be recorded. (Robyn Witness Tampering)

1. **Off-the-Clock Contrast — Disparate Treatment Smoking Gun:** During the call, David Kremm told Robyn Smith directly: Kremm described the same FLSA-impacting working-through-lunch pattern as applying to many employees in the group, explaining that the pressure came from management and that employees felt

they had no alternative but to complete work off-the-clock or face escalation to their subcontractor employer. Hollan added that a workplace climate in which remaining employees understood that speaking up risked being targeted. Robyn Smith's reaction: calm, receptive—(Smith responded positively, acknowledging the need to know about workplace issues)—no warning, no discipline, no consequences. This creates devastating comparator evidence: When Plaintiff reported the identical off-the-clock/FLSA violation on September 18, 2023, Robyn Smith issued a Final Warning 26 minutes later that used the disclosure as a basis for discipline. When David and Jordan reported the same systemic violation directly to Robyn Smith on April 24, 2024, she thanked them. The same HR Director, hearing the same complaint about the same practice, took diametrically opposite actions—proving the September 18 Final Warning was retaliation for Plaintiff's protected activity, not a legitimate response to a timekeeping violation.

2. **"Building a Portfolio" — Direct Evidence of Predetermined Termination:** David Kremm described Brent Wong's conduct during this period as building a record of complaints intended to justify removing Plaintiff, and characterized Plaintiff as the next employee Wong was targeting. This witness testimony supports that Wong was manufacturing a termination file — not managing performance.

3. **Witness Description of Removal and Chilling Effect:** Hollan stated that Plaintiff had been singled out for removal in connection with concerns she had raised at work.* Separately, Hollan described a chilling effect in which remaining employees understood that speaking up risked being targeted*—proves the chilling effect of

Plaintiff's retaliation was known and felt by remaining employees, confirming the retaliatory purpose was accomplished.

4. **Hidden July Complaints and Papering Strategy:** Robyn Smith made self-contradicting statements on the call: She stated Defendants had talked with Plaintiff about everything and that Leidos was not building a case, but then revealed that other people had begun reporting Plaintiff starting mysteriously in July—reports Plaintiff was never made aware of. Standard HR practice requires notice and discussion of behavior issues to allow correction. Defendants collected complaints about Plaintiff beginning July 2023—14 days after Plaintiff's harassment report—without ever informing her, then used those hidden complaints to justify termination at TWC and deny unemployment benefits. This proves the complaints were not corrective discipline—they were evidence manufactured for a predetermined termination after protected activity made at-will termination legally risky.

5. **Robyn Smith's Performance Admission:** Robyn Smith stated on the call: *"I know that Amanda had a lot of good quality, and she did get a lot of kudos, so I know she was performing well, and her termination was not based on that performance, not at all."* This is a party admission that termination was not performance-based—eliminating the most common legitimate justification for termination.

6. **Robyn Acknowledged Brent's Behavior Was Plausible:** Robyn Smith stated: *"We know Brant very well, and, um, never have seen this side of Brent, but don't question that it can exist."* This admission—that the harasser's problematic behavior was

plausible—undermines any defense that Plaintiff invented or exaggerated the harassment.

7. **Robyn Smith's Self-Proclaimed Authority Proves Deliberate Indifference and Disability Stereotyping:** On the same call, Robyn Smith stated: *"Amanda became very combative with me one day, which showed me that if she can be combative with me—I'm way above management—if she would get combative with me then I'm sure she would get combative with other people. Any other people."* Robyn Smith further bolstered this claimed authority by attaching her personal resume as **Attachment 1** to All Points' November 26, 2024 EEOC Position Statement (APL EEOC Position Statement)—the very first attachment, before even the Employee Handbook— describing herself as a *"Senior level Human Resource professional with over twenty-five years' experience"* who is *"responsible for administrative functions at the corporate level including human resources, policies and compliance, EEOC, Affirmative Action, disciplinary actions, hiring and terminations."* This is legally significant for four independent reasons:

a. **Authority Proves Deliberate Indifference:** An HR executive who claims to be "way above" site management had the authority and responsibility to stop Brent Wong's harassment, investigate complaints, ensure ADA compliance, and protect Plaintiff from retaliation—and chose not to. This establishes deliberate indifference, not mere negligence.

b. **Circular Reasoning Is Disability Stereotyping:** Robyn Smith's logic—"if she's combative with me (the most senior person), she must be combative with

everyone"—is textbook disability stereotyping. She used autistic communication traits (directness, persistence in seeking clarity, unwillingness to accept vague answers) to manufacture a "combative" narrative that justified the papering strategy. Dr. Whaling's ASD evaluation documents these exact traits as autism-related, not personality defects.

c. **Active Professional Credentials Prove Knowledge, Not Ignorance:** Robyn Smith signs her emails with **"SHRM-SCP, CBP"** after her name (Robyn ADA Denial; Final Warning Sept 18). SHRM-SCP (Society for Human Resource Management – Senior Certified Professional) is the highest-level SHRM certification, requiring demonstrated competence in strategic HR policy-making and **mandatory continuing education to maintain active status**. CBP (Certified Benefits Professional) likewise requires continuing education. These are not honorary titles—they are active professional certifications that require ongoing training in disability law, anti-retaliation protections, and ADA interactive process obligations. Smith placed these credentials in her signature block on the very emails where she denied ADA accommodations without interactive process, issued a Final Warning with no progressive discipline, and used an FLSA complaint as a basis for a disciplinary threat. She was not merely trained to know better—she was actively maintaining professional certifications that certified her competence in the exact areas of law she was violating.

d. **She Authored the Employee Handbook She Violated:** In January 2023, Robyn Smith distributed the All Points employee handbook to all employees, signing as

"HR Director" (Employee Handbook 2023 - Robyn Smith). That handbook contains the company's own ADA accommodation procedures, anti-retaliation policies, progressive discipline procedures, harassment reporting protocols, and investigation requirements. Smith personally authored or approved the policies she subsequently violated in every material respect: she skipped the interactive process she wrote, bypassed the progressive discipline she codified, disregarded the anti-retaliation protections she published, and conducted no investigation under the investigation procedures she established. A 25-year HR executive who holds the highest SHRM certification, authors the company's employment policies, and then systematically violates every one of those policies cannot plausibly claim ignorance of ADA interactive process obligations, FLSA anti-retaliation protections, or the illegality of using an employee's off-the-clock disclosure as a basis for discipline into a Final Warning 26 minutes after protected activity. Her resume—which she voluntarily submitted to the EEOC as Attachment 1, before any evidence—proves she had the training, credentials, and authority to know that every adverse action she took against Plaintiff was unlawful. The question is not whether she knew the law. The question is whether she believed it applied to her.

---

## V.H — False Attestations by Remote HR Management Without Site Access

1. The All Points executives who made every critical employment decision affecting Plaintiff—VP Ed Scarborough and HR Director Robyn Smith—did not hold NASA security badges or clearances and could not pass through JSC security to enter the

facility where Plaintiff worked. During Plaintiff's entire 16-month employment, neither Scarborough nor Smith was ever present at Plaintiff's worksite inside JSC. Plaintiff's only two in-person meetings with Smith occurred entirely off-base at annual All Points holiday events: the December 13, 2022 Holiday Happy Hour at Tommy's Seafood Restaurant (2555 Bay Area Blvd), a company event where the invitation confirmed executive attendance including Smith (Holiday Party Invite Dec 2022; Email to Bike Maintenance - Free Range Bikes)—and the December 5, 2023 Holiday Luncheon at the Gilruth Center (a public facility technically connected to JSC but located outside the security perimeter), where Plaintiff received her one-year service pin just 30 days before termination and All Points publicly praised Plaintiff's group for "bringing in kudos that help All Points with investors" (Service Pin Holiday Party Photo Dec 2023; Holiday Luncheon Invite; Holiday Party Kudos Praise Dec 2023). Smith and Scarborough made every adverse employment decision —the September 18, 2023 Final Warning, the categorical ADA denial, the suspension, and the January 4, 2024 termination—from outside the fence, based entirely on unverified accounts from the same Leidos managers (Wong, Murray) whom Plaintiff had accused of harassment and retaliation. Meanwhile, Plaintiff held both a NASA government ID (Public Trust Clearance) and a Leidos hazardous access badge granting her entry to restricted areas at JSC—meaning the employee had higher security access to her own workplace than the executives who fired her. This physical access disparity independently establishes that NASA and Leidos, not All Points, exercised actual day-to-day control over Plaintiff's work environment,

and that All Points' termination decision was made without any firsthand knowledge of workplace conditions, the alleged assault, or the investigation.

2. **Shifting Titles to Evade Accountability.** The titles used by Smith and Scarborough shifted repeatedly across documents, depending on the audience and purpose—a pattern of strategic misrepresentation designed to claim authority when useful and disclaim responsibility when convenient:

**Robyn Smith** signed Plaintiff's September 2022 offer letter as **"Chief Human Resource Officer"** —the title that told employees she was their HR contact. In January 2023, she distributed the employee handbook as **"HR Director"** . But by September 2023—the month Plaintiff filed her ADA accommodation request— Smith's signature block on the Final Warning read **"Chief Administrative Officer"** , and her ADA denial the next day used the same CAO title. Yet on the same day she denied the ADA request, Smith threatened Plaintiff by phone while identified as **"CHRO"** . In her March 25, 2024 email to NASA's Acting Chief Counsel requesting the security report, she signed as **"CHRO"** again. In her April 17, 2024 ODEO statement, she was **"CAO"** . In the TWC hearing, she was **"HR Director/CAO"** . And in the November 26, 2024 EEOC Position Statement, Smith signed as **"Chief Administrative Officer"** and attached her personal resume as Attachment 1—which claimed she had not held an HR title since **2015**. Yet Ed Scarborough's sworn attestation in the same Position Statement confirmed Smith was "responsible for administrative functions at the corporate level including **human resources, policies and compliance, EEOC, Affirmative Action, disciplinary**

**actions, hiring and terminations**." Smith cannot simultaneously be the person responsible for all HR functions (per Scarborough's sworn statement) and claim she has not been HR since 2015 (per her own resume). One of these sworn representations is false.

**Ed Scarborough** was listed as Plaintiff's **"Manager"** on the September 2022 New Hire Transmittal. His email signature identified him as **"VP Florida Operations"**—a title referencing All Points' Merritt Island, Florida office, with no connection to JSC or the NEST contract in Texas. Yet in his November 21, 2024 sworn attestation to the EEOC, Scarborough identified himself as **"VP and General Manager"** with "program management oversight of NEST contract"—claiming direct oversight of the very contract he had never visited.

Notably, the Final Warning signature block reveals that **Smith also operated from the same Florida office**: "190 S. Sykes Creek Parkway, Suite 4, Merritt Island, FL 32952." Both executives who controlled every employment decision affecting Plaintiff worked from the same office in Florida, over 1,000 miles from Plaintiff's worksite—yet neither ever set foot inside JSC.

3. **Comparator: Other Subcontractors Provided On-Site Management.** Plaintiff observed that other PC Support Technicians employed by different subcontractors on the same NEST contract had their subcontractor managers come on-site to JSC to conduct in-person meetings, discuss working conditions, and address employee concerns including compensation. All Points never provided comparable on-site management presence during Plaintiff's entire 16-month employment. The NEST

contract (Contract No. 80NSSC19D0001) likely contains requirements for subcontractor management accessibility and employee support—a discovery target that may reveal All Points' contractual obligations to provide on-site HR presence that they failed to meet.

4. Throughout Plaintiff's employment and continuing after her termination, Defendants' management made materially false statements to federal agencies, state agencies, and within internal proceedings—a coordinated pattern of false attestations designed to conceal discrimination and manufacture post-hoc justifications for retaliation.

5. **Shifting and Contradictory Termination Narratives.** Defendants provided materially inconsistent explanations for Plaintiff's termination across different proceedings, each contradicted by their own documents:

a. To the Texas Workforce Commission, Defendants characterized the termination as based on Plaintiff's "false" assault report—yet Robyn Smith admitted on March 25, 2024 that "We were not told the actual results of the security investigation" (Robyn Not Told Results), proving Defendants never verified whether the report was false before terminating Plaintiff.

b. To the EEOC, Defendants implied NASA directed the termination—yet in the NASA ODEO Contingent Worker Analysis (ODEO Counselors Report), Robyn Smith stated that JSC Security did not tell All Points to terminate Plaintiff, and that Leidos's request was limited to collecting Plaintiff's personal belongings.

c. In the EEOC Position Statement (APL EEOC Position Statement), Defendants shifted to performance-based justifications—yet Robyn Smith stated on the April 24,

2024 recorded call (Robyn Witness Tampering): "her termination was not based on that performance, not at all."

d. At various points, Defendants cited "combative behavior"—yet Dr. Whaling's March 2025 autism evaluation documented the labeled behaviors as autism-related; and Defendants' own December 27, 2023 audit showed Plaintiff was the top performer with 3 of 9 passing tickets.

6. **Remote HR Decision-Making Without Direct Workplace Knowledge.** Robyn Smith, the HR executive who issued the 26-minute Final Warning, denied the ADA accommodation request, and directed the termination, managed All Points' HR from a remote location—not from NASA JSC. Smith made critical employment decisions affecting Plaintiff without direct observation of the workplace, without visiting the site to investigate complaints, and based entirely on information filtered through the same managers accused of harassment and retaliation (Wong, Murray). This remote management structure enabled Defendants to make adverse employment decisions based on one-sided accounts from Plaintiff's harassers while claiming plausible deniability about workplace conditions.

### V.I — Pattern of Impossible Standards, Selective Enforcement, and Obsessive Surveillance

1. Following Plaintiff's protected activities, Defendants subjected her to a systematic pattern of heightened scrutiny, impossible standards, and selective enforcement not applied to similarly situated male employees—designed to manufacture a paper trail justifying predetermined termination.

2. **Manufactured Documentation Campaign.** After Plaintiff's July 2023 harassment report and September 2023 accommodation request, management created a series of false complaints timed to protected activity: Daniel Murphy's complaint (July 19, 2023—6 days after harassment report); Brent Wong's "7 Day Neglected List" email (September 18, 2:21 PM—hours before Plaintiff's protected complaint); the "Final Warning" (September 18, 5:46 PM—26 minutes after); Wong's "Poor Daily Tag-Up Attendance" complaint (September 20—false; Plaintiff attended the meetings); and the Walters/Murray "Observed Negative Behavior" memo (November 27— containing no specific incidents, dates, or times). Witness David Kremm confirmed: Kremm stated that Wong appeared to be building a record of complaints to justify Plaintiff's removal (Robyn Witness Tampering). Hollan independently stated that Plaintiff had been singled out for removal in connection with concerns she had raised at work.

3. **Selective Enforcement of Workplace Rules.** Defendants enforced rules against Plaintiff that were routinely violated by male employees without consequence:

   a. **Off-the-clock work:** When Plaintiff reported being pressured to work off the clock on September 18, 2023, Robyn Smith used the disclosure as a basis for a Final Warning within 26 minutes. When David Kremm and Jordan Hollan reported the identical systemic practice to Robyn Smith on April 24, 2024, Smith responded: (Smith responded positively, acknowledging the need to know about workplace issues)—no warning, no discipline. Same HR director, same complaint about the same practice, diametrically opposite responses.

b. **Workplace conduct:** Jesse Smith called management "useless" and "incompetent" in front of customers and was told to "go for a walk." Plaintiff's calm, professional emails requesting accommodations were characterized as "combative" and punished with a Final Warning.

c. **Medical accommodations:** Ryan Sauer's accommodation request for a back injury was approved without resistance. Plaintiff's comparable ADA accommodation request was denied within 24 hours, followed by threats of termination for continuing to seek accommodations.

d. **Performance standards:** William Figueredo repeatedly failed to meet job expectations and SLAs yet was accommodated with a Spacebar assignment and retained without discipline. Spencer Adams missed SLAs and traded assignments without approval yet faced no consequences. Plaintiff—the top performer in Brent Wong's audit with 59 Kudos awards in 2023—was terminated.

4. **Obsessive Monitoring and Isolation.** Following protected activities, management subjected Plaintiff to heightened surveillance and isolation: hostile "security interviews" disguised as routine meetings (the "tech meetup" that was actually an interrogation about the VPN event); selective overtime cancellation (Wong cancelled Plaintiff's overtime while comparators Sauer and Hollan continued receiving it); exclusion from workplace culture (denied official NASA photos despite multiple requests while Wong and Murray arranged them for themselves and friends); and Brent Wong spreading false sexual narratives about Plaintiff to coworker John Riley. Hollan confirmed the chilling effect: Hollan described a workplace climate in which

remaining employees understood that speaking up risked being targeted (Robyn Witness Tampering).

### V.J — Pretext: No Written Termination Notice and Shifting Explanations

1. The circumstances surrounding Plaintiff's January 4, 2024 termination independently establish pretext. Defendants failed to follow basic employment practices, and their post-hoc justifications have shifted repeatedly—each version contradicted by their own evidence.

2. **No Written Termination Notice.** Plaintiff received no written termination letter, email, or notice of any kind on January 4, 2024. Plaintiff was logged in and actively teleworking when her access was suddenly cut. She sent multiple emails and made multiple phone calls trying to determine her employment status. **Plaintiff had to chase down Ed Scarborough** to learn she had been fired. The termination letter was provided to the Texas Workforce Commission, and Plaintiff first received a copy at her unemployment appeal hearing—not from her employer. An employer with a legitimate, good-faith basis for termination documents it contemporaneously. The absence of a written termination notice is independent evidence of pretext.

3. **No Progressive Discipline.** The September 18, 2023 "Final Warning" was the only disciplinary action in Plaintiff's 16-month employment—and it was issued 26 minutes after protected activity. No verbal warning, no written warning, no performance improvement plan preceded it. There was no discipline between the September 18 Final Warning and January 4 termination—a gap of 108 days during which Plaintiff continued working, earned additional Kudos awards, and was praised

as the top performer in the December 27 audit. Defendants' entire "disciplinary record" consists of a single retaliatory document.

4. **Temporal Impossibility of Good-Faith Investigation.** Between Plaintiff's December 29, 2023 assault report and January 4, 2024 termination, only two (2) business days were available for investigation (January 2-3, 2024). During those two days, Defendants conducted zero investigation: never interviewed Plaintiff, never interviewed any witness, never obtained or reviewed the NASA Security Report, never reviewed recordings or footage. The termination decision was predetermined on December 30 when Scarborough's email recorded Murray's false claim that "nothing happened" (Ed Scarborough Smoking Gun).

5. **Five Contradictory Termination Narratives.** Defendants have offered at least five materially inconsistent explanations for Plaintiff's termination:

a. **"False report"** — stated to TWC. Contradicted by: John Walters (Defendants' own acting manager) instructed Plaintiff to call NASA Security; Susana Kane admitted physical contact ("I barely touched the box"); Defendants never obtained NASA's investigation results.

b. **"NASA prohibited Plaintiff from site"** — implied to EEOC. Contradicted by: NASA Security recommended both employees return; NASA issued no site-access prohibition; Kane continued working.

c. **"Performance issues"** — raised in EEOC Position Statement. Contradicted by: Robyn Smith's admission "her termination was not based on that performance, not at

all" (Robyn Witness Tampering); December 27 audit showing Plaintiff as top performer; 59 Kudos in 2023.

d. **"Collect her belongings"** — Robyn Smith's statement to NASA ODEO (ODEO Counselors Report), minimizing the termination.

e. **"Combative behavior"** — per Final Warning and EEOC submissions. Contradicted by: autism diagnosis documenting these traits as disability-related; no prior discipline for this alleged behavior.

6. **Shifting Explanations Are Independent Evidence of Pretext.** The Fifth Circuit holds that shifting, inconsistent explanations for an adverse employment action are themselves evidence of pretext. *Burrell v. Dr. Pepper/Seven Up Bottling Grp., Inc.*, 482 F.3d 408, 414 (5th Cir. 2007). Defendants' five contradictory justifications cannot all be true, and their inconsistency proves none was the real reason for termination.

## V.K — Joint Employer Control and Workforce Fragmentation

1. Plaintiff worked within a fragmented three-tier employment structure—All Points Logistics (staffing subcontractor), Leidos (prime contractor), and NASA Johnson Space Center (federal agency)—where each entity exercised substantial control over Plaintiff's work while the corporate structure was designed to diffuse accountability. Under the economic reality test and joint employer standards applied in the Fifth Circuit, all three entities were Plaintiff's joint employers.

2. **Federal Contractor Status.** All Points Logistics, LLC and Leidos Innovations Corporation both performed work under NASA Contract No. 80NSSC19D0001 (the

NEST contract) as, respectively, subcontractor and prime contractor. As federal contractors performing services on a federal worksite (NASA Johnson Space Center), both Defendants were subject to the Federal Acquisition Regulation (FAR) and to contract clauses flowing down from the prime contract, which impose direct, non-delegable obligations on the contractor with respect to its employees' work conditions, supervision, and compliance.

3. **Service Contract Act and Applicable Wage Determinations.** The NEST contract is expressly subject to the Service Contract Act, 41 U.S.C. §§ 6701–6707. NASA Contract No. 80NSSC19D0001, Section I (Model Contract), at FAR 52.212-5(a)(xiii), incorporates by reference FAR 52.222-41, Service Contract Labor Standards (Aug 2018) (41 U.S.C. chapter 67). The contract's own Attachment I-7, Schedule of Fully Burdened Labor Rates, further provides verbatim that "This contract is subject to the Service Contract Act. DOL rate changes, due to new Wage Determinations, will be incorporated into this contract by the Contracting Officer as required." Department of Labor Wage Determination No. 2015-5233, Rev. 25 (July 12, 2023), governing occupation code 14160 (Personal Computer Support Technician) at NASA JSC, was therefore incorporated into the NEST contract and flowed down to All Points as SCA employer of record. As the SCA employer of record, All Points was statutorily obligated to compensate its service employees in accordance with the applicable wage determination, maintain payroll records, control pay rates, and supervise wage-hour compliance — activities that independently satisfy the third and fourth factors of the Fifth Circuit's joint-employer control test.

4.  **Equal Opportunity and Non-Discrimination Clauses.** NASA Contract No. 80NSSC19D0001, Section I (Model Contract), at FAR 52.212-5(a), expressly incorporates by reference the following federal Equal Opportunity and non-discrimination clauses: FAR 52.222-26, Equal Opportunity (Sep 2015) (implementing Executive Order 11246) (subparagraph (viii)); FAR 52.222-35, Equal Opportunity for Veterans (Jun 2020) (38 U.S.C. § 4212) (subparagraph (ix)); FAR 52.222-36, Equal Opportunity for Workers with Disabilities (Jun 2020) (29 U.S.C. § 793) (subparagraph (x)); and FAR 52.222-37, Employment Reports on Veterans (Jun 2020) (38 U.S.C. § 4212) (subparagraph (xi)). These clauses obligated Leidos as prime contractor — and, by mandatory flow-down, All Points as subcontractor performing services on the same federal worksite — to take affirmative action to ensure equal opportunity in employment and to refrain from discrimination and retaliation on the bases of race, color, religion, sex, sexual orientation, gender identity, national origin, protected veteran status, and disability. Each clause binds each Defendant independently with respect to Plaintiff's employment.

5.  **Independent-Contractor Defense Preempted.** Neither All Points nor Leidos can credibly claim Plaintiff was an independent contractor or that either entity lacked control over her employment. The FAR and flow-down clauses in the NEST contract *required* both entities to exercise direct control over Plaintiff's work: All Points was required by contract and federal regulation to manage Plaintiff's wages, hours, benefits, EEO compliance, and recordkeeping; Leidos, as prime contractor, was required to supervise subcontractor performance, manage day-to-day service

delivery at NASA JSC, and enforce compliance with the statement of work—a role that necessarily included direct supervision of subcontractor personnel, including Plaintiff.

6. **Joint Employer Under Fifth Circuit Framework.** Applying the Fifth Circuit's four-factor joint-employer test (authority to hire/fire; authority over work rules, assignments, and conditions; day-to-day supervision and discipline; and control of employee records), both All Points and Leidos qualify as joint employers of Plaintiff. The federal-contractor framework above establishes each factor inherently, independent of any individual decisionmaker's conduct, and the specific acts alleged in paragraphs 7–9 below (Leidos' Brent Wong and Christy Murray directing Plaintiff's daily work; All Points' Robyn Smith and Ed Scarborough managing payroll, issuing the Final Warning, and authorizing termination) confirm what the contract framework already compels.

7. **NASA's Direct Control Over Plaintiff's Work.** Despite claiming Plaintiff was "Unknown by the Government" in the April 2024 ODEO Contingent Worker Analysis, NASA exercised pervasive control:

a. NASA owned and controlled the worksite, equipment (including NASA bicycles), and workspace layout. NASA issued Plaintiff's Public Trust clearance and JSC badge, controlling her physical access.

b. NASA conducted the formal OCIO Root Cause Analysis under NASA SOP SMO-2022-003 (NASA OCIO Root Cause Analysis - VPN Incident), listing

Plaintiff by name—proving direct government knowledge of and involvement in her work activities.

c. NASA provided Plaintiff access to the JSC medical clinic (documented in ODEO Contingent Worker Analysis, Question 12)—an agency benefit typically reserved for government employees or workers under direct government control.

d. All Points HR Director Robyn Smith admitted that Plaintiff's "ichiban" recognition came from "the government customer," that NASA controlled the workspace layout, and that workers followed NASA's operational procedures (ODEO Counselors Report).

e. NASA Security conducted the investigation into Plaintiff's assault report, and NASA ODEO independently investigated her discrimination complaint—direct government involvement in employment-related processes.

8. **Leidos's Day-to-Day Supervisory Control.** Leidos exercised daily supervisory control typically associated with a direct employer: Plaintiff's work was directed by Leidos employees Brent Wong (Service Delivery Lead) and Christy Murray (Center Operations Manager), who assigned tasks, managed scheduling, and imposed discipline. Leidos controlled the timekeeping and labor-allocation systems (confirmed by Robyn Smith's September 1, 2023 email: "you will have a new charge code in the Leidos system"). Leidos managers participated in every adverse action— Wong manufactured the documentation campaign, Murray co-authored disciplinary memos, Murray provided the false "nothing happened" statement, and Murray/Lynn made false attestations to NASA during the RCA.

9. **Coordinated Adverse Actions Across All Three Entities.** Each major adverse action required cross-entity coordination: the July 13, 2023 harassment meeting involved Leidos HRBP Carolyn Dianne Brief coordinating directly with All Points HR Robyn Smith via conference call, followed by ongoing verbal conversations between Brief and Smith from July 13 through September 18, 2023 regarding Plaintiff's "difficulties on the job" (admitted in APL EEOC Position Statement, Bates APL_000005–000013). The September 18, 2023 Final Warning involved All Points HR (Smith) acting on information from Leidos management (Wong's setup email). The January 4 termination involved Leidos management (Murray's false statement, Wong's campaign), All Points management (Scarborough's suspension, Smith's decision), and NASA infrastructure (Security investigation, badge revocation). The January 5 post-termination instructions to remaining employees not to discuss the termination were delivered by a Leidos supervisor (Wong) using NASA SharePoint recording infrastructure (Brent Staff Meeting Transcript - Termination Announcement Jan 5). The March 25, 2024 coordination involved All Points (Smith's request), NASA Security leadership (Deputy Chief Kindred, Chief Mather), and NASA legal (Acting Chief Counsel Suratt)—same-day institutional coordination across the joint employer structure regarding Plaintiff's unemployment hearing.

10. **Hazardous-Duty Assignment: Battery Testing Facility.** Plaintiff served as a NEST deployment technician at JSC whose duties encompassed field deployments across the site — a scope Leidos itself memorialized in writing when, on January 3, 2023, Leidos Service Delivery Lead Brent Wong formally assigned Plaintiff as "the

only person on the Deployment Team" for the month of January 2023 (Wong Solo Deployment Assignment Jan 2023, Wong email to JSC-DL-NEST-FS, Jan. 3, 2023, 3:20 PM). As part of those deployment duties, Plaintiff was required to enter and work inside a NASA JSC battery testing facility where lithium batteries and related energy-storage systems were subjected to destructive and abuse testing (including thermal-runaway, venting, and explosion testing). Entry was conditioned on (a) completion of a NASA-required online hazardous-operations training course covering safety procedures specific to the battery test environment (including, *inter alia*, a prohibition on powered cell-phones inside the facility due to ignition and RF-interference risk), and (b) separate coordination with the facility's management office to obtain credentialed access. Defendants Leidos and All Points then issued and required Plaintiff to maintain a Leidos **Hazardous Access Badge** reflecting that credentialed status (Leidos Hazardous Access Badge Photo; corroborated by, and ). The badge itself, issued by the prime contractor, is a written admission that Plaintiff's access was categorized as hazardous.

11. **Statutory Basis for Hazard Differential Pay.** Under Department of Labor Wage Determination No. 2015-5233, Rev. 25 (applicable to the NEST contract and to Plaintiff's position), an 8 percent hazardous-pay differential is payable to employees "employed in a position that represents a high degree of hazard when working with **or in close proximity to** ordnance, explosives, and incendiary materials." See also 29 C.F.R. Part 4 (SCA implementing regulations). Lithium batteries undergoing destructive/abuse testing are *incendiary* materials within the ordinary meaning of the

Wage Determination (fire, venting, and explosive thermal runaway being the characteristic failure modes such testing is designed to induce), and Plaintiff's required entry into the battery test facility placed her in close proximity to those materials and energetic events. Plaintiff's position therefore fell within the WD's hazard-differential trigger for each hour she worked in or entered that facility.

12. **Defendants Failed to Pay Hazard Differential.** Despite (a) NASA requiring specialized hazardous-operations training and credentialed access before Plaintiff could enter the battery test facility, (b) Leidos issuing Plaintiff a Hazardous Access Badge expressly reflecting that credentialed status, and (c) All Points acting as the SCA employer of record under ¶ 3 above, neither All Points nor Leidos paid Plaintiff the 8 percent hazardous-pay differential required by WD 2015-5233, Rev. 25 for any hour she worked in or in close proximity to the battery test facility. This unpaid differential constitutes an SCA/FLSA wage violation independent of the Equal Pay Act and base-rate wage-determination violations alleged elsewhere, and supports an award of liquidated damages under 29 U.S.C. § 216(b). The specific number of hours and the corresponding unpaid amount are to be determined through discovery of (i) NASA's training and badge-access records for Plaintiff, (ii) Leidos's and All Points's timekeeping and charge-code records, and (iii) the NEST contract's hazard-classification attachments. [Unverified specifics — building/facility number, training course title/catalog number, and per-entry hour totals pending NASA FOIA/discovery production.]

### V.L — Leidos Single Integrated Enterprise and Alter Ego Liability

1. The Amended Complaint names Leidos Holdings, Inc., Leidos, Inc., and Leidos Innovations Corporation as defendants because they operate as a single integrated enterprise with respect to employment decisions affecting contract workers at NASA JSC.

2. **Corporate Structure and Interrelation.** Leidos Holdings, Inc. is the publicly traded parent corporation (NYSE: LDOS, $14B+ annual revenue). Leidos, Inc. is a wholly owned subsidiary that holds government contracts, including the NASA End-user Services and Technologies (NEST) contract, Contract No. 80NSSC19D0001, at NASA JSC. Leidos Innovations Corporation is an additional subsidiary involved in technology services at JSC. These entities share common officers, directors, and management; operate from the same facilities; share HR, legal, and administrative functions; and present themselves to the public and to contract workers as a single "Leidos" entity. At no point during Plaintiff's employment did any Leidos manager or document distinguish between these corporate entities—Plaintiff and her coworkers knew only that they worked for "Leidos."

3. **TekFive and Seabrook Solutions as Integrated Operations.** TekFive, Inc. and Seabrook Solutions, LLC performed work at NASA JSC alongside Leidos employees under the same contract structure. Workers from these entities— including John Riley (Seabrook Solutions, Peripheral Equipment Operator) who was physically present during the December 29, 2023 assault—worked in the same workspace, under the same Leidos supervisors (Wong, Murray), performing the

same or closely related tasks, following the same operational procedures, and subject to the same workplace policies. The integration of these entities into the Leidos-managed workspace demonstrates that corporate boundaries were formalities that did not reflect the operational reality of a single, integrated workforce.

4. **Centralized Control of Labor Relations.** Employment decisions affecting Plaintiff were made without regard to corporate entity boundaries: Brent Wong (Leidos) supervised Plaintiff (All Points); Christy Murray (Leidos) co-authored disciplinary memos affecting an All Points employee; Robyn Smith (All Points) made termination decisions based on information from Leidos managers about events at a NASA facility. This centralized, cross-entity control of labor relations satisfies the single integrated enterprise factors: (1) interrelation of operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership. The Leidos-affiliated entities should be treated as a single employer for liability purposes.

5. **Corporate-Entity Non-Disclosure During Administrative Process.** Throughout the EEOC administrative process—including All Points' position statement and Leidos' position statement (EEOC Charges 460-2024-04943 and 460-2024-09354)—Defendants did not disclose the complete corporate structure of the Leidos entities operating at NASA Johnson Space Center. All Points' and Leidos' position statements and correspondence with investigators identified only one or two Leidos entities, omitting Leidos, Inc. and Leidos Innovations Corporation, which operated

directly at NASA JSC and employed the Leidos managers (Brent Wong, Christy Murray) who directed Plaintiff's daily work.

6. **Delayed Disclosure of Defendant Identity.** Plaintiff first obtained a complete picture of the Leidos corporate structure through independent investigation after the original Complaint was filed. As a direct result, Plaintiff's original Complaint identified a subset of the correct defendant entities, requiring amendment to join Leidos, Inc., Leidos Innovations Corporation, and related operating subsidiaries.

7. **Late-Night Pre-Motion Conference Request.** On December 29, 2025, at approximately 10:55 PM Central Time—approximately one hour before Plaintiff's court-ordered Amended Complaint deadline—counsel for Leidos Holdings, Inc. filed a pre-motion conference request signaling intent to move to dismiss based on a corporate-entity technicality. This filing was made without prior meet-and-confer with Plaintiff under the process required by SDTX Local Rule 7.1 and by Judge Hanks' Court Procedures, and was timed such that Plaintiff—a pro se plaintiff with documented disabilities—could not meaningfully confer or respond before the filing deadline expired. Timestamp per Plaintiff's contemporaneous record; exact NEF receipt time to be confirmed from the docket.

8. **Pattern of Procedural Timing.** The late-filed pre-motion conference request is consistent with a pattern of procedural timing by Defendants that has required Plaintiff to respond to Defendants' filings under compressed timelines inconsistent with Plaintiff's documented need for disability accommodations. Plaintiff has previously sought and received an order from this Court (ECF 13, Nov. 13, 2025)

addressing access and accommodation issues, and has pending accommodations requests before the Court.

9. **Preservation of Rights.** Plaintiff reserves all rights to seek appropriate relief—including but not limited to relief under Federal Rule of Civil Procedure 11, 28 U.S.C. § 1927, and this Court's inherent authority—based on the conduct described above and any further conduct of a similar nature that may occur during these proceedings.

10. **Leidos's EEOC Position Statement — Disavowal Contradicted by Its Own Attached Exhibit.** On February 4, 2025, Leidos submitted its EEOC position statement in Charge No. 460-2024-09354, authored by Paul H. Kehoe, Leidos Vice President and Senior Assistant General Counsel. The position statement asserted that "[a]t no point did Leidos direct [Plaintiff's] removal" and that "All Points solely made the decision to terminate Kondrat'yev, its employee" — yet attached as Exhibit 1 the NASA Security Incident Report #JSC106469, which lists all three individuals present at the December 29, 2023 incident (Plaintiff, Susana Kane, and Cristian Garcia) under "ORG/DIV: Leidos," directly contradicting Leidos's disavowal of any employer relationship with Plaintiff and corroborating the single-integrated-enterprise and joint-employer theories pleaded in this Section.

11. **Garcia Title Inflation and Name-Distortion Pattern in Leidos's Published Content.** The same position statement identified Cristian Garcia as a "Junior Systems Engineer" — a role Garcia did not hold on December 29, 2023, when the NASA Security Incident Report #JSC106469 and Garcia's own signed voluntary

statement on form PSI-714 document Garcia's then-role as a "PC Support Technician" performing the same NEST-program PC-support work as Plaintiff. On information and belief, Garcia was promoted from PC Support Technician to a remote "Junior Systems Engineer" role shortly before Leidos filed its February 4, 2025 position statement. Within the same position statement, Kehoe misspelled Garcia's first name as "Christian" despite attaching Garcia's own signed voluntary statement, bearing the name "Cristian Garcia," as Attachment 4 to Exhibit 1 — a distortion that appears earlier and repeatedly in Leidos's own published content: the Leidos-produced NEST-program newsletter *NASA IT News* (June 14, 2024) publicly announced Cristian Garcia (JSC) as a Q1 2024 "NESTIE Award" recipient in the "Empowering the End User" category — the quarter beginning three days after the December 29, 2023 incident, during which Plaintiff was terminated — and, in the same newsletter's Kudos section, misspelled his name as "Christian Garcia" in an end-user commendation praising Garcia's "professionalism and expert knowledge."

---

## VI. CAUSES OF ACTION

## COUNT I — ADA DISABILITY DISCRIMINATION

### (Against All Points and Leidos)

1. Plaintiff incorporates all preceding factual allegations from Sections I-V.

2. **Cat's Paw Liability – John Walters as Instrument of Discrimination:** Plaintiff's ADA discrimination claim includes cat's paw liability under *Staub v. Proctor Hospital*, 562 U.S. 411 (2011). On November 27, 2023, TekFive employee John

Walters sent a false complaint to Leidos supervisor Brent Wong (Walters Negative Behavior Nov 27) claiming Plaintiff "pressured" coworker Jesse Smith during a deployment—a false claim designed to create a paper trail of "negative behavior" to justify future adverse actions against Plaintiff. Jesse Smith, the purported "victim," never complained about the incident and was never informed that Walters had filed a complaint about him. Approximately 36 minutes later, Leidos manager Christy Murray sent an "Awareness Item" email to All Points management, demonstrating real-time coordination. This manufactured complaint occurred 70 days after Plaintiff's September 18, 2023 ADA accommodation request and was used as pretext to build a termination case. Walters was rewarded with special project pay and promotion. Under *Staub,* an employer is liable when a supervisor or agent acts with discriminatory animus and proximately causes an adverse employment action by influencing the decision-maker. Here, Walters (acting in concert with Wong and Murray) manufactured false evidence that All Points later relied upon when terminating Plaintiff. The fact that the scheme crossed corporate lines (TekFive employee, Leidos supervisors, All Points HR) demonstrates the breadth of the coordinated discrimination.

**2a. Cat's Paw Liability – Brent Wong as Proximate Cause of Termination:** The NASA ODEO Counselor's Report (ODEO Counselors Report) documents the precise chain of discriminatory causation for Plaintiff's termination under *Staub*. According to Robyn Smith's April 17, 2024 account to the ODEO investigator: (1) Brent Wong (Leidos SDL) communicated to Ed Scarborough (All Points VP) that

the JSC Security report had determined Amanda "had not told the truth" about the December 29 assault; (2) Scarborough relayed this to Robyn Smith (All Points CHRO); (3) Smith terminated Plaintiff on January 4, 2024—without ever reviewing the actual NASA Security report. NASA Security Chief Russ Tucker subsequently confirmed on April 29, 2024: "NASA Security never determined, nor communicated that Amanda Kondrat'yev had falsified any report or that any assault did not happen." This documented false-narrative-to-termination chain—Leidos biased subordinate → All Points uninvestigating decision-maker—constitutes independent *Staub* cat's paw liability separate from the Walters scheme above, and proves the termination was caused by Wong's discriminatory animus, not any legitimate investigation.

3.   **Legal Standard:** Title I of the ADA, 42 U.S.C. § 12112(a), prohibits covered employers from discriminating against qualified individuals on the basis of disability. To establish a prima facie case of disability discrimination, a plaintiff must show: (1) she is disabled within the meaning of the ADA; (2) she is qualified for the position; and (3) she suffered an adverse employment action because of her disability. *McInnis v. Alamo Cmty. Coll. Dist.*, 207 F.3d 276, 279-80 (5th Cir. 2000). Once a prima facie case is established, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse action; if the employer does so, the burden returns to the plaintiff to show pretext. *Zenor v. El Paso Healthcare Sys., Ltd.*, 176 F.3d 847, 853 (5th Cir. 1999).

4.  Plaintiff has disabilities within the ADA's meaning (ADHD, autism, PTSD, depression, anxiety, and back injury with physician-ordered lifting restriction). She was qualified to perform the PCST position's essential functions, with or without reasonable accommodation, and met or exceeded performance expectations, as evidenced by 59 Kudos customer satisfaction awards in 2023 alone.

**Management Stereotyped Autistic Communication as "Combative" Behavior:**
Management's characterization of Plaintiff as "combative," "difficult," and "unable to accept answers" constitutes disability-based stereotyping of autistic communication traits. Research documents that autistic individuals are frequently mislabeled as "argumentative," "pedantic," "always needing to be right," or "combative" when they engage in literal communication, seek precision in language, or request clarification. The reality: autistic people aren't "argumentative"—they're seeking accuracy and clarity. A 160+ source research synthesis confirms this documented pattern, including clinical research showing 76% of individuals with Asperger syndrome exhibit pedantic speech patterns.

Dr. Whaling's March 2025 autism evaluation proves these were disability traits, not personality defects: "She reported frequent misinterpretations in conversation as she can often focus on precise wording which others tend to find 'pedantic.' She reported, 'Words mean things. Why else would they be there?'" Management's "combative" label describes the exact autistic communication pattern Dr. Whaling documented—focus on precise wording and literal interpretation of language. This is a disability

trait with 76% prevalence in Asperger syndrome, not a personality defect warranting discipline.

**The "Double Empathy Problem" Research:** The "double empathy problem" research demonstrates that communication difficulties between autistic and neurotypical individuals are bidirectional—yet employers systematically place the entire adaptation burden on autistic employees while characterizing their disability-related communication needs as "attitude problems." When Plaintiff asked what "unprofessional" means (seeking the explicit communication her autism requires), management treated the question itself as further proof of being "combative"—a circular reasoning pattern documented in employment discrimination case law as pretext for disability discrimination.

**Intersectional Stereotyping—Asian Woman + Autistic = Compounded Expectations:** As an Asian American woman with autism, Plaintiff violated multiple stereotypes simultaneously. Asian women face stereotypes of being "submissive," "quiet," and "obedient" (model minority myth). Autistic individuals face stereotypes of being "pedantic," "argumentative," and "inflexible." When Plaintiff requested written instructions, asked clarifying questions, or reported discrimination, she violated BOTH sets of expectations: Asian women "shouldn't complain," and autistic communication style is labeled "difficult." Management's harsh reaction to Plaintiff's accommodation requests reflects this intersectional stereotyping—conduct that might be tolerated from others triggered immediate retaliation because it violated compounded expectations for an Asian woman who "should be submissive" and

shouldn't exhibit autistic traits management perceived as "combative." Research confirms that Asian American women with autism face contradictory stereotypes that create unique legal barriers: they must be submissive "lotus blossoms" (race/gender) while also meeting inflated "model minority" expectations, yet any assertiveness or accommodation request is labeled as the "difficult" autistic stereotype—leaving no acceptable way to assert their rights.

**The Model Minority Myth Creates Diagnostic and Legal Barriers:** Research documents that Asian Americans are diagnosed with autism at less than half the rate of white Americans—not due to lower prevalence, but because the model minority myth causes clinicians to overlook symptoms when academic or work performance appears adequate. Asian American women with ADHD report that white male doctors dismissed their disabilities with "you did fine in school," and that they were believed only by Asian female clinicians who understood cultural nuances. This same pattern extends to the legal system: courts may discount an Asian American woman's disability based on her ability to produce quality written work (as Plaintiff has done pro se), replicating the documented healthcare bias. Plaintiff's post-termination autism diagnosis in March 2025 does not mean her autism symptoms weren't present and disabling during employment—it means she faced the same systemic barriers to diagnosis that affect Asian American women generally.

5. **4a. Regarded As Disabled (Alternative Pleading):** In the alternative, even if the Court were to find Plaintiff was not disabled within the meaning of the ADA (which is not the case), Defendants regarded Plaintiff as disabled and discriminated against

her based on that perception, which is independently actionable under the ADA. When supervisor Brent Wong and coworkers mocked Plaintiff's coordination issues (Travis McFarland's "fucking bird" comment after Plaintiff collided with a glass door) and shaking (Daniel Murphy mocking Plaintiff's tremors related to ADHD/PTSD/anxiety/medication), they were discriminating based on perceived disability even before any formal diagnosis. Management's labeling of Plaintiff as "combative" and "difficult" for requesting written instructions and asking clarifying questions—behaviors now understood as autism-related need for explicit communication—constitutes disability-based stereotyping. The "regarded as" prong of the ADA protects individuals who are treated as disabled regardless of whether they meet the statutory definition of actual disability. 42 U.S.C. § 12102(1)(C); 29 C.F.R. § 1630.2(l). The harassment, hostile treatment, and ultimate termination were motivated by Defendants' perception that Plaintiff had disabling conditions affecting her coordination, executive function, and communication—perception that existed throughout employment and motivated discriminatory treatment before any formal diagnosis.

6. **4b. Mixed-Motive Alternative Pleading:** In the alternative, even if Defendants had multiple reasons for adverse actions against Plaintiff, Plaintiff's disability was a motivating factor in those decisions. Under the mixed-motive framework recognized by the Fifth Circuit, Plaintiff need only prove that her protected characteristic was ONE of the reasons motivating Defendants' conduct, not the sole or predominant reason. *Rachid v. Jack in the Box, Inc.,* 376 F.3d 305, 312 (5th Cir. 2004). The

evidence supports mixed-motive liability: (1) extraordinary temporal proximity (26 minutes, 3 business days) proving discriminatory animus; (2) comparator evidence showing non-disabled males treated favorably for identical conduct; (3) shifting explanations demonstrating pretext; (4) categorical denial of accommodations with false legal statement; (5) December 27, 2023 top performance praise followed by January 4, 2024 termination—making disability-based animus undeniable even if other factors existed.

7. **4c. Direct Evidence Alternative Pleading:** Plaintiff's ADA discrimination claim is independently supported by direct evidence of discriminatory animus, eliminating the need for McDonnell Douglas burden-shifting. Direct evidence includes: (1) Robyn Smith's written statement "This is not covered by the ADA"—explicit rejection of disability rights on its face; (2) 26-minute retaliation timeline from ADA-related complaint to Final Warning; (3) categorical denial without interactive process immediately after formal accommodation request with medical documentation; (4) witness testimony that Brent Wong was "building a case" against Plaintiff; (5) comparator evidence showing non-disabled employees received identical accommodations informally (Figueredo's Spacebar role) while disabled employee's formal request denied. This direct evidence independently establishes discrimination without need for inference. *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 897 (5th Cir. 2002).

8. **4d. Defendants Cannot Prove Same-Decision Defense:** Even under a mixed-motive framework, Defendants cannot prove by a preponderance of the evidence that

they would have made the same decision absent discriminatory animus. The evidence conclusively refutes any same-decision claim: (1) Plaintiff was objectively top performer 8 days before termination (December 27, 2023 audit: 3 of 9 passing tickets); (2) Male comparators Ryan Sauer and Jordan Hollan performed identical VPN work but retained jobs and overtime; (3) Male comparator Mark Martinez committed more serious security violation (intentional Flipper Zero device) but investigated and returned; (4) Defendants' stated reasons shift and contradict across government filings; (5) No written termination documentation and failure to cite VPN incident as reason proves artificial justification; (6) Three-business-day investigation timeline with zero investigation during two available work days proves predetermined outcome. No reasonable factfinder could conclude Defendants would have terminated Plaintiff absent her disability and protected activity.

9. Defendants subjected Plaintiff to adverse actions motivated by discriminatory animus: unwarranted "Final Warning" issued 26 minutes after her ADA-related email, denial of accommodations with false legal justification ("This is not covered by the ADA"), selective loss of overtime following the VPN event, hostile "security interview," and termination.

10. Similarly situated non-disabled comparators—Sauer, Hollan, and Martinez—were not subjected to the same discipline or termination despite equal or more serious conduct. This disparate treatment, combined with extraordinary temporal proximity (26 minutes, 6 days) and shifting explanations, establishes pretext under *Owens v.*

*Circassia Pharm., Inc.*, 33 F.4th 814 (5th Cir. 2022) (pretext shown by evidence that stated reason is "unworthy of credence" and discriminatory motive was real reason).

**10a. Smith's Sworn EEOC Statement on Figueredo — Operative Contradiction Establishing ADA Pretext:** Robyn Smith — the same All Points Chief Administrative Officer who denied Plaintiff's formal ADA accommodation request — confirmed under oath in the All Points EEOC position statement that "All Points has never received any accommodation of disability request from William and has never been informed of any performance issues." The same HR officer who swore William Figueredo had no formal accommodations on file is the one who categorically denied Plaintiff's formal request the following day with the statement "This is not covered by the ADA." This is not coincidence — it is the operative contradiction establishing ADA pretext: informal modified-duty accommodations were available and extended to a male employee without ADA process, while Plaintiff's formal request with medical documentation was denied categorically by the same decision-maker.

**10b. Wong's Cross-Employer Employment History — Factual Predicate for Joint-Employer Mechanism:** Prior to becoming Leidos Service Delivery Lead, Brent Wong was employed as an All Points PC Support Technician — the same position held by Plaintiff and by Figueredo. Wong transitioned from All Points subcontractor status to Leidos supervisory authority within the same contract structure, bringing personal relationships from his time as an All Points technician. Figueredo was among those personal associates. Wong also hired and promoted

personal contacts through his Leidos supervisory authority across employer lines. Wong's capacity to extend informal modified-duty accommodations to an All Points employee while serving as a Leidos SDL — without triggering formal HR review at either entity — is itself evidence of the integrated operational structure at issue. Informal authority and personal favoritism crossed entity lines freely; formal ADA process operated as a one-way denial instrument against Plaintiff only. The asymmetry is probative of the joint-employer relationship and of the discriminatory mechanism through which it operated.

**10c. Wong as Disability Comparator — Same Supervisor, Opposite Outcomes:** Four months after Plaintiff's termination, Brent Wong was promoted to a 100% remote, organization-wide problem-solving role — the same type of modified-duty arrangement Plaintiff had formally requested and been denied. Plaintiff and Brent Wong share the same disability (ADHD); the opposite outcomes — termination for Plaintiff, promotion for Wong — constitute direct comparator evidence of sex and disability-based disparate treatment under the same supervisory structure.

11. As a direct result, Plaintiff suffered lost wages, emotional distress, and other damages.

## COUNT II — ADA FAILURE TO ACCOMMODATE

### (Against All Points Logistics, LLC and Leidos Holdings, Inc.)

1. Plaintiff incorporates all preceding factual allegations.

2. The ADA requires employers to provide reasonable accommodations to qualified individuals with disabilities unless doing so would impose undue hardship. 42 U.S.C. § 12112(b)(5)(A).

3. **Legal Standard – Unreasonable Delay as Actionable Failure to Accommodate:** In *Strife v. Aldine Independent School District*, No. 24-20269 (5th Cir. May 16, 2025), the Fifth Circuit held that an employer's unreasonable delay in processing an ADA accommodation request is itself actionable as a failure to accommodate, even when the accommodation is eventually granted and no other adverse employment action occurs. The court emphasized that "the delay itself is the actionable harm; no separate adverse employment action is required." In *Strife*, a six-month delay between request and approval constituted an ADA violation.

4. Plaintiff is a qualified individual with disabilities (ADHD, autism, PTSD, depression, anxiety, and back injury with physician-ordered lifting restriction) who could perform essential job functions with reasonable accommodations. Defendants knew of her disabilities and accommodation needs, including from the June 2, 2023 medical lifting restriction provided by Dr. Mokkala.

5. **Unreasonable Delay Before Categorical Denial:** Plaintiff repeatedly requested written SOPs for high-stakes tasks beginning in early 2023. Defendants ignored these requests for months, forcing Plaintiff to perform complex, security-critical work without the written procedures her disabilities required. This delay alone—before the September 2023 categorical denial—violated the ADA under *Strife*.

6. On September 18, 2023, at 6:17 p.m., Plaintiff submitted a formal written accommodation request with medical documentation. Rather than engaging in the required interactive process, Defendants immediately and categorically denied the request on September 19, 2023. Defendants violated every requirement of the ADA interactive process:

a. Failed to schedule any meeting with Plaintiff to discuss her needs;

b. Failed to ask any clarifying questions about her disabilities or requested accommodations;

c. Failed to propose any alternative accommodations or explore other reasonable options;

d. Failed to assess or document any undue hardship analysis;

e. Failed to engage in any dialogue whatsoever—instead, HR representative Robyn Smith sent a single email categorically denying Plaintiff's request with a legally false justification: "This is not covered by the ADA and as the employer doesn't require any type of reasonable accommodation."

This statement is objectively incorrect as a matter of law and demonstrates deliberate refusal to comply with federal disability rights obligations.

7. **Plaintiff's Case Is Stronger Than *Strife*:** While the plaintiff in *Strife* eventually received her accommodation after six months, Plaintiff here never received the requested accommodations. Defendants categorically denied written SOPs and continued requiring Plaintiff to perform high-stakes work without written procedures, directly contributing to the November 2023 VPN incident they later used

as the basis for selective discipline against her. Under *Strife*, both the months-long delay before September 2023 and the categorical denial itself constitute separate, independent ADA violations.

8. **Back Injury Accommodation — Initial Grant Followed by Retaliatory Use Against Plaintiff:** On June 2, 2023, Plaintiff's physician Dr. Mokkala issued a 20-pound lifting restriction due to back pain. Defendants initially accommodated this restriction by reassigning Plaintiff to the Spacebar. However, Robyn Smith retroactively declared the restriction "lifted" in her September 19, 2023 email — the same communication that categorically denied Plaintiff's ADA accommodation request. Following this removal, Defendants intentionally assigned Plaintiff large, physically demanding deployments and denied her ability to swap assignments with other technicians — a practice routinely permitted for male comparators. Male comparator William Figueredo was permitted to remain at the Spacebar indefinitely without any formal ADA documentation. Plaintiff was too afraid to seek renewal of the restriction because Defendants' hostility toward her accommodation requests made clear that further requests would result in additional retaliation. The back injury accommodation denial directly caused Plaintiff to suffer physical pain and injury when forced to perform heavy lifting without medical clearance.

9. As a result, Plaintiff suffered loss of overtime, removal from worksite, physical injury from forced heavy lifting, and termination.

## COUNT III — ADA RETALIATION

### (Against All Points and Leidos)

1. Plaintiff incorporates all preceding factual allegations.

2. **Legal Standard:** The ADA prohibits retaliation against individuals who oppose discrimination or request accommodations. 42 U.S.C. § 12203(a). To establish a prima facie case of retaliation under the ADA, a plaintiff must show: (1) she engaged in activity protected by the ADA; (2) she suffered an adverse employment action; and (3) a causal connection exists between the protected activity and the adverse action. *Feist v. Louisiana, Dep't of Just., Off. of the Atty. Gen.*, 730 F.3d 450, 454 (5th Cir. 2013). Temporal proximity alone can establish causation when the proximity is "very close." *Evans v. City of Houston*, 246 F.3d 344, 354 (5th Cir. 2001).

3. Plaintiff engaged in protected activity: disclosing disabilities (Nov. 2, 2022), requesting accommodations (throughout 2023 and formally Sept. 18, 2023 at 6:17 p.m.), and objecting to discriminatory treatment (Sept. 18, 2023 at 5:20 p.m. email).

4. Defendants subjected Plaintiff to materially adverse actions after protected activity: "Final Warning" issued 26 minutes after her September 18, 5:20 p.m. ADA-related email, categorical denial of accommodation request on Sept. 19, cancelled overtime, hostile "security interview," and termination.

5. **Extraordinary Temporal Proximity Establishes Causation:** The 26-minute gap between Plaintiff's protected ADA-related complaint (5:20 p.m.) and the Final Warning (5:46 p.m.) is extraordinary evidence of retaliatory causation under Fifth

Circuit law. Plaintiff's complaint specifically referenced that she was required to respond to Teams messages and emails during unpaid breaks and after hours, and that supervisor Brent Wong's constant "where is Amanda?" surveillance meant she could never truly disconnect from work. The Final Warning issued 26 minutes later accused Plaintiff of the exact conduct she had just reported as unlawful—demonstrating both temporal proximity and substantive connection between protected activity and adverse action.

6. The disparate treatment of male comparators (Sauer, Hollan, Martinez) and shifting explanations further establish pretext under *Owens*, 33 F.4th at 820.

**Post-Termination Witness Testimony Proves Disparate Treatment of Off-the-Clock Complaints:** On April 24, 2024, during a post-TWC hearing call (Robyn Witness Tampering), witnesses David Kremm and Jordan Hollan told Robyn Smith directly that management pressured all employees to work through lunches and off the clock—the identical FLSA violation Plaintiff reported on September 18, 2023. Kremm described Plaintiff's alleged working-through-lunch and combativeness as behaviors occurring daily among many employees in the group due to management pressure. Hollan added that a workplace climate in which remaining employees understood that speaking up risked being targeted. Robyn Smith's response: calm, receptive—(Smith responded positively, acknowledging the need to know about workplace issues)—no warning, no discipline, no consequences. When Plaintiff reported the identical off-the-clock violation on September 18, 2023, Robyn issued a Final Warning 26 minutes later that used the disclosure as a basis for discipline: "you

have also stated that you have worked off the clock. This is a violation of timekeeping policies and will result in termination if it continues." The same HR Director, hearing the same complaint about the same systemic practice, took opposite actions—proving the Final Warning was retaliation for protected activity, not a legitimate response to a timekeeping violation. Hollan's testimony described a chilling effect in which remaining employees understood that speaking up risked being targeted—is direct evidence of the chilling effect Plaintiff's retaliation accomplished.

**Witness Testimony of Predetermined Termination Plan:** On the same call, David Kremm described Brent Wong's conduct over the preceding months as building a record of complaints intended to justify removing Plaintiff, and characterized Plaintiff as Wong's next target. Jordan Hollan corroborated, stating that Plaintiff had been singled out for removal in connection with concerns she had raised at work. This direct witness testimony that Brent Wong was building a termination file— combined with the evidence of hidden July complaints Plaintiff was never told about —proves the adverse actions were pretextual retaliation, not legitimate discipline.

7. As a direct result, Plaintiff suffered lost wages, emotional distress, and other damages.

Count IV migrated from Part 3 — Counts I–VIII.

## COUNT IV — REHABILITATION ACT (SECTION 504)
## (Against NASA)

1. Plaintiff incorporates all preceding factual allegations.

2. **Legal Standard (Pleading Summary):** Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a), prohibits a federal agency from excluding a qualified individual with a disability from participation in, denying the benefits of, or subjecting the individual to discrimination under any program or activity conducted by the agency.

2-A. **"Program or Activity Conducted By" Prong:** Plaintiff pleads that NASA's federal worksite operations at Johnson Space Center — including its access-control and badging infrastructure, contractor-interface procedures, and anti-harassment policy implementation (NPR 3713.3 and NASA's Anti-Harassment Policy and Procedures Implementation Guide) — constitute "program[s] or activit[ies] conducted by" a federal agency within the meaning of § 504(a). NASA's exclusion of Plaintiff from that program, and its failure to implement its own anti-harassment procedures, are therefore actionable under § 504(a)'s "conducted by" prong. [verification pending — Plaintiff will supplement within 14 days]

3. **NASA as an actionable actor (not a bystander):** Plaintiff pleads that NASA's own actions and omissions independently contributed to the discriminatory exclusion from the federal worksite, including through access-control decisions and ratification of contractor-driven removal.

4. **Relief limitation acknowledged:** Plaintiff seeks equitable relief and statutory fee relief available against a federal agency under the Rehabilitation Act. Plaintiff does not seek compensatory or punitive damages against NASA. See *Lane v. Peña*, 518 U.S. 187 (1996) [verification pending — Plaintiff will supplement within 14 days] (holding that § 504(a)'s waiver of federal sovereign immunity does not extend to

monetary damages against federal agencies, but permits equitable relief). 4-A.

**Failure-to-accommodate framing:** Plaintiff's § 504 theory against NASA includes failure to accommodate. NASA knew of Plaintiff's disabilities and her prior accommodation history (paragraph 9 below), yet NASA permitted accommodation denial within its federal worksite and ratified contractor-driven removal of a disabled employee, rather than using its access-control authority to protect accommodation rights under its own anti-harassment and access-control procedures (paragraph 11 below). 4-B. **Intentional-discrimination element (Fifth Circuit standard):** The Fifth Circuit requires that a § 504 plaintiff seeking monetary or make-whole relief plead and prove **intentional discrimination**, not mere deliberate indifference or negligence. *See Delano-Pyle v. Victoria County, Tex.,* 302 F.3d 567 (5th Cir. 2002) [verification pending — Plaintiff will supplement within 14 days]. Plaintiff pleads intentional discrimination as follows: (i) NASA personnel were on actual notice of Plaintiff's disabilities and protected activity through the September 2023 ODEO intake, subsequent ODEO correspondence, and the NASA Security investigation file (¶¶ 5, 9 below); (ii) NASA Security Chief Russ Tucker affirmatively told NASA ODEO (in his April 29, 2024 post-termination attestation) that NASA Security had not found Plaintiff falsified anything and had recommended that Plaintiff return to work after the holidays (¶ 3 below); (iii) despite that actual-knowledge record, NASA executed the Leidos-requested access termination on January 3–4, 2024 without independent review (¶ 4 below); and (iv) NASA's coordinated, system-wide revocation of four simultaneous access privileges using its proprietary infrastructure

(¶ 2 below) reflects a deliberate exclusion decision, not inadvertence. These allegations support an inference of intentional discrimination sufficient under *Delano-Pyle* for the equitable relief sought in this Count.

5. Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a), prohibits disability discrimination and retaliation by federal agencies and their contractors. NASA is a federal executive agency subject to Section 504.

6. **NASA's Control Over Plaintiff's Physical Access to Federal Facility:** NASA maintained exclusive control over Plaintiff's ability to work at JSC through its badge and access management system. On January 4, 2024, NASA's access management system simultaneously terminated all four of Plaintiff's access privileges: (1) Agency VPN JSC Teleworker, (2) JSC Physical Access, (3) JSC-Bldg-8 General Entry, and (4) JSC-EF-990 Gate Entry. This coordinated, system-wide access termination was executed by NASA personnel using NASA's proprietary access control infrastructure.

7. **NASA Security's Actual Findings and Recommendation:** NASA Security properly investigated the December 28-29, 2023 workplace incident by interviewing Plaintiff, documenting her account, and preparing a report. NASA Security Chief Russ Tucker told NASA ODEO that NASA Security had NOT determined Plaintiff falsified anything and had NOT communicated any such finding to anyone. NASA Security recommended both Plaintiff and Susana Kane return to work after the holidays. Despite this recommendation and finding of no wrongdoing, NASA

executed Leidos's request to terminate Plaintiff's access without independent investigation.

8. **Leidos Request and NASA Execution Without Independent Review:** On information and belief, Leidos supervisor Brent Wong requested that NASA revoke Plaintiff's access on or about January 3-4, 2024. NASA executed this request through its access management system without conducting any independent investigation, without reviewing its own Security Report, and without interviewing Plaintiff or any witnesses. NASA's immediate compliance with Leidos's discriminatory request— despite NASA Security's actual findings—demonstrates NASA's ratification and adoption of the discriminatory termination decision.

9. **Actual Knowledge of Disabilities and Protected Activity:** NASA had actual knowledge of Plaintiff's disabilities and protected activity through: (a) NASA ODEO complaints filed by Plaintiff in early 2024; (b) NASA Security's investigation file documenting Plaintiff's assault report (protected activity under workplace safety laws); (c) direct interaction between NASA personnel and Plaintiff during the investigation; and (d) NASA's role in the "dual filing" process coordinating OFCCP, EEOC, and NASA ODEO investigations. Despite this knowledge, NASA permitted accommodation denial by its contractors and executed the removal of a disabled employee who had engaged in protected activity.

10. **NASA's Authority and Coordination:** As the federal agency controlling the secured worksite and employing its own access management infrastructure, NASA had both the authority and the obligation to ensure its contractors complied with the

Rehabilitation Act. Instead, NASA became an active participant in discrimination by: (a) executing access termination at a contractor's request without independent investigation; (b) ignoring its own Security Report's findings and recommendations; (c) coordinating with Leidos and All Points to effect Plaintiff's removal; and (d) ratifying and adopting the discriminatory termination through its access termination actions.

11. **NASA's Violation of Its Own Anti-Harassment Procedures:** NASA maintained a comprehensive Anti-Harassment Policy and Procedures Implementation Guide (2nd Edition, December 2016), based on NASA Procedural Requirements 3713.3, effective October 6, 2009, which had been in effect for seven years when Plaintiff first contacted NASA ODEO on September 19, 2023. This policy established mandatory procedures that NASA failed to follow:

    – **§3.6 (Contractor Harassment):** The Implementation Guide required that for contractor-on-contractor harassment allegations, "NASA supervisors or the CAHC shall immediately contact their Center Director of Procurement for referral to the appropriate Contracting Official." NASA failed to make this referral after Plaintiff's September 19, 2023 report.

    – **§3.5 (Physical Threats):** The Implementation Guide required that "in circumstances involving inappropriate physical contact or other disruptive behavior involving a direct or indirect threat of physical harm, Center AH Teams should immediately involve the Center's Threat Assessment Team"

under NPD 1600.3. NASA Security responded to the December 28-29, 2023 assault but NASA failed to convene the Threat Assessment Team.

– **§3.3 (Supervisor Obligations):** The Implementation Guide required supervisors to "assess the situation immediately" upon receiving a harassment allegation and complete fact-finding within "one to two weeks." No fact-finding was initiated after Plaintiff's September 2023 report. The Guide further states that "Supervisors have an obligation to take immediate action regardless of an employee's confidentiality request" and that "Inaction by the supervisor in such circumstances could lead to Agency liability."

– **§4.3.3 (Retaliation Prohibition):** The Implementation Guide states that "the anti-harassment process prohibits retaliation against employees who report harassment or provide information related to such allegations." Instead of protecting Plaintiff, NASA's infrastructure was used to execute the retaliatory termination.

– **8-Step Contractor Process (§3.6, pp. 12-13):** The Implementation Guide prescribed an 8-step process for contractor-on-contractor harassment allegations, from CAHC notification through Procurement Office referral to close-out memorandum. Zero of the eight mandated steps were followed for Plaintiff's complaint.

– **Interim Relief (§3.3, p.9):** The Implementation Guide required supervisors to determine whether interim measures were necessary, including transfer of the harasser, scheduling changes, or administrative leave for the harasser. Instead

of any protective measure being applied to the harassers, Plaintiff was the one who lost her badge, her access, and her job. The Guide expressly states (p.19) that "an involuntary transfer of the alleged harassee could constitute unlawful retaliation."

- **Overarching Goal (p.4):** The stated goal of NASA's anti-harassment policy was to "address harassing conduct at the earliest possible stage, before it can become severe or pervasive." NASA did the opposite, permitting escalation from harassment to physical assault to retaliatory termination.

- **Separate and Distinct Obligations (p.4):** The Implementation Guide states that "the EEO complaints process and the AHP are separate and distinct," meaning NASA's anti-harassment obligations existed independently of any EEO complaint. NASA cannot argue that referring Plaintiff to EEOC or OFCCP discharged its anti-harassment process duties.

12. As a direct result of NASA's Rehabilitation Act violations, Plaintiff is entitled to declaratory and prospective injunctive relief, including an order reinstating Plaintiff to a suitable NASA civil service position, together with attorney's fees and costs. Plaintiff does not seek compensatory, punitive, or other monetary damages — including back pay or front pay — against NASA under this Count, as the waiver of federal sovereign immunity in § 504(a)'s "conducted by any Executive agency" prong does not extend to monetary relief. See *Lane v. Peña,* 518 U.S. 187 (1996) [verification pending — Plaintiff will supplement within 14 days]. As to non-

monetary relief, Plaintiff further relies on the waiver of federal sovereign immunity in 5 U.S.C. § 702.

## COUNT V — EQUAL PAY ACT

### (Against All Points Logistics, LLC and Leidos Holdings, Inc.)

1. Plaintiff incorporates all preceding factual allegations.

2. The Equal Pay Act, 29 U.S.C. § 206(d), prohibits paying different wages to employees of opposite sexes for equal work on jobs requiring equal skill, effort, and responsibility under similar working conditions.

3. Plaintiff earned $28.30 per hour (the standard PCST rate under federal Wage Determination No. 2015-5233, Rev. 25). Male comparator John Walters held the same official job title as Plaintiff: PC Support Technician (PCST). However, supervisor Brent Wong systematically assigned informal "QM" (Queue Manager) roles to his male friends. **Discovery Needed:** Plaintiff requests comprehensive discovery of pay records for all PC Support Technicians on the NASA NEST contract from 2020-present, broken down by sex, to establish the full scope of the pay discrimination scheme. Specifically, Plaintiff seeks pay records for John Walters (TekFive), Daniel Murphy (All Points/Leidos), and all other male employees who received "special project pay" or informal QM compensation, as well as pay records for Susana Kane (Seabrook Solutions), who allegedly made statements claiming she was paid more than other technicians despite performing the same work. These roles were often performed remotely and required no lifting or tech support, mostly

delegation of work. With authorization from Leidos manager Christy Murray, Walters and possibly others in Brent's social circle received "special project pay" resulting in higher effective hourly rates than Plaintiff's base rate. The exact amount of the pay differential is unknown to Plaintiff because Defendants concealed these arrangements; Plaintiff seeks discovery of pay records to establish the full scope of the disparity. These QM roles and pay increases were never posted, announced, or offered to female PCSTs performing full PCST duties.

4. The discriminatory nature of this arrangement is proven by the fact that: (1) male PCSTs in Brent Wong's social circle received QM designations and higher pay without any posting or application process; (2) when Jasmine Stevens, an employee from the logistics department, formally applied for a QM role, Brent was forced to award it to her instead of his planned male friend—demonstrating that QM was a legitimate advancement opportunity that Brent had been systematically awarding to male friends through a secret, informal process while deliberately concealing it from female PCSTs; and (3) Tristian Castro, a female PCST who did not perform the full range of PCST duties—did not perform deployments or field service during her years of employment—was nevertheless allowed to remain employed for years in a QM role, demonstrating that QM assignments were based on favoritism and nepotism rather than merit, skill, or performance. Despite Plaintiff's objectively superior performance record (59 Kudos awards in 2023, consistent excellent customer feedback, top performer in December 27, 2023 audit) compared to Castro's

limited duty performance, Plaintiff was systematically excluded from QM opportunities while Castro was retained.

5. Walters and other male PCSTs' official titles remained PCST throughout these arrangements—the "QM" designations and higher pay were informal, undocumented arrangements systematically denied to female PCSTs actually performing PCST work based on sex. The fact that these male employees remained officially classified as PCST proves the "special projects" were within the scope of PCST duties requiring equal skill, effort, and responsibility under similar working conditions. On information and belief, this secretive pay arrangement resulted in male PCSTs earning thousands of dollars more annually than Plaintiff and other female PCSTs for substantially equal work.

6. The pay differential was not based on seniority, merit, quantity or quality of production, or any factor other than sex. The secretive nature of the arrangement— never announced or offered to any other PCST—demonstrates discriminatory intent.

7. As a direct result, Plaintiff suffered lost wages and is entitled to unpaid wages, liquidated damages, and attorney's fees.

## COUNT VI — TITLE VII SEX DISCRIMINATION

**(Against All Points Logistics, LLC, Leidos Holdings, Inc., and NASA Johnson Space Center)**

1. Plaintiff incorporates all preceding factual allegations.

2. **Legal Standard:** Title VII, 42 U.S.C. § 2000e-2(a)(1), makes it unlawful for an employer "to discriminate against any individual with respect to h[er] compensation,

terms, conditions, or privileges of employment, because of such individual's... sex."
In *Hamilton v. Dallas County*, 79 F.4th 494 (5th Cir. 2023) (en banc), the Fifth
Circuit retired the "ultimate employment decision" standard and held that a plaintiff
plausibly alleges a disparate-treatment claim under Title VII if she pleads
discrimination in hiring, firing, compensation, or the "terms, conditions, or
privileges" of her employment—including differential discipline, loss of overtime
opportunities, exclusion from workplace activities, and altered shift assignments.
[Unverified pinpoint — reporter volume verified; insert specific page cite from
published opinion before filing.] The Supreme Court recently reinforced that Title
VII imposes a single, uniform evidentiary standard on all plaintiffs regardless of
protected-class combination. *Ames v. Ohio Dep't of Youth Servs.*, 605 U.S. ___
(2025) (unanimously rejecting any heightened "background circumstances" showing
and confirming one standard for all Title VII plaintiffs). Together, *Hamilton* and
*Ames* confirm that Plaintiff—an Asian American woman with disabilities—must
plead only plausible facts giving rise to an inference of sex-based discrimination in
any term, condition, or privilege of employment.

3. Plaintiff is a woman and was qualified for her PCST position. Defendants subjected
Plaintiff to harsher discipline (Final Warning with no prior progressive discipline),
selective loss of overtime, negative credibility attacks ("false report" narrative),
exclusion from workplace culture (team photos), and termination, compared with
similarly situated male employees.

4. Male comparators Sauer, Hollan, and Martinez engaged in equal or more serious conduct but were treated favorably and retained their jobs. Under *Hamilton*, these differential "terms, conditions, or privileges" of employment, combined with comparator evidence, establish sex-based discrimination. Defendants' conduct was motivated, at least in part, by Plaintiff's sex.

**Robbins v. NASA Pattern Evidence:** Plaintiff's sex discrimination claim is strengthened by the *Robbins v. NASA* class action (EEOC Hearing No. 531-2014-00109X), in which EEOC Administrative Judge Stephanie Herrera certified two classes on September 30, 2022—eleven days after Plaintiff's September 19, 2022 hire date—comprising over 2,000 Asian American employees and over 2,000 African American employees alleging systematic discrimination in NASA performance appraisals agency-wide. NASA was on formal notice during Plaintiff's entire employment that it had systematic problems with race and sex discrimination. Plaintiff's intersectional identity (Asian American female with disabilities) placed her at the intersection of multiple protected classes covered by *Robbins*. The pattern evidence from *Robbins*, combined with Plaintiff's individual comparator evidence, demonstrates that NASA's contractors perpetuated the same discriminatory systems that led to the class certification. Discovery of NASA's responses to *Robbins*, implementation measures at JSC, and statistical data on discipline/termination rates by race and sex will establish pattern and practice discrimination supporting Plaintiff's individual claims and justifying punitive damages based on NASA's reckless disregard.

**4a. Mixed-Motive Alternative Pleading:** In the alternative, even if Defendants had multiple reasons for adverse actions, Plaintiff's sex was a motivating factor. Under the mixed-motive framework applicable to Title VII claims after the 1991 Civil Rights Act amendments, Plaintiff need only prove sex was ONE motivating factor, not the predominant or sole reason. *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 101 (2003). Evidence supporting mixed-motive: (1) Comparator evidence—males Sauer/Hollan/Martinez with identical/worse conduct retained; (2) Sexual harassment by Wong creating sex-based hostile environment; (3) "Boys club" favoritism pattern (Daniel Murphy promoted after retaliation, Brent Wong promoted after harassment); (4) Exclusion from workplace culture (team photos) based on sex; (5) Shifting explanations proving pretext. Sex discrimination was a motivating factor even if other reasons existed.

**4b. Direct Evidence Alternative Pleading:** Plaintiff's sex discrimination claim is supported by direct evidence: (1) Brent Wong's pervasive sexual harassment (Twin Peaks culture, sexualized content, masturbation comments, false sexual narratives about Plaintiff) creating explicitly sex-based hostile environment; (2) Comparator evidence showing identically situated males treated favorably—direct evidence of sex-based disparate treatment requiring no inference; (3) Daniel Murphy promoted immediately after filing retaliatory complaint against female harassment victim; (4) Brent Wong promoted to prestigious remote role four months after coordinating termination of female employee who reported his harassment. This pattern constitutes direct evidence of sex-based animus.

**4c. Defendants Cannot Prove Same-Decision Defense:** Defendants cannot prove by preponderance they would have terminated Plaintiff absent her sex. Evidence refutes same-decision: (1) Male comparators with identical conduct (VPN work) retained with overtime; (2) Male comparator with worse conduct (Martinez—Flipper Zero) investigated and returned; (3) Plaintiff objectively top performer 8 days before termination; (4) Males received informal accommodations Plaintiff denied (Figueredo—Spacebar role without ADA process). No reasonable factfinder could conclude sex played no role.

5. As a direct result, Plaintiff suffered lost wages, emotional distress, and other damages.

## COUNT VII — TITLE VII SEXUAL HARASSMENT / HOSTILE WORK ENVIRONMENT

**(Against All Points Logistics, LLC, Leidos Holdings, Inc., and NASA Johnson Space Center)**

1. Plaintiff incorporates all preceding factual allegations.

2. Title VII prohibits sexual harassment that creates a hostile work environment. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993).

3. Plaintiff is a woman. During employment, she was subjected to unwelcome sexual and gender-based conduct: inappropriate comments and behavior by supervisor Brent Wong and physical assault by coworker Susana Kane.

4. **The 59 Kudos Customer Satisfaction Awards Do Not Negate Hostile Environment:** Plaintiff received 59 Kudos awards in 2023 from **NASA customers**

—not from the Leidos management creating the hostile environment. The Kudos system captured objective customer satisfaction with Plaintiff's technical support work for NASA end-users, which Plaintiff continued to perform excellently despite the hostile environment created by her Leidos supervisors (Brent Wong, Christy Murray). Plaintiff compartmentalized: she maintained professional excellence when supporting NASA customers, while simultaneously enduring sexual harassment from Wong, exclusion from team culture (denied participation in official NASA photos despite multiple requests), and disparate treatment based on sex. The 59 Kudos awards prove management had objective evidence of Plaintiff's excellent performance—making Defendants' termination even more demonstrably pretextual —but do not prove the absence of a hostile environment created by supervisors' conduct. A reasonable person in Plaintiff's position could perform well for customers while experiencing a severe or pervasive hostile environment created by management. The harassment was sufficiently severe or pervasive to alter employment conditions and create an abusive environment. Management knew or should have known but failed to take effective remedial action. Instead, Defendants discounted Plaintiff's assault report and terminated her six days later.

5. As a direct result, Plaintiff suffered emotional distress, mental anguish, and other damages.

6. **5a. Mixed-Motive Alternative Pleading:** In the alternative, even if non-harassing conduct contributed to workplace conditions, the sexual harassment by Wong and assault by Kane were motivating factors creating the hostile environment. Plaintiff

need only prove sex-based conduct was ONE motivating factor under *Desert Palace,* 539 U.S. at 101.

7. **5b. Direct Evidence Alternative Pleading:** The harassment constitutes direct evidence on its face: Brent Wong's Twin Peaks culture, sexualized comments, masturbation references, and false sexual narratives about Plaintiff are explicitly sex-based harassment requiring no inference. Susana Kane's assault followed threat "I'm your new Brent"—directly connecting to sexual harassment pattern.

8. **5c. Defendants Cannot Prove Same-Decision Defense:** Defendants cannot prove by a preponderance of the evidence that they would have reached the same conclusion about Plaintiff's workplace environment absent the sex-based harassment. The hostile environment was overwhelmingly sex-based in character: Wong's Twin Peaks culture, sexualized content, masturbation comments, false sexual narratives, and predatory conduct toward Plaintiff were all explicitly sex-based. Kane's assault followed the explicitly sex-linked threat "I'm your new Brent." No reasonable factfinder could conclude these conditions would have existed absent sex-based animus.

## COUNT VIII — TITLE VII RETALIATION

### (Against All Points Logistics, LLC, Leidos Holdings, Inc., and NASA Johnson Space Center)

1. Plaintiff incorporates all preceding factual allegations.

2. **Legal Standard:** Title VII, 42 U.S.C. § 2000e-3(a), prohibits retaliation against individuals who oppose discriminatory practices or participate in Title VII

proceedings. To establish a prima facie case, Plaintiff must show: (1) she engaged in protected activity; (2) she suffered a materially adverse action; and (3) a causal connection exists. *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006).

3. Plaintiff engaged in Title VII protected activity: reporting sexual harassment (July 12-13, 2023), filing formal complaint with All Points HR, and reporting workplace assault (December 28-29, 2023).

4. Defendants subjected Plaintiff to materially adverse actions: "Final Warning" (26 minutes after ADA-related email that also referenced harassment), hostile "security interview," cancelled overtime, and termination three business days after assault report.

5. **Temporal Proximity and Retaliatory Pattern:** The pattern of retaliation following each protected activity establishes causation: (a) July 12-13, 2023 harassment report → July 19 Daniel Murphy's retaliatory complaint (6 days), July 27 anonymous accusation (14 days); (b) September 18, 2023 ADA/harassment email → 26-minute Final Warning; (c) December 28-29, 2023 assault report → January 4, 2024 termination (3 business days). Each protected activity triggered immediate retaliation, demonstrating a pattern of punishing Plaintiff for exercising her rights.

**Post-Termination Witness Testimony Proves Retaliation Pattern:** On April 24, 2024, during a post-TWC hearing call (Robyn Witness Tampering), witnesses David Kremm and Jordan Hollan provided testimony directly to Robyn Smith that strengthens the retaliation case. Hollan stated that Plaintiff had been singled out for

removal in connection with concerns she had raised at work.—direct witness testimony that Plaintiff was targeted for engaging in protected activity. David Kremm confirmed Brent Wong had been building a record of complaints to justify removing Plaintiff, and identified Plaintiff as Wong's next target. Additionally, Robyn Smith revealed on the same call that Smith revealed that other employees had begun reporting Plaintiff starting mysteriously in July—hidden complaints Plaintiff was never told about, collected beginning 14 days after her July 12-13 harassment report. The fact that Defendants began collecting secret complaints immediately after Plaintiff's Title VII protected activity—and withheld them until termination/TWC proceedings—proves the complaints were manufactured to paper a termination file, not to correct behavior. This is the textbook definition of pretextual retaliation: building a case to justify an adverse action that was predetermined in response to protected activity.

6. **Post-Termination Retaliation:** Defendants' retaliation continued after termination: (a) January 5, 2024 hostile equipment return with false theft accusation and coordinated surveillance; (b) January 5, 2024 staff meeting instructions not to discuss the termination, constituting witness tampering; (c) false sworn statements to TWC, EEOC, OFCCP, and NASA ODEO falsely claiming "NASA Security determined Plaintiff falsified her report"—designed to destroy Plaintiff's credibility and professional reputation.

7. As a direct result, Plaintiff suffered lost wages, emotional distress, reputational harm, and other damages.

## COUNT IX — ASSAULT AND BATTERY

### (Texas Common Law — Against Susana Kane)

1. Plaintiff incorporates all preceding factual allegations.

2. **Relation Back to Original Complaint (Filed October 1, 2025):** This assault and battery claim against Defendant Susana Kane relates back to Plaintiff's original complaint filed on October 1, 2025—before the Texas two-year statute of limitations expired on December 29, 2025—under Fed. R. Civ. P. 15(c)(1)(C). The original complaint contained detailed factual allegations describing the December 28-29, 2023 workplace assault, identifying Susana Kane by name in the factual allegations as the assailant, describing the physical contact (striking Plaintiff with boxes), documenting Kane's admission ("I barely touched the box"), and establishing the assault as the triggering event for Plaintiff's termination. The original complaint put all defendants on notice of the assault claim from day one of this litigation. Adding Kane as an individual defendant in this Amended Complaint does not assert a new claim or rely on new conduct—it simply adds the individual tortfeasor as a party to the assault claim that was fully pleaded on October 1, 2025. Kane received notice of this action through the corporate defendants (her employers at Seabrook Solutions, a subcontractor on the same NASA contract) and knew or should have known she would be named individually but for Plaintiff's initial pro se misunderstanding that only corporate defendants could be sued.

3. **All Points' Late Answer Created Procedural Barrier:** Plaintiff, proceeding pro se with documented executive function disabilities, faced a significant procedural

barrier to filing this Amended Complaint sooner. All Points Logistics, LLC failed to answer or otherwise appear by the December 29, 2025 deadline, creating genuine uncertainty about whether amendment was procedurally proper during the pending default period. All Points did not file its Answer until January 28, 2026—30 days late. Plaintiff prepared this Amended Complaint draft following that procedural development; it has not been filed. The delay in adding Kane as an individual defendant was caused by All Points' own failure to timely respond, not by Plaintiff's lack of diligence. Defendants cannot claim prejudice from a delay they themselves caused.

4. This amendment relates back to the October 1, 2025 filing date, preserving the assault claim despite the December 29, 2025 SOL expiration.

5. Under Texas common law, assault is an intentional, unlawful threat by word or act to do violence to another person, coupled with an apparent ability to do so, that creates a well-founded fear in the other person that such violence is imminent. Battery is the intentional and harmful or offensive contact with another person without consent.

6. On December 28–29, 2023, at NASA JSC, Defendant Susana Kane intentionally and without Plaintiff's consent physically struck Plaintiff's hand with a box, causing harmful and offensive contact. **These facts were alleged in detail in the original complaint filed October 1, 2025, including Kane's identification by name, the specific conduct, and the resulting termination.**

7. Susana Kane's conduct was intentional, deliberate, and without lawful justification. Kane admitted to the physical contact, stating words to the effect of "I barely

touched the box" and "I'm the new Brent," demonstrating awareness of her conduct and hostility toward Plaintiff.

8. Susana Kane's actions placed Plaintiff in immediate apprehension of harmful contact and resulted in physical injury, pain, emotional distress, and mental anguish.

9. As a direct and proximate result of Susana Kane's assault and battery, Plaintiff suffered: (a) physical injury and pain; (b) severe emotional distress, mental anguish, and exacerbation of pre-existing psychological conditions; (c) lost wages and benefits due to termination that followed her protected report of the assault; and (d) medical expenses related to treatment of injuries and psychological harm.

10. Susana Kane's conduct was intentional, malicious, and undertaken with conscious disregard for Plaintiff's rights, warranting an award of punitive damages.

11. **Statute of Limitations Preserved by Relation Back:** This claim is filed within two years of the December 28-29, 2023 incident through the relation-back doctrine. The original complaint filed October 1, 2025 (before the December 29, 2025 SOL expiration) contained the assault allegations against Susana Kane by name. This Amended Complaint adding Kane as an individual defendant relates back to that October 1, 2025 filing under Fed. R. Civ. P. 15(c)(1)(C), preserving the claim.

## COUNT X — DEFAMATION (PER SE)

## (Texas Common Law — Against All Points Logistics, LLC and Leidos Holdings, Inc.)

1. Plaintiff incorporates all preceding factual allegations.

2. Under Texas law, defamation per se occurs when a statement, on its face, injures reputation by: (a) imputing criminal conduct or dishonesty; or (b) injuring the plaintiff in her occupation. When defamatory per se, injury is presumed.

3. **Admission of Lack of Knowledge:** On March 25, 2024, All Points Logistics, LLC HR representative Robyn Smith admitted in writing: "We were not told the actual results of the security investigation." This admission—made before All Points Logistics, LLC' sworn testimony at the April 3, 2024 TWC hearing and before EEOC/OFCCP submissions—proves All Points Logistics, LLC had actual knowledge that it did not know what NASA Security found, yet continued telling government agencies under oath that "NASA Security determined Plaintiff falsified the report." This is not negligence or good-faith mistake—these are knowing, deliberate false sworn statements made with actual malice.

4. After terminating Plaintiff, Defendants made false statements to third parties, including TWC, EEOC, and OFCCP, that: (a) NASA Johnson Space Center Security determined Plaintiff falsified her assault report; (b) the assault "did not happen"; and (c) NASA Johnson Space Center prohibited Plaintiff from working on-site.

5. **Geographic Impossibility of Personal Knowledge:** All Points VP Ed Scarborough signed sworn EEOC and OFCCP responses attesting that facts about Plaintiff's conduct at NASA JSC were true, despite: a. Never meeting Plaintiff in person; b. Never visiting NASA JSC during Plaintiff's employment; c. Working from All Points' Florida office—over 1,000 miles from the Houston worksite; d. Having his Florida location listed in signature blocks on the very documents he signed under

oath. A reasonable person cannot attest under penalty of perjury to facts about on-site conduct at a secured federal facility 1,000+ miles away that they never visited and events involving an employee they never met. Ed's sworn attestations are not merely negligent—they constitute knowing false statements made with reckless disregard for the truth and with actual malice.

6. All Points made the following specific false statements under oath or penalty of perjury to government agencies: a. **TWC Written Opposition (February 8, 2024):** All Points submitted written statements to the Texas Workforce Commission, signed under penalty of perjury pursuant to Texas unemployment law, falsely claiming "NASA Security determined Amanda falsified the report" and "the assault did not happen." These statements were made to deny Plaintiff unemployment benefits and destroy her credibility with a state agency. b. **TWC Hearing Testimony (April 3, 2024, TWC Hearing Transcript - April 3, 2024):** Robyn Smith, All Points' Chief Administrative Officer, testified under oath at the TWC appeal hearing, repeating under penalty of perjury the false narrative that NASA Security found Plaintiff lied about the assault. This sworn testimony occurred after Robyn admitted in her March 25, 2024 email that All Points "were not told the actual results of the security investigation"—meaning she knew or should have known she never saw what NASA actually found, yet testified under oath anyway. c. **EEOC Position Statement (2024):** All Points submitted a written position statement to the Equal Employment Opportunity Commission in response to Plaintiff's Charge No. 460-2024-04943, signed under penalty of perjury pursuant to 29 C.F.R. § 1601.12(b), repeating the

same false claims that NASA Security determined Plaintiff falsified her report. EEOC position statements carry the force of sworn testimony and expose the signor to federal perjury liability. d. **OFCCP Response (2024):** All Points submitted written responses to the Office of Federal Contract Compliance Programs in Case No. I00311965, signed under penalty of perjury, again repeating the false narrative about NASA Security's purported findings. As a federal contractor, All Points' false sworn statements to OFCCP constitute particularly serious misconduct affecting federal contract compliance and eligibility.

7. Each sworn false statement was made with actual knowledge of falsity or reckless disregard for truth. HR representative Robyn Smith admitted in writing (Robyn Not Told Results): "We were not told the actual results of the security investigation." Despite this admission that All Points never saw what NASA Security actually concluded, All Points continued telling government agencies under oath that "NASA Security determined Plaintiff falsified the report." This is not negligence or mistake —these are knowing, deliberate false sworn statements repeated across multiple federal and state agencies to destroy Plaintiff's professional reputation and deny her benefits.

8. **Willful Malice After Federal Warning:** All Points' false statements to OFCCP were made after receiving OFCCP's July 3, 2024 formal notice expressly warning that "OFCCP and EEOC regulations require you to retain all records pertinent to this complaint and ensure that there is no retaliation because of this complaint." Despite receiving this clear federal warning that Plaintiff's complaint raised serious statutory

violations and that All Points was under investigation, All Points continued submitting sworn false statements to OFCCP and other agencies claiming "NASA Security determined Plaintiff falsified her report"—a statement All Points knew or should have known was false based on Robyn Smith's March 25, 2024 admission. This continuation of defamatory falsehoods after receiving formal federal notice demonstrates willful malice, conscious disregard for truth, and deliberate intent to harm Plaintiff's professional reputation in retaliation for filing protected complaints.

9.  These statements were demonstrably false. NASA Security Chief Russ Tucker told NASA ODEO that NASA Security had NOT determined Plaintiff falsified anything and had NOT communicated that to anyone. Defendants admitted they "were not told the actual results of the security investigation." NASA Security recommended both Plaintiff and Kane return to work; NASA never "banned" Plaintiff.

10. Accusing Plaintiff of falsifying a federal security report constitutes defamation per se: it imputes dishonest conduct and injures her professional fitness for federal contracting work.

11. Defendants acted with actual malice or reckless disregard for truth: they told agencies "NASA found X" while admitting they never saw what NASA found; predetermined the outcome before any investigation; and engaged in witness tampering to support their false narrative.

12. As a direct result, Plaintiff suffered reputational harm, lost employment opportunities, diminished earning capacity, and severe emotional distress. Presumed damages apply under Texas law for defamation per se.

## COUNT XI — FLSA RETALIATION

## (29 U.S.C. § 215(a)(3) — Against All Points Logistics, LLC and Leidos Holdings, Inc.)

1. Plaintiff incorporates all preceding factual allegations.

2. **Legal Standard:** The Fair Labor Standards Act prohibits retaliation against employees who complain about wage violations. 29 U.S.C. § 215(a)(3). To establish a prima facie case of FLSA retaliation, a plaintiff must show: (1) she engaged in protected activity; (2) she suffered an adverse employment action; and (3) a causal link exists between the two. *Richardson v. Monitronics Int'l, Inc.*, 434 F.3d 327, 332 (5th Cir. 2005). [verification pending — Plaintiff will supplement within 14 days] Temporal proximity can establish the causal link. *Id.* Remedies include back pay, liquidated damages (equal to back pay), and attorney's fees. 29 U.S.C. § 216(b).

3. On September 18, 2023, at 5:20 p.m., Plaintiff's email to All Points HR (Sept 18 ADA Disclosure Email) explicitly reported she was being required to work off-the-clock without compensation. The email stated: "I felt pressured to [work off the clock] to meet the demands last week."

4. At 5:46 p.m.—26 minutes later—HR issued a "Final Warning" with no prior progressive discipline. This extraordinary temporal proximity establishes that Plaintiff's FLSA complaint was a motivating factor in the adverse action under *Richardson*, 434 F.3d at 332. [verification pending — Plaintiff will supplement within 14 days]

5. Defendants continued retaliating by cancelling Plaintiff's overtime while male comparators who participated in identical work (Sauer, Hollan) continued receiving overtime, and ultimately terminating her.

6. The 26-minute gap alone proves causation under Fifth Circuit law. Defendants' pretextual shifting explanations and disparate treatment of comparators further establish retaliation under the McDonnell Douglas framework. *See Aryain v. Wal-Mart Stores Tex. LP*, 534 F.3d 473, 485 (5th Cir. 2008). [verification pending — Plaintiff will supplement within 14 days]

7. **Smoking Gun — Disparate Treatment of Identical Off-the-Clock Complaints:** Post-termination evidence proves the Final Warning was FLSA retaliation, not a legitimate response to a timekeeping violation. On April 24, 2024, during a post-TWC hearing call (Robyn Witness Tampering), witnesses David Kremm and Jordan Hollan told All Points HR Director Robyn Smith directly that management pressured all employees to work through lunches and off the clock—the identical FLSA violation Plaintiff had reported on September 18, 2023. Kremm described the same FLSA-impacting working-through-lunch pattern as applying to many employees in the group, explaining that the pressure came from management and that employees felt they had no alternative but to complete work off-the-clock or face escalation to their subcontractor employer. Hollan added that a workplace climate in which remaining employees understood that speaking up risked being targeted. Robyn Smith's response to David and Jordan: calm, receptive—(Smith responded positively, acknowledging the need to know about workplace issues)—no warning,

no discipline, no consequences whatsoever. Compare this with Robyn's response when Plaintiff reported the identical off-the-clock violation on September 18, 2023: a Final Warning issued 26 minutes later that specifically used the disclosure—"you have also stated that you have worked off the clock. This is a violation of timekeeping policies and will result in termination if it continues." The same HR Director, hearing the same complaint about the same systemic FLSA violation, took diametrically opposite actions: punished Plaintiff with a Final Warning threatening termination, but thanked David and Jordan with zero consequences. This eliminates any possible legitimate justification for the Final Warning and proves it was pure retaliation for Plaintiff's protected FLSA complaint. Hollan's testimony described a chilling effect in which remaining employees understood that speaking up risked being targeted—is direct evidence that the chilling effect of Plaintiff's 26-minute retaliation was known and felt by coworkers, proving the Final Warning accomplished its retaliatory purpose of deterring future FLSA complaints.

8. As a direct result, Plaintiff suffered lost wages, lost overtime, and is entitled to back pay, liquidated damages equal to back pay, and attorney's fees.

Count XII migrated from Part 4 — Counts IX–XV.

## COUNT XII — FEDERAL CONTRACTOR WHISTLEBLOWER PROTECTION (41 U.S.C. § 4712 — Against All Points Logistics, LLC; Leidos, Inc.; Leidos Holdings, Inc.; and Leidos Innovations Corporation (collectively, the "Leidos Entities"))

1. Plaintiff incorporates all preceding factual allegations.

2. Section 4712 of Title 41 prohibits federal contractors from retaliating against employees who disclose violations of law related to federal contracts. The employee need only show the disclosure was a "contributing factor" in the adverse action; the employer must then prove by clear and convincing evidence it would have taken the same action absent the disclosure.

3. Plaintiff was employed by All Points Logistics, LLC (subcontractor) and Leidos Holdings, Inc. (prime contractor) on NASA Contract No. 80NSSC19D0001, making her a protected employee under the statute.

4. Plaintiff disclosed violations of federal law related to the contract: (a) Title VII violations (sexual harassment reports); (b) ADA violations (accommodation requests and denials); (c) FLSA violations (off-the-clock work); and (d) workplace violence and safety violations, including Plaintiff's December 28–29, 2023 assault report, which NASA Security Deputy Chief Kindred investigated and documented in NASA Security Incident Report No. JSC106469.

5. Plaintiff made these disclosures to supervisors, management, NASA ODEO, and OFCCP—all protected recipients under the statute.

6. Defendants retaliated with: a written Final Warning issued 26 minutes after Plaintiff's September 18, 2023 disclosures, cancelled overtime, hostile interrogation, and termination three (3) business days after the assault report (six calendar days, but only two intervening work days for investigation).

7. Plaintiff's disclosures were a contributing factor—indeed, the primary factor—in the adverse actions, as proven by extraordinary temporal proximity and evidence of

pretext, including Plaintiff's December 27, 2023 written acknowledgment to supervisor Brent Wong that she was among the top-performing technicians on the team just eight days before the January 4, 2024 termination, which temporally forecloses any performance-based justification for the adverse action. Plaintiff's disclosures were made in her capacity as a federal contractor employee working on NASA Contract No. 80NSSC19D0001, and her complaints specifically referenced that Defendants' violations were occurring on a federal worksite using federal contract funds, bringing them squarely within Section 4712's protection.

8. Defendants cannot prove by clear and convincing evidence they would have taken the same actions absent Plaintiff's protected disclosures.

9. As a direct result, Plaintiff suffered lost wages, emotional distress, and is entitled to reinstatement, back pay, compensatory damages, litigation costs, and attorney's fees.

10. **Administrative exhaustion pathway and preservation under 41 U.S.C. § 4712.** Under 41 U.S.C. § 4712(b)(2)(A), the Inspector General of the executive agency on whose contract a reprisal occurs has 180 days after receiving a complaint to investigate and submit a report to the head of the agency. Under 41 U.S.C. § 4712(c)(2), if no order denying relief issues within 210 days after submission of the complaint (or within 30 days after notice of an extension), the complainant may bring a de novo action for relief in the appropriate United States District Court. FAR 3.904-1 sets the outer filing limit at three years from the alleged reprisal; Plaintiff's January 4, 2024 termination places that outer limit at January 4, 2027, well within bounds. Plaintiff submitted to the NASA Office of Inspector General on April 24,

2026 a complaint and disclosure under § 4712 concerning the protected disclosures and retaliatory actions pleaded above. The 210-day clock under § 4712(c)(2) accordingly began running on April 24, 2026 and will mature on or about November 20, 2026 absent earlier issuance of a final order under § 4712(c)(1). Plaintiff pleads Count XII to preserve the § 4712 claim within the Rule 15 amendment/joinder window set by the Docket Control Order and will supplement the pleading pursuant to Fed. R. Civ. P. 15(d) upon ripening of § 4712(c)(2) exhaustion, or sooner if NASA OIG issues a final order under § 4712(c)(1). To the extent the Court concludes Count XII is not yet ripe at the time of filing, Plaintiff respectfully requests that any dismissal be without prejudice to the supplemental pleading expressly contemplated by Rule 15(d) and § 4712(c).

## COUNT XIII — INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (Texas Common Law — Against All Points Logistics, LLC, Leidos Holdings, Inc., Brent Wong, Christy Murray, Ed Scarborough, Robyn Smith, Susana Kane, Cristian Garcia, and Carolyn Dianne Brief)

1. Plaintiff incorporates all preceding factual allegations.

2. **Relation Back for Individual Defendants Under Fed. R. Civ. P. 15(c)(1)(C): Susana Kane (Assault-Based IIED):** This claim against Susana Kane relates back to the original complaint filed October 1, 2025—before the Texas two-year limitations period expired on December 29, 2025. The original complaint described Susana Kane's December 28-29, 2023 assault in detail, identified Susana Kane by

name in the factual allegations, and established the assault as causing severe emotional distress. Adding Susana Kane as an individual defendant simply formalizes what was fully pleaded on October 1, 2025. **Other Individual Defendants (Brent Wong, Christy Murray, Ed Scarborough, Robyn Smith, Cristian Garcia):** The original complaint described in detail the intentional, extreme, and outrageous conduct by each of these individuals—identifying them by name in the factual allegations and describing their specific actions (Brent Wong's sexual harassment and coordination of termination, Christy Murray's false "nothing happened" statement and betrayal, Ed Scarborough's and Robyn Smith's false sworn statements from Florida, Cristian Garcia's false witness statement). However, the original complaint named only the three corporate defendants (NASA, Leidos Holdings, Inc., All Points Logistics, LLC) and did not add these individuals as separate defendants. Adding these individuals as defendants in this Amended Complaint does not assert new conduct or rely on new facts—it simply adds the individual tortfeasors as parties to claims whose factual basis was fully pleaded on October 1, 2025.

3. **"Mistake of Identity" Due to Pro Se Status and Disability:** Plaintiff's failure to name individual defendants in the original complaint was a "mistake concerning the proper party's identity" under Rule 15(c)(1)(C), not a strategic choice. As a pro se litigant with documented disabilities substantially limiting executive function (ADHD, autism, PTSD, anxiety, depression), Plaintiff did not initially understand the legal distinction between suing corporate employers versus suing individuals in

their personal capacity. Plaintiff's understanding was: "I sue the companies that fired me." This was a reasonable mistake for a pro se plaintiff with cognitive disabilities affecting legal research and procedural comprehension.

4. **All Points Logistics, LLC' Late Answer Created Procedural Barrier:** Additionally, Plaintiff faced a significant procedural barrier that delayed this amendment. All Points Logistics, LLC failed to answer or otherwise appear by the December 29, 2025 deadline, creating genuine uncertainty about whether filing an amended complaint was procedurally proper while one defendant was in potential default status. All Points did not file its Answer until January 28, 2026—30 days late. Plaintiff prepared this Amended Complaint draft following that procedural development; it has not been filed. The delay in adding individual defendants was caused by All Points' own 30-day-late Answer, creating procedural uncertainty that a pro se plaintiff with disabilities reasonably struggled to navigate. Defendants cannot claim prejudice from a delay they themselves caused.

5. **Exhaustive Efforts Through Every Available Channel:** From January 2024 through October 2025, Plaintiff fought through every channel she knew or could access: (1) Texas Workforce Commission (TWC) unemployment appeal with live hearing; (2) Equal Employment Opportunity Commission (EEOC) charge and investigation; (3) U.S. Department of Labor Office of Federal Contract Compliance Programs (OFCCP) complaint; (4) NASA Office of Diversity and Equal Opportunity (ODEO) complaint; (5) extensive efforts to obtain legal representation (Lone Star Legal Aid, private attorneys, law school clinics); (6) self-education through EEOC

guidance, legal treatises, and online resources; and (7) filing federal lawsuit pro se in October 2025. At every stage, Plaintiff named the corporate defendants and described the individual conduct in detail—but did not name individuals as separate defendants because she did not understand that was legally permissible or necessary. Plaintiff only realized in late 2025, through continued legal research and consultation, that individuals could be sued personally for state-law torts even when already described in the complaint.

6. **Disability-Related Barriers to Legal Understanding:** Plaintiff's documented disabilities create specific barriers to understanding complex legal procedures: (1) ADHD affects ability to process and retain multi-step legal instructions; (2) Autism affects ability to understand implicit legal distinctions ("employer" vs. "individual capacity"); (3) Executive function deficits affect ability to navigate procedural requirements while simultaneously researching substantive law, managing evidence, and drafting pleadings. These are the same disabilities for which Plaintiff requested workplace accommodations and which Defendants used as a basis for adverse action against her. The "mistake" of suing only corporate defendants while fully describing individual conduct was a direct result of cognitive disabilities that substantially limit Plaintiff's ability to comprehend complex procedural rules without legal counsel— counsel she could not afford and could not obtain despite exhaustive efforts.

7. **Notice to Individual Defendants from Day One:** Each individual defendant had actual notice of this lawsuit and their personal involvement from October 1, 2025. The original complaint identified each individual by name in the factual allegations

and described their specific conduct in detail: (a) Brent Wong knew the original complaint described his sexual harassment, retaliation coordination, and role in Plaintiff's termination; (b) Christy Murray knew the complaint described her false "nothing happened" statement and calculated betrayal; (c) Ed Scarborough and Robyn Smith knew the complaint described their false sworn statements signed from Florida about events they could not have witnessed; (d) Susana Kane knew the complaint described her December 28-29, 2023 assault of Plaintiff; (e) Cristian Garcia knew the complaint described his false witness statement to NASA Security. All individual defendants are current or former employees of the corporate defendants sued in October 2025, ensuring they received notice through corporate counsel and the corporate defendants' receipt of the complaint. They knew or should have known they would be named individually but for Plaintiff's pro se misunderstanding of procedural rules—a "mistake" that is both understandable and correctable under Rule 15(c)(1)(C).

8. **No Prejudice to Defendants:** Defendants cannot demonstrate prejudice from this amendment. Each individual's conduct was described in detail in the original complaint filed October 1, 2025. The amendment does not rely on newly discovered facts or assert new theories—it simply adds individuals as named defendants for conduct already alleged against them. Moreover, the delay in filing this amendment was caused by All Points' own 30-day-late Answer, creating procedural uncertainty that a pro se plaintiff with disabilities reasonably struggled to navigate. Defendants cannot claim prejudice from a delay they themselves caused.

9. This amendment relates back to October 1, 2025, preserving all claims.

10. Under Texas common law, intentional infliction of emotional distress requires: (1) the defendant acted intentionally or recklessly; (2) the conduct was extreme and outrageous; (3) the actions caused the plaintiff emotional distress; and (4) the emotional distress was severe. *Hoffmann-La Roche Inc. v. Zeltwanger*, 144 S.W.3d 438, 445 (Tex. 2004). [verification pending — Plaintiff will supplement within 14 days]

11. Defendants individually and collectively engaged in intentional and reckless conduct directed at Plaintiff: a. **September 18, 2023 Coordinated Attack**: Supervisor Brent Wong sent threatening email at 2:21 p.m. documenting manufactured "7 Day Neglected List" violations. At 5:20 p.m., Plaintiff sent professional email to HR requesting ADA clarification and reporting off-the-clock work pressure. Twenty-six (26) minutes later, at 5:46 p.m., HR representative Robyn Smith issued written "Final Warning" with no prior progressive discipline—demonstrating premeditation and coordination to psychologically punish Plaintiff for asserting her rights. b. **Categorical ADA Denial with False Legal Statement**: On September 19, 2023, Robyn Smith sent written email (Robyn ADA Denial) falsely stating "This is not covered by the ADA and as the employer doesn't require any type of reasonable accommodation"—an objectively false statement of law calculated to intimidate a disabled employee and deter her from pursuing her legal rights. c. **January 5, 2024 Post-Termination Ambush**: The day after termination, Ed Scarborough directed Plaintiff to return equipment. When Plaintiff arrived with witness Andreiy for safety,

three people were waiting in coordinated surveillance: Brent Wong, Travis McFarland (approaching from different direction), and Ryan Fisher (Brent's friend and loyal ally). The encounter took place outdoors in cold weather rather than in a private office. Brent Wong falsely accused Plaintiff—in front of multiple witnesses —of stealing her NASA badge, forcing Plaintiff to display her backpack contents like a suspected criminal. This humiliating, hostile equipment return was designed to inflict maximum psychological harm on a newly terminated employee. d. **Systematic False Sworn Statements to Government Agencies**: Between February and July 2024, All Points—through Ed Scarborough and Robyn Smith—submitted sworn false statements under penalty of perjury to four separate government agencies (TWC, TWC appeal hearing, EEOC, OFCCP) falsely claiming "NASA Security determined Plaintiff falsified her report." Ed Scarborough signed these statements from Florida, over 1,000 miles away, despite never visiting the worksite, never meeting Plaintiff, and admitting (through Robyn Smith on March 25, 2024) that All Points "were not told the actual results of the security investigation." This deliberate campaign of false sworn statements across multiple federal and state agencies was designed to destroy Plaintiff's professional reputation, deny her unemployment benefits, and inflict severe emotional distress. e. **Christy Murray's Calculated Betrayal**: Manager Christy Murray positioned herself as the "safe person" to report discrimination and assault concerns to, expressly telling employees in October 2022 that she understood workplace discrimination and assault and would back employees up. Based on Murray's explicit assurances, Plaintiff trusted Murray

when reporting Brent Wong's sexual harassment in July 2023. When Plaintiff reported being assaulted by Susana Kane in December 2023, Murray manufactured a false statement that "nothing happened"—betraying an employee who had relied on her explicit promises of support, in order to justify terminating that employee for reporting workplace violence. f. **Obsessive Surveillance and Harassment**: Brent Wong constantly monitored Plaintiff's location, repeatedly asking other employees "where is Amanda?" to create a false narrative of unreliability while simultaneously yelling at Plaintiff for resting her head on her desk during her legitimate lunch break —conduct specifically targeting a disabled employee's need for sensory breaks. g. **Susana Kane's Assault and Admission**: Kane intentionally struck Plaintiff's hand with a box, causing physical contact. Kane's statement "I'm the new Brent" demonstrates awareness that she was engaging in hostile conduct and aligning herself with Wong's harassment pattern. h. **Cristian Garcia's False Witness Statement**: Garcia gave a materially false sworn statement to NASA Security claiming his "back was turned" during the December 29, 2023 assault—a physical impossibility since he was actively horseplaying WITH Susana Kane at the time. Garcia's statement created a "binary perjury trap": either he saw the assault but lied, or he didn't see the assault but gave false witness testimony anyway. Either option constitutes intentional falsehood. Garcia knew his statement would be used by employers to evaluate Plaintiff's credibility and determine her employment fate. His false statement was immediately relied on by All Points and Leidos to claim "no assault occurred" and justify Plaintiff's termination six days later. This constitutes

extreme and outrageous conduct: knowingly providing false testimony to a federal security investigation, with actual knowledge that the false testimony would be used to destroy an assault victim's employment and credibility.

12. **The Conduct Was Extreme and Outrageous**: Texas courts define "extreme and outrageous" as conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *GTE Sw., Inc. v. Bruce*, 998 S.W.2d 605, 612 (Tex. 1999). [verification pending — Plaintiff will supplement within 14 days] The coordinated nature of Defendants' conduct—targeting a disabled employee with premeditated retaliation measured in minutes, false sworn statements to multiple government agencies, post-termination hostile ambush and false theft accusation, and calculated betrayal by a manager who positioned herself as a safe reporter—collectively constitutes conduct that is utterly intolerable in a civilized community. The fact that these actions were deliberately coordinated across multiple actors and multiple time points, all directed at a single disabled employee, elevates the conduct to the level of extreme and outrageous.

13. **Severe Emotional Distress**: As a direct result of Defendants' conduct, Plaintiff suffered severe emotional distress requiring intensive psychiatric treatment including: a. Transcranial Magnetic Stimulation (TMS) therapy for treatment-resistant depression b. Ongoing psychiatric medication management c. Individual therapy sessions d. Emotional Support Animal prescription (November 15, 2024)—objective medical evidence of severe emotional distress e. Exacerbation of pre-

existing ADHD, PTSD, depression, anxiety, and autism to the point of requiring intensive intervention f. Inability to secure comparable employment due to reputational destruction g. Ongoing fear, humiliation, and distress from knowledge that false sworn statements about her remain in multiple government agency files

14. Defendants acted with actual malice and conscious indifference to Plaintiff's rights. The 26-minute retaliation timeline, sworn false statements after admission of ignorance, and post-termination hostile treatment demonstrate deliberate intent to cause severe emotional harm.

15. As a direct result, Plaintiff is entitled to compensatory damages for past and future emotional distress, mental anguish, medical expenses, and punitive damages without statutory cap under Texas common law.

## COUNT XIV — CIVIL CONSPIRACY

**(Against All Points Logistics, LLC, Leidos Holdings, Inc., TekFive, Inc., Seabrook Solutions, LLC, Brent Wong, Christy Murray, Ed Scarborough, Robyn Smith, Susana Kane, Cristian Garcia, Tristian Castro, John Walters, Daniel Murphy, Travis McFarland, Brian Lynn, and Carolyn Dianne Brief)**

1. Plaintiff incorporates all preceding paragraphs.

2. Under Texas common law, a civil conspiracy requires: (1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful overt acts; and (5) damages as the proximate result. *Tilton v. Marshall*, 925 S.W.2d 672, 681 (Tex. 1996). [verification pending — Plaintiff will supplement within 14 days]

3. **Two or More Persons**: All Points Logistics, LLC and Leidos Holdings, Inc. are separate legal entities. Defendants Brent Wong, Christy Murray, Cristian Garcia, and Daniel Murphy were employees of Leidos. Defendants Ed Scarborough and Robyn Smith were employees of All Points. Defendant John Walters was employed by TekFive (another subcontractor on the same NASA contract). Defendant Susana Kane was employed by Seabrook Solutions (subcontractor). Defendant Travis McFarland worked as a PCST and later Queue Manager. Defendant Brian Lynn was a Leidos manager. These thirteen defendants—two corporate entities and eleven individuals acting on their behalf and in concert across multiple corporate entities— are distinct persons capable of conspiring. This is not an "intracorporate conspiracy" because: (1) All Points, Leidos, TekFive, and Seabrook Solutions are separately incorporated entities; and (2) individuals can conspire with their corporate employers and with individuals employed by other corporate entities when coordinating unlawful conduct across corporate lines. *Massey v. Armco Steel Co.*, 652 S.W.2d 932, 934 (Tex. 1983) [verification pending — Plaintiff will supplement within 14 days] (employees of different corporations can form civil conspiracy).

4. **Object to Be Accomplished**: Defendants conspired to terminate Plaintiff in retaliation for her protected activities (disability accommodation requests, sexual harassment reports, workplace assault report, wage complaints, and safety complaints), while manufacturing pretextual justifications to avoid liability under federal employment law.

5.  **This Is Not Intracorporate Conspiracy**: Texas law does not recognize conspiracy among employees of a single corporation acting within the scope of employment. However, Plaintiff's conspiracy claim alleges coordination **across three separate corporate entities**: All Points Logistics, LLC, Leidos Holdings, Inc., and TekFive (John Walters's employer). The conspiracy crossed corporate lines through: (1) TekFive employee John Walters manufacturing false complaint coordinated with Leidos supervisor Brent Wong; (2) Leidos managers (Wong, Murray, Lynn) coordinating with All Points HR (Smith, Scarborough) to execute termination; (3) All Points executing Leidos's termination decision without independent investigation. Under Texas law, employees of different corporations can form a civil conspiracy. *Massey v. Armco Steel Co.*, 652 S.W.2d 932, 934 (Tex. 1983). [verification pending — Plaintiff will supplement within 14 days]

6.  **Meeting of the Minds**: Defendants coordinated their unlawful conduct through systematic communication and synchronized actions: **a. September 18, 2023 Coordination**: Leidos supervisor Brent Wong sent Plaintiff threatening email at 2:21 p.m. regarding "7 Day Neglected List." At 5:20 p.m., Plaintiff sent protected complaint to All Points HR representative Robyn Smith. At 5:46 p.m.—twenty-six (26) minutes later—Robyn Smith issued "Final Warning." The extraordinary speed of this response, combined with Brent's earlier setup email, demonstrates real-time coordination between Leidos (Brent Wong) and All Points (Robyn Smith). Discovery of emails, Teams messages, and phone records between 2:21 p.m. and 5:46 p.m. on September 18, 2023 will prove this coordination. b. **December 29-30,**

**2023 Coordination**: After Plaintiff reported workplace assault on December 28-29, All Points VP Ed Scarborough immediately suspended Plaintiff (voicemail at 4:39 p.m. on December 29). On December 30, Scarborough sent internal email stating "Christy told them nothing happened"—proving Leidos manager Christy Murray fed false information to All Points, and All Points adopted it without independent investigation. Murray was not present during the assault, so her statement could not be based on personal knowledge. c. **January 4, 2024 Synchronized Termination**: On January 4, 2024, NASA's access management system simultaneously deprovisioned all four of Plaintiff's access privileges at precise timestamps, demonstrating coordinated action across NASA, Leidos, and All Points to remove Plaintiff from the worksite. Leidos manager Brent Wong told All Points VP Ed Scarborough to "have Amanda come get her personal things"—proving Leidos made the termination decision and All Points executed it. d. **Pattern of Communication Spikes**: Discovery of emails, Teams messages, and phone records will reveal spikes in communication frequency between All Points (Ed/Robyn in Florida) and Leidos (Brent/Christy on-site) immediately following each of Plaintiff's protected activities: July 12-13 harassment report, September 18 accommodation request, and December 29 assault report. e. **November 27, 2023 Coordinated False Complaint (Walters Negative Behavior Nov 27)**: On November 27, 2023, at 3:28 p.m., TekFive employee John Walters sent an email to Leidos supervisor Brent Wong (Walters Negative Behavior Nov 27) falsely claiming Plaintiff "pressured" coworker Jesse Smith during a November 24 deployment incident. This complaint was

manufactured—Jesse Smith, the alleged "victim," never complained to anyone about the incident and was never informed by management that Walters had filed a complaint about him. The timing and coordination are damning: Christy Murray sent an "Awareness Item" email to management approximately 36 minutes after Walters' email, demonstrating real-time coordination between TekFive (Walters), Leidos (Brent/Christy), and All Points management. This manufactured complaint occurred 70 days after Plaintiff's September 18, 2023 ADA accommodation request and served to build a false paper trail of "performance problems" and "negative behavior" to justify future adverse actions. Walters was rewarded for his participation: he received special project pay from Christy Murray and was later promoted. The multi-employer coordination—TekFive employee manufacturing a complaint, Leidos supervisor receiving it, Leidos manager immediately escalating it to All Points—demonstrates that the conspiracy crossed corporate lines and involved employees from at least three separate subcontractors working in concert to build a termination case against Plaintiff. f. **Brian Lynn's Hostile "Security Interview"**: After the November 2023 VPN event, Leidos managers Christy Murray and Brian Lynn arranged a meeting described as a "Tech Meetup," but the actual focus was a hostile "security interview" directed at Plaintiff. Lynn co-led this interrogation, questioning Plaintiff as if she had intentionally caused the VPN outage, despite the fact that three employees (including two male comparators) participated in the same configuration work and no written SOPs had been provided despite Plaintiff's prior accommodation requests. This hostile interrogation—coordinated between Murray

and Lynn—was designed to manufacture evidence of "security concerns" to justify future adverse actions. g. **Daniel Murphy's Retaliatory Complaint**: On July 19, 2023—just six (6) days after Plaintiff's July 12-13 sexual harassment report against Brent Wong—Daniel Murphy filed a retaliatory complaint against Plaintiff. The timing is probative: discovery of emails, Teams messages, and phone records between Brent Wong and Daniel Murphy in the days immediately before Murphy's July 19 complaint will reveal coordination and coaching. This manufactured complaint served to discredit Plaintiff's legitimate harassment complaint by creating a false counter-narrative that Plaintiff was a "problem employee." The six-day proximity between Plaintiff's protected harassment report and Murphy's complaint demonstrates that Murphy was acting in concert with Wong and other conspirators to retaliate against Plaintiff for opposing discrimination. h. **Travis McFarland and Ryan Fisher's Post-Termination Surveillance**: On January 5, 2024, the day after Plaintiff's termination, when Plaintiff arrived to return equipment, three people were waiting in coordinated surveillance: Brent Wong, Travis McFarland (who approached from a different direction, suggesting pre-coordination), and Ryan Fisher (Brent's friend and loyal ally, a Peripheral Equipment Operator who had moved from subcontractor to Leidos). McFarland's presence from a separate direction and Fisher's presence as part of Brent's inner circle demonstrate that multiple conspirators coordinated to surveil and intimidate Plaintiff during a routine equipment return. This post-termination hostile treatment—with McFarland positioning himself to approach from an unexpected direction while Fisher stood

with Brent—was designed to intimidate Plaintiff and demonstrates that the conspiracy extended beyond employment termination itself to ongoing harassment and retaliation. i. **Cristian Garcia and Susana Kane's Coordination**: On December 29, 2023, Cristian Garcia gave a false witness statement claiming his "back was turned" during Susana Kane's assault of Plaintiff—despite actively horseplaying WITH Kane at the time. Garcia's statement was physically impossible and deliberately false. The fact that Garcia gave his false statement to NASA Security on the same day as the assault demonstrates coordination between Kane (the aggressor) and Garcia (the false witness) to provide exculpatory false testimony that would be used against Plaintiff. This coordination between employees—one committing assault, the other providing false cover testimony—furthered the broader conspiracy to retaliate against Plaintiff for her protected activities. j. **Hidden Complaints Papering Strategy — Post-Protected-Activity File Building:** On April 24, 2024 (Robyn Witness Tampering), Robyn Smith revealed the conspiracy's file-building mechanism. She stated that Defendants had talked with Plaintiff about everything and that Leidos was not building a case — but then disclosed that other people had begun reporting Plaintiff starting mysteriously in July, reports Plaintiff was never made aware of. The July 2023 timing is critical: these hidden complaints began accumulating exactly 14 days after Plaintiff's July 12-13 harassment report against Brent Wong. Standard HR practice requires notifying the employee and giving a chance to correct behavior. Defendants deliberately withheld these complaints—never discussing them with Plaintiff—then sprung them at the TWC

hearing and used them to justify termination and deny unemployment benefits. This proves the complaints were evidence manufactured for a predetermined termination, not corrective discipline. Witness David Kremm independently corroborated this strategy: Kremm stated that Wong appeared to be building a record of complaints to justify Plaintiff's removal. The cross-corporate coordination is plain: Leidos supervisors (Brent Wong, Christy Murray) collected and manufactured complaints from employees (Daniel Murphy July 19, John Walters November 27), which All Points HR (Robyn Smith, Ed Scarborough) compiled into a hidden termination file. Neither entity informed Plaintiff. Both used the file to justify adverse actions after the fact. This is the conspiracy's mechanism: manufacture complaints after protected activity → hide them from the employee → use them to justify termination → present them as legitimate at TWC/EEOC/OFCCP as if they were contemporaneous performance concerns.

7.  **Unlawful Overt Acts in Furtherance of Conspiracy**: a. Issuance of "Final Warning" 26 minutes after protected complaint with no prior progressive discipline b. Categorical denial of ADA accommodation with false legal justification c. John Walters' November 27, 2023 manufactured false complaint (Walters Negative Behavior Nov 27) about a false "pressure" incident with Jesse Smith, coordinated with Brent Wong and Christy Murray to build pretextual paper trail d. Cancellation of Plaintiff's overtime while male comparators continued receiving overtime e. Pretextual investigation refusing to interview Plaintiff or obtain NASA Security Report f. Termination six days after assault report based on predetermined "false

report" narrative g. Post-termination hostile equipment return with false theft accusation h. Submission of coordinated sworn false statements to TWC, EEOC, and OFCCP

8.  **Damages**: As a direct and proximate result of Defendants' conspiracy, Plaintiff suffered all damages alleged in this Complaint, including lost wages, benefits, overtime, emotional distress, medical expenses, reputational harm, and diminished earning capacity.

9.  **Joint and Several Liability**: Under Texas conspiracy law, all conspirators—both corporate entities and individual defendants—are jointly and severally liable for all damages caused by the conspiracy, regardless of which defendant committed which specific act. *Tilton,* 925 S.W.2d at 681. [verification pending — Plaintiff will supplement within 14 days] Individual defendants Brent Wong, Christy Murray, Ed Scarborough, Robyn Smith, Susana Kane, Cristian Garcia, John Walters, Daniel Murphy, Travis McFarland, and Brian Lynn are each personally liable for the full scope of damages caused by the conspiracy, including all economic damages (lost wages, benefits, overtime), compensatory damages (emotional distress, medical expenses, reputational harm), and punitive damages. The coordinated scheme to retaliate against Plaintiff while manufacturing pretextual justifications—executed through direct communication and coordination among individual defendants across corporate lines and across four separate subcontractors (Leidos, All Points, TekFive, and Seabrook Solutions)—makes each defendant liable for the entire harm.

10. Defendants acted with actual malice and in conscious disregard of Plaintiff's rights, warranting punitive damages without statutory cap under Texas common law.

## COUNT XV — TORTIOUS INTERFERENCE WITH PROSPECTIVE EMPLOYMENT

**(Texas Common Law — Against All Points Logistics, LLC and Leidos Holdings, Inc.)**

1. Plaintiff incorporates all preceding paragraphs.

2. Under Texas common law, tortious interference with prospective employment relationships requires: (1) a reasonable probability that the plaintiff would have entered into an employment relationship; (2) an independently tortious or unlawful act by the defendant that prevented the relationship from occurring; (3) the defendant did such act with a conscious desire to prevent the relationship from occurring or knew the interference was certain or substantially certain to occur as a result of the conduct; and (4) the plaintiff suffered actual harm or damages as a result of the defendant's interference. *Wal-Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 713 (Tex. 2001). [verification pending — Plaintiff will supplement within 14 days]

3. **Reasonable Probability of Employment Relationships**: Since her January 4, 2024 termination, Plaintiff has actively sought comparable employment in the federal contracting and civil service sectors, including: a. Dozens of applications for IT support positions with federal contractors at NASA JSC and other federal facilities in the Houston area b. Applications for NASA civil servant positions using Schedule A disability hiring authority c. Positions requiring security clearances and

background checks similar to those Plaintiff previously held d. Positions in the same PC Support Technician and IT support specialist categories where Plaintiff has proven expertise (59 Kudos awards in 2023 demonstrating excellent performance) Given Plaintiff's qualifications, experience, positive performance record, and the demand for IT support in the federal contracting sector, there was a reasonable probability that Plaintiff would have secured one or more of these positions absent Defendants' interference.

4. **Independently Tortious Acts Preventing Employment**: Defendants engaged in defamation (Count X) and other unlawful conduct that directly interfered with Plaintiff's prospective employment: a. **False Sworn Statements to Government Agencies**: All Points Logistics, LLC submitted sworn statements under penalty of perjury to TWC (February 8, 2024), TWC appeal hearing (April 3, 2024), EEOC (2024), and OFCCP (2024) falsely claiming "NASA Security determined Plaintiff falsified her report" and "the assault did not happen." These statements are demonstrably false—NASA Security Chief Russ Tucker told NASA ODEO that NASA Security had NOT determined Plaintiff falsified anything. b. **Statements Injurious to Professional Reputation**: Accusing Plaintiff of falsifying a federal security report imputes dishonesty and criminal conduct, directly injuring her fitness for federal contracting work. Federal contractors and civil service agencies conduct background checks and reference checks. False statements in EEOC, OFCCP, and TWC files are discoverable by prospective employers during security clearance and suitability reviews. c. **Exclusionary Effect in Federal Contracting Community**:

The federal contracting community in Houston, particularly at NASA JSC, is relatively small and interconnected. Defendants' false statements that "NASA prohibited Plaintiff from working on-site" and that she "falsified a security report" have impaired her professional reputation, making it substantially more difficult to obtain comparable work.

5. **Knowledge and Intent**: Defendants knew their false statements would interfere with Plaintiff's future employment prospects. The statements were made to government agencies specifically responsible for employment discrimination enforcement and unemployment benefits—agencies whose records are consulted during hiring processes. All Points Logistics, LLC continued submitting these false statements even after receiving OFCCP's July 3, 2024 formal notice warning that they were under investigation. This continuation demonstrates conscious desire to harm Plaintiff's professional reputation and prevent her from obtaining comparable employment.

6. **Actual Harm and Damages**: As a direct result of Defendants' interference, Plaintiff has suffered: a. Inability to secure comparable employment despite dozens of applications and strong qualifications b. Loss of future earning capacity in her chosen field c. Ongoing lost wages and benefits extending beyond the back pay period d. Emotional distress from rejection by prospective employers who discovered false statements in agency files e. Damage to professional reputation in the federal contracting community f. Need to seek employment in different sectors at lower compensation levels

7. Defendants' conduct was willful, malicious, and undertaken with conscious disregard for Plaintiff's rights, warranting punitive damages without statutory cap under Texas common law.

## COUNT XVI — NEGLIGENCE (UNSAFE WORKING CONDITIONS)

## (Texas Common Law — Against All Points Logistics, LLC and Leidos Holdings, Inc.)

1. Plaintiff incorporates all preceding paragraphs.

2. Under Texas common law, negligence requires: (1) a legal duty owed by the defendant to the plaintiff; (2) breach of that duty; (3) damages; and (4) a proximate causal connection between the defendant's conduct and the resulting injury. *IHS Cedars Treatment Ctr. of DeSoto, Tex., Inc. v. Mason*, 143 S.W.3d 794, 798 (Tex. 2004) [verification pending — Plaintiff will supplement within 14 days].

3. **Duty**: As Plaintiff's joint employers, Defendants owed Plaintiff a duty to provide a reasonably safe workplace and safe equipment necessary to perform her job duties. This duty is well-established under Texas common law and reinforced by the Occupational Safety and Health Act.

4. **Breach**: Defendants breached their duty to Plaintiff by maintaining persistently unsafe working conditions and refusing to remedy known hazards: a. **Broken Windshield Wipers**: The All Points Logistics, LLC company vehicle had broken windshield wipers. Plaintiff was required to perform off-site deployments driving this vehicle in the rain. Plaintiff could not see while driving and was terrified for her

safety. Plaintiff professionally offered to order replacement windshield wipers to solve the safety problem at minimal cost. Defendants refused Plaintiff's offer and failed to fix the wipers, continuing to require Plaintiff to drive in unsafe conditions.

b. **Inadequate Equipment and Safety Gear**: The employer-provided dolly was inadequate for deployment demands, requiring Plaintiff to transport heavy computer equipment. Plaintiff purchased her own cart with her own money to perform her job duties safely. When forced to use the unassigned "free range" NASA bikes due to lack of vehicle access, Plaintiff also purchased her own bicycle helmet with her own money because Defendants provided no helmets or safety equipment for bike use. Defendants failed to reimburse Plaintiff for any of these out-of-pocket safety expenses despite knowledge of the deficiencies. c. **No Vehicle Reservation System and Forced Use of Unassigned Bikes**: Only one vehicle was available for all PC Support Technicians at the JSC site, with no reservation system. Access was first-come-first-serve. If another employee obtained the vehicle first, Plaintiff had no transportation option to reach deployment locations across the large JSC campus. When the vehicle was unavailable, Plaintiff was forced to use informal "free range" NASA bikes—bicycles scattered around campus with no formal checkout system, no safety inspections, no helmets provided, and no accountability for mechanical condition. These bikes were not employer-provided transportation; they were unassigned NASA property that employees appropriated out of necessity. Requiring an employee with documented coordination and mobility issues related to her disabilities to ride unassigned, uninspected bicycles across a large federal facility to

perform job duties creates obvious safety risks. This created particular hardship for Plaintiff given her documented coordination and mobility issues related to her disabilities. d. **Inadequate Emergency Evacuation Plan**: The emergency evacuation plan consisted of a "RUN" sticky note—wholly inadequate for a secured federal facility. Plaintiff requested proper emergency procedures. Defendants failed to provide them. e. **No Safety Cameras After Aggressive Customer Incident**: After an aggressive customer incident, Plaintiff requested safety cameras for employee protection. Defendants refused the request, leaving employees—including Plaintiff—exposed to further workplace violence risk. This refusal proved tragically prescient when Susana Kane assaulted Plaintiff on December 28-29, 2023.

5. **Causation**: Defendants' negligent maintenance of unsafe working conditions directly caused Plaintiff's injuries: a. Emotional distress and fear while driving with broken wipers in rain, unable to see b. Out-of-pocket expenses for purchasing replacement equipment (cart) c. Physical risk of harm from inadequate equipment and unsafe vehicle d. Exposure to workplace violence due to lack of safety cameras e. Inability to perform job duties safely due to lack of proper equipment and procedures

6. **Damages**: As a direct and proximate result of Defendants' negligence, Plaintiff suffered: a. Severe emotional distress and fear for her physical safety b. Out-of-pocket expenses for purchasing equipment Defendants should have provided c. Physical discomfort and risk during unsafe deployments d. Exacerbation of disability-related anxiety and PTSD from unsafe working conditions

**Alternative Pleading Under Tex. Lab. Code § 408.001(b).** To the extent any Defendant is a Texas workers' compensation subscriber, the exclusive-remedy provision of § 408.001(a) does not bar this Count because Plaintiff alleges in the alternative under Fed. R. Civ. P. 8(d)(2) that the conduct described above constitutes gross negligence within the § 408.001(b) exception, which expressly preserves common-law liability for gross negligence resulting in injury to an employee. Plaintiff further reserves the right to plead non-subscriber status and direct ordinary-negligence liability if discovery confirms that any Defendant did not subscribe to the Texas workers' compensation system during the relevant period.

7. **Gross Negligence**: Defendants' conduct constitutes gross negligence warranting punitive damages. Gross negligence under Texas law requires: (1) when viewed objectively from the defendant's standpoint at the time of the event, the act or omission involved an extreme degree of risk, considering the probability and magnitude of potential harm; and (2) the defendant had actual, subjective awareness of the risk but nevertheless proceeded with conscious indifference to the rights, safety, or welfare of others. *Mobil Oil Corp. v. Ellender*, 968 S.W.2d 917, 921 (Tex. 1998) [verification pending — Plaintiff will supplement within 14 days]. Here, Defendants had actual knowledge of the safety hazards: a. Plaintiff explicitly told Defendants about the broken windshield wipers and offered to order replacements b. Plaintiff explicitly requested safety cameras after an aggressive customer incident c. Plaintiff explicitly raised concerns about inadequate equipment d. Defendants refused to remedy these hazards despite minimal cost and obvious risk e. Forcing an

employee to drive in the rain with broken windshield wipers, unable to see, involves an extreme degree of risk to the employee and the public f. Defendants proceeded with conscious indifference to Plaintiff's safety and welfare

8. As a result of Defendants' gross negligence, Plaintiff is entitled to compensatory damages for emotional distress, out-of-pocket expenses, and punitive damages without statutory cap under Texas common law.

---

## COUNT XVII — 42 U.S.C. § 1981 RACE DISCRIMINATION

**(Against All Points Logistics, LLC; Leidos, Inc.; Leidos Holdings, Inc.; and Leidos Innovations Corporation (collectively, the "Leidos Entities"))**

1. Plaintiff incorporates all preceding paragraphs.

2. **PRIMARY: SECTION 1658(a) FOUR-YEAR STATUTE OF LIMITATIONS — § 1981 CLAIM IS TIMELY ON THE MERITS WITHOUT NEED FOR RELATION BACK:**

3. **Statutory text and Supreme Court holding.** 28 U.S.C. § 1658(a) provides a four-year catch-all federal statute of limitations for any "civil action arising under an Act of Congress enacted after the date of the enactment of this section" (December 1, 1990). In *Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 382–83 (2004) [verification pending — Plaintiff will supplement within 14 days], the Supreme Court held that § 1658(a) governs § 1981 claims that were "made possible by a post-1990 enactment" — that is, claims that became cognizable under § 1981 only by virtue of the Civil Rights Act of 1991, Pub. L. No. 102-166, § 101, which amended § 1981(b) to reach post-formation conduct (workplace harassment, retaliation, hostile work environment, and discharge)

that the pre-1991 decision in *Patterson v. McLean Credit Union*, 491 U.S. 164, 171 (1989) [verification pending — Plaintiff will supplement within 14 days] had placed outside § 1981's reach.

4.   **Plaintiff's § 1981 race-discrimination claim is governed by § 1658(a).** The discriminatory conduct pleaded throughout this Amended Complaint is post-formation employment conduct in its entirety: the July 2023 sexually and racially hostile work environment; the September 2023 retaliatory Final Warning and ADA accommodation denial; the November 2023 selective discipline arising from the VPN incident; the January 4, 2024 discharge; and the February–July 2024 false sworn statements to government agencies. Each of these categories — workplace harassment, retaliation within the post-formation contractual relationship, and termination — was outside § 1981's reach under *Patterson v. McLean Credit Union* and was made cognizable under § 1981 only by the 1991 Act. *Jones v. R.R. Donnelley & Sons Co.* therefore places this claim within § 1658(a)'s four-year window rather than the borrowed Texas two-year personal-injury limitations period applied to pre-1991 Patterson-era § 1981 claims.

5.   **The four-year window has not run.** The earliest limitations expiration on Plaintiff's § 1981 race-discrimination claim is January 4, 2028 — four years from the January 4, 2024 discharge, the latest discrete adverse-employment act on the face of the original complaint. Under the continuing-violation doctrine pleaded below, the limitations period runs from the last act in the unlawful pattern (the false sworn statements continuing through July 2024), pushing the SOL expiration further still. The First Amended Complaint — which adds the § 1981 statutory label to facts already pleaded

in the October 1, 2025 original complaint — is therefore timely on the merits with substantial time remaining inside § 1658(a)'s window. Relation back is not required to preserve the claim.

6. **The pre-1991 borrowed-SOL framework does not apply.** To the extent any Defendant argues that *Goodman v. Lukens Steel Co.*, 482 U.S. 656, 660 (1987) [verification pending — Plaintiff will supplement within 14 days] (pre-1991 § 1981 claims borrow forum-state personal-injury SOL) controls, that authority addresses only claims governed by § 1981 as it existed before the 1991 Act and was expressly displaced by *Jones v. R.R. Donnelley & Sons Co.* for post-1991-enacted causes of action. None of the conduct alleged here falls within the narrow pre-1991 Patterson-era core (refusal to enter into a contract on racial grounds at the moment of contract formation); all of it is post-formation employment conduct made cognizable by the 1991 Act and therefore governed by § 1658(a).

7. **ALTERNATIVE PLEADING UNDER FED. R. CIV. P. 8(d)(2)–(3) — RELATION BACK TO ORIGINAL COMPLAINT UNDER FED. R. CIV. P. 15(c)(1)(B):**

    a.  To the extent the Court declines to apply § 1658(a)'s four-year SOL — for example, on a theory that any component of Plaintiff's § 1981 race-discrimination claim survives under *Patterson v. McLean Credit Union / Goodman v. Lukens Steel Co.* and borrows Texas's two-year personal-injury SOL — Plaintiff alternatively pleads under Fed. R. Civ. P. 8(d)(2)–(3) that this Section 1981 claim relates back to Plaintiff's original complaint filed October 1, 2025, preserving the claim despite the January 4, 2026 borrowed-SOL expiration, under Federal Rule of Civil Procedure 15(c)(1)(B).

8. **Procedural Context: Why Section 1981 Was Not Added Before SOL Expiration:** 2a. Plaintiff is proceeding pro se with documented disabilities (ADHD, autism, PTSD, anxiety, depression) that substantially limit executive function, working memory, and ability to manage complex multi-step legal procedures under time pressure. Between the October 1, 2025 original complaint filing and the January 4, 2026 Section 1981 SOL expiration, Plaintiff faced extraordinary procedural complications that consumed all available time and cognitive capacity: **December 29, 2025 - Last-Minute Defense Filings on Answer Deadline Day:** On December 29, 2025—the final day for Leidos Holdings, Inc. to file an answer or responsive pleading—defense counsel Stephen J. Quezada (Ogletree Deakins) filed a pre-motion conference request (ECF 16) challenging corporate entity designation and threatening dismissal based on administrative exhaustion technicalities. This last-minute filing created immediate crisis:

- Leidos had engaged in meet-and-confer discussions about the Amended Complaint without raising entity objections

- The entity challenge threatened to void months of work on the Amended Complaint

- Court granted Leidos permission to file Motion to Dismiss the very next day (ECF 17, December 30, 2025)

- This reset answer deadlines and created new procedural uncertainty

 **December 30, 2025 - TWO EEOC FOIA Dumps on Same Day:** On December 30, 2025—the same day the Court granted Leidos permission to

file MTD—Plaintiff received TWO separate EEOC FOIA responses totaling 1,721 pages of investigation files requiring immediate review and integration:

- FOIA No. 460-2025-019437 (Leidos charge 460-2024-09354): 931 pages

- FOIA No. 460-2025-019438 (All Points charge 460-2024-04943): 790 pages

  These files included:

- Witness statements contradicting defendants' sworn testimony

- Employer position statements revealing new admissions

- Investigative materials requiring careful legal analysis

- Evidence that needed to be incorporated into the Amended Complaint before filing Plaintiff was forced to simultaneously: (1) review 1,721 pages of dense FOIA materials from TWO separate responses received that morning; (2) respond to Leidos's entity challenge threatening dismissal; (3) finalize and file the Amended Complaint by end of business; and (4) manage the competing demands of single parenthood and disability limitations—all on the same day.

**All Points Motion for Entry of Default - Adding to Procedural Chaos:** All Points: Dec 29, 2025 (MISSED — Motion for Entry of Default filed Jan 2, 2026 (ECF 18)). Plaintiff was given approximately 28 hours' notice by the case manager that the Motion for Entry of Default needed to be filed immediately. **Most critically:** during the entire period between the January 2, 2026 filing of the default motion and the January 4, 2026 Section 1981 SOL expiration two days later, the default motion remained pending without Clerk's action, creating acute strategic uncertainty: filing the Amended

Complaint before default entry risked resetting All Points' deadline under FRCP 15(a)(3), but waiting indefinitely for default entry risked missing other critical deadlines. All Points ultimately filed a late Answer on January 28, 2026 (ECF 23) — thirty days past its answer deadline and only after Plaintiff's default motion compelled a response — and the Court subsequently denied ECF 18 as moot by minute order on March 25, 2026. The procedural chaos that consumed Plaintiff's cognitive capacity during the critical pre-SOL window is not cured retroactively by All Points' belated appearance. **January 2026 - ISC Crisis and Discovery Deadline:**

– January 2, 2026: NASA filed pre-motion conference request for Motion to Dismiss

– January 5, 2026: Court granted NASA permission to file MTD (ECF 20)

– January 14, 2026: Court staff notified Plaintiff that discovery plan due by noon January 15, 2026—less than 24 hours' notice

– January 14-15, 2026: Plaintiff sent overnight conferral emails to NASA and Leidos counsel

– January 15, 2026: Plaintiff filed Motion to Continue ISC (ECF 21, 11:58 PM) —GRANTED, ISC continued to March 25, 2026 **Court Clerk Calls About PACER Docket Updates:** In late December 2025, Plaintiff called the SDTX Court Clerk's office because PACER was not displaying service returns despite USMS email confirmation (from Gabriella Osoria on December 22) that service had been completed on December 8, 2025. The Court Clerk

explained that the Marshals had served the defendants but had not yet filed their proof of service returns with the court, creating uncertainty about answer deadlines and procedural timelines. The Court Clerk advised Plaintiff to email the marshal who sent the confirmation to ask when they would file the proof of service with the court. These basic administrative tasks—tracking down why official service records weren't appearing on the public docket despite email confirmation of completed service—consumed hours of Plaintiff's time and cognitive capacity, illustrating how disability-related barriers compound procedural complexity for pro se litigants managing federal court procedures without legal training. **Disability Impact and Systematic Corrections:** Between December 29, 2025 and January 15, 2026, Plaintiff conducted systematic audit discovering that stale procedural information (Leidos answer deadline) had propagated across 50+ pages in her case management system. Correcting these errors while managing surprise defense filings, FOIA document review (1,721 pages from TWO separate responses), discovery deadlines, and preparing multiple motions consumed all available cognitive capacity. A pro se plaintiff with disabilities affecting executive function cannot simultaneously: (1) respond to last-minute defense tactical maneuvers; (2) integrate 1,721 pages of newly obtained evidence from two separate FOIA responses; (3) research and add new statutory claims requiring sophisticated legal analysis; and (4) meet court-imposed deadlines on 24-28 hours' notice while managing repeated calls to court staff and USMS coordination

difficulties. **Repeated Requests for Help—Knowing When and How to Ask:** Plaintiff filed a Combined Motion for Appointment of Counsel and ADA Accommodations (ECF 3) shortly after filing the original complaint. On November 13, 2025, the Court granted Plaintiff CM/ECF access but denied appointment of counsel without prejudice (ECF 13), finding that while Plaintiff's financial circumstances strongly supported the need for counsel, the claims on the then-existing pleadings did not appear particularly strong and Plaintiff had shown ability to present her case pro se based on her EEOC filings. Plaintiff then prepared a detailed First Amended Complaint addressing the Court's noted gaps (comparators, qualification, disability-to-termination connection) and filed a Renewed Combined Motion for Appointment of Counsel documenting additional unsuccessful efforts to secure counsel. Throughout this period, Plaintiff has been conducting conferrals with defense counsel, preparing discovery plans, and filing motions to continue deadlines when necessary. However, knowing when and how to ask for more help—and understanding which procedural barriers require immediate attention versus which can be managed through self-help—is itself a complex executive-function task that Plaintiff's disabilities substantially impair. Between managing the Court's feedback on the initial motion, preparing the strengthened Amended Complaint, conducting mandatory conferrals, and responding to surprise defense filings, Plaintiff did not have the cognitive capacity to simultaneously research and add sophisticated new statutory

claims (Section 1981) requiring relation-back analysis before the January 4, 2026 SOL expiration. The difficulty of knowing when to seek help, how to seek help, and what kind of help to request is an invisible barrier for pro se plaintiffs with disabilities—one that consumed substantial time and energy during the critical October 2025-January 2026 period. **Liberal Construction and Equitable Tolling:** Under *Haines v. Kerner*, 404 U.S. 519, 520 (1972) [verification pending — Plaintiff will supplement within 14 days], pro se complaints must be liberally construed. The procedural chaos documented above—last-minute defense filings on deadline day, 931-page FOIA dump requiring immediate review, multiple surprise court deadlines, and All Points' failure to appear creating strategic uncertainty—combined with Plaintiff's documented disabilities substantially limiting executive function, justify relation back under Rule 15(c)(1)(B) and, alternatively, equitable tolling of the Section 1981 SOL. Plaintiff acted diligently: she filed the original complaint within 90 days of receiving her Right to Sue notice, exhausted administrative remedies with four separate agencies, and has been in continuous active litigation since October 2025. The 15-day gap between the January 4, 2026 SOL expiration and this Amended Complaint filing resulted from extraordinary procedural complications created by defendants' tactical litigation choices, not from Plaintiff's lack of diligence. The amended complaint "relates back to the date of the original pleading when... the claim or defense asserted in the amended pleading arose out of the conduct,

transaction, or occurrence set forth or attempted to be set forth in the original pleading."

9. **Same Conduct, Transaction, and Occurrence**: The Section 1981 race discrimination claim arises from the exact same conduct, transaction, and occurrence as the Title VII and ADA claims in the October 1, 2025 original complaint: a. Same employment relationship (PC Support Technician at NASA JSC, September 2022 - January 2024) b. Same discriminatory acts (sexual harassment beginning July 2023, accommodation denial September 2023, selective discipline November 2023, termination January 2024) c. Same adverse employment actions (Final Warning, loss of overtime, hostile interrogation, termination) d. Same comparators and disparate treatment evidence (Sauer, Hollan, Martinez, Figueredo treated more favorably) e. Same dates, times, and temporal proximity evidence (26-minute retaliation, 3-business-day termination) f. Same corporate defendants (All Points and Leidos as joint employers)

10. **Defendants Had Notice from Day One**: The original complaint filed October 1, 2025 put All Points and Leidos on notice that Plaintiff was asserting discrimination based on her protected characteristics. While the original complaint emphasized sex and disability discrimination under Title VII and the ADA, **Plaintiff is an Asian American woman**, and all the discriminatory conduct alleged in the original complaint was directed at an employee with intersectional protected characteristics including race. Defendants knew from the original complaint that they were facing

discrimination allegations arising from the same employment relationship and the same adverse actions now alleged under Section 1981.

11. **Common Nucleus of Operative Facts**: The Fifth Circuit applies a "common nucleus of operative facts" test for relation back. *Mayle v. Felix*, 545 U.S. 644, 650–64 (2005) [verification pending — Plaintiff will supplement within 14 days]; Krupski v. Costa Crociere S.p.A., 560 U.S. 538, 547–48 (2010) [verification pending — Plaintiff will supplement within 14 days] (constructive notice under Rule 15(c)(1)(C) turns on what defendants knew or should have known from the original complaint). Here, the operative facts are identical: a. Plaintiff's identity as an Asian American woman with disabilities b. Same employment at NASA JSC through All Points/Leidos c. Same July 2023 harassment report triggering retaliation d. Same September 2023 accommodation request and 26-minute Final Warning e. Same November 2023 VPN incident used for selective discipline f. Same December 2023 assault report and 3-business-day termination g. Same comparator evidence showing non-Asian males treated more favorably

12. **Pro Se Pleading and Liberal Construction**: Plaintiff filed the original complaint pro se without legal training. Under *Haines v. Kerner*, 404 U.S. 519, 520 (1972) [verification pending — Plaintiff will supplement within 14 days], pro se complaints must be liberally construed. A pro se plaintiff's failure to cite every applicable statute does not forfeit claims arising from the same facts when the original complaint put defendants on notice of the factual basis for liability. The original complaint

described in detail the discriminatory conduct—the amended complaint simply adds the statutory label "Section 1981" to facts already pleaded.

13. **Continuing Violation Doctrine Alternative**: Even if relation back were denied (which would be error), Plaintiff's Section 1981 claims are timely under the continuing violation doctrine. Defendants' discriminatory conduct constituted a continuing pattern from July 2023 through January 2024 and beyond (false sworn statements to agencies through July 2024). Under *National Railroad Passenger Corp. v. Morgan,* 536 U.S. 101 (2002) [verification pending — Plaintiff will supplement within 14 days], and *Heath v. Bd. of Sup'rs for S. Univ. & Agric. & Mech. Coll.,* 850 F.3d 731 (5th Cir. 2017) [verification pending — Plaintiff will supplement within 14 days], the statute of limitations runs from the last act in a continuing pattern of discrimination. The January 4, 2024 termination and January 5, 2024 post-termination retaliation are within the 2-year Section 1981 limitations period when calculated from any date through early January 2026.

14. **LEGAL STANDARD AND ELEMENTS:**

    a. Section 1981 of Title 42, codified at 42 U.S.C. § 1981, provides: "All persons within the jurisdiction of the United States shall have the same right... to make and enforce contracts... as is enjoyed by white citizens." Section 1981 prohibits intentional race discrimination in the making, performance, modification, and termination of contracts, including employment contracts. *CBOCS West, Inc. v. Humphries,* 553 U.S. 442, 446 (2008) [verification pending — Plaintiff will supplement within 14 days].

b. **No Damages Cap**: Unlike Title VII, Section 1981 has **no statutory cap** on compensatory or punitive damages. This makes Section 1981 a critical alternative remedy when a plaintiff has strong discrimination claims but faces Title VII's statutory caps ($50,000 - $300,000 per defendant depending on employer size).

c. To establish a Section 1981 race discrimination claim, Plaintiff must show: (1) she is a member of a racial minority; (2) defendants intended to discriminate on the basis of race; and (3) the discrimination concerned one or more of the activities enumerated in Section 1981 (making, performance, modification, or termination of contracts). *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 476 (2006) [verification pending — Plaintiff will supplement within 14 days].

15. **APPLICATION TO PLAINTIFF'S CASE:**

a. **Plaintiff Is a Racial Minority**: Plaintiff is an Asian American woman. Asian Americans are a protected racial minority under Section 1981. *Saint Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 613 (1987) [verification pending — Plaintiff will supplement within 14 days] (Section 1981 protects against discrimination based on ancestry or ethnic characteristics).

b. **Robbins v. NASA Pattern Evidence**: On September 30, 2022—**eleven days after Plaintiff's September 19, 2022 hire date**—EEOC Administrative Judge Stephanie Herrera certified two classes in *Robbins v. NASA* (EEOC Hearing No. 531-2014-00109X), comprising over 2,000 Asian American

employees and over 2,000 African American employees alleging systematic race discrimination in NASA performance appraisals agency-wide, including at Johnson Space Center. NASA was on formal legal notice during Plaintiff's **entire employment** that it had systematic problems with race discrimination against Asian Americans at JSC.

c.   **Intersectional Discrimination**: Plaintiff's Section 1981 race discrimination claim is inseparable from her sex and disability discrimination claims. As an Asian American woman with disabilities, Plaintiff experienced discrimination at the intersection of multiple protected characteristics. The same conduct that violated Title VII (sex discrimination) and the ADA (disability discrimination) also violated Section 1981 (race discrimination): a. **Sexual harassment by supervisor Brent Wong** created a hostile environment based on both sex and race b. **Denial of accommodations** while non-disabled employees received informal accommodations demonstrates disability discrimination intertwined with racial favoritism c. **Selective discipline** for the November 2023 VPN incident while white male comparators (Sauer, Hollan) received no discipline demonstrates race and sex discrimination d. **Termination three business days after assault report** while white male comparators who committed more serious violations (Martinez—Flipper Zero) were investigated and retained demonstrates race-based disparate treatment

d. **Badge Flipping Pattern as Evidence of Race Discrimination**: During Plaintiff's employment, she observed that Asian male employees (Scott Vong, Khue Le) successfully "badge flipped"—transferred between NASA contracts while maintaining JSC access—to escape the hostile NEST contract environment. However, when Plaintiff (Asian American female) made inquiries about opportunities with other NASA contractors on July 27, 2023—just 14 days after reporting sexual harassment—All Points HR representative Robyn Smith accused Plaintiff of misconduct and demanded a written explanation by end of business Friday. This disparate treatment demonstrates **intersectional discrimination**: even within the *Robbins* protected class (Asian Americans), females who complained about discrimination were treated more harshly than males who quietly badge flipped without reporting violations.

e. **Intentional Discrimination**: Defendants' intent to discriminate based on race is proven by: a. Comparator evidence: Asian American female (Plaintiff) terminated for conduct that white males (Sauer, Hollan, Martinez) engaged in without termination b. Extraordinary temporal proximity (26 minutes, 3 business days) demonstrating pretext and discriminatory animus c. Shifting explanations and failure to cite legitimate reasons (VPN incident never mentioned as termination basis) d. Context of *Robbins v. NASA* class action putting NASA and contractors on notice of systematic race discrimination at JSC e. Pattern of excluding Plaintiff from workplace culture (team photos,

advancement opportunities) while favoring employees in supervisor's social circle

f.  **Interference with Contract Rights**: Section 1981 protects the right to "make and enforce contracts." Defendants interfered with Plaintiff's contract rights by: a. Terminating her employment contract based on race discrimination b. Denying her equal terms and conditions of employment (lost overtime, hostile environment, lack of accommodations) without race-based disparate treatment c. Subjecting her to a hostile work environment that constructively modified her employment contract d. Retaliating against her for opposing race discrimination, thereby interfering with her ability to enforce her contract rights e. The right to have her employment terminated only for legitimate, non-discriminatory reasons

g.  As a direct result of Defendants' race discrimination under Section 1981, Plaintiff suffered lost wages, benefits, emotional distress, and other damages. **Plaintiff is entitled to unlimited compensatory and punitive damages** under Section 1981, uncapped by Title VII's statutory limits.

---

## COUNT XVIII — 42 U.S.C. § 1981 RETALIATION

(Against All Points Logistics, LLC; Leidos, Inc.; Leidos Holdings, Inc.; and Leidos Innovations Corporation (collectively, the "Leidos Entities"))

1.  Plaintiff incorporates all preceding paragraphs.

2. **TIMELINESS — PRIMARY (28 U.S.C. § 1658(a)) AND ALTERNATIVE (FED. R. CIV. P. 15(c)(1)(B)) FRAMEWORKS:**

3. **PRIMARY: 28 U.S.C. § 1658(a) four-year statute of limitations.** Section 1981 retaliation as a cause of action was "made possible" by the Civil Rights Act of 1991. *CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 446 (2008) (post-1991 § 1981 retaliation claims are cognizable under the amended statute). Because § 1981 retaliation arises under "an Act of Congress enacted after" December 1, 1990, the four-year catch-all federal statute of limitations at 28 U.S.C. § 1658(a) governs. *Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 382–83 (2004) [verification pending — Plaintiff will supplement within 14 days]. The pre-1991 borrowed-state-SOL framework of *Goodman v. Lukens Steel Co.*, 482 U.S. 656, 660 (1987) [verification pending — Plaintiff will supplement within 14 days] does not apply: § 1981 retaliation as pleaded here did not exist as a cognizable cause of action before the 1991 Act expanded § 1981(b) to cover post-formation conduct, and *Patterson v. McLean Credit Union*, 491 U.S. 164, 171 (1989) [verification pending — Plaintiff will supplement within 14 days] expressly placed retaliation in the post-formation employment relationship outside pre-1991 § 1981's reach.

4. **§ 1981 retaliation SOL has not run.** The earliest limitations expiration on Plaintiff's § 1981 retaliation claim is January 4, 2028 (four years from the January 4, 2024 discharge — the latest discrete retaliatory adverse action on the face of the original complaint), with the continuing-violation doctrine extending accrual further (the false sworn statements through July 2024 push the last-act-in-pattern accrual into 2028

territory). The First Amended Complaint is timely on the merits regardless of relation back, with substantial time remaining inside § 1658(a)'s four-year window.

5. **ALTERNATIVE PLEADING UNDER FED. R. CIV. P. 8(d)(2)–(3) — RELATION BACK UNDER FED. R. CIV. P. 15(c)(1)(B).** To the extent the Court finds § 1658(a) inapplicable to this Section 1981 retaliation claim, Plaintiff alternatively pleads under Fed. R. Civ. P. 8(d)(2)–(3) that this claim relates back to Plaintiff's original complaint filed October 1, 2025, under Fed. R. Civ. P. 15(c)(1)(B), for all the reasons stated in Count XVII (both the primary § 1658(a) framework and the alternative Rule 15(c)(1)(B) relation-back framework, including the procedural-context predicate facts). The retaliation alleged in this Count arises from the exact same conduct, transaction, and occurrence as the Title VII and ADA retaliation claims in the original complaint. Defendants had notice from October 1, 2025 that Plaintiff was asserting retaliation claims based on the same protected activities and adverse actions now alleged under Section 1981.

6. **LEGAL STANDARD:**

   a. Section 1981 prohibits retaliation against individuals who oppose race discrimination or assert their Section 1981 rights. *CBOCS West, Inc. v. Humphries,* 553 U.S. 442, 446 (2008) [verification pending — Plaintiff will supplement within 14 days] (Section 1981 encompasses retaliation claims). The Supreme Court held that "the legislation which Congress passed in 1866 and reenacted in 1870... included within its coverage a remedy for retaliation based on the making of complaints about racially discriminatory employment decisions."

b. To establish Section 1981 retaliation, Plaintiff must show: (1) she engaged in activity protected under Section 1981 (opposing race discrimination or asserting contract rights); (2) defendants took an adverse employment action against her; and (3) a causal connection exists between the protected activity and the adverse action. *Septimus v. University of Houston*, 399 F.3d 601, 609 (5th Cir. 2005) [verification pending — Plaintiff will supplement within 14 days].

c. **No Damages Cap**: Section 1981 retaliation claims have no statutory cap on compensatory or punitive damages, making them a critical supplement to Title VII retaliation claims which are capped at $50,000 - $300,000 per defendant.

7. **PROTECTED ACTIVITY:**

a. Plaintiff engaged in Section 1981 protected activity by: a. **Reporting race-based hostile work environment**: Plaintiff's July 12-13, 2023 report of supervisor Brent Wong's sexual harassment was simultaneously a complaint about race-based harassment. Wong's conduct created a hostile environment for Plaintiff as an Asian American woman, and Plaintiff's opposition to this conduct constituted protected activity under Section 1981. b. **Opposing intersectional discrimination**: Plaintiff's September 18, 2023 accommodation request and complaint about off-the-clock work requirements opposed discriminatory practices that disproportionately affected Plaintiff as an Asian American woman with disabilities. c. **Reporting workplace**

**assault**: Plaintiff's December 28-29, 2023 report of assault by Susana Kane was protected activity. Opposing workplace violence is protected under Section 1981 when the violence occurs in a discriminatory environment or is used to silence complaints about discrimination. d. **Filing administrative charges**: Plaintiff's EEOC, OFCCP, TWC, and NASA ODEO complaints explicitly alleged race discrimination in the context of intersectional discrimination as an Asian American woman with disabilities. These complaints constitute quintessential Section 1981 protected activity.

8.  **ADVERSE EMPLOYMENT ACTIONS:**

   a.  After protected activity, Defendants subjected Plaintiff to materially adverse actions: a. **26-minute retaliatory Final Warning** (September 18, 2023, 5:46 PM) issued 26 minutes after Plaintiff's 5:20 PM complaint—extraordinary temporal proximity proving causation b. **Categorical denial of ADA accommodation** (September 19, 2023) with false legal statement one day after protected complaint c. **Retaliatory cancellation of overtime (November 20, 2023):** Leidos Service Delivery Lead Brent Wong (brent.c.wong@nasa.gov) sent a group email to PCST/PEO technicians on November 20, 2023 cancelling Plaintiff's previously-authorized overtime, approximately 29 days after the October 21–22, 2023 VPN incident and Plaintiff's cooperation with the NASA OCIO Root Cause Analysis. Male comparators Ryan Sauer and Jordan Hollan, who performed the same VPN provisioning work alongside Plaintiff, continued to receive overtime. See

Section V.K ¶¶ 7–8 (Leidos day-to-day supervisory control, including scheduling and timekeeping); FAC §VII Damages (C.1 reserved for discovery) d. **Hostile "security interview"** following November 2023 VPN incident, treating Plaintiff as a security threat e. **Immediate suspension** (December 29, 2023, 4:39 PM) within hours of assault report f. **Termination** (January 4, 2024) three business days after assault report, with zero investigation during two available work days g. **Post-termination hostile equipment return** (January 5, 2024) with false theft accusation and three-person surveillance h. **False sworn statements to government agencies** (February - July 2024) destroying professional reputation

9. **CAUSAL CONNECTION:**

   a. The causal connection between Plaintiff's Section 1981 protected activity and the adverse actions is overwhelming: a. **26-minute temporal proximity**: The time between Plaintiff's September 18, 5:20 PM complaint and the 5:46 PM Final Warning is so extraordinarily close that it proves causation without any other evidence. *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) [verification pending — Plaintiff will supplement within 14 days] (suggesting periods of days or weeks can establish causation; 26 minutes far exceeds this standard). b. **3-business-day temporal proximity**: The termination occurred January 4, 2024, just three business days after the December 29, 2023 assault report, with only two intervening work days available for investigation. Defendants conducted zero investigation during those two available days,

proving the termination was a predetermined retaliatory response to the protected assault report. c. **Comparator evidence**: Male employees (Sauer, Hollan, Martinez) who engaged in identical or more serious conduct were not subjected to immediate termination, proving Plaintiff's termination was motivated by her protected activity (opposing discrimination) rather than the stated reasons. d. **Shifting explanations**: Defendants' failure to cite the November 2023 VPN incident as a termination reason—despite using it to strip Plaintiff's overtime and conduct hostile interrogation—proves the stated reason ("false report") was pretextual and the real reason was retaliation for protected activity. e. **Admission of predetermination**: All Points HR representative Robyn Smith admitted on March 25, 2024 that "We were not told the actual results of the security investigation," yet All Points terminated Plaintiff on January 4, 2024 claiming NASA Security found she falsified the report. This admission proves Defendants predetermined the termination outcome before any investigation—classic evidence of retaliatory motive.

b. **Pattern of Retaliation Across Multiple Protected Activities**: Defendants established a pattern of immediate retaliation following each instance of protected activity: a. July 12-13, 2023: Harassment report → July 19, 2023 (6 days): Daniel Murphy files retaliatory complaint → July 27, 2023 (14 days): Anonymous accusation and hostile HR email b. September 18, 2023, 5:20 PM: Accommodation request → September 18, 2023, 5:46 PM (26 minutes): Final Warning → September 19, 2023: Categorical accommodation denial c.

December 29, 2023: Assault report → December 29, 2023, 4:39 PM (same day): Suspension → January 4, 2024 (3 business days): Termination → January 5, 2024 (next day): Hostile equipment return with false accusation

10. As a direct result of Defendants' Section 1981 retaliation, Plaintiff suffered lost wages, benefits, emotional distress, and other damages. **Plaintiff is entitled to unlimited compensatory and punitive damages** under Section 1981, uncapped by Title VII's statutory limits.

---

## COUNT XIX — 42 U.S.C. § 1981 INTERFERENCE WITH CONTRACT RIGHTS

**(Against All Points Logistics, LLC; Leidos, Inc.; Leidos Holdings, Inc.; and Leidos Innovations Corporation (collectively, the "Leidos Entities"))**

1. Plaintiff incorporates all preceding paragraphs.

2. **TIMELINESS — PRIMARY (28 U.S.C. § 1658(a)) AND ALTERNATIVE (FED. R. CIV. P. 15(c)(1)(B)) FRAMEWORKS:**

3. **PRIMARY: 28 U.S.C. § 1658(a) four-year statute of limitations.** § 1981 interference-with-contract-rights claims that depend on the post-formation reach of § 1981(b) — workplace harassment, denial of equal terms and conditions of the employment contract, retaliatory interference with the contractual relationship, and racially motivated termination — were "made possible" by the Civil Rights Act of 1991, which amended § 1981(b) to define "make and enforce contracts" to include "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." Pub. L.

No. 102-166, § 101. The Civil Rights Act of 1991 thereby brought post-formation interference within § 1981 for the first time, displacing the pre-1991 *Patterson v. McLean Credit Union*, 491 U.S. 164, 171 (1989) [verification pending — Plaintiff will supplement within 14 days] holding that confined § 1981 to the moment of contract formation. Because Plaintiff's interference-with-contract-rights claim arises under § 1981 as amended by a post-1990 Act of Congress, the four-year catch-all federal statute of limitations at 28 U.S.C. § 1658(a) governs. *Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 382–83 (2004) [verification pending — Plaintiff will supplement within 14 days]; *CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 446 (2008) (confirming post-1991 § 1981 reach to retaliation and post-formation interference). The pre-1991 borrowed-state-SOL framework of *Goodman v. Lukens Steel Co.*, 482 U.S. 656, 660 (1987) [verification pending — Plaintiff will supplement within 14 days] does not apply.

4. **§ 1981 interference SOL has not run.** The earliest limitations expiration is January 4, 2028 (four years from the January 4, 2024 termination of the employment contract — the most decisive single act of contractual interference on the face of the original complaint), with the continuing-violation doctrine extending accrual further (post-termination false sworn statements through July 2024 continue to interfere with Plaintiff's § 1981 right to make new employment contracts in the federal-contracting sector and push the last-act-in-pattern accrual into 2028 territory). The First Amended Complaint is timely on the merits regardless of relation back.

5. **ALTERNATIVE PLEADING UNDER FED. R. CIV. P. 8(d)(2)–(3) — RELATION BACK UNDER FED. R. CIV. P. 15(c)(1)(B).** To the extent the Court finds § 1658(a)

inapplicable to this Section 1981 interference-with-contract-rights claim, Plaintiff alternatively pleads under Fed. R. Civ. P. 8(d)(2)–(3) that this claim relates back to Plaintiff's original complaint filed October 1, 2025, under Fed. R. Civ. P. 15(c)(1)(B), for all the reasons stated in Count XVII (both the primary § 1658(a) framework and the alternative Rule 15(c)(1)(B) relation-back framework, including the procedural-context predicate facts). The interference with contract rights alleged in this Count arises from the exact same conduct, transaction, and occurrence as the discrimination and retaliation claims in the original complaint.

6. **LEGAL STANDARD:**

   a. Section 1981 provides that all persons shall have "the same right... to make and enforce contracts... as is enjoyed by white citizens." 42 U.S.C. § 1981(a). Section 1981(b) defines "make and enforce contracts" to include "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."

   b. An employment relationship is a "contract" within the meaning of Section 1981. *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 476 (2006) [verification pending — Plaintiff will supplement within 14 days]. Employers violate Section 1981 when they interfere with an employee's ability to make, perform, modify, or enjoy the terms and conditions of an employment contract on the basis of race or in retaliation for asserting Section 1981 rights.

   c. **No Damages Cap**: Section 1981 claims for interference with contract rights have no statutory cap on compensatory or punitive damages.

7. **PLAINTIFF'S CONTRACT RIGHTS:**

   a. Plaintiff had an employment contract with All Points Logistics, LLC beginning September 19, 2022. The contract was for at-will employment as a PC Support Technician, with specified compensation ($28.30/hour plus benefits), duties, work location (NASA Johnson Space Center), and terms and conditions of employment governed by federal contractor requirements, workplace policies, and applicable law.

   b. As a federal contractor employee working under NASA Contract No. 80NSSC19D0001, Plaintiff's employment contract incorporated federal equal employment opportunity requirements, including: a. Executive Order 11246 prohibiting race and sex discrimination by federal contractors b. Section 503 of the Rehabilitation Act prohibiting disability discrimination by federal contractors c. Federal wage determinations establishing minimum compensation d. Federal contractor obligations to provide safe workplaces and equal opportunity

   c. Plaintiff's Section 1981 rights included: a. The right to form and maintain an employment contract free from race discrimination b. The right to perform her job duties without interference based on race c. The right to enjoy equal terms and conditions of employment (compensation, overtime, training, advancement opportunities, workplace safety) without race-based disparate treatment d. The right to modify or continue her employment relationship

without race-based retaliation for opposing discrimination e. The right to have her employment terminated only for legitimate, non-discriminatory reasons

8. **DEFENDANTS' INTERFERENCE WITH CONTRACT RIGHTS:**

a. Defendants interfered with Plaintiff's Section 1981 contract rights in multiple ways: **a. Interference with Performance of Contract Duties:**

- Denied Plaintiff equal access to overtime opportunities while permitting male employees to work overtime

- Subjected Plaintiff to impossible standards and obsessive surveillance not applied to male comparators

- Denied Plaintiff written SOPs for high-stakes tasks while holding her responsible for errors

- Excluded Plaintiff from workplace activities (team photos, advancement discussions) while including male employees in supervisor's social circle

- Created hostile work environment through sexual harassment and disability-based harassment that interfered with Plaintiff's ability to perform her job **b. Interference with Benefits, Privileges, and Terms of Employment:**

- Paid male employees higher rates for the same PC Support Technician work through secret "special project pay" and informal "QM" designations

- Granted informal accommodations to non-disabled male employees (William Figueredo received "Spacebar" role without ADA process) while categorically denying Plaintiff's formal, documented accommodation requests

- Provided flexibility and second chances to male comparators (Sauer, Hollan, Martinez) while subjecting Plaintiff to immediate, severe discipline

- Retaliated against Plaintiff for inquiring about badge flipping opportunities (standard practice male employees used freely) while permitting male employees to badge flip without discipline **c.**

**Wrongful Termination of Contract:**

- Terminated Plaintiff's employment contract on January 4, 2024 based on race discrimination, sex discrimination, disability discrimination, and retaliation for protected activity

- Terminated Plaintiff without legitimate investigation: zero interviews during two available work days, never obtained NASA Security Report before termination, predetermined outcome based on false narrative

- Terminated Plaintiff for conduct (reporting assault, participating in VPN work) that did not result in termination for male comparators **d.**

**Post-Termination Interference with Future Contract Rights:**

- Submitted false sworn statements to government agencies claiming "NASA Security determined Plaintiff falsified her report," poisoning

Plaintiff's professional reputation and interfering with her ability to form new employment contracts

- Told prospective employers (implicitly through false government agency statements) that Plaintiff falsified a federal security report, interfering with her right to make new employment contracts

- Created an exclusionary effect in the federal contracting community, preventing Plaintiff from exercising her Section 1981 right to contract for employment in her chosen field

9. **RACIAL MOTIVATION:**

   a. Defendants' interference with Plaintiff's contract rights was motivated by race and occurred in the context of systematic race discrimination: a. **Robbins v. NASA pattern**: NASA was on notice during Plaintiff's entire employment that it had systematic race discrimination problems against Asian Americans at Johnson Space Center b. **Intersectional discrimination**: As an Asian American woman, Plaintiff experienced discrimination at the intersection of race and sex—neither Asian male employees who badge flipped nor white employees received the same harsh treatment c. **Comparator evidence**: The employees who received favorable treatment (retention after serious violations, informal accommodations, higher pay, badge flipping tolerance) were predominantly white males, while Plaintiff (Asian American female) was subjected to immediate termination d. **Pattern of exclusion**: Defendants systematically excluded Plaintiff from workplace culture, advancement

opportunities, and equal compensation while favoring employees in the supervisor's social circle

10. **Continuing Interference**: Defendants' interference with Plaintiff's Section 1981 contract rights is ongoing. The false sworn statements submitted to government agencies from February through July 2024 continue to poison Plaintiff's professional reputation and interfere with her ability to form new employment contracts in the federal contracting sector.

11. As a direct result of Defendants' interference with Plaintiff's Section 1981 contract rights, Plaintiff suffered: a. Lost wages from January 4, 2024 to present b. Lost benefits, overtime, and advancement opportunities c. Loss of future earning capacity due to reputational damage d. Inability to secure comparable employment despite qualifications and experience e. Emotional distress, mental anguish, and medical expenses f. Damage to professional reputation in federal contracting community

12. **Plaintiff is entitled to unlimited compensatory and punitive damages** under Section 1981 for Defendants' interference with her contract rights, uncapped by Title VII's statutory limits.

---

## COUNT XX — NEGLIGENT HIRING, SUPERVISION, AND RETENTION (Texas Common Law — Against All Points Logistics, LLC, Leidos Holdings, Inc., TekFive, Inc., and Seabrook Solutions, LLC)

1. Plaintiff incorporates all preceding factual allegations.

2. **Relation Back Under Fed. R. Civ. P. 15(c)(1)(B):** This claim arises from the identical conduct, transactions, and occurrences set forth in the original complaint filed October 1, 2025. The original complaint described in detail each individual's harmful conduct, management's knowledge of that conduct, and management's failure to address it. Defendants have had notice since October 1, 2025 that Plaintiff's claims arise from their failure to supervise or discipline employees who harassed, assaulted, and retaliated against her. This claim is also independently timely under the two-year Texas statute of limitations, as the negligent retention continued through and caused injury at the January 4, 2024 termination.

3. Under Texas common law, an employer owes a duty to hire, supervise, and retain competent employees, and is liable when it knew or should have known that an employee posed an unreasonable risk of harm to others. *THI of Tex. at Lubbock I, LLC v. Perea*, 329 S.W.3d 548, 573 (Tex. App.—Amarillo 2010, pet. denied); *Dangerfield v. Ormsby*, 264 S.W.3d 904, 912 (Tex. App.—Fort Worth 2008, no pet.); *see also Waffle House, Inc. v. Williams*, 313 S.W.3d 796, 804 (Tex. 2010) and *Doe v. Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d 472, 477 (Tex. 1995) (Texas Supreme Court authorities are distinguishable because Plaintiff's negligent hiring, supervision, and retention claim does not overlap with a TCHRA sexual-harassment claim of the kind that triggers the gap-filler preemption doctrine; the allegations reach physical assault by coworker Susana Kane, cross-entity supervisory misconduct by Brent Wong, and independent duties owed by All Points, Leidos,

TekFive, and Seabrook Solutions as contracting employers to screen, supervise, and retain employees on the NASA NEST contract worksite).

4. **Negligent Supervision of Brent Wong:** a. In July 2023, Plaintiff formally reported Brent Wong for sexual harassment to All Points HR. EEOC and OFCCP filings indicate "at least two other females" also reported Wong for similar conduct. b. Despite actual knowledge of Wong's pattern of harassment against multiple women, Defendants took no corrective action. Wong was not disciplined, removed from supervisory authority, counseled, or investigated. c. Wong remained Plaintiff's direct supervisor and continued retaliating—coordinating the September 18, 2023 "Final Warning" 26 minutes after Plaintiff's protected complaint, orchestrating the November 27, 2023 manufactured false complaint through TekFive employee Travis McFarland, and directing the January 4, 2024 termination. d. Defendants' failure to supervise or discipline Wong after actual notice of his harassment was a direct and proximate cause of Plaintiff's subsequent injuries.

5. **Negligent Supervision of Susana Kane:** a. Prior to the December 28-29, 2023 assault, coworker Jose had repeatedly complained about Kane's disruptive and sexually inappropriate workplace behavior (sexual moaning in the workplace). Management acknowledged the complaints but took no corrective action. b. Kane escalated from disruptive behavior to physical violence, striking Plaintiff with a box on December 28-29, 2023 and declaring "I'm the new Brent"—demonstrating awareness she was joining an established pattern of harassment and that management would not hold her accountable. c. Defendants' failure to address Kane's known

pattern of escalating behavior was a direct and proximate cause of the assault and Plaintiff's resulting physical and emotional injuries.

6. **Negligent Retention After Known Misconduct:** a. After July 2023 harassment reports from multiple women, Defendants retained Brent Wong in a supervisory role over the employees he harassed, including Plaintiff. b. After the December 28-29, 2023 assault, Defendants returned Susana Kane to the worksite while terminating the assault victim (Plaintiff). This decision rewarded the aggressor and punished the reporter. c. After Christy Murray manufactured a false "nothing happened" statement used to justify Plaintiff's termination, Defendants retained Murray in her management position without investigation or consequence. d. After Cristian Garcia gave a demonstrably false witness statement to NASA Security—claiming his "back was turned" during the assault despite actively horseplaying with Kane at the time—Defendants took no action against Garcia and instead used his false statement to justify terminating Plaintiff.

7. **Foreseeability:** Given Defendants' actual knowledge of Wong's harassment pattern (multiple reports from multiple women), Kane's escalating disruptive behavior (repeated complaints from Jose), Murray's false statement, and Garcia's false witness testimony, it was foreseeable that retaining these employees without corrective action would result in continued and escalating harm to Plaintiff and others.

8. As a direct and proximate result of Defendants' negligent hiring, supervision, and retention, Plaintiff suffered lost wages, benefits, emotional distress, physical injury from Kane's assault, medical expenses, and reputational harm.

9. Defendants' conduct constitutes **gross negligence** warranting punitive damages: Defendants had actual, subjective awareness that retaining known harassers and assailants in supervisory positions and returning an assailant to the worksite while terminating the victim posed an extreme degree of risk—and proceeded with conscious indifference to Plaintiff's rights, safety, and welfare. *Mobil Oil Corp. v. Ellender*, 968 S.W.2d 917, 921 (Tex. 1998) [verification pending — Plaintiff will supplement within 14 days]. Punitive damages are sought without statutory cap under Texas common law.

---

## COUNT XXI — FRAUD / FRAUDULENT MISREPRESENTATION

## (Texas Common Law — Against All Points Logistics, LLC, through Robyn Smith as Agent)

1. Plaintiff incorporates all preceding factual allegations.

2. **Relation Back Under Fed. R. Civ. P. 15(c)(1)(B):** This count pleads **two distinct fraudulent misrepresentations** by All Points, acting through Robyn Smith as agent, both tied to the same core nucleus of operative fact alleged in the original complaint filed October 1, 2025 — All Points' handling of Plaintiff's ADA accommodation request, Plaintiff's employment and termination, and All Points' course of conduct in the administrative proceedings that followed: a. **First Predicate (¶ 4 and ¶¶ 5–9 below):** All Points' categorical denial of ADA accommodation and the false statement of law used to justify that denial on September 19, 2023. The original complaint put Defendants on notice that Plaintiff's accommodation request was

unlawfully denied with a false legal justification. This count adds the specific legal theory of fraud to facts already fully alleged. Independently timely under Texas's four-year fraud statute of limitations (Tex. Civ. Prac. & Rem. Code § 16.004), running from September 19, 2023 to September 2027. b. **Second Predicate (¶¶ 4-A through 4-F below):** Robyn Smith's November 26, 2024 submission to the U.S. Equal Employment Opportunity Commission, acting as All Points' designated Respondent's Representative in Charge No. 460-2024-04943, of the superseded January 2022 Employee Handbook as the operative policy document, while personally knowing of and having distributed to all employees the January 2023 Employee Handbook with Track Changes (distributed January 9, 2023) and the January 2024 Employee Benefits Guide (distributed November 14, 2023). Independently timely under Tex. Civ. Prac. & Rem. Code § 16.004, running from November 26, 2024 through November 2028. The original complaint alleged All Points' fraudulent course of conduct in connection with Plaintiff's employment, termination, and the administrative proceedings that followed; this predicate adds the specific legal theory of fraud-on-the-agency to facts within the original pleading's factual scope.

3. Under Texas common law, fraud requires: (1) a material misrepresentation; (2) that was false; (3) that was either known to be false when made or was made recklessly without knowledge of its truth; (4) that was made with the intent that it be acted upon; (5) that was actually relied upon; and (6) that caused injury. *Formosa Plastics*

*Corp. USA v. Presidio Engineers & Contractors, Inc.*, 960 S.W.2d 41, 47 (Tex. 1998) [verification pending — Plaintiff will supplement within 14 days].

4.  **Material Misrepresentation (First Predicate — September 19, 2023 ADA Denial):** On September 19, 2023, All Points Chief Administrative Officer and HR representative Robyn Smith sent Plaintiff a written email stating: **"This is not covered by the ADA and as the employer doesn't require any type of reasonable accommodation."** This statement contains two material misrepresentations of law: a. That Plaintiff's documented disabilities (ADHD, autism) are "not covered by the ADA"—**false.** ADHD and autism spectrum disorder are well-established qualifying conditions under the ADA Amendments Act of 2008. 42 U.S.C. § 12102(1)-(2). b. That the employer "doesn't require any type of reasonable accommodation"—**false.** The ADA requires covered employers to provide reasonable accommodations to qualified individuals with disabilities unless the employer demonstrates undue hardship. 42 U.S.C. § 12112(b)(5)(A). The employer does not get to unilaterally declare accommodations are not "required."

---

**Second Predicate — November 26, 2024 EEOC Submission**

**4-A. Second Material Misrepresentation (EEOC Submission).** On or about November 26, 2024, Robyn Smith, acting as All Points' designated Respondent's Representative before the U.S. Equal Employment Opportunity Commission in Charge No. 460-2024-04943, submitted to the EEOC a Position Statement with attachments, including as "Attachment 2" the All Points Employee Handbook effective January 2022. Smith

submitted this 2022 handbook as the operative handbook governing Plaintiff's employment and affirmatively represented to the EEOC that the attached policies were the All Points policies in force during the relevant period.

**4-B. Falsity.** The January 2022 handbook was not the operative handbook during the relevant period. On January 9, 2023 — twenty-two months before Smith's EEOC submission — Smith personally distributed to all All Points employees an updated **January 2023 Employee Handbook with Track Changes**, a document whose title and content expressly memorialized edits to the 2022 version. On November 14, 2023 — thirteen months before Smith's EEOC submission — Smith personally distributed to all All Points employees the **January 2024 Employee Benefits Guide** via her "2024 Open Enrollment — IMPORTANT" email. Smith therefore submitted an outdated version of the governing policies to a federal investigating agency while personally knowing that newer, superseding versions existed and had been disseminated under her own signature.

**4-C. Knowledge of Falsity or Reckless Disregard.** Smith's dual role makes knowledge indisputable. She was both (a) the HR personnel who personally distributed the 2023 and 2024 versions and (b) the Respondent's Representative who selected the 2022 version for submission to the EEOC. She cannot credibly assert she forgot or overlooked documents she personally distributed by email under her own name. Her SHRM-SCP credential (which requires continuing education in employment law to maintain active status), her admitted responsibility for "EEOC and Affirmative Action" compliance (Resume, Attachment 1 to the Position Statement), and her authorship role over the All Points handbook itself eliminate any good-faith mistake theory. Either she knowingly selected

an outdated document to misrepresent All Points' policies, or she was so recklessly indifferent to basic document-selection obligations — despite her credentials, training, and direct distribution of the newer versions — that recklessness is the only possible characterization. Either satisfies scienter under *Formosa Plastics*.

**4-D. Intent to Induce Reliance.** The EEOC relies on Respondent position statements to conduct its investigation and issue cause determinations under 29 C.F.R. § 1601. Smith's submission of an outdated handbook was intended to induce the EEOC to evaluate Plaintiff's charge against obsolete policies — including, critically, All Points' Complaint Resolution and Chain of Command provisions, whose continuing presence in the 2023 version (Smith's own distribution) definitively proves All Points' conscious maintenance of chilling policies throughout the relevant period. By submitting the 2022 version alone, Smith foreseeably caused the EEOC to evaluate the charge without access to the document most probative of All Points' state of mind.

**4-E. Reliance and Injury to Plaintiff.** The EEOC relied on Smith's submission in conducting its investigation and issuing its determination. Plaintiff relied on the EEOC's investigation as the statutorily required gateway to a federal right-to-sue under Title VII and the ADA; she could not bring those claims in federal court without first exhausting at the agency. Smith's fraudulent submission caused Plaintiff to: (a) proceed through an EEOC investigation materially distorted by the submission of obsolete policies, depriving the investigator of the document most probative of All Points' continued maintenance of facially unlawful complaint-procedure language throughout the relevant period; (b) incur the time, expense, and emotional burden of later identifying and correcting the record

through federal litigation discovery; and (c) suffer continued injury from All Points' maintenance of facially unlawful complaint-procedure policies whose continued presence was concealed from the investigating agency.

**4-F. Federal Public-Policy Overlay (Non-Predicate).** Knowing submission of materially false or fraudulent statements to a federal agency is also conduct proscribed by 18 U.S.C. § 1001(a)(2). Plaintiff does not assert a private right of action under § 1001. The statute is referenced solely to establish the public-policy gravity of Smith's conduct, its relevance to the *Kolstad* "malice or reckless indifference" standard for punitive damages under 42 U.S.C. § 1981a(b)(1), and the foundation for any discretionary referral to the EEOC Office of Inspector General.

---

### First Predicate — Elements Continued (September 19, 2023 ADA Denial)

5. **Knowledge of Falsity or Reckless Disregard:** Robyn Smith is not merely an HR professional—she holds **SHRM-SCP** (Society for Human Resource Management – Senior Certified Professional), the highest-level SHRM certification requiring demonstrated competence in strategic HR policy-making and **mandatory continuing education** in employment law to maintain active status. She also holds **CBP** (Certified Benefits Professional), another credential requiring continuing education. She placed both credentials—"SHRM-SCP, CBP"—in her signature block on the very email denying Plaintiff's ADA accommodation. She has over 25 years of HR experience and is "responsible for administrative functions at the corporate level including human resources, policies and compliance, EEOC,

Affirmative Action, disciplinary actions, hiring and terminations" (her own resume, Attachment 1 to EEOC Position Statement). She is a minority owner of All Points. And critically, in January 2023, Smith personally distributed the All Points employee handbook to all employees—the very handbook that contains the company's own ADA accommodation procedures, interactive process requirements, and anti-retaliation policies. Smith did not merely know ADA law—she **authored** the company's implementation of it and **certified** her expertise in it through active professional credentials she displayed on her correspondence. A person who holds the highest HR certification, maintains it through continuing education in disability law, authors the company's ADA accommodation procedures, and is responsible for EEOC and Affirmative Action compliance either: (a) knew that ADHD and autism are ADA-qualifying conditions and that the interactive process is mandatory, making her categorical denial knowingly false; or (b) was so recklessly indifferent to basic employment law—despite her credentials, training, handbook authorship, and 25 years of experience—that recklessness is the only possible characterization. Either satisfies the scienter requirement. The credentials she placed on are not just professional decorations—they are her own sworn representation to Plaintiff that she possessed the expertise to make legally accurate statements about ADA coverage. That representation was false.

6. **Intent to Induce Reliance:** The statement was made in direct written response to Plaintiff's formal accommodation request. Its purpose was to end the accommodation

discussion and induce Plaintiff to accept the categorical denial as legally justified, rather than pursuing her rights through EEOC, OFCCP, or other channels.

7. **Actual Reliance and Causation:** Plaintiff relied on her employer's written statement about the law. As a non-lawyer with documented ADHD and autism affecting executive function and ability to independently research complex legal questions under time pressure, Plaintiff took her HR representative's written legal statement at face value. This reliance caused Plaintiff to: a. Accept the accommodation denial without immediately escalating to EEOC or OFCCP; b. Continue working without the written SOPs, adjusted schedules, sensory breaks, and other accommodations she needed; c. Suffer the foreseeable consequences of working without accommodations —including the November 2023 VPN incident, which occurred because Plaintiff had no written SOPs for high-stakes network configuration tasks despite repeatedly requesting them. Defendants then **used this incident** (caused by their own fraudulent accommodation denial) to strip Plaintiff's overtime, conduct a hostile "security interview," and build the pretextual paper trail supporting her termination.

8. **Injury:** As a direct result of Robyn Smith's fraudulent misrepresentation, Plaintiff suffered: a. Months of working without needed disability accommodations, causing increased disability-related difficulties, errors, and distress; b. The VPN incident— directly caused by lack of written SOPs—was used to build the false paper trail supporting Plaintiff's termination; c. Lost wages, benefits, and overtime; d. Emotional distress from working in an unaccommodated environment while being told her legally protected disabilities were "not covered" by the law.

9. Defendants acted with actual malice and conscious disregard for Plaintiff's legal rights. An HR professional deliberately or recklessly lying to a disabled employee about whether the ADA covers their disabilities—to induce them to stop requesting accommodations—is conduct that goes beyond all possible bounds of decency. Punitive damages are sought without statutory cap under Texas common law.

---

## COUNT XXII — 42 U.S.C. § 1985(3) — CONSPIRACY TO DEPRIVE OF EQUAL PROTECTION

**(Against All Points Logistics, LLC, Leidos Holdings, Inc., TekFive, Inc., Seabrook Solutions, LLC, Brent Wong, Christy Murray, Ed Scarborough, Robyn Smith, Susana Kane, Cristian Garcia, Tristian Castro, Travis McFarland, John Walters, Daniel Murphy, Brian Lynn, and Dianne Brief)**

1. Plaintiff incorporates all preceding factual allegations, including the detailed conspiracy allegations in Count XIV.

2. **Relation Back Under Fed. R. Civ. P. 15(c)(1)(B):** This federal conspiracy claim arises from the identical conduct, transactions, and occurrences alleged in the original complaint filed October 1, 2025. The original complaint described in detail the coordinated, multi-employer campaign to retaliate against and terminate Plaintiff. This count adds the specific federal statutory basis (§ 1985(3)) to the cross-corporate conspiracy already fully pleaded. Additionally, this claim is **independently timely**: § 1985(3) borrows the forum state's personal injury statute of limitations (2 years in Texas), and the conspiracy's overt acts continued through at least July 2024 (false

sworn statements to OFCCP after July 3 federal warning), making the claim timely through at least July 2026 without relation back.

3. **Legal Standard:** Section 1985(3) of Title 42 provides a federal cause of action when "two or more persons... conspire... for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws." 42 U.S.C. § 1985(3). To establish a § 1985(3) claim, Plaintiff must show: (1) a conspiracy of two or more persons; (2) for the purpose of depriving a person of the equal protection of the laws; (3) an act in furtherance of the conspiracy; and (4) an injury or deprivation of rights. The conspiracy must be motivated by "class-based, invidiously discriminatory animus." *Griffin v. Breckenridge,* 403 U.S. 88, 102 (1971) [verification pending — Plaintiff will supplement within 14 days].

4. **Conspiracy of Two or More Persons Across Corporate Lines:** As detailed in Count XIV, thirteen defendants across **four separate corporate entities** (All Points Logistics, LLC, Leidos Holdings, Inc., TekFive, and Seabrook Solutions) and eleven individual defendants across those entities conspired to retaliate against and terminate Plaintiff. The **intracorporate conspiracy doctrine does not apply** because the conspiracy crossed corporate lines between separately incorporated entities operating under the same NASA contract. *Massey v. Armco Steel Co.*, 652 S.W.2d 932, 934 (Tex. 1983) [verification pending — Plaintiff will supplement within 14 days]. Specifically: TekFive employee Travis McFarland manufactured a false complaint coordinated with Leidos supervisor Brent Wong; Leidos managers

(Brent Wong, Christy Murray, John Walters) coordinated with All Points HR (Robyn Smith, Ed Scarborough) to execute termination; Seabrook Solutions employee Susana Kane committed the assault while Leidos employee Cristian Garcia provided false cover testimony; and Leidos HRBP Dianne Brief coordinated directly with All Points HR (Robyn Smith) regarding Plaintiff's employment from July 13, 2023 through at least September 18, 2023, participating in the joint employer conference call and ongoing verbal conversations about Plaintiff's "difficulties on the job" — yet Brief's involvement was concealed from Plaintiff and omitted from initial disclosures.

5. **Class-Based Discriminatory Animus — Race:** The conspiracy was motivated by race-based discriminatory animus directed at Plaintiff as an Asian American woman: a. **Robbins v. NASA Pattern:** On September 30, 2022—eleven days after Plaintiff's September 19, 2022 hire date—EEOC Administrative Judge Stephanie Herrera certified two classes in *Robbins v. NASA* (EEOC Hearing No. 531-2014-00109X), comprising over 2,000 Asian American employees and over 2,000 African American employees alleging systematic race discrimination in NASA performance appraisals agency-wide, including at Johnson Space Center. NASA and all contractors on NASA Contract No. 80NSSC19D0001 were on formal legal notice of systematic race discrimination against Asian Americans at JSC during **Plaintiff's entire employment.** b. **Comparator Evidence:** Non-Asian male employees received systematically favorable treatment: Ryan Sauer and Jordan Hollan (not terminated for identical VPN incident); Mark Martinez (not immediately terminated for Flipper

Zero violation and received accommodations); William Figueredo (received informal "Spacebar" accommodation without ADA process). Plaintiff—the only Asian American woman on the team—was subjected to immediate, severe discipline and termination for protected activity. c. **Intersectional Targeting:** Asian male employees (Scott Vong, Khue Le) who quietly "badge flipped" between contracts without complaining were tolerated. Plaintiff—an Asian American **female** who actively **reported discrimination**—was targeted and terminated. This intersectional pattern demonstrates that the conspiracy specifically targeted Plaintiff at the intersection of race, sex, and disability. d. **Individual Racial Animus:** Brent Wong's obsessive surveillance of Plaintiff, exclusion from team activities and photos, sexual harassment, and selective targeting for discipline—while favoring employees in his predominantly male social circle—demonstrates individual discriminatory animus that pervaded the conspiracy.

6. **Acts in Furtherance of the Race-Based Conspiracy:** The conspirators committed numerous overt acts, including all acts enumerated in Count XIV (paragraphs 6-7), incorporated herein by reference. Key acts include: the September 18, 2023 coordinated 26-minute retaliation across Leidos-All Points corporate lines; the November 27, 2023 TekFive-Leidos-All Points manufactured false complaint; the December 29-January 4 synchronized suspension and termination; the January 5, 2024 three-person post-termination surveillance and false theft accusation; Cristian Garcia's false witness statement coordinated with Susana Kane; and the February-

July 2024 campaign of coordinated false sworn statements to four government agencies.

7. **Injury and Deprivation of Rights:** As a direct result of the race-based conspiracy, Plaintiff was deprived of: a. Her right to equal terms and conditions of employment under 42 U.S.C. § 1981; b. Her right to be free from race discrimination in the making, performance, and termination of her employment contract; c. Her right to equal protection in reporting workplace violence and discrimination without race-based retaliation; d. Her economic rights (lost wages, benefits, overtime, earning capacity); and e. Her personal rights (emotional distress, physical injury from assault, reputational harm from false sworn statements).

8. **Distinction from Count XIV (Texas Civil Conspiracy):** This federal § 1985(3) claim provides: (a) independent federal subject matter jurisdiction over the conspiracy; (b) no exhaustion of administrative remedies required; (c) no damages cap; (d) attorney's fees and costs under 42 U.S.C. § 1988; and (e) specific federal protection against race-based conspiracies to deprive civil rights. It survives even if Title VII counts are dismissed on exhaustion, procedural, or entity grounds, and is not subject to Texas procedural limitations applicable to state conspiracy claims.

9. As a direct result of the race-based conspiracy, Plaintiff suffered all damages alleged in this Complaint. All conspirators are jointly and severally liable under § 1985(3). Plaintiff is entitled to compensatory damages, punitive damages, and reasonable attorney's fees and costs under 42 U.S.C. § 1988.

## COUNT XXIII — PROMISSORY ESTOPPEL / DETRIMENTAL RELIANCE (Texas Common Law — Against All Points Logistics, LLC and Leidos Holdings, Inc.)

1. Plaintiff incorporates all preceding factual allegations.

2. **Relation Back Under Fed. R. Civ. P. 15(c)(1)(B):** This claim arises from the identical conduct described in the original complaint filed October 1, 2025—specifically, the December 29, 2023 events, the two options presented to Plaintiff by NASA Security, and the broken promise that management would "work it out" after the January 1 holiday. The original complaint described NASA Security's intervention, Plaintiff's reliance on the management resolution option, and Defendants' immediate breach of that promise through suspension and termination. This count adds the specific legal theory of promissory estoppel to facts already fully alleged. Additionally, this claim is **independently timely** under Texas's four-year statute of limitations for promissory estoppel, running from January 4, 2024 (when the promise was broken by termination) through January 2028.

3. **Legal Standard:** Under Texas common law, promissory estoppel requires: (1) a promise; (2) foreseeability by the promisor that the promisee would rely on it; (3) substantial reliance by the promisee to her detriment. *Wheeler v. White*, 398 S.W.2d 93, 96 (Tex. 1965) [verification pending — Plaintiff will supplement within 14 days]. Promissory estoppel operates as a substitute for consideration and allows recovery when injustice can only be avoided by enforcement of the promise. *Restatement (Second) of Contracts* § 90.

4. **The Promise:** On December 29, 2023, during the NASA Security investigation of the workplace assault, Deputy Chief Christopher M. Kindred (NASA Security, JSC-JS411) — the same investigating officer who had handled Plaintiff's November 27, 2022 AirPods theft report and who collected written statements from all parties in the December 29, 2023 assault investigation resulting in NASA Security Incident Report JSC106469 — presented Plaintiff with two options: a. **Option 1 (Formal Investigation):** NASA Security would conduct a full formal investigation. Both Plaintiff and Susana Kane would lose their NASA badges and site access—and therefore their paychecks—during the investigation period. b. **Option 2 (Management Resolution):** NASA Security would not conduct a formal investigation at that time. Instead, **management would "work it out" after the January 1 holiday.** Both employees would keep their badges and continue working. Plaintiff chose Option 2, relying on the explicit promise that management—meaning Leidos and All Points management, who were Plaintiff's supervisors and employers on the NASA contract—would resolve the situation after the holiday. This choice and the promise were communicated to All Points and Leidos management, who were aware of the NASA Security process and the commitment made to Plaintiff.

5. **Foreseeability of Reliance:** It was entirely foreseeable that Plaintiff would rely on the promise that management would "work it out." Plaintiff was forced to choose between two options, one of which (formal investigation) would result in immediate loss of income for both the assault victim and the aggressor during the holiday season. Any reasonable person would rely on the management resolution promise to

avoid financial hardship. Ed Scarborough (All Points VP), Christy Murray (Leidos manager), and Brent Wong (Leidos supervisor) were aware of the promise and knew Plaintiff had relied on it in choosing Option 2.

6. **Substantial Detrimental Reliance:** Plaintiff relied on the promise to her substantial detriment: a. By choosing Option 2, Plaintiff **forfeited the formal NASA Security investigation** that would have independently documented the assault through an impartial federal investigation with access to security cameras, badge logs, and witness interviews conducted by trained federal investigators—none of which Plaintiff could independently obtain; b. By choosing Option 2, Plaintiff gave management **control over the resolution**—control they used not to "work it out" but to immediately begin building the termination case; c. On December 29—mere **hours** after the promise was communicated—Ed Scarborough called Plaintiff and **suspended her** (voicemail at 4:39 PM), directly contradicting the promise that both employees would keep working; d. On December 30, Ed Scarborough sent internal email stating "Christy told them nothing happened"—proving management had already predetermined the outcome and adopted a false narrative before any investigation or "working it out"; e. On January 4, 2024—**three business days** after the holiday—Defendants **terminated Plaintiff** instead of "working it out" as promised; f. Plaintiff lost her job, income, benefits, career trajectory, and professional reputation because she relied on a promise that was broken before the holiday even ended.

7. **Injustice Can Only Be Avoided by Enforcement:** Defendants used Plaintiff's reliance on their promise against her. By inducing Plaintiff to choose Option 2 (management resolution) over Option 1 (formal NASA investigation), Defendants obtained control over the process—and used that control to manufacture the "nothing happened" / "false report" narrative without the independent NASA investigation that would have contradicted it. Plaintiff's reasonable reliance on her employer's promise left her **more vulnerable**, not less—the exact opposite of what was promised. Allowing Defendants to benefit from a promise they made to induce Plaintiff to forgo formal federal protections, only to terminate her days later, would constitute manifest injustice.

8. As a direct and proximate result of Defendants' broken promise, Plaintiff suffered: lost wages and benefits; lost opportunity for formal NASA Security investigation that would have independently documented the assault; emotional distress from the betrayal of a promise made during a vulnerable moment; and all other damages alleged in this Complaint.

## COUNT XXIV — REHABILITATION ACT, SECTION 504 (DAMAGES) (Against All Points Logistics, LLC; Leidos, Inc.; Leidos Holdings, Inc.; and Leidos Innovations Corporation (collectively, the "Leidos Entities"))

1. Plaintiff incorporates all preceding factual allegations.

2. **Legal Standard (Pleading Summary):** Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a), prohibits disability discrimination and retaliation by any *program*

*or activity receiving Federal financial assistance* and by contractors performing federally assisted programs or activities. Compensatory damages are available against non-federal recipients. *See Barnes v. Gorman*, 536 U.S. 181 (2002) [verification pending — Plaintiff will supplement within 14 days] (compensatory damages available under § 504; punitive damages not available).

3.  **Covered entities:** All Points Logistics, LLC, and the Leidos Entities are recipients of Federal financial assistance within the meaning of 29 U.S.C. § 794(a) and (b) by virtue of their NASA prime and subcontract awards and the programs they perform at Johnson Space Center. Specifically, and on information and belief: (a) **Leidos, Inc.** holds the NASA End-user Services and Technologies (NEST) prime contract No. 80NSSC19D0001 (*see* Section V.L ¶2) and is therefore a direct recipient of Federal financial assistance within the meaning of § 794(a) and (b); (b) **Leidos Holdings, Inc.**, the publicly traded parent (NYSE: LDOS), is reached under § 504 via the single integrated enterprise and alter-ego theory pleaded in Section V.L, incorporated herein by reference; (c) **Leidos Innovations Corporation**, a subsidiary performing technology services at JSC, is likewise reached under the same integrated-enterprise theory and, to the extent it holds its own federal subcontract or task-order assignments at JSC, as a direct recipient; and (d) **All Points Logistics, LLC** performs work at JSC under a subcontract flowing from the NASA prime and is subject to § 504 as a recipient of Federal financial assistance and as a contractor performing a federally assisted program or activity. Plaintiff will confirm the specific funding instruments, award numbers, flow-down provisions, and program

scope through discovery. 3-A. **Alternative pleading under FRCP 8(d)(2) —
procurement vs. Federal financial assistance:** Plaintiff acknowledges the threshold
question under *Paralyzed Veterans of America v. Civil Aeronautics Bd.*, 752 F.2d
694 (D.C. Cir. 1985) [verification pending — Plaintiff will supplement within 14
days], whether the NASA NEST contract (No. 80NSSC19D0001) is structured as a
procurement contract or as a vehicle carrying Federal financial assistance. Plaintiff
therefore pleads, in the alternative under FRCP 8(d)(2):

- **(a) Direct recipient (primary):** The Leidos Entities and APL are direct
  recipients of Federal financial assistance within 29 U.S.C. § 794(a) by virtue
  of the NEST prime contract and its flow-down provisions to subcontractors,
  as alleged in ¶ 3 above;

- **(b) Entire-corporation prong:** Under 29 U.S.C. § 794(b)(3)(A)(ii), if any
  operation of Leidos, Inc. (or any of the Leidos Entities) receives Federal
  financial assistance apart from the NEST contract — including but not limited
  to research grants, cooperative agreements, or technical-assistance awards
  from federal agencies — § 504 reaches the entire corporation, which
  encompasses the Leidos Entities' NEST operations and the APL subcontract;

- **(c) Program-participation prong:** Even if the NEST contract is
  characterized as procurement, Plaintiff was an active participant in, and was
  denied the benefits of, the federally assisted PCST/PEO program at JSC
  within the meaning of 29 U.S.C. § 794(a), as further developed in ¶ 5 below;
  and

- **(d) Contractor performing federally assisted program or activity:** APL and the Leidos Entities perform a federally assisted program or activity at JSC within the meaning of 29 U.S.C. § 794(b)(1) and are subject to § 504 as contractors performing such program. Plaintiff will confirm the operative funding instruments, award numbers, flow-down provisions, and program scope through discovery. *See* ¶ 13 (reservation).

4. **Contractor-side reach — Fifth Circuit:** The Fifth Circuit has recognized that § 504 reaches employment decisions by federally assisted contractors that affect qualified individuals with disabilities. *See Flynn v. Distinctive Home Care, Inc.*, 812 F.3d 422 (5th Cir. 2016) [verification pending — Plaintiff will supplement within 14 days].

5. **First-impression risk flagged:** Plaintiff acknowledges that the precise contours of § 504's reach over a sub-subcontractor employee assigned to a federal worksite are not fully settled in the Fifth Circuit. Plaintiff therefore pleads an explicit *program-participation* theory in the alternative: Plaintiff was an active participant in, and was denied the benefits of, the federally assisted program (the PCST/PEO program at JSC) within the meaning of 29 U.S.C. § 794(a).

6. **Statute of limitations:** The statute of limitations for § 504 claims in Texas is borrowed from Texas Civil Practice & Remedies Code § 16.003 (two years). *See Frame v. City of Arlington*, 657 F.3d 215 (5th Cir. 2011) (en banc) [verification pending — Plaintiff will supplement within 14 days]. All adverse actions pleaded occurred within the two-year window preceding filing of the original Complaint.

7. **Qualified individual with a disability:** Plaintiff is a qualified individual with a disability within the meaning of 29 U.S.C. § 705(20) and 29 C.F.R. § 1630.2(m). Plaintiff's disabilities, accommodation history, and ability to perform the essential functions of her position with reasonable accommodation are set forth in Section V (Factual Allegations) and the ADA counts incorporated above.

8. **Notice to APL and the Leidos Entities:** APL and the Leidos Entities had actual knowledge of Plaintiff's disabilities and her requests for reasonable accommodation through: (a) Plaintiff's direct communications to supervisors and HR; (b) the accommodation history documented in EV-series evidence; and (c) the chain of command coordinating with NASA ODEO beginning in September 2023.

9. **Failure to accommodate:** APL and the Leidos Entities failed to engage in the interactive process in good faith and failed to provide reasonable accommodations, instead escalating discipline, revoking previously-authorized overtime, and ultimately terminating Plaintiff's access and employment. Specific adverse actions are pleaded in detail in the ADA counts and Count XVIII (§ 1981 retaliation) and are incorporated here.

10. **Adverse actions attributable to APL and the Leidos Entities under § 504:**
    – Denial of reasonable accommodation;
    – Retaliatory cancellation of overtime (November 20, 2023) by Leidos Service Delivery Lead Brent Wong, approximately 29 days after the October 21–22, 2023 VPN incident (cross-reference Count XVIII);

- Coordinated request to NASA to revoke Plaintiff's access on or about January 3–4, 2024 (cross-reference Count IV paragraph 8); and

- Effective termination of Plaintiff's employment on January 4, 2024 via access revocation executed by NASA at APL / Leidos' request.

11. **Coordination with ADA claims — no double recovery:** Plaintiff pleads § 504 in the alternative to and in coordination with her ADA Title I claims against APL and the Leidos Entities. Plaintiff does not seek duplicative compensatory recovery for the same injury under § 504 and the ADA; she seeks whichever framework affords the broadest remedy permitted by law. *See* 29 U.S.C. § 794(d) (rights, remedies, and procedures of Title I of the ADA apply to § 504 employment claims). [verification pending — Plaintiff will supplement within 14 days]

12. **Relief sought against APL and the Leidos Entities under § 504:** compensatory damages including back pay, front pay, and other make-whole relief (exclusive of emotional distress damages under § 504, *see Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212 (2022) [verification pending — Plaintiff will supplement within 14 days]); equitable relief including reinstatement or front pay in lieu of reinstatement; and attorney's fees and costs to the extent available to a prevailing pro se litigant under 29 U.S.C. § 794a(b) and related authority. Plaintiff does *not* seek punitive damages under § 504. *See Barnes v. Gorman*, 536 U.S. 181 (2002) [verification pending — Plaintiff will supplement within 14 days].

13. **Reservation:** Plaintiff reserves the right to refine the § 504 program-participation theory and the specific federal-financial-assistance nexus after discovery identifies the operative award instruments and flow-down provisions.

---

**LEIDOS ENTITY SCOPE EXPANDED — April 21, 2026 (Task #40):**

Count XXV expanded from two-entity scope (APL + Leidos Holdings) to four-entity scope (APL + Leidos, Inc. + Leidos Holdings, Inc. + Leidos Innovations Corporation, collectively the "Leidos Entities") per Amanda decision, matching Count XXIV (§ 504 damages) parity. Theory: single-integrated-enterprise / alter-ego under *Trevino v. Celanese Corp.,* 701 F.2d 397, 403-04 (5th Cir. 1983) [verification pending — Plaintiff will supplement within 14 days], pleaded in Section V.L and incorporated herein by reference. Same employment relationship, same operational structure as Count XXIV; expansion eliminates inconsistency between the race claim and the disability-damages claim. Header line, ¶1 incorporation, and new ¶3-A added accordingly.

## COUNT XXV — TITLE VII RACE DISCRIMINATION

## (Against All Points Logistics, LLC; Leidos, Inc.; Leidos Holdings, Inc.; and Leidos Innovations Corporation (collectively, the "Leidos Entities"))

1. Plaintiff incorporates all preceding factual allegations, including Section IV (Exhaustion of Administrative Remedies), the Dual-Agency Suppression of Race Discrimination Claims subsection, the single-integrated-enterprise / alter-ego pleading in Section V.L, and all race-coded factual allegations in Section V.

2. **Legal Standard.** Title VII, 42 U.S.C. § 2000e-2(a)(1), makes it unlawful for an employer "to discriminate against any individual with respect to h[er] compensation, terms, conditions, or privileges of employment, because of such individual's race [or] color." After *Hamilton v. Dallas County*, 79 F.4th 494 (5th Cir. 2023) (en banc), a Title VII plaintiff plausibly pleads disparate treatment by alleging differential treatment in any "term, condition, or privilege" of employment — not only ultimate employment actions. The Supreme Court has reaffirmed a single, uniform evidentiary standard for all Title VII plaintiffs regardless of protected-class combination. *Ames v. Ohio Dep't of Youth Servs.*, 605 U.S. ___ (2025).

3. **Plaintiff's Protected Class and Qualifications.** Plaintiff is an Asian American woman of Korean descent. Her race and color were documented in her original NASA Form 1882 EEO intake on February 22, 2024 (Color ✔ Asian; National Origin ✔ Korea), in her April 16, 2024 EEOC online inquiry (Race ✔), and throughout the factual narratives submitted to EEOC, NASA ODEO, OFCCP, and TWC. At all relevant times, Plaintiff was qualified for her position and performed her duties satisfactorily, as evidenced by 59 Kudos awards between January 5 and December 26, 2023 and her December 27, 2023 top-performer audit. 3-A. **Defendant Scope — Single Integrated Enterprise / Joint Employer.** Each named Defendant is a proper Title VII "employer" within the meaning of 42 U.S.C. § 2000e(b) as to Plaintiff: a. **All Points Logistics, LLC** was Plaintiff's W-2 employer of record at all relevant times. b. **Leidos, Inc.** holds the NASA End-user Services and Technologies (NEST) prime contract No. 80NSSC19D0001 (*see* Section V.L

¶2) and exercised operational control over Plaintiff's daily duties, work schedule, performance evaluation, discipline, and access through its Service Delivery Lead Brent Wong and other Leidos personnel assigned to JSC. c. **Leidos Holdings, Inc.** — the publicly traded parent (NYSE: LDOS) — is reached as Plaintiff's Title VII employer under the single-integrated-enterprise / alter-ego theory pleaded in Section V.L, incorporated herein by reference. *See Trevino v. Celanese Corp.*, 701 F.2d 397, 403-04 (5th Cir. 1983) [verification pending — Plaintiff will supplement within 14 days] (four-factor test: interrelation of operations, common management, centralized control of labor relations, and common ownership/financial control). d. **Leidos Innovations Corporation** — a subsidiary performing technology services at JSC — is likewise reached under the same integrated-enterprise theory and, to the extent it directly employed personnel assigned to the NEST contract or shared management/labor-relations centralization with Leidos, Inc. and Leidos Holdings, Inc., as a direct or joint employer. Plaintiff will confirm corporate organizational charts, payroll attribution, decision-maker authority, and labor-relations centralization through discovery.

4. **Administrative Exhaustion — Scope of the Charge.** Plaintiff's Title VII race discrimination claim is properly exhausted under the Fifth Circuit's scope-of-charge doctrine. a. **Race was affirmatively raised at intake.** On April 16, 2024, Plaintiff submitted an EEOC online inquiry for Charge No. 460-2024-04943 expressly identifying Race as a basis of discrimination. b. **Race was stripped during EEOC's custody of the charge.** On September 18, 2024, EEOC Houston District Office

reassigned the charge from original investigator Ashley Waller to Investigator Deirdre Arthur-Reed. On September 19, 2024 between 17:01:22 and 17:05:00 EDT — a four-minute window — Arthur-Reed coded seven separate allegations into the EEOC case management system: Title VII Sex-Female Terms/Conditions, Title VII Sex-Female Sexual Harassment, Title VII Retaliation-Participation Discharge, ADA Psychiatric Conditions (Anxiety, Depression, PTSD), and Reasonable Accommodation. No Race allegation was coded, despite Plaintiff's prior inquiry having identified Race. c. **Parallel suppression at NASA ODEO.** Plaintiff's initial NASA ODEO intake on February 22, 2024 also included Color ✔ Asian and National Origin ✔ Korea, but EEO Counselor Rob Blake advised Plaintiff in or about May 2024 that her race and color claims were "not going to go anywhere" and directed her to focus on disability and sex bases only, resulting in those boxes being removed from the NASA ODEO counseling file. This pattern — race present at intake, missing after agency processing — recurred at both NASA ODEO and EEOC. d. **Race discrimination reasonably grew out of the sex and retaliation charge.** The factual narratives Plaintiff submitted to EEOC and TWC repeatedly describe race-coded conduct, including (i) disparate treatment of Plaintiff, an Asian American woman, compared to white male comparators (Sauer, Hollan, Adams, Walters, Dismukes) and African American female comparators in the badge-flipping incident; (ii) NASA Security's disparate treatment of Plaintiff's assault report relative to white and African American coworkers' reports; and (iii) NASA JSC's then-pending *Robbins v. NASA* class certification (EEOC Hearing No. 531-2014-00109X)

covering 2,000+ Asian American employees, certified eleven days after Plaintiff's September 19, 2022 hire date. A reasonable EEOC investigation of Plaintiff's charge would have encompassed race discrimination. *Sanchez v. Standard Brands, Inc.,* 431 F.2d 455, 466 (5th Cir. 1970) (Title VII claim is properly exhausted as to "any kind of discrimination like or related to allegations contained in the charge and growing out of such allegations during the pendency of the case before the Commission"); *Pacheco v. Mineta,* 448 F.3d 783, 788-89 (5th Cir. 2006) (scope of Title VII suit determined by scope of EEOC investigation that could reasonably be expected to grow out of the charge). e. **Equitable modification, if required.** To the extent the Court concludes that the administrative-exhaustion requirement was not strictly satisfied as to Race, the requirement is a non-jurisdictional "claim-processing rule" subject to waiver, forfeiture, estoppel, and equitable tolling. *Fort Bend County v. Davis,* 587 U.S. ___, 139 S. Ct. 1843 (2019); *Melgar v. T.B. Butler Publ'g Co.,* 931 F.3d 375, 380 (5th Cir. 2019); *Manning v. Chevron Chem. Co.,* 332 F.3d 874, 881 (5th Cir. 2003). Where, as here, a pro se complainant identified Race at intake and agency personnel stripped the basis during pendency of the charge, equitable modification is warranted. *Johnson v. Railway Express Agency, Inc.,* 421 U.S. 454, 460 (1975) (EEOC's deficient handling of a charge cannot defeat a complainant's rights).

5. **Disparate Treatment — Terms, Conditions, and Privileges.** Defendants subjected Plaintiff, an Asian American woman, to terms, conditions, and privileges of employment materially less favorable than those afforded similarly situated non-

Asian employees, including: a. **Discipline disparity.** Plaintiff received a Final Warning 26 minutes after her September 18, 2023 email raising ADA, FLSA, and harassment concerns, with no prior progressive discipline. White male comparators Ryan Sauer, Jordan Hollan, Spencer Adams, and Robert "Russ" Dismukes engaged in equal or more serious conduct (including unapproved VPN activity, unauthorized device use, and documented absenteeism) and received no comparable discipline. b. **Compensation disparity.** Male comparator John Walters received secret "QM" pay at +$4/hour for work substantially equal to Plaintiff's PCST duties; this arrangement was never offered to Plaintiff or to other PCSTs. (See COUNT V — Equal Pay Act.) c. **Adverse-action severity supporting inference.** Plaintiff (an Asian American woman) had her NASA access simultaneously revoked from four badges within minutes of termination on January 4, 2024, without independent NASA investigation. The abruptness and totality of this revocation, combined with the comparator evidence at ¶5(a), supports an inference that race was a motivating factor. (See COUNT IV — Rehabilitation Act §504.) d. **Post-termination handling disparity.** Defendants submitted false sworn statements to TWC, EEOC, and OFCCP characterizing Plaintiff — an Asian American woman — as having filed a false assault report, despite NASA Security's actual finding of no falsification. Plaintiff is aware of no comparable agency submissions made about similarly situated non-Asian former employees.

6. **Inference of Race Discrimination.** Plaintiff's pleading is strengthened by pattern-and-practice evidence from *Robbins v. NASA.* On September 30, 2022 — eleven

days after Plaintiff's September 19, 2022 hire date — EEOC Administrative Judge Stephanie Herrera certified two classes in *Robbins v. NASA*, EEOC Hearing No. 531-2014-00109X, comprising (i) over 2,000 Asian American NASA employees and (ii) over 2,000 African American NASA employees, alleging systemic discrimination in NASA performance-appraisal, promotion, and discipline systems agency-wide. NASA was on formal notice throughout Plaintiff's employment that it had documented systemic race-discrimination problems. *Robbins* provides FRE 404(b) pattern evidence of race-based animus and motive at JSC, independent of Plaintiff's individual comparator showing.

7. **Mixed-Motive Alternative Pleading.** In the alternative, even if Defendants had multiple reasons for adverse actions, Plaintiff's race was a motivating factor. *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 101 (2003); 42 U.S.C. § 2000e-2(m). Evidence of mixed motive: (a) comparator evidence showing non-Asian comparators retained for identical or worse conduct; (b) the *Robbins* pattern; (c) the simultaneous badge-flipping disparity between Asian female and Asian male / African American coworkers; (d) the dual-agency Race-box stripping at NASA ODEO and EEOC; (e) intersectional targeting (Asian American woman + disability), where non-Asian women with disabilities and Asian men in the workgroup did not experience the same discipline-termination-smear sequence.

8. **Pretext.** Defendants' shifting and internally inconsistent explanations across TWC, EEOC, OFCCP, and their Answer — including the March 25, 2024 admission by

Robyn Smith that "we were not told the actual results" from NASA Security — demonstrate pretext. *Owens v. Circassia Pharms., Inc.*, 33 F.4th 814 (5th Cir. 2022).

9. **Injury and Damages.** As a direct and proximate result of Defendants' race-based discrimination, Plaintiff suffered lost wages, lost benefits, lost professional reputation (compounded in the small federal-contracting community by the false-assault-report narrative), prolonged unemployment (21+ months, 4–8x the expected search duration for a qualified IT professional), emotional distress, and other damages. Plaintiff seeks compensatory and punitive damages (subject to the statutory caps of 42 U.S.C. § 1981a(b)(3)), back pay, front pay, prejudgment interest, injunctive and declaratory relief including orders prohibiting further race-based discrimination and correcting Defendants' false agency submissions, costs (including expert witness fees) under 42 U.S.C. § 2000e-5(k), and all other relief the Court deems just.

## COUNT XXVI — ADA HOSTILE WORK ENVIRONMENT
## (Against All Points Logistics, LLC and Leidos Holdings, Inc.)

1. Plaintiff incorporates all preceding factual allegations, including Counts I–III and Sections V.B, V.C, V.F, V.G, and V.I.

2. **Legal Standard.** The ADA prohibits harassment that creates a hostile work environment based on disability. To state a claim, Plaintiff must allege: (a) she is a qualified individual with a disability; (b) she was subjected to unwelcome harassment; (c) the harassment was based on her disability; (d) the harassment was

sufficiently severe or pervasive to alter the terms and conditions of employment; and (e) the employer knew or should have known of the harassment and failed to take prompt remedial action. *Flowers v. S. Reg'l Physician Servs., Inc.*, 247 F.3d 229, 235–36 (5th Cir. 2001) [verification pending — Plaintiff will supplement within 14 days]; *Gowesky v. Singing River Hosp. Sys.*, 321 F.3d 503, 509 (5th Cir. 2003) [verification pending — Plaintiff will supplement within 14 days].

3. **Plaintiff's Disabilities.** Plaintiff has documented disabilities including ADHD, Autism Spectrum Disorder, PTSD, anxiety, depression, and a back injury with physician-ordered lifting restriction. Her disabilities were disclosed to Defendants on multiple occasions, including (a) September 15, 2023, when Plaintiff submitted a formal ADA accommodation request; (b) September 18, 2023, 5:20 PM email to Robyn Smith expressly invoking ADA rights; and (c) October 16, 2023 follow-up accommodation request. She is a "qualified individual" under 42 U.S.C. § 12111(8) — her 59 Kudos awards and December 27, 2023 top-performer audit demonstrate ability to perform essential functions.

4. **Severe or Pervasive Harassment Based on Disability.** The following course of conduct, taken together, was severe or pervasive and targeted Plaintiff's disabilities: a. **Travis McFarland's disability harassment** — ongoing workplace conduct directed at Plaintiff's visible ADHD/autism traits, including mockery of Plaintiff's processing style, executive-function differences, and sensory-related accommodation needs; b. **Categorical denial of accommodation with knowingly false legal statement** — On or about September 26, 2023, Robyn Smith denied Plaintiff's

accommodation request with a written statement of ADA law she knew to be false (as alleged in Count XXI), and failed to engage in any interactive process as required by 29 C.F.R. § 1630.2(o)(3); c. **26-minute Final Warning after ADA-protected activity** — at 5:20 PM on September 18, 2023, Plaintiff emailed Smith invoking ADA rights; at 5:46 PM the same day Smith issued a Final Warning, creating a 26-minute temporal proximity that is itself severe and pervasive conduct centered on Plaintiff's disability-related advocacy; d. **Obsessive surveillance tied to disability traits** — Section V.I documents a pattern of monitoring keyed to Plaintiff's ADHD/autism-influenced work style, including selective enforcement of informal rules, tracking of lunch and break durations beyond the discipline levels applied to non-disabled comparators, and radio-log surveillance; e. **Disability-documentation misuse** — medical and psychiatric information disclosed through the accommodation process was referenced by Defendants in post-termination filings to TWC, EEOC, and OFCCP, in violation of 42 U.S.C. § 12112(d)(4)(B) and 29 C.F.R. § 1630.14(c)(1) confidentiality requirements, and used to discredit Plaintiff's assault report; f. **Post-assault context** — the December 28–29, 2023 assault by Susana Kane and Defendants' three-business-day post-assault termination without interviewing Plaintiff occurred in a workplace where Plaintiff's disability-accommodation request had already been used against her as a basis for adverse action, heightening the severity of the hostile environment as perceived by a reasonable person with Plaintiff's documented PTSD; g. **Post-termination smear campaign** — Defendants' continuing false statements to four agencies through July

2024, characterizing Plaintiff (whose psychiatric disabilities they knew of) as having "falsified" reports, extended the hostile environment beyond her last day of employment in a manner particularly calculated to injure a PTSD-diagnosed employee.

5. **Objectively and Subjectively Hostile.** A reasonable person with Plaintiff's documented disabilities would find the environment alleged above severely abusive, and Plaintiff subjectively did, resulting in a PTSD escalation now requiring transcranial magnetic stimulation (TMS) — a treatment reserved for treatment-resistant conditions. *See Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21–23 (1993) [verification pending — Plaintiff will supplement within 14 days] (totality-of-the-circumstances framework).

6. **Employer Liability.** Defendants had actual knowledge of the harassment through Plaintiff's September 18, 2023 ADA email, her September–October 2023 accommodation requests, and her post-termination ODEO, OFCCP, EEOC, and TWC complaints. Defendants failed to take prompt remedial action; instead, they escalated — issuing the 26-minute Final Warning, terminating Plaintiff three business days after the Kane assault, and launching the post-termination false-statement campaign. *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998) [verification pending — Plaintiff will supplement within 14 days]; *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998) [verification pending — Plaintiff will supplement within 14 days].

7.  **Damages.** Plaintiff seeks compensatory damages (including emotional distress and medical expenses for TMS, counseling, medications, and ESA prescription), punitive damages under 42 U.S.C. § 1981a (subject to caps), back pay, front pay, equitable relief, and attorneys' fees and costs.

---

## COUNT XXVII — RETALIATORY HOSTILE WORK ENVIRONMENT (Under Title VII, the ADA, and 42 U.S.C. § 1981 — Against All Points Logistics, LLC and Leidos Holdings, Inc.)

1.  Plaintiff incorporates all preceding factual allegations, including Count III — ADA Retaliation, Count VIII — Title VII Retaliation, Count XI — FLSA Retaliation, Count XVIII — § 1981 Retaliation, and Sections V.D, V.E, V.F, V.G, V.I, and V.J.

2.  **Legal Standard.** An employer violates Title VII's, the ADA's, and § 1981's anti-retaliation provisions when, following an employee's protected activity, the employer's actions — viewed cumulatively — "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) [verification pending — Plaintiff will supplement within 14 days]. Retaliatory harassment that is severe or pervasive satisfies this standard. *Noviello v. City of Boston*, 398 F.3d 76, 84–88 (1st Cir. 2005) [verification pending — Plaintiff will supplement within 14 days]; *Gowesky v. Singing River Hosp. Sys.*, 321 F.3d 503 (5th Cir. 2003). Section 1981 retaliation is coextensive with Title VII retaliation. *CBOCS West, Inc. v.*

*Humphries,* 553 U.S. 442 (2008) [verification pending — Plaintiff will supplement within 14 days].

3. **Protected Activity.** Plaintiff engaged in multiple instances of protected activity: a. **July 2023** — Reported Daniel Murphy's sexual harassment to All Points HR and Leidos; b. **September 15, 2023** — Submitted formal ADA accommodation request; c. **September 18, 2023, 5:20 PM** — Emailed Robyn Smith invoking ADA, FLSA, and harassment concerns; d. **October 16, 2023** — Renewed ADA accommodation request; e. **November 20–22, 2023** — Cooperated with NASA OCIO Root Cause Analysis concerning VPN provisioning, reporting comparator misconduct; f. **December 29, 2023 – January 4, 2024** — Reported Kane assault to NASA Security and All Points management (Ed Scarborough); g. **January 23 – February 22, 2024** — Filed charges with TWC (3719044), OFCCP (I00311965), and NASA ODEO (NCN-24-JSC-00038); h. **April 16 – October 30, 2024** — Filed EEOC charges 460-2024-04943 (APL) and 460-2024-09354 (Leidos).

4. **Severe or Pervasive Retaliatory Harassment.** Following Plaintiff's protected activity, Defendants engaged in a sustained pattern of harassment that a reasonable worker in Plaintiff's position would find materially adverse: a. **26-minute Final Warning** (Sept 18, 2023, 5:46 PM) — immediately following Plaintiff's 5:20 PM ADA/FLSA/harassment email; b. **Retaliatory overtime cancellation** (Nov 20, 2023) — 29 days after Plaintiff's cooperation with the NASA OCIO Root Cause Analysis, while male comparators Ryan Sauer and Jordan Hollan continued to receive overtime; c. **Selective VPN-incident discipline** (Oct–Nov 2023) —

disparate application of policy to Plaintiff while non-complaining comparators received no comparable treatment; d. **Pretextual investigation preceding termination** (Dec 29, 2023 – Jan 4, 2024) — refusal to interview Plaintiff or obtain the NASA Security Report, while proceeding to terminate her three business days after the Kane assault; e. **Post-termination hostile equipment return** (Jan 5, 2024) — Defendants staged a hostile return of Plaintiff's work equipment accompanied by a false theft accusation; f. **Simultaneous four-badge revocation** (Jan 4, 2024) — Plaintiff's NASA access was revoked across four badges within minutes, without independent NASA investigation, in a manner not imposed on similarly situated non-complaining employees; g. **Cross-agency false-statement campaign** (Feb 2024 – July 2024) — Defendants submitted sworn or quasi-sworn statements to TWC, EEOC, OFCCP, and NASA ODEO characterizing Plaintiff as having "falsified" reports despite NASA Security's actual finding of no falsification, and continued this campaign after the March 25, 2024 admission by Robyn Smith that Defendants "were not told the actual results," and after the July 3, 2024 OFCCP formal record-preservation and anti-retaliation warning; h. **OFCCP warning violation** — continuing submission of false statements AFTER the July 3, 2024 OFCCP notice demonstrates willfulness and malice; i. **Deliberate professional exclusion** — Defendants' false statements to government agencies and inclusion of the false "falsification" narrative in materials discoverable through background checks have materially obstructed Plaintiff's 27.5+ month job search in the federal-contracting market (see Damages Section).

5. **Objectively Adverse.** The conduct alleged in ¶ 4 — particularly the continuation of false sworn statements after an admission of ignorance and an OFCCP record-preservation warning — would dissuade any reasonable worker from pursuing a discrimination charge. The statutory caps on Title VII/ADA punitive damages were designed for exactly this kind of willful post-protected-activity misconduct.

6. **Causation.** The temporal proximity between Plaintiff's protected activity and the retaliatory conduct (26 minutes in some instances, 3–29 days in others) and Defendants' admitted knowledge of the protected activity establish but-for causation under *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338 (2013) [verification pending — Plaintiff will supplement within 14 days].

7. **Damages.** Plaintiff seeks compensatory damages (including emotional distress and the TMS-level PTSD escalation), punitive damages, back pay, front pay, and injunctive and declaratory relief, as set forth in the Prayer for Relief.

---

## COUNT XXIX — TITLE VII FEDERAL-SECTOR DISCRIMINATION

## (Against NASA)

1. Plaintiff incorporates all preceding factual allegations, including Section IV (Exhaustion of Administrative Remedies), Section V (Factual Allegations) in its entirety, and all race-, color-, national-origin-, sex-, and reprisal-coded factual allegations. Plaintiff incorporates and re-alleges the joint-employer and cat's paw theories pleaded in Sections V.K and V.L, which establish that NASA's own agents (including Ed Scarborough (APL site supervisor), Brent Wong (Leidos), and Robyn

Smith (APL HR remote)) directed or acted with NASA's effective imprimatur in the January 4, 2024 termination.

2. **Legal Standard.** Section 717 of Title VII, 42 U.S.C. § 2000e-16(a), makes "[a]ll personnel actions affecting employees or applicants for employment" in executive-branch agencies, including NASA, subject to a federal prohibition on discrimination "based on race, color, religion, sex, or national origin." *Brown v. GSA*, 425 U.S. 820, 835 (1976) (§ 2000e-16 is the "exclusive" judicial remedy for federal-employment discrimination claims within its scope). The Fifth Circuit applies the same substantive disparate-treatment framework to § 2000e-16 claims as to § 2000e-2 claims. *Hamilton v. Dallas County*, 79 F.4th 494 (5th Cir. 2023) (en banc) (plaintiff plausibly pleads disparate treatment by alleging differential treatment in any "term, condition, or privilege" of employment); *Ames v. Ohio Dep't of Youth Servs.*, 605 U.S. ___ (2025) (uniform Title VII evidentiary standard for all protected-class plaintiffs).

3. **Coverage — Federal Employer and Contingent-Worker Status.** NASA is a federal executive-branch agency and qualifies as a covered "employer" under § 2000e-16. Plaintiff was jointly employed by NASA, All Points Logistics, LLC, and Leidos under the NASA End-User Services and Technology (NEST) Contract, Prime Contract No. 80NSSC19D0001, at NASA Johnson Space Center, Houston, Texas. NASA controlled the means and manner of Plaintiff's day-to-day work, including (a) issuing four NASA badges authorizing access to JSC facilities and systems (revoked simultaneously within minutes of termination on January 4, 2024); (b) dictating the

safety-critical mission function for which Plaintiff provided IT support; (c) imposing NASA-promulgated training, credentialing, and conduct requirements; and (d) exercising de facto control over discipline by communicating directly with contractor supervisors regarding Plaintiff. The 15-factor contingent-worker analysis set forth on NASA Form 1882 and in Plaintiff's NASA ODEO counseling file supports joint-employer status for § 2000e-16 purposes. *See* 29 C.F.R. § 1614.103(d)(3) (applicants and employees of agencies include certain contract workers where the agency has sufficient control).

4. **Plaintiff's Protected Class and Qualifications.** Plaintiff is an Asian American woman of Korean descent with documented disabilities (ADHD, Autism Spectrum Disorder, PTSD, anxiety, depression, back injury). Her race, color, national origin, and sex were affirmatively identified on NASA Form 1882 submitted to NASA ODEO on February 22, 2024 (Race ✔ Asian; Color ✔ Asian; National Origin ✔ Korea; Sex ✔ Female; Disability ✔; Reprisal ✔). At all relevant times, Plaintiff was qualified for her position and performed her duties satisfactorily, as evidenced by 59 Kudos awards between January 5 and December 26, 2023 and her December 27, 2023 top-performer audit.

5. **Administrative Exhaustion Under 29 C.F.R. Part 1614.** a. **Timely EEO counselor contact.** Plaintiff was terminated on January 4, 2024. On February 12, 2024 — thirty-nine (39) days after termination and well within the 45-day window prescribed by 29 C.F.R. § 1614.105(a)(1) — NASA ODEO Deputy Director Rob Blake issued a Rights and Responsibilities notice to Plaintiff initiating NASA

informal counseling as Pre-complaint Case No. PRE-00047-2024. b. **Intake (Feb 22, 2024) — all five Title VII bases affirmatively raised.** On February 22, 2024, Plaintiff submitted NASA Form 1882 with the following Part II Bases Identified: Race ✔ (Asian), Color ✔ (Asian), National Origin ✔ (Korea), Sex ✔ (Female), and Reprisal ✔, together with Disability ✔. PRE-00047-2024 was converted to formal counseling Case No. NCN-24-JSC-00038. c. **Notice of Right to File (May 21, 2024) — three bases preserved, three stripped.** On May 21, 2024, NASA ODEO issued a Notice of Right to File under 29 C.F.R. § 1614.105(d) listing bases as Race, Sex, and Disability only. Color, National Origin, and Reprisal were removed from the charge during counseling, over Plaintiff's documented objection. d. **Race, Sex, and Disability are squarely exhausted; formal § 1614.106 complaint timely filed.** Race, Sex, and Disability appear on the Notice of Right to File. Within the 15-day window prescribed by 29 C.F.R. § 1614.106(b), Plaintiff filed her formal NASA Form 1355P complaint of discrimination on **May 24, 2024**. NASA EEO Officer Daphne Carter (HQ-YA000) acknowledged receipt that same day and stated the 180-day investigation deadline as November 20, 2024. The 180-day investigation period elapsed without a Final Agency Decision. Plaintiff thereafter filed her Original Complaint in this Court on October 1, 2025. Exhaustion as to the Race, Sex, and Disability bases is therefore established under the constructive-exhaustion route of 42 U.S.C. § 2000e-16(c) ("after one hundred and eighty days from the filing of the initial charge... if there has been no decision"). 29 C.F.R. § 1614.407(b). e. **Color, National Origin, and Reprisal are exhausted under the Fifth Circuit's scope-of-**

**charge doctrine.** All three bases were (i) affirmatively raised at intake on February 22, 2024, (ii) arose from the identical course of conduct as the preserved Race and Sex bases (the September 2023 through January 2024 termination sequence and the post-termination smear campaign), and (iii) would reasonably have been encompassed within the scope of any investigation that could reasonably be expected to grow out of the charge. *Sanchez v. Standard Brands, Inc.*, 431 F.2d 455, 466 (5th Cir. 1970) (Title VII claim is properly exhausted as to "any kind of discrimination like or related to allegations contained in the charge and growing out of such allegations during the pendency of the case before the Commission"); *Pacheco v. Mineta*, 448 F.3d 783, 788-89 (5th Cir. 2006) (scope of Title VII suit is determined by scope of EEOC investigation that could reasonably grow out of the charge, not by the four corners of the filed form). f. **Color and National Origin are factually coextensive with Race.** Plaintiff identified her Color as Asian — identical to her Race — and her National Origin as Korea. The Fifth Circuit has recognized that a race discrimination charge inherently encompasses factually coextensive color and national-origin theories where, as here, the same protected characteristic (Asian ethnicity / Korean ancestry) animates all three. Cutting Color and National Origin from the charge did not cure the scope-of-charge question because the underlying factual narrative — disparate treatment of an Asian American woman of Korean descent relative to non-Asian comparators — did not change between intake and the May 21, 2024 Notice. g. **Reprisal is encompassed by the preserved Title VII and ADA bases.** The Reprisal basis identified at intake arose from the same September

18, 2023 protected-activity email that forms the factual predicate for Plaintiff's Title VII Retaliation count (Count VIII) and ADA Retaliation count (Count III), both of which are separately exhausted through the parallel EEOC charge (460-2024-04943). A reasonable EEO investigation triggered by the February 22, 2024 intake would have developed the Reprisal theory regardless of the counselor's May 21, 2024 narrowing. h. **Equitable modification — backup grounds for the basis-stripping only.** The Pacheco / Sanchez scope-of-charge doctrine pleaded in ¶ 5(e)–(g) is sufficient to preserve the Color, National Origin, and Reprisal bases. To the extent the Court finds scope-of-charge insufficient as to any one of those three bases, the § 2000e-16 charge-content requirements are claim-processing rules subject to waiver, forfeiture, estoppel, and equitable tolling. *Fort Bend County v. Davis*, 587 U.S. ___, 139 S. Ct. 1843 (2019); *Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 95-96 (1990) (federal-sector Title VII filing periods subject to equitable tolling on the same terms as private-sector limitations periods); *Melgar v. T.B. Butler Publ'g Co.*, 931 F.3d 375, 380 (5th Cir. 2019); *Manning v. Chevron Chem. Co.*, 332 F.3d 874, 881 (5th Cir. 2003). Two grounds support equitable modification of the basis-stripping: **(i) Agency mismanagement / Blake-specific estoppel.** Where, as here, the responsible agency's own EEO Counselor of record — here, JSC-ODEO Deputy Director Robert F. Blake — personally walked the complainant through the Form 1355P during the May 21, 2024 Final Interview and directed her to remove the Color and National Origin checkboxes, telling her she was "basically the same color", the agency cannot be heard to argue that the complainant's resulting form omits those

bases. *Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454, 461 (1975) (the EEOC's deficient handling of a charge cannot defeat a complainant's rights); *Glus v. Brooklyn E. Dist. Terminal*, 359 U.S. 231, 232-33 (1959) (no party may take advantage of a wrong it has induced); *Wilson v. Sec'y, Dep't of Veterans Affairs*, 65 F.3d 402, 405 (5th Cir. 1995) [verification pending — Plaintiff will supplement within 14 days]. **(ii) Disability-based equitable tolling for the pro se complainant.** Plaintiff is a pro se complainant with contemporaneously documented diagnoses of Autism Spectrum Disorder, ADHD, PTSD, anxiety, and depression, navigating the post-assault, post-termination period in acute psychological distress. To the extent any technical deficiency in the formal complaint's basis enumeration is attributed to Plaintiff rather than to Blake, the Fifth Circuit recognizes equitable tolling where a complainant's pursuit of her rights is impaired by a documented disability and where she nonetheless exercised reasonable diligence. *Granger v. Aaron's, Inc.*, 636 F.3d 708, 712 (5th Cir. 2011) [verification pending — Plaintiff will supplement within 14 days]. Plaintiff demonstrated diligence by timely contacting an EEO counselor (Day 39 of 45), timely filing the formal NF1355P (within 15 days of the NRTF), maintaining ongoing communication with NASA ODEO throughout the investigation period, and parallel-filing EEOC Charge No. 460-2024-04943 against the joint-employer contractor. i. **Constructive exhaustion under the 180-day rule and timeliness of suit.** Section 2000e-16(c) authorizes civil action by a federal-sector complainant "after one hundred and eighty days from the filing of the initial charge with the [agency]... until such time as final action may be taken by [the

agency]." 29 C.F.R. § 1614.407(b) (parallel regulatory authorization). Plaintiff filed her formal NF1355P on May 24, 2024. The 180-day investigation period elapsed on November 20, 2024 without a Final Agency Decision. NASA never issued a FAD on NCN-24-JSC-00038 at any point between the November 20, 2024 expiration of the 180-day investigation window and Plaintiff's October 1, 2025 filing of the Original Complaint in this Court. Plaintiff filed her Original Complaint in this Court on October 1, 2025 — well within the constructive-exhaustion window opened on November 20, 2024 and continuing "until such time as final action may be taken." § 2000e-16(c). Independently, Plaintiff's parallel EEOC Charge No. 460-2024-04943 against the joint-employer contractor was issued a Notice of Right to Sue on July 3, 2025, and the Original Complaint was filed within 90 days of that NRTS.

6. **Joint-Employer and Cat's Paw Theory of NASA Liability.** NASA is liable for the January 4, 2024 termination and the surrounding course of adverse personnel actions because NASA's own agents and instrumentalities were the proximate cause of those actions: a. **NASA Security as the upstream trigger.** The termination was predicated on the false characterization that Plaintiff had "falsified" an assault report to NASA JSC Security. NASA Security Chief Russ Tucker admitted on April 29, 2024 that "NASA Security never determined, nor communicated that Amanda Kondrat'yev had falsified any report or that any assault did not happen." APL Human Resources Manager Robyn Smith separately admitted that "at no point were they told by JSC Security to terminate this employee." The falsification narrative that drove the termination originated at the NASA-contractor interface and was

unsupported by NASA Security's actual findings. b. **Cat's paw chain.** Leidos employee Brent Wong communicated the false NASA-Security-said-she-lied narrative to APL site supervisor Ed Scarborough, who in turn communicated it to APL HR Manager Robyn Smith, who effected the termination. NASA Security's silence — its failure to correct the false narrative once aware of it — together with NASA's badge-revocation sequence, establishes that NASA's own agents functioned as the proximate cause of the termination. *Staub v. Proctor Hospital*, 562 U.S. 411 (2011). c. **NASA's direct acts — simultaneous four-badge revocation.** Within minutes of the January 4, 2024 termination, NASA revoked all four of Plaintiff's JSC badges without any independent NASA investigation. That act was NASA's own, not a contractor's, and was materially adverse within the meaning of *Hamilton*, 79 F.4th at 498 [verification pending — Plaintiff will supplement within 14 days].

7. **Disparate Treatment — Terms, Conditions, and Privileges.** NASA, directly and through its cat's paw agents, subjected Plaintiff, an Asian American woman of Korean descent, to terms, conditions, and privileges of employment materially less favorable than those afforded similarly situated non-Asian, non-female, non-Korean employees, including: a. **Discipline disparity.** Plaintiff received a Final Warning twenty-six (26) minutes after her September 18, 2023 email raising ADA, FLSA, and harassment concerns, with no prior progressive discipline. White male comparators Ryan Sauer, Jordan Hollan, Spencer Adams, and Robert "Russ" Dismukes engaged in equal or more serious conduct and received no comparable discipline. b. **Badge-flipping disparity.** Plaintiff (Asian American woman) had her

NASA access simultaneously revoked from four badges within minutes of termination on January 4, 2024, without independent NASA investigation. No similarly situated non-Asian, non-female contractor employee received comparable simultaneous multi-badge revocation under comparable circumstances. c. **Post-assault handling disparity.** After the December 28-29, 2023 physical assault by Susana Kane, NASA-affiliated decision-makers terminated Plaintiff three business days later without interviewing her or the witnesses she identified, in contrast to the materially different treatment afforded white and African American coworkers who reported workplace incidents. d. **Post-termination agency-submission disparity.** NASA-affiliated declarants submitted sworn statements to TWC, EEOC, and OFCCP characterizing Plaintiff — an Asian American woman — as having filed a false assault report, despite NASA Security's actual finding of no falsification. Plaintiff is aware of no comparable agency submissions made about similarly situated non-Asian former contractor employees.

8. **Inference of Discrimination — *Robbins v. NASA* Pattern Evidence.** On September 30, 2022 — eleven (11) days after Plaintiff's September 19, 2022 contractor hire date at JSC — EEOC Administrative Judge Stephanie Herrera certified two classes in *Robbins v. NASA*, EEOC Hearing No. 531-2014-00109X, comprising (i) over 2,000 Asian American NASA employees and (ii) over 2,000 African American NASA employees, alleging systemic discrimination in NASA performance-appraisal, promotion, and discipline systems agency-wide. NASA was on formal notice throughout Plaintiff's contractor engagement that it had documented

systemic race-discrimination problems. *Robbins* provides Federal Rule of Evidence 404(b) pattern evidence of race-based animus and motive at JSC, independent of Plaintiff's individual comparator showing.

9. **Mixed-Motive Alternative Pleading.** In the alternative, even if NASA's agents had multiple reasons for adverse personnel actions, Plaintiff's race, color, national origin, sex, and/or protected activity was a motivating factor. *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 101 (2003); 42 U.S.C. § 2000e-2(m) (applied through § 2000e-16's incorporation of Title VII's substantive standards).

10. **Pretext.** NASA's and its agents' shifting and internally inconsistent explanations across TWC, EEOC, OFCCP, and the pleadings — including Tucker's April 29, 2024 admission that NASA Security never found falsification and Smith's admission that JSC Security did not direct termination — demonstrate pretext. *Owens v. Circassia Pharms., Inc.*, 33 F.4th 814 (5th Cir. 2022).

11. **Injury and Damages.** As a direct and proximate result of NASA's § 2000e-16 violations, Plaintiff suffered lost wages, lost benefits, lost professional reputation (compounded in the small federal-contracting community by the false-assault-report narrative), prolonged unemployment, emotional distress, and related injuries. Plaintiff seeks all relief available under 42 U.S.C. § 2000e-16(d) and 42 U.S.C. § 2000e-5(g), including back pay, front pay, prejudgment interest, reinstatement or front-pay-in-lieu, equitable and declaratory relief (including orders prohibiting further discrimination against Plaintiff and correcting NASA's false agency submissions), compensatory damages subject to the statutory cap of 42 U.S.C. §

1981a(b)(3), costs, and all other relief the Court deems just. Plaintiff does not seek punitive damages against NASA under this count. 42 U.S.C. § 1981a(b)(1).

## VII. DAMAGES

**Damages-scope limitations — Spending Clause and federal sovereign immunity.** The damages categories pleaded in this Section VII are sought under the federal and state-law claims to which they apply by their own terms, subject to three express carve-outs: (a) emotional-distress, mental-anguish, pain-and-suffering, and loss-of-enjoyment damages are not sought under § 504 of the Rehabilitation Act, see Cummings v. Premier Rehab Keller, P.L.L.C., 596 U.S. 212 (2022) (emotional-distress damages unavailable under Spending Clause statutes including § 504); (b) no monetary damages of any kind are sought against NASA under § 504 — including back pay, front pay, compensatory damages, or punitive damages — see Lane v. Peña, 518 U.S. 187 (1996) (§ 504(a)'s waiver of federal sovereign immunity does not extend to monetary relief against federal agencies); and (c) no punitive damages are sought under § 504 against any defendant, see Barnes v. Gorman, 536 U.S. 181 (2002). Emotional-distress and other compensatory non-economic damages remain fully available under ADA Title I, Title VII (private-sector under § 2000e-2 and federal-sector under § 2000e-16, subject to the § 1981a(b)(3) caps), 42 U.S.C. § 1981, 42 U.S.C. § 1985(3), and Texas common-law claims, as further specified in the Prayer for Relief.

1.  As a direct result of Defendants' unlawful conduct, Plaintiff suffered:

a. Lost wages, overtime, and benefits from January 4, 2024 to present;

b. Loss of future earnings and diminished earning capacity;

c. Emotional distress, mental anguish, and related medical expenses;

d. Out-of-pocket expenses and other consequential damages; and

e. Mitigation efforts and barriers to reemployment: Plaintiff has diligently sought comparable employment since her January 4, 2024 termination, applying for dozens of IT support positions with federal contractors and civil service roles at NASA and other agencies.

However, Defendants' false statements to government agencies (that "NASA Security determined Plaintiff falsified a report" and "NASA prohibited her from working on-site") have impaired Plaintiff's professional reputation in the federal contracting community, making it substantially more difficult to obtain comparable work. Plaintiff applied for NASA civil servant positions using Schedule A disability qualification, demonstrating her active mitigation efforts despite Defendants' reputational sabotage. The defamatory statements and exclusionary effect are ongoing barriers to mitigation, for which Defendants remain liable.

**f. Structural Barriers to Mitigation – Lack of Centralized Job Postings:** Plaintiff's mitigation efforts are further hampered by the systemic lack of centralized job postings for NASA contractor positions. Federal contractors at NASA JSC—including Leidos Holdings, Inc., All Points Logistics, LLC, and other subcontractors—do not post positions through centralized systems accessible to all qualified candidates. Instead, positions are filled through informal networks, word-of-mouth,

and personal connections to people already working at NASA or in proximity to the facility. This "who you know" hiring system rewards candidates with social proximity to NASA insiders while systematically excluding qualified candidates—including Plaintiff—who apply through formal channels but lack insider connections. This practice potentially violates OFCCP requirements for federal contractors to take affirmative action and avoid disparate impact in recruitment and hiring under Executive Order 11246. Plaintiff reported this concern to OFCCP in her April 22, 2024 response (Case No. I00311965), documenting that federal contractors operating under NASA Contract No. 80NSSC19D0001 maintain hiring practices that create barriers to equal employment opportunity. During her current job search, Plaintiff repeatedly applies when learning of positions, only to discover they were informally promised to insider candidates before any posting occurred. This structural barrier—which Plaintiff already reported to federal regulators as part of the same contractor accountability gaps underlying her termination—constitutes an ongoing obstacle to mitigation for which Defendants' joint employer arrangement and workforce fragmentation scheme bears responsibility.

2. Defendants acted with malice or reckless indifference to Plaintiff's federally protected rights, warranting punitive damages. The evidence includes: HR's written false statement of ADA law; predetermination of termination outcome; pretextual investigation refusing to interview Plaintiff or obtain NASA Security Report; admission that Defendants terminated Plaintiff without knowing NASA Security's

findings; extraordinary 26-minute and 6-day temporal proximity proving retaliatory causation; and shifting explanations and false statements to government agencies.

**Defendants Cannot Establish Good Faith Defense:** Under the ADA and FLSA, employers may avoid liquidated damages only by proving they acted in "good faith" and had "reasonable grounds" to believe their conduct was lawful. 29 U.S.C. §§ 216(b), 260; 42 U.S.C. § 1981a(b)(1). All Points cannot meet this burden because the person who made every critical adverse employment decision—Robyn Smith— held **SHRM-SCP** (the highest SHRM certification, requiring mandatory continuing education in employment law) and **CBP** credentials, which she displayed in her signature block on the very documents violating Plaintiff's rights. Smith personally authored or distributed the All Points employee handbook containing the company's own ADA accommodation procedures, progressive discipline policies, anti-retaliation protections, and investigation requirements—then systematically violated every one of those policies. She has over 25 years of HR experience, an MBA in Human Resource Management, is a minority owner of All Points, and is "responsible for administrative functions at the corporate level including human resources, policies and compliance, EEOC, Affirmative Action, disciplinary actions, hiring and terminations" (her own resume, EEOC Position Statement Attachment 1). An employer whose HR decision-maker holds the highest professional HR certification, maintains it through continuing education, authors the company's own compliance procedures, and then categorically violates those procedures cannot claim "good faith" or "reasonable grounds." The credentials prove knowledge. The handbook

proves she wrote the rules. The violations prove she believed neither applied to her. This is the definition of reckless indifference to federally protected rights, warranting maximum punitive damages under every applicable statute.

3.  **Spoliation of Defendants' Own Compliance Documents — Adverse Inference.** Defendants' exposure to punitive damages is independently aggravated by their spoliation of compliance documents within their exclusive control. The 2023 All Points Logistics, LLC Employee Handbook — the very document that, per Defendant Robyn Smith's own EEOC Position Statement, contained All Points's ADA-accommodation procedures, progressive-discipline policy, anti-retaliation protections, and investigation requirements — was not preserved or produced in litigation: it was omitted from Defendants' Initial Disclosures and never made available through any later corporate-records production, despite being directly responsive to Plaintiff's claims and within Defendants' exclusive custody and control. The handbook's continued existence in Defendants' control during the relevant period is independently confirmed by a contemporaneous third-party copy: former All Points employee David Kremm preserved and forwarded the 2023 handbook outside the corporation's records system, demonstrating that the document existed, that it was the same instrument All Points's HR decision-maker authored or distributed, and that Defendants' non-production was a litigation choice rather than a records-management impossibility. Under Federal Rule of Civil Procedure 37(e) and Guzman v. Jones, 804 F.3d 707 (5th Cir. 2015) [verification pending — Plaintiff will supplement within 14 days], the failure to preserve or produce ESI and corporate

compliance records that should have been preserved in anticipation of litigation, where the loss prejudices the opposing party and cannot be restored, supports an adverse inference that the spoliated material would have been unfavorable to the spoliating party. Plaintiff will accordingly seek (a) an adverse-inference jury instruction at trial that the 2023 All Points Logistics, LLC Employee Handbook would have demonstrated the company's own ADA, anti-retaliation, investigation, and progressive-discipline procedures and Defendants' systematic violation of those procedures with respect to Plaintiff; (b) sanctions under FRCP 37(e)(2); and (c) consideration of the spoliation as a separate aggravating factor supporting the maximum available punitive award under each applicable claim.

### Cascading Harm Theory — Termination as Triggering Event

The January 4, 2024 termination was not an isolated employment action — it was the triggering event for a cascading chain of harm that continues to compound:

1. **Termination** (Jan 4, 2024) → Immediate loss of income, benefits, and Public Trust clearance status

2. **Financial devastation** → Unable to pay bills, maintain housing stability, or provide for 13-year-old child (K.K.) at the standard established during NASA employment

3. **Reputational poisoning** → Defendants' false statements to EEOC, TWC, and OFCCP ("falsified a report," "NASA prohibited her from working on-site") discoverable in background checks, destroying employability in the federal contractor community where 60-70% of Clear Lake jobs require clearance

4. **Medical escalation** → PTSD worsened to the point of requiring transcranial magnetic stimulation (TMS), a treatment reserved for treatment-resistant conditions; ESA prescription issued Nov 2024; ongoing psychiatric medication management

5. **Family destabilization** → Financial stress and medical deterioration contributed to divorce proceedings, compounding the caregiving burden on a single parent with AuDHD managing a 13-year-old

6. **27.5-month unemployment spiral (and continuing)** → 56+ applications, 6+ cancelled NASA positions due to Presidential hiring freeze (Jan 2025), multiple rejections from ARES and other contractors — 4x to 8x longer than typical IT professional job search, directly correlated with Defendants' exclusionary conduct

7. **Forced career restart** → At age 40+, Plaintiff is retraining from scratch through Per Scholas (CompTIA A+ / Google IT Support) in the exact field she was terminated from — a program designed for people entering IT, not experienced NASA technicians who were the top performer in their unit

Each link in this chain is independently provable with documentary evidence already in the Evidence Vault. The cascade theory is critical because it establishes that Defendants' conduct caused not just lost wages but the systematic destruction of Plaintiff's professional life, family stability, and health — exactly the kind of "malice or reckless indifference" that warrants maximum punitive damages.

### Specific Damages Summary

The following provides specific damages amounts based on documented losses and conservative calculations:

- **ECONOMIC DAMAGES**

- Back pay (base wages + SCA H&W fringe + other benefits): **$192,475** — 841 days (January 4, 2024 termination through April 24, 2026 FAC filing) × 40 hrs/wk = 4,806 regular hours, applying the escalating SCA base rate under WD 2015-5233 (Rev. 25: $28.30/hr; Rev. 28: $28.30/hr; Rev. 31: $28.58/hr, incorporated at NEST annual option renewals per FAR 52.222-41) and the escalating DOL H&W fringe ($4.98 → $5.36 → $5.55 per DOL AAM Directives, including AAM 250 effective July 7, 2025), yielding $136,387 in base wages + $25,496 in SCA H&W fringe + $30,592 in other benefits (employer-provided health insurance, 401(k) match, accrued PTO). Back-pay period [Unverified: subject to deduction for any unpaid leave days, to be confirmed through payroll discovery]. Continuing to accrue at approximately $162/day base (≈ $325/day with FLSA liquidated doubling) through date of judgment

- **Retaliatory Overtime Cancellation (C.1): To be proven at trial** — On November 20, 2023, Leidos Service Delivery Lead Brent Wong (brent.c.wong@nasa.gov) sent a group email to PCST/PEO technicians cancelling Plaintiff's previously-authorized overtime, approximately 29 days after the October 21–22, 2023 VPN incident and Plaintiff's cooperation with the NASA OCIO Root Cause Analysis. Male comparators Ryan Sauer and Jordan Hollan, who performed the same VPN provisioning work alongside Plaintiff, continued to receive overtime. This cancellation is pleaded as a retaliatory adverse action in Count XVIII (§ 1981 Retaliation) and related retaliation counts. Plaintiff reserves the right to prove at trial

the lost overtime wages (at 1.5× the escalating SCA base rate) and automatic FLSA liquidated doubling under 29 U.S.C. § 216(b), based on Leidos/All Points timekeeping records produced in discovery for Plaintiff's pre-November 2023 baseline overtime and comparators' post-November 2023 overtime

- **Off-the-Clock and Missed-Lunch FLSA Wages (C.2): To be proven at trial** — Plaintiff was required to perform work during unpaid meal periods and outside scheduled hours throughout her employment (approximately March 2022 – January 4, 2024). See Section V.D (26-Minute Retaliation Sequence); Plaintiff's September 18, 2023, 5:20 PM email to Robyn Smith reporting off-the-clock pressure, which triggered the 5:46 PM Final Warning 26 minutes later. Plaintiff reserves the right to prove at trial unpaid wages under 29 U.S.C. § 207 and automatic liquidated doubling under 29 U.S.C. § 216(b), based on Plaintiff's declaration specifying frequency and duration of missed lunches, pre-shift login time, and post-shift wrap-up time, together with Leidos/All Points timekeeping records and radio/ticketing logs produced in discovery

- **Hazard Differential Pay (8% under WD 2015-5233, Rev. 25): To be proven at trial** — unpaid 8 percent hazardous-pay differential owed under the Service Contract Act and WD 2015-5233, Rev. 25 for each hour Plaintiff worked in or in close proximity to the NASA JSC battery testing facility, where lithium batteries were subjected to destructive/abuse testing (incendiary materials within the WD's hazard trigger). Entry required NASA-specified hazardous-operations training (including prohibition on powered cell-phones inside the facility) and credentialed access

reflected in Plaintiff's Leidos Hazardous Access Badge. See Section V.K ¶¶ 10–12. Unverified specific amount pending production of NASA training/badge-access records and Leidos/All Points timekeeping records in discovery; at an illustrative 10% of working hours spent in hazardous proximity, estimated unpaid differential ≈ $1,088 (10% × 4,806 hrs × $28.30 × 8%) — final figure subject to proof.

- Front pay (3-year conservative): **$176,592** — 3 years @ $28.30/hr, 2,080 hrs/year

- Equal Pay Act unpaid wages: **To be proven at trial** — Pay differential amount unknown to Plaintiff; Defendants concealed special project pay arrangements. Plaintiff seeks discovery of pay records for all PCSTs on the NEST contract to establish the full scope of the wage disparity

- EPA liquidated damages: **Equal to unpaid wages (amount to be proven at trial)** — Automatic doubling under 29 U.S.C. § 216(b)

- FLSA liquidated damages: **$192,475** — Automatic doubling of back pay under 29 U.S.C. § 216(b); continuing to accrue with back pay. Will also apply to C.1 (retaliatory overtime cancellation, reserved) and C.2 (off-the-clock / missed-lunch wages, reserved) once quantified through discovery

- Medical expenses: **$30,000+** — TMS therapy, counseling, medications, ESA expenses

- **Self-funded disability-accommodation expenses: $115.49 documented + additional expenses to be proven at trial** — On February 16, 2023, Plaintiff personally purchased an Olympia Tools Pack-N-Roll Folding Service Cart (Order #114-2502936-8247418, total $115.49) because employer-provided hand dollies

were inadequate for transporting heavy computer equipment across NASA JSC's distributed campus, including hazardous zones, Ellington Field, and Sonny Carter Training Facility. The purchase preceded Dr. Mokkala's June 2, 2023 lifting restriction by nearly four months, demonstrating a pre-existing, employer-known accommodation need that Defendants failed to provide. Plaintiff disclosed the cost to Defendants; no reimbursement was ever offered. The cart was subsequently borrowed by coworkers (including Defendant Susana Kane), used as the assault implement during the December 28-29, 2023 attack, and collected as personal property on the January 4, 2024 termination day. Plaintiff reserves the right to prove additional out-of-pocket disability-accommodation expenses (transportation, ergonomic supplies, and similar items) at trial.

- **Career-retraining opportunity cost and program-related out-of-pocket (Per Scholas AI-Enabled IT Support program, Cohort Mar 16 – Jun 26, 2026): To be proven at trial** — Plaintiff was accepted into Per Scholas, a tuition-free workforce-development nonprofit, as the only viable retraining pathway after Defendants' reputational sabotage foreclosed lateral IT employment in the federal-contracting market. The 15-week full-time cohort (approximately 600 program hours) required Plaintiff to forgo paid employment during the program window, incur transportation, equipment, and study-materials costs, and absorb the indignity of retraining — at age 40+, as a 59-Kudos top performer with an active NASA Public Trust clearance at termination — in the exact skill domain (IT support / CompTIA A+ / Google IT Support) from which Defendants unlawfully terminated

her. The consequential-damage measure is the wages Plaintiff could have earned during the program period but for Defendants' exclusionary conduct, plus program-related out-of-pocket expenses. The fact that Per Scholas is tuition-free does **not** reduce the claim; it establishes only that Plaintiff mitigated the direct tuition cost by securing scarce scholarship-funded training, consistent with her duty to mitigate

- **Loss of Public Trust Clearance economic value: To be proven at trial** — Plaintiff held an active NASA Public Trust clearance at the time of termination, carrying measurable market value in the federal-contracting labor market (the 20–40% salary premium typically commanded by cleared personnel is reflected in standard federal-contractor compensation surveys). Defendants' defamatory statements — including the false "NASA Security determined falsification" narrative circulated to TWC, EEOC, and OFCCP — have foreclosed Plaintiff's access to cleared positions and constitute a discrete economic loss distinct from general back pay. *See also* Section V.L and Section VII (barriers to mitigation)

- **Consequential family-destabilization damages: To be proven at trial** — financial devastation caused by the termination and Defendants' subsequent exclusionary conduct contributed to divorce proceedings, caregiving strain on a single parent with documented AuDHD managing a 13-year-old child (K.K.), and the medical escalation requiring transcranial magnetic stimulation (TMS) therapy. These consequential damages flow from Defendants' unlawful conduct under the cascading-harm theory set out below

- **Economic Subtotal (hard numbers): $613,008+** — plus retaliatory overtime cancellation (C.1 — reserved), off-the-clock / missed-lunch FLSA wages (C.2 — reserved), and hazard differential — all to be proven at trial; continuing to accrue

- **NON-ECONOMIC DAMAGES**

- Compensatory (emotional distress): **$200,000 - $350,000** — TMS therapy, ESA prescription, 24+ months harm, impact on child

- **PUNITIVE DAMAGES**

- Title VII/ADA (All Points): **$200,000 (est.)** — Statutory cap for 201-500 employees (subject to discovery)

- Title VII/ADA (Leidos): **$300,000** — Statutory cap for 501+ employees

- Assault & Battery (Kane): **$250,000** — No statutory cap (Texas common law)

- Aiding & Abetting / Obstruction (Garcia): **$150,000** — No statutory cap; false witness statement used to justify termination

- Defamation Per Se (All Points): **$150,000** — No statutory cap; willful malice after March 25 admission + OFCCP warning

- Defamation Per Se (Leidos): **$150,000** — No statutory cap; coordination with All Points' false statements

- IIED (all defendants): **$200,000** — No statutory cap; 26-min retaliation + post-termination ambush + perjury campaign

- Civil Conspiracy (all defendants): **$200,000** — No statutory cap; cross-corporate coordination (All Points + Leidos + TekFive)

- Tortious Interference (All Points): **$100,000** — No statutory cap; deliberate professional exclusion via false sworn statements

- Tortious Interference (Leidos): **$100,000** — No statutory cap; coordination in exclusionary scheme

- Negligence (All Points): **$100,000** — No statutory cap; gross negligence (broken wipers, forced bike use)

- Negligence (Leidos): **$100,000** — No statutory cap; gross negligence (inadequate equipment, no safety protocols)

- Negligent Hiring/Supervision (All Points, Leidos, TekFive, Seabrook): **$150,000** — No statutory cap; gross negligence (retained known harassers/assailant after actual notice)

- Fraud (All Points through Robyn Smith): **$200,000** — No statutory cap; knowing false statement of ADA law to disabled employee

- § 1985(3) Conspiracy (all defendants): **$200,000** — No statutory cap; race-based cross-corporate conspiracy to deprive civil rights

- **Punitive Subtotal: $2,550,000**

- **GRAND TOTAL (Conservative): $3,363,008+** — Using low end of compensatory range, through April 24, 2026; continuing to accrue at approximately $325/day (back pay + FLSA liquidated); plus retaliatory overtime cancellation (C.1), off-the-clock / missed-lunch FLSA wages (C.2), and hazard differential — all to be proven at trial

- **GRAND TOTAL (High): $3,513,008+** — Using high end of compensatory range, through April 24, 2026; continuing to accrue at approximately $325/day (back pay +

FLSA liquidated); plus retaliatory overtime cancellation (C.1), off-the-clock / missed-lunch FLSA wages (C.2), and hazard differential — all to be proven at trial

**Key Notes on Damages Calculations:**

1. **Liquidated Damages Are Mandatory:** Under both the Equal Pay Act and FLSA, liquidated damages equal 100% of unpaid wages/back pay unless the employer proves it acted in good faith and had reasonable grounds to believe it was not violating the law. 29 U.S.C. §§ 216(b), 260. Defendants cannot meet this burden given: (a) Robyn Smith's false legal statement about ADA coverage; (b) explicit knowledge of off-the-clock work requirements; (c) admission of secret pay arrangements for male employees; and (d) 26-minute retaliatory Final Warning after FLSA complaint.

2. **State Law Punitive Damages Have No Caps But Are Calculated Realistically:** While Title VII and ADA punitive damages are capped at $200,000-$300,000 per defendant based on employer size, Texas common law claims (defamation, IIED, conspiracy, tortious interference, negligence, negligent hiring/supervision, fraud) have no statutory caps. Plaintiff's punitive damages requests for state law claims ($100,000-$200,000 per defendant per claim) reflect realistic amounts that Texas courts award in employment cases, while accounting for the extraordinary aggravating factors present here: (a) knowing false statements under oath to multiple agencies; (b) continuation of false statements AFTER March 25, 2024 admission of ignorance AND AFTER July 3, 2024 OFCCP warning; (c) geographic impossibility (Ed/Robyn in Florida signing sworn statements about events 1,000+ miles away they

could not have witnessed); (d) 26-minute extraordinary temporal proximity proving premeditation; (e) post-termination hostile ambush and false theft accusation; and (f) deliberate professional exclusion to prevent future employment. These factors justify punitive awards significantly higher than typical wrongful termination cases, while remaining within the range Texas courts find reasonable.

3. **Joint and Several Liability and No Double Recovery:** All Points and Leidos are jointly and severally liable for all economic damages (back pay, front pay, EPA/FLSA damages) because they jointly employed Plaintiff and jointly participated in the unlawful conduct. Plaintiff may collect the full economic damages from either or both defendants. **Plaintiff seeks the highest available remedy under overlapping claims, not duplicative recovery for the same harm.** For example: (a) back pay from January 4, 2024 to judgment is sought once across all employment claims, not separately per count; (b) FLSA liquidated damages and EPA liquidated damages compensate for different harms (wage theft vs. sex-based pay discrimination) and are not duplicative; (c) emotional distress damages are sought once under federal statutes (Title VII/ADA combined cap) plus once under state law claims where no cap applies, but Plaintiff will not recover twice for the same specific instance of emotional harm; (d) punitive damages under federal statutes and state law serve different purposes (deterrence under capped federal schemes vs. punishment under uncapped state law) and are not duplicative where the conduct justifies both.

4. **Mitigation Evidence:** Plaintiff's 56+ job applications, career retraining through Per Scholas (AI-Enabled IT Support program, Cohort starting March 16, 2026 through June 26, 2026, covering CompTIA A+ and Google IT Support certifications — directly addressing the exact skill domain from which she was terminated), and use of Schedule A disability hiring authority for NASA civil service positions demonstrate diligent mitigation efforts. The 27.5-month unemployment period (and continuing) (4x to 8x longer than typical IT professional job search) directly correlates with Defendants' defamatory statements to government agencies, which are discoverable during background checks and security clearance investigations required for federal contracting positions.

---

## VIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff Amanda L. Kondrat'yev respectfully requests that this Court enter judgment in her favor and against Defendants, and grant the following relief:

1. **Declaratory Relief:** A declaration that Defendants' conduct violated the Americans with Disabilities Act, Title VII of the Civil Rights Act of 1964, the Rehabilitation Act of 1973, the Fair Labor Standards Act, the Equal Pay Act, 41 U.S.C. § 4712, 42 U.S.C. § 1981, 42 U.S.C. § 1985(3), and Texas common law;

2. **Back Pay and Lost Benefits:** Back pay, overtime, the 8% hazardous-pay differential required by WD 2015-5233, Rev. 25 for hours worked in or in close proximity to the NASA JSC battery testing facility (see Section V.K ¶¶ 10–12), and lost benefits from January 4, 2024 through the date of judgment (sought as against

Defendants All Points Logistics, LLC and the Leidos Entities only; Plaintiff does not seek back pay against NASA under the Rehabilitation Act per Lane v. Peña, 518 U.S. 187 (1996) [verification pending — Plaintiff will supplement within 14 days]);

3. **Front Pay:** Front pay in lieu of reinstatement for a period to be determined at trial (sought as against Defendants All Points Logistics, LLC and the Leidos Entities only; Plaintiff does not seek front pay against NASA under the Rehabilitation Act per Lane v. Peña, 518 U.S. 187 (1996) [verification pending — Plaintiff will supplement within 14 days]);

4. **Liquidated Damages:** Liquidated damages under the FLSA (equal to back pay) and the Equal Pay Act (equal to unpaid wage differential);

5. **Compensatory Damages:** Compensatory damages for emotional distress, mental anguish, medical expenses, pain and suffering, and loss of enjoyment of life (excluding claims arising under § 504 of the Rehabilitation Act, as to which emotional-distress damages are unavailable per Cummings v. Premier Rehab Keller, P.L.L.C., 596 U.S. 212 (2022) [verification pending — Plaintiff will supplement within 14 days], and which as against NASA are further limited to equitable relief per Lane v. Peña, 518 U.S. 187 (1996) [verification pending — Plaintiff will supplement within 14 days]);

6. **Punitive Damages:** Punitive damages under Title VII, ADA, Section 1981, Section 1985(3), and Texas common law for Defendants' willful, malicious, and reckless conduct;

7. **Equitable Relief Against NASA:** Reinstatement to a comparable position at NASA Johnson Space Center, together with declaratory relief and such other prospective injunctive relief as the Court deems just and proper, consistent with the limitation of § 504(a) remedies against federal agencies to equitable relief per Lane v. Peña, 518 U.S. 187 (1996) [verification pending — Plaintiff will supplement within 14 days] and the waiver of federal sovereign immunity for non-monetary relief in 5 U.S.C. § 702;

8. **Attorney's Fees and Costs:** Reasonable attorney's fees (or pro se litigant fees where applicable), litigation costs, and expert fees under all applicable statutes;

9. **Pre-Judgment and Post-Judgment Interest:** Pre-judgment and post-judgment interest at the applicable legal rate;

10. **Injunctive Relief:** An order requiring Defendants to: (a) retract false statements made to TWC, EEOC, OFCCP, and other agencies; (b) cease and desist from further defamatory statements; (c) implement anti-retaliation training; and (d) provide neutral employment references;

11. **Tax Gross-Up Award:** An award sufficient to offset the adverse federal income-tax consequences of receiving back pay and front pay in a lump sum in a single tax year, rather than over the years the wages would otherwise have been earned. See Eshelman v. Agere Sys., Inc., 554 F.3d 426, 441–42 (3d Cir. 2009); Clemens v. CenturyLink, Inc., 874 F.3d 1113, 1117 (9th Cir. 2017);

12. **§ 504 Record-Correction and Policy Injunctive Relief (NASA):** Pursuant to the Rehabilitation Act of 1973, 29 U.S.C. § 794, and consistent with the Supreme

Court's limitation of § 504 remedies against federal agencies to equitable relief (Lane v. Peña, 518 U.S. 187 (1996)), an order directing NASA to: (a) correct or expunge from its ODEO counseling file, NASA Security Report, and any personnel-management system the false statements originated by or relayed from Defendants All Points and Leidos regarding Plaintiff's January 4, 2024 termination and assault report; (b) issue a neutral reference and written confirmation that NASA Security did not determine Plaintiff falsified a report; (c) implement contractor-level anti-retaliation and disability-accommodation training for all NEST-contract Service Delivery Leads and HR decision-makers with NASA-facing role-authority; and (d) permit Plaintiff, if she so elects, to apply to NASA JSC or other NASA facilities without reference to the Defendants' false narratives;

13. **Nominal Damages:** In the alternative, and to the extent any federal statutory claim establishes liability without provable compensatory harm, nominal damages under Carey v. Piphus, 435 U.S. 247 (1978), and its progeny;

14. **Reservation of Right to Amend and Supplement.** Plaintiff respectfully reserves the right to amend and supplement this Amended Complaint — including to add additional claims, defendants, factual allegations, and damages categories — as evidence is developed in discovery, as additional administrative exhaustion matures, and as the Court may permit under Fed. R. Civ. P. 15(a)(2), (c), and (d). To the extent any claim appears inadequately pleaded or any defendant inadequately joined, Plaintiff requests leave to cure by amendment rather than dismissal, consistent with the Fifth Circuit's preference that pro se plaintiffs be given at least one opportunity to

cure pleading deficiencies. See Bazrowx v. Scott, 136 F.3d 1053, 1054 (5th Cir. 1998) [verification pending — Plaintiff will supplement within 14 days].

15. **Such Other Relief:** Such other and further relief as the Court deems just and proper.

## IX. JURY DEMAND

Plaintiff demands a trial by jury on all claims and issues so triable as a matter of right under the Seventh Amendment to the United States Constitution and Federal Rule of Civil Procedure 38.

Respectfully submitted,

/s/ Amanda L. Kondrat'yev

Amanda L. Kondrat'yev

Pro Se Plaintiff

1102 Buoy Rd

Houston, Texas 77062

Telephone: 346-366-0787

amandakondratyev@gmail.com

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF TEXAS**

**HOUSTON DIVISION**

**AMANDA L. KONDRAT'YEV,**

 Plaintiff,

**v. Civil Action No. 4:25-cv-04785**

**NASA JOHNSON SPACE CENTER, et al.,**

 Defendants.

**CERTIFICATE OF SERVICE**

I, Amanda L. Kondrat'yev, hereby certify that on April 24, 2026, a true and correct copy of Plaintiff's First Amended Complaint was served on all parties and counsel of record as follows.

**A. Service via CM/ECF (Electronic Notice)**

The following counsel of record are served via the Court's CM/ECF electronic filing system, which generates a Notice of Electronic Filing (NEF) constituting service under Fed. R. Civ. P. 5(b)(2)(E) and S.D. Tex. LR 5.1:

1. Ariel Nicole Wiley, Assistant United States Attorney

 U.S. Department of Justice

 *Counsel for Defendant NASA Johnson Space Center*

2. Stephen J. Quezada, Ogletree, Deakins, Nash, Smoak & Stewart, P.C.

 *Counsel for Defendant Leidos Holdings, Inc.*

3. Laura E. De Santos and Katherine Strathman, Gordon Rees Scully Mansukhani, LLP

 *Counsel for Defendant All Points Logistics, LLC*


**B. Service via U.S. Marshal (New Defendants — Not Yet Served)**

The following new defendants have not yet appeared in this action and are not registered

CM/ECF users. Pursuant to 28 U.S.C. § 1915(d) and Fed. R. Civ. P. 4, Plaintiff has

requested that the Clerk issue summons and that the U.S. Marshal effect service on each:


**New Corporate Defendants (4):**

1. Leidos, Inc.

 c/o The Corporation Trust Company, 1209 Orange Street, Wilmington, DE 19801

2. Leidos Innovations Corporation

 c/o The Corporation Trust Company, 1209 Orange Street, Wilmington, DE 19801

3. TekFive Inc.

 850 Ben Graves Dr NW, Suite 324, Huntsville, AL 35816

4. Seabrook Solutions, LLC

 1525 Perimeter Parkway NW, Suite 255, Huntsville, AL 35806

*(Principal place of business; service per Fed. R. Civ. P. 4(h)(1)(B).)*

**New Individual Defendants (12):**

1. Brent Wong — [Address to be provided to U.S. Marshal]

2. Christy Murray — 2101 E NASA Pkwy, Bldg 8, Houston, TX 77058

3. Ed Scarborough — 190 S. Sykes Creek Pkwy, Suite 4, Merritt Island, FL 32952

4. Robyn Smith — 190 S. Sykes Creek Pkwy, Suite 4, Merritt Island, FL 32952

5. Susana Kane — [Address to be provided to U.S. Marshal]

6. John Walters — [Address to be provided to U.S. Marshal]

7. Daniel Murphy — 2101 E NASA Parkway, Building 8, Houston, TX 77058

8. Travis McFarland — [Address to be provided to U.S. Marshal]

9. Brian Lynn — [Address to be provided to U.S. Marshal]

10. Cristian Garcia — [Address to be provided to U.S. Marshal]

11. Tristian Castro — [Address to be provided to U.S. Marshal]

12. Carolyn Dianne Brief — [Address to be provided to U.S. Marshal]

**C. Service on United States (Supplemental — Required for Federal Defendant)**

Because NASA Johnson Space Center is a federal agency, service of the Amended

Complaint adding new claims must also comply with Fed. R. Civ. P. 4(i):

1. United States Attorney for the Southern District of Texas

 1000 Louisiana St, Suite 2300, Houston, TX 77002

*(via certified mail or hand delivery)*

2. Attorney General of the United States

 U.S. Department of Justice, 950 Pennsylvania Avenue NW, Washington, DC 20530

 *(via certified mail)*

Respectfully submitted,

/s/ Amanda L. Kondrat'yev

**Amanda L. Kondrat'yev, Pro Se**

1102 Buoy Rd

Houston, Texas 77062

Telephone: 346-366-0787

amandakondratyev@gmail.com

**Dated: April 24, 2026**